UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | NO. 3:25-00115 |
| | ) | |
| v. | ) | |
| | ) | 8 U.S.C. § 1324(a)(1)(A)(ii) |
| | ) | 8 U.S.C. § 1324(a)(1)(A)(v) |
| | ) | 8 U.S.C. § 1324(a)(1)(B)(i) |
| KILMAR ARMANDO ABREGO GARCIA | ) | 18 U.S.C. § 2 |

# INDICTMENT

THE GRAND JURY CHARGES:

INTRODUCTORY ALLEGATIONS

At all times material to this Indictment unless otherwise indicated:

1. From in or around 2016 through in or around 2025, **KILMAR ARMANDO ABREGO GARCIA** and others known and unknown to the Grand Jury, conspired to bring undocumented aliens to the United States from countries such as Guatemala, El Salvador, Honduras, Ecuador, and elsewhere, ultimately passing through Mexico before crossing into Texas. The co-conspirators knew the undocumented aliens did not possess authorization to enter the United States.

2. **KILMAR ARMANDO ABREGO GARCIA** and co-conspirators from El Salvador, Guatemala, Mexico, the United States, and elsewhere, communicated with each other using cellular telephones and social media applications to facilitate the unlawful transportation of undocumented aliens without authorization to and throughout the United States.

3. **KILMAR ARMANDO ABREGO GARCIA** and co-conspirators collected financial payments from undocumented aliens for illegal transportation into and throughout the

United States. The co-conspirators then knowingly transferred money between one another in an effort to conceal the origin of the payments.

4. CC-1, CC-2, CC-3, CC-4, and CC-5, all persons known to the Grand Jury, were co-conspirators with **KILMAR ARMANDO ABREGO GARCIA**, all were citizens of El Salvador, and all were not United States citizens. CC-6, also a person known to the Grand Jury, was a citizen of Guatemala and not a United States citizen.

5. **KILMAR ARMANDO ABREGO GARCIA** was a citizen of El Salvador, was not a United States citizen, and was living in the United States. **KILMAR ARMANDO ABREGO GARCIA** was also a member and associate of the transnational criminal organization, La Mara Salvatrucha, otherwise known and hereinafter referred to as MS-13.

6. MS-13 was a criminal enterprise engaged in, among other activities, acts and threats involving murder, extortion, narcotics trafficking, firearms trafficking, alien smuggling, and money laundering. MS-13 operated throughout North and Central America, including in El Salvador, Guatemala, Mexico, the United States, including in Texas, Maryland, New York, Tennessee, and elsewhere.

7. **KILMAR ARMANDO ABREGO GARCIA**, as detailed further below, used his status in MS-13 to further his criminal activity. Over the course of the conspiracy, the co-conspirators knowingly and unlawfully transported thousands of undocumented aliens who had no authorization to be present in the United States, and many of whom were MS-13 members and associates. The co-conspirators also worked with transnational criminal organizations in Mexico to transport undocumented aliens through Mexico and into the United States.

2

Case 3:25-cr-00115    Document 3    Filed 05/21/25    Page 2 of 10 PageID #: 4

# COUNT ONE

## 8 U.S.C. § 1324 (a)(1)(A)(v)(I)

### (Conspiracy to Transport Aliens)

8. Paragraphs one through seven are incorporated by reference and realleged as if fully set forth herein.

**A. The Conspiracy**

9. Between in or around 2016 and 2025, in the Middle District of Tennessee and elsewhere, **KILMAR ARMANDO ABREGO GARCIA** did combine, conspire, confederate, and agree with CCs-1 through 6, and others known and unknown to the Grand Jury, to knowingly and in reckless disregard of the fact that certain aliens had come to, entered, and remained in the United States in violation of law, transport and move said aliens within the United States by means of transportation and otherwise in furtherance of such violation of law, with intent to further the unlawful presence of the aliens in the United States and for private financial gain, in violation of Title 8, United States Code Sections 1324(a)(1)(A)(ii) and (B)(i).

**B. Manner and Means**

10. In or around 2016, shortly after meeting each other, CC-1 and **KILMAR ARMANDO ABREGO GARCIA** agreed to work together to transport undocumented aliens for profit and private financial gain.

11. Co-conspirators outside the United States facilitated the travel of undocumented aliens from El Salvador, Guatemala, Honduras, Ecuador, Mexico, and elsewhere to illegally cross the United States border into Texas without inspection. CC-6 was one of the primary sources of supply of undocumented aliens for the conspiracy, and many of the undocumented aliens supplied by CC-6 included MS-13 members and associates.

12. **KILMAR ARMANDO ABREGO GARCIA** and CC-1 ordinarily picked up the undocumented aliens in the Houston, Texas area shortly after the aliens had unlawfully crossed the Southern border of the United States from Mexico. **KILMAR ARMANDO ABREGO GARCIA** and CC-1 then transported the undocumented aliens from Texas to other parts of the United States to further the aliens' unlawful presence in the United States.

13. During the course of the conspiracy, CC-1 was incarcerated for alien smuggling and was deported from the United States. During that period, CC-2, at the direction of CC-1, began working with **KILMAR ARMANDO ABREGO GARCIA** to transport undocumented aliens for profit. After CC-1 was released from prison and deported, CC-1 illegally re-entered the United States and returned to work with **KILMAR ARMANDO ABREGO GARCIA**, CC-2, and other co-conspirators to transport undocumented aliens for profit.

14. In addition to transporting undocumented aliens, **KILMAR ARMANDO ABREGO GARCIA**, CC-1, and CC-2 occasionally and simultaneously transported firearms illegally purchased in Texas for distribution and resale in Maryland.

15. In addition to transporting undocumented aliens, and firearms at times, **KILMAR ARMANDO ABREGO GARCIA** occasionally and simultaneously transported undocumented aliens and narcotics purchased in Texas for distribution and resale in Maryland.

16. On some occasions, members and associates of MS-13 in Maryland accompanied **KILMAR ARMANDO ABREGO GARCIA** on his trips to transport undocumented aliens in Texas to other parts of the United States.

17. On various occasions throughout the conspiracy, among the undocumented aliens **KILMAR ARMANDO ABREGO GARCIA** and his co-conspirators transported from Texas to other parts of the United States, were MS-13 members and associates.

18. **KILMAR ARMANDO ABREGO GARCIA** and CC-1 regularly required the undocumented aliens they transported to pay **KILMAR ARMANDO ABREGO GARCIA** and CC-1 in cash for facilitating their transport throughout the United States. The MS-13 members and associates transported by CC-2 refused to pay CC-2 for his transportation services, but the MS-13 members and associates **KILMAR ARMANDO ABREGO GARCIA** transported generally treated **KILMAR ARMANDO ABREGO GARCIA** with respect and also paid him for his transportation services. Co-conspirators later transferred, via Western Union and other means, at least some of these monies derived from the unlawful transportation within the United States to other co-conspirators in foreign countries such as Mexico and Guatemala as part of the wider alien smuggling operation.

19. CC-3, on multiple occasions along with **KILMAR ARMANDO ABREGO GARCIA** and CC-1, transported undocumented aliens within the United States. CC-3 also received and transferred payments from undocumented aliens derived from the unlawful transportation within the United States and in furtherance of the conspiracy.

20. CC-4 and CC-5 received and transferred thousands of dollars of criminal proceeds derived from the conspiracy by wire to and from other co-conspirators, both within and outside of the United States. CC-1 also directed CC-6 and other co-conspirators known and unknown to the Grand Jury to transfer money to other individuals by wire for a fee, to obscure the recipient of the money. CC-6 also transferred criminal proceeds by wire to CC-4.

21. In an effort, in part, to protect operational security and conceal their illegal alien smuggling operation, **KILMAR ARMANDO ABREGO GARCIA**, CC-1, and CC-2 varied their transportation routes within the United States.

22. **KILMAR ARMANDO ABREGO GARCIA**, CC-1, and CC-2 also routinely took the undocumented aliens' cellular phones they transported within the United States, and they provided them back to the undocumented aliens at the end of the trip. They did this to ensure the undocumented aliens could not and would not contact anyone else during the trip.

23. **KILMAR ARMANDO ABREGO GARCIA**, CC-1, and CC-2 transported undocumented aliens in an unsafe manner, including using reconfigured vehicles with after-market unattached seating rows, and they transported children on the floorboards of vehicles in order to maximize profits.

24. As a part of the conspiracy, none of the undocumented aliens transported by **KILMAR ARMANDO ABREGO GARCIA**, CC-1, and CC-2 carried luggage because they had just crossed the border from Mexico into the United States.

25. To conceal their illegal activity, **KILMAR ARMANDO ABREGO GARCIA**, CC-1, and CC-2 routinely devised and employed knowingly false cover stories to provide to law enforcement if they were stopped during a transport. These false cover stories regularly involved the transportation of individuals (i.e. the undocumented aliens) for work such as a construction job.

26. In 2021, as part of CC-6's criminal activities in these international transports, CC-6 was involved in the transportation of more than 150 migrants that ended when the tractor trailer carrying them overturned in Mexico, resulting in the deaths of more than 50 migrants and injuring many others.

27. **KILMAR ARMANDO ABREGO GARCIA** sometimes brought close relatives with him when he picked up undocumented aliens in Texas and transported them to other parts of the United States. On other occasions, he came alone. During some of the trips **KILMAR**

ARMANDO ABREGO GARCIA operated when he did not bring a close relative, CC-6 received reports from undocumented aliens that KILMAR ARMANDO ABREGO GARCIA had abused some of the female undocumented aliens. Knowing this was bad for business, CC-6 reported these allegations of abuse by KILMAR ARMANDO ABREGO GARCIA to both CC-1 and CC-2, and CC-6 directed CC-1 and CC-2 to cause KILMAR ARMANDO ABREGO GARCIA to stop the abuse.

28. KILMAR ARMANDO ABREGO GARCIA, CC-1, and CC-2 routinely transported between six and ten undocumented aliens per trip to maximize efficiency and profits.

29. Over the course of the conspiracy, KILMAR ARMANDO ABREGO GARCIA transported undocumented aliens who had entered the United States without authorization on approximately more than 100 trips between Texas to Maryland and other states.

### C. Representative Acts of the Conspiracy

<u>Transportation in Tennessee</u>

30. On or about the following dates, as representative of the manner and means of the conspiracy, KILMAR ARMANDO ABREGO GARCIA and his co-conspirators took and caused the following actions:

    a. On or about November 30, 2022, a state trooper with the Tennessee Highway Patrol ("THP") conducted a traffic stop on a Chevrolet Suburban on Interstate I-40 in Putnam County, Tennessee, outside of Cookeville, Tennessee, located in the Middle District of Tennessee. Other THP troopers subsequently responded to the scene of the traffic stop.

    b. The November 30, 2022, traffic stop was captured on video by THP body worn cameras.

    c. KILMAR ARMANDO ABREGO GARCIA was the driver of the Suburban.

    d. There were nine additional passengers in the Suburban, all of whom were Hispanic males, and none of whom had any identification.

e. When asked where they were traveling from, **KILMAR ARMANDO ABREGO GARCIA** knowingly and falsely told the state trooper he and the passengers were coming from St. Louis. He further knowingly and falsely stated to the state trooper that the Suburban passengers had been in St. Louis for two weeks doing construction. **KILMAR ARMANDO ABREGO GARCIA** also offered that the passengers were on their way back to Maryland, which he also then knew to be false because the passengers had been picked up in Texas.

f. Multiple passengers told the THP state troopers they were going to the same address in Maryland.

g. The Suburban that **KILMAR ARMANDO ABREGO GARCIA** was driving had an after-market third row of seats placed where a cargo area should be, which was occupied by undocumented passengers.

h. None of the nine undocumented passengers had any luggage, nor was there any tools or construction equipment in the Suburban.

i. License Plate Reader (LPR) data, which can track a particular vehicle's location at a given point in time, showed that the Chevrolet Suburban **KILMAR ARMANDO ABREGO GARCIA** was driving had not been near St. Louis in the past twelve months and, in fact, had been in the Houston, Texas area within the week leading up to the traffic stop on November 30, 2022.

j. **KILMAR ARMANDO ABREGO GARCIA** had $1,400 in cash in his pocket.

k. Shortly after the traffic stop, **KILMAR ARMANDO ABREGO GARCIA** informed other members of the conspiracy that he had been stopped by law enforcement in Tennessee but that he had been released.

All in violation of Title 8 United States Code, Sections 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i).

## COUNT TWO

### 8 U.S.C. §1324 (a)(1)(A)(ii)

**(Unlawful transportation of undocumented aliens)**

31. The Grand Jury realleges paragraphs one through seven and ten through thirty of this Indictment and further alleges the following.

32. On or about November 30, 2022, in the Middle District of Tennessee and elsewhere, **KILMAR ARMANDO ABREGO GARCIA**, aided and abetted by others known and unknown to the Grand Jury, did knowing and in reckless disregard of the fact that certain aliens had come to, entered, and remained in the United States in violation of law, did transport and move said aliens within the United States by means of transportation and otherwise in furtherance of such violation of law, with intent to further the unlawful presence of the aliens in the United States and for private financial gain, and did aid and abet the same.

In violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii) and 1324(a)(1)(B)(i), and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATION

1. The allegations contained in this Indictment are re-alleged and incorporated by reference as if fully set forth in support of this forfeiture.

2. Upon conviction of Counts One or Two, **KILMAR ARMANDO ABREGO GARCIA** shall forfeit to the United States of America, pursuant to Title 8, United States Code, Section 1324(b) and Title 18, United States Code, Section 981(d):

    (A)    Any conveyance, including any vessel, vehicle, or aircraft, that was being used in the commission of a violation of Count One or Two;

    (B)    the gross proceeds of such violation; and

    (C)    any property traceable to such conveyance or proceeds.

A TRUE BILL

_____
FOREPERSON

_____
ROBERT E. MCGUIRE
ACTING UNITED STATES ATTORNEY
MIDDLE DISTRICT OF TENNESSEE

_____
JACOB WARREN
CHRISTOPHER EASON
CO-DIRECTORS, JOINT TASK FORCE VULCAN
JEREMY I. FRANKER
DEPUTY DIRECTOR, JOINT TASK FORCE VULCAN
UNITED STATES DEPARTMENT OF JUSTICE