## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:25-cr-00115-1** |
| | ) | |
| **KILMAR ARMANDO ABREGO GARCIA** | ) | |

## MEMORANDUM OPINION

The defendant Kilmar Armando Abrego Garcia ("Abrego")[1] appeared with counsel, Federal Public Defender Dumaka Shabazz and Assistant Federal Public Defenders Richard Tennent and Will Allensworth, on June 13, 2025, for arraignment and a hearing on the government's motion for detention. (Docket No. 8.) Acting U.S. Attorney Robert McGuire and Jeremy Franke, Deputy Director of Joint Task Force Vulcan, appeared for the United States (the "government").

## I.      INTRODUCTION

Perhaps the sole circumstance about which the government and Abrego may agree in this case is the likelihood that Abrego will remain in custody regardless of the outcome of the issues raised in the government's motion for detention. Either Abrego will remain in the custody of the Attorney General or her designee pending trial if detained under the Bail Reform Act or he will likely remain in U.S. Immigration and Customs Enforcement ("ICE") custody subject to anticipated removal proceedings that are outside the jurisdiction of this Court. That suggests the Court's determination of the detention issues is little more than an academic exercise. That suggestion is understandable. But the foundation of the administration of our criminal law depends on the bedrock of due process. That due process demands that every person charged with a federal

---

[1] According to statements of defense counsel at the June 13, 2025 hearing, Kilmar Abrego Garcia's preferred surname reference is Abrego.

crime be afforded a presumption of innocence unless proven guilty beyond a reasonable doubt and that deprivation of an individual's liberty prior to trial can occur only in carefully limited circumstances with all the procedural safeguards afforded by the Bail Reform Act. Abrego, like every person arrested on federal criminal charges, is entitled to a full and fair determination of whether he must remain in federal custody pending trial. The Court will give Abrego the due process that he is guaranteed.

## II.     DETERMINATIONS UNDER BAIL REFORM ACT

As required by the Bail Reform Act, the Court has reviewed the evidence presented at the June 13 hearing and considered the parties' arguments and the Pretrial Services report. For the reasons detailed below, the government's motion for detention (Docket No. 8) is **DENIED**. Specifically, the Court finds that no detention hearing is authorized under the Bail Reform Act in this case because the government failed to prove that this case involves: (1) a minor victim within the meaning of § 3142(f)(1)(E); (2) a "serious risk" that Abrego will flee, as required by § 3142(f)(2)(A); or, (3) a "serious risk" that Abrego will obstruct justice or otherwise interfere with the integrity of this proceeding, as required by § 3142(f)(2)(B).

Even if, however, the government was entitled to a detention hearing, the Court would still conclude that the government has not met its burden under § 3142(g) because the Court finds that there are conditions of release that can be imposed to reasonably assure the safety of others and the community and to reasonably assure Abrego's appearance as required. Overall, the strength of the factors weighing in favor of release outweighs all other factors in favor of detention, which compels Abrego's release, particularly given the clear default under the law that persons who have not yet been convicted of a crime should be released pending trial.

2

### III.    PROCEDURAL AND FACTUAL BACKGROUND

Abrego is charged in an indictment of May 21, 2025[2] with one count of conspiracy to unlawfully transport illegal aliens[3] for financial gain in violation of 8 U.S.C. § 1324(a)(1)(A)(v) and (B)(i) and one count of illegal transportation of illegal aliens for financial gain in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (B)(i).[4] (Docket No. 3.) Abrego was returned to the United States from El Salvador,[5] and was arrested in Nashville on June 6, 2025. (Docket No. 9.) Contemporaneously, the government filed a motion for detention. (Docket No. 8.) An initial appearance was held on June 6, 2025, at which Abrego was appointed counsel and advised of the charges, penalties, and his rights. (Docket No. 10.) The government did not, in its original motion, articulate the specific grounds for its request for Abrego's detention. At the initial appearance, the Court therefore directed the government to supplement its motion. *See* June 6, 2025 Order (Docket No. 13). To allow Abrego an opportunity to fully review the indictment with counsel and with the assistance of an interpreter, which he did not have an opportunity to do before the June 6 initial appearance, arraignment and hearing on the government's motion for detention were set for June 13, 2025.[6] (*Id*.)  A hearing was held on June 13, 2025.

---

[2] The indictment was originally sealed at the government's request. (Docket Nos. 1 and 2.) Upon the government's motion (Docket No. 6), the indictment was unsealed on June 6, 2025. (Docket No. 7.)

[3] Because the statute uses the language "illegal aliens," the Court uses that same reference in specific references to the statute.

[4] The second count arises out of a traffic stop by the Tennessee Highway Patrol ("THP") on November 30, 2022 of a vehicle driven by Abrego.

[5] *See Noem v. Abrego Garcia*, 604 U.S. ___, 145 S.Ct. 1017, 1018 (2025) (describing circumstances of Abrego's removal from the United States to El Salvador).

[6] The hearing held on June 13, 2025 was for purposes of determining both whether the government is entitled to a detention hearing in this case, and, if so, whether Abrego must be

To be clear, the offenses of which Abrego is charged are human smuggling, not human trafficking. Although "smuggling" and "trafficking" were sometimes used interchangeably during the detention hearing, there is a distinct difference between the two under the law. They are not transposable. According to the United States Citizenship and Immigration Services ("USCIS") Policy Manual:

> Federal law distinguishes between the crimes of human smuggling and human trafficking. Trafficking is a crime committed against a person regardless of the person's immigration status or the crossing of a transnational border, while smuggling is a crime committed against a country's immigration laws and involves the willful movement of a person across a country's border.
>
> A person may voluntarily consent to be smuggled. In contrast, an act of trafficking must involve both a particular means, such as the use of force, fraud, or coercion, and a particular purpose, such as subjection to involuntary servitude or a commercial sex act.

USCIS POLICY MANUAL, *Difference Between Trafficking and Smuggling*, Vol. 3, Pt. B, Ch. 2, § B.7, https://www.uscis.gov/policy-manual/volume-3-part-b-chapter-2. The Cornerstone Report,[7] a quarterly bulletin highlighting key issues related to investigations by ICE Homeland Security Investigations ("HSI"), also explains the difference between human trafficking and human smuggling:

> Human trafficking and human smuggling are often confused. The two crimes are very different and it is critical to understand the difference between the two.
>
> **Human trafficking** involves exploiting men, women, or children for the purposes of forced labor or commercial sexual exploitation.

---

detained or released pending trial. For simplicity, unless otherwise noted, references to "the detention hearing" encompass both these issues.

[7] Cornerstone is described in the quarterly report as "a U.S. Immigration and Customs Enforcement's (ICE) comprehensive investigative initiative for fighting financial crime." The Cornerstone Report, *Human Trafficking vs Human Smuggling*, Volume XIII, No. 1, Summer 2017, p.1.

> **Human smuggling** involves the provision of a service—typically, transportation or fraudulent documents—to an individual who voluntarily seeks to gain illegal entry into a foreign country.

The Cornerstone Report, *Human Trafficking vs Human Smuggling*, Vol. XIII, No. 1, Summer 2017, p.1. As the report states: "**Smuggling** is transportation-based. **Trafficking** is exploitation-based." *Id.* "These are *not* interchangeable terms." *Id.*

At the detention hearing, the government presented testimony from ICE HSI Special Agent Peter Joseph and the following admitted exhibits: body camera footage of the traffic stop by the Tennessee Highway Patrol ("THP") on November 30, 2022; a screenshot taken from the November 30, 2022 traffic stop body camera footage; a passenger roster from the November 30, 2022 traffic stop; a snapchat screenshot between Abrego and cooperator N.V.; an August 2020 temporary order of protection against Abrego; and a May 2021 temporary order of protection against Abrego.

Abrego offered his brother as a third-party custodian, by submission of a sworn declaration, which was admitted as an exhibit. Additionally admitted as defense exhibits were an immigration court memo and order granting Abrego's withholding of removal and a letter from CASA in support of Abrego.

Having reviewed all the evidence, and considered the parties' arguments and the Pretrial Services report, the Court makes the following findings of fact and conclusions of law.

## IV. APPLICABLE PROVISIONS OF THE BAIL REFORM ACT

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception. . . . [T]he provisions for pretrial detention in the Bail Reform Act of 1984 [18 U.S.C. §§ 3141 *et seq.*] fall within the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Specifically, the Bail Reform Act charts four outcomes mandating that the court "shall issue an order that, pending trial," that the person be: (1) released on their own

recognizance; (2) released on conditions; (3) temporarily detained for purposes not at issue here; or, (4) detained until trial, if the court finds, after a hearing, that "no condition or combination of conditions will reasonably assure" the defendant's appearance or the safety of others. 18 U.S.C. §§ 3142(a).

"To balance a defendant's fundamental interest in pretrial liberty with adequate protection of the community and integrity of the judicial process, Congress authorized detention hearings only in limited circumstances." *United States v. Figueroa-Alvarez*, 681 F.Supp.3d 1131, 1134–35 (D. Idaho 2023). Those limited circumstances include five categories of serious crimes, as described in § 3142(f)(1)(A) through (E), or when the person presents either a serious risk of flight or a serious risk of obstruction or intimidation under § 3142(f)(2)(A) or (B), which are acts that pose the greatest peril to the integrity of the judicial process. It is beyond dispute that the default position of the Bail Reform Act is that a person should be released pending trial. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).

Put simply, pretrial detention is not a possibility for all persons charged with a federal crime. The Bail Reform Act does not "authorize a detention hearing whenever the government thinks detention would be desirable." *United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) (per curiam). *See also United States v. Ploof*, 851 F.2d 7, 10–11 (1st Cir. 1988) (Congress did not intend to authorize preventive detention unless one of the § 3142(f) conditions for holding a detention hearing exists). "The § 3142(f) categories are not incantations that will conjure a hearing by their simple utterance." *United States v. Subil*, Case No. 2:23-cr-00030-TL, 2023 WL 3866709, at *4 (W.D. Wash. June 7, 2023). Nor does the Bail Reform Act allow for a detention hearing simply because a person is alleged to be a danger to others. *United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003) (per curiam) (collecting cases). *See also Byrd*, 969 F.2d at 110 ("[A] defendant's threat

to the safety of other persons or to the community, standing alone, will not justify pre-trial detention."). Further, the question of whether the person poses a danger to the safety of the community "cannot be considered unless the [person] is found to be eligible for detention under § 3142(f)." *United States v. Romero-Martinez*, No. 3:23-CR-176 (JAM), 2024 WL 965150, at *4 (D. Conn. Mar. 6, 2024) (quoting *United States v. Dillard*, 241 F.3d 88, 96 (2d Cir. 2000)).

Absent a showing of one or more of the requisite circumstances authorizing a detention hearing, the person charged must be released, subject to appropriate conditions. *See, e.g.*, *United States v. Hardon*, 149 F.3d 1185 (Table), No. 98-1625, 1998 WL 320945, at *1 (6th Cir. June 4, 1998) (district court order denying revocation of detention order reversed and case remanded to set conditions of release because the threshold circumstances set forth in § 3142(f) not shown); *United States v. Mendoza-Balleza*, 420 F. Supp. 3d 716, 718 (E.D. Tenn. 2019) (magistrate judge's detention order vacated because government unable to satisfy threshold burden of showing serious risk of flight under § 3142(f)(2)(A) due to ICE hold on defendant). This two-step process under the Bail Reform Act was exhaustively analyzed and discussed in *United States v. White*, No. 3:21-mj-04070, 2021 WL 2155441 (M.D. Tenn. May 27, 2021) (Richardson, D.J.).

To proceed with a detention hearing, the government must establish by a preponderance of the evidence that one of the statutory circumstances exists. *Id.* at *7 (citing *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); *United States v. Salgado*, No. CR 20-53JJM, 2020 WL 4747931, at *3 (D.R.I. Aug. 17, 2020)). In other words, the government bears the burden of proving the person is not eligible for release. *See Stone*, 608 F.3d 946; *White*, 2021 WL 2155441, at *4–5 ("even before having a shot at obtaining *detention* pursuant to a motion brought under 18 U.S.C. § 3142(f)(2)(A), the [g]overnment must prevail (with some degree of evidentiary showing)

on its motion for a detention [hearing]") (citing *United States v. Wright*, No. 2:18-CR-336-DN, 2018 WL 3946642, at *1-2 (D. Utah July 20, 2018)).

The court can make the determination as to whether the case involves one of the enumerated bases for a detention hearing either before the detention hearing or at the detention hearing. *White*, 2021 WL 2155441, at *11. This is so because the best way to assess whether the asserted basis for a detention hearing exists "is via an actual hearing with live testimony, rather than via pre-hearing filings with mere proffers of information or (surely generally self-serving) declarations not subject to cross-examination." *Id*. If, at the hearing, the motion for detention fails at step one, that determination is "essentially a retroactive finding that the hearing eventually proved unauthorized in the first place." *Id*.

Evidence rules (other than privilege) generally do not apply in the detention hearing context. 18 U.S.C. § 3142(f) ("The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."). *See also* Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to the following: considering whether to release on bail or otherwise."). The focus is evidentiary reliability and accuracy. *United States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291, 1998 WL 381686, at *1 (6th Cir. 1998). *See also United States v. Black*, No. 23-1622, 2025 WL 1356614, at *3–5 (6th Cir. May 9, 2025) (per curiam) (discussion of reliability of hearsay evidence in informal sentencing hearings). Given this hearing informality, the court properly considers a wide range of proof, the nature and quality of which, though, impacts the probative value and ultimate weight of the proof in the detention calculus. The court must also be mindful of the high stakes involved in the decision of whether to release or detain a person prior to conviction of the offense charged.

The plain language of the Bail Reform Act permits the person charged to proffer evidence in connection with a detention hearing. 18 U.S.C. § 3142(f). Although the statute neither expressly permits nor prohibits proffers by the government, such proffers are the generally accepted practice. *See, e.g.*, *Salerno*, 481 U.S. at 743 (discussing government's proffered evidence); *United States v. Tawfik*, 852 F. App'x. 965, 966–67 (6th Cir. 2021) (holding that detention was warranted based on government's proffered evidence); *United States v. Caldwell*, Case No. 1:24-cr-70, 2024 WL 2080985, at *1–2 (N.D. Ohio May 9, 2024) (discussion of evidence proffered by government); *United States v. Foster*, No. 3:23-CR-36-TAV-DCP-6, 2023 WL 4355331, at *1 (E.D. Tenn. July 5, 2023) (discussion of evidence proffered by government); *United States v. Baldinger*, No. 3:85-0031, 1985 WL 2043, at *2 n.2 (M.D. Tenn. May 8, 1985) (acknowledging that government may proffer evidence at a detention hearing).

If the court is satisfied that the government has sustained its burden of showing a supported basis for a detention hearing, the court then proceeds to consider the factors detailed in § 3142(g) to determine whether the person should be released on conditions or detained pending trial.[8] This analysis is focused on "whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18

---

[8] Some courts apply the factors under § 3142(g) in consideration of whether a detention hearing is authorized under § 3142(f). In this Court's view, the better approach, and the one more consistent with the carefully crafted structure and limited purpose of the Bail Reform Act, is a two-step analysis in which the broader considerations of § 3142(g) are not reached unless the government has first demonstrated a basis for a detention hearing under § 3142(f). *See Hardon*, 1998 WL 320945, at *1 (district court order denying revocation of detention order reversed and case remanded to set conditions of release because the threshold circumstances set forth in § 3142(f) not shown); *Ploof*, 851 F.2d at 10–11 (Congress did not intend to authorize preventive detention unless one of the § 3142(f) conditions for holding a detention hearing exists); *White*, 2021 WL 2155441, at *4–5 ("even before having a shot at obtaining *detention* pursuant to a motion brought under 18 U.S.C. § 3142(f)(2)(A), the [g]overnment must prevail (with some degree of evidentiary showing) on its motion for a detention [hearing]").

U.S.C § 3142(g). In making this determination, the court must consider the available information relating to (1) the nature and circumstances of the charged offense, (2) the weight of the evidence against the person, (3) the person's history and characteristics, and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C § 3142(g)(1)–(4). The weight of the evidence goes only to the likelihood that the person charged will pose a danger to the community or a risk of flight and is not a pretrial determination of guilt. *Stone*, 608 F.3d at 948. In weighing the strength of the evidence, the court may not modify or limit the person's presumption of innocence. 18 U.S.C. § 3142(j). The personal history and characteristics include "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). Also included is whether the person was on probation or parole at the time he committed the alleged offense. 18 U.S.C. § 3142(g)(3)(B).

As to likelihood of nonappearance, the government must carry its burden by a preponderance of the evidence. *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004). With respect to dangerousness, the government must present clear and convincing evidence to prevail. *Stone,* 608 F.3d at 946 (citing 18 U.S.C. § 3142(f)(2)(B)). Clear and convincing evidence requires a firm belief or abiding conviction that what is alleged is highly probable. *United States v. Beard*, No. 1:21-MJ-02082, 2021 WL 1111240, at *5 (N.D. Ohio Mar. 23, 2021) (internal citations omitted). The analyses of dangerousness and likelihood of nonappearance are distinct, and conditions that could adequately address a person's appearance will not necessarily mitigate danger to a sufficient degree. *United States v. Mercedes*, 254 F.3d 433, 436–37 (2d Cir. 2001).

Detention decisions depend on the individual circumstances of each case and each person. *United States v. Marroquin-Ramirez*, No. 5:25-CR-125 (AJB), 2025 WL 1248652, at *3 (N.D.N.Y. Apr. 17, 2025). The court has broad discretion to determine how much weight to assign the factors listed in § 3142(g) based on the circumstances of a particular case. As the Second Circuit explained:

> Although § 3142(g) of the Bail Reform Act lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether to release or detain a defendant . . . That silence is unsurprising, because the weight given to each factor will inevitably vary from case to case, and might even vary depending on whether the inquiry relates to a defendant's danger or to his risk of flight. What is more, certain factors might interact with one another in a particular case in a way that alters a court's analysis of a defendant's danger to the community or flight risk.

*United States v. Zhang*, 55 F.4th 141, 149-50 (2d Cir. 2022). In other words, while the court must consider each factor, the factors may be weighed differently in different cases and even within the same case depending on whether the consideration is one of dangerousness or of nonappearance. Further, "prior decisions to grant or deny detention hearings, or for that matter to grant or deny detention, based on the unique facts presented in certain cases should not be misunderstood to compel the same results in later cases with different facts." *Marroquin-Ramirez*, 2025 WL 1248652, at *3

With these principles in mind, the Court turns to the issues in this case. For the reasons discussed below, the Court finds that the government failed to demonstrate that this is a case in which a detention hearing is authorized. Even if, however, the government was entitled to a detention hearing, the Court would still conclude that the government has not met its burden under § 3142(g) to detain Abrego pending trial, because the Court finds that there are conditions of release that can be imposed to reasonably assure the safety of others and the community and to reasonably assure Abrego's appearance as required.

## V.    ANALYSIS

The government maintains a detention hearing is warranted in this case: (i) because the offenses of which Abrego is charged involve a minor victim within the meaning of § 3142(f)(1)(E); (ii) under § 3142(f)(2)(A) because there is a serious risk that Abrego will flee; and (iii) under § 3142(f)(2)(B) because there is a serious risk that Abrego will obstruct or attempt to obstruct justice, or threaten, injury, or intimidate, or attempt to threaten, injure or intimidate a prospective witness. (Docket No. 14 at 1.) The government also contends that consideration of the statutory factors found in § 3142(g) requires Abrego's detention pending trial. (Docket Nos. 8, 14.)

For the reasons detailed below, the Court finds the government failed to carry its burden to demonstrate a statutory basis for a detention hearing, which compels Abrego's release. Nevertheless, even if the government were entitled to a detention hearing, consideration of the factors detailed in § 3142(g) compels release of Abrego on conditions.

### A.    Is this a case in which a detention hearing is authorized?

The government bears the burden of showing by a preponderance of the evidence that a case falls within the scope of § 3142(f) to justify a detention hearing. *White*, 2021 WL 2155441, at *7. Preponderance of the evidence generally means "such evidence as, when considered and compared with that opposed to it, has more convincing force and produces [a] belief that what is sought to be proved is more likely true than not true." *Williams v. Eau Claire Pub. Sch.*, 397 F.3d 441, 446 (6th Cir. 2005). *See also White*, 2021 WL 2155441, at *7 n.13 (recognizing subjectivity in application of preponderance standard for purposes of § 3142(f)(2)(A) or (B))

The government's principal basis for a detention hearing in this case, as indicated by the evidence presented at the detention hearing, is that Abrego is charged with a "felony that is not otherwise a crime of violence that involves a minor victim" under 18 U.S.C. § 3142(f)(1)(E).

Separately, the government argues that a detention hearing is authorized by either 18 U.S.C. § 3142(f)(2)(A) or (B) because there is a serious risk that Abrego will flee and a serious risk that Abrego will obstruct or attempt to obstruct justice, or threaten, injury, or intimidate, or attempt to threaten, injure or intimidate a prospective witness.[9]

### 1. Does the case involve a minor victim within the meaning of § 3142(f)(1)(E)?

There is no dispute that the offenses of which Abrego is charged are not felonies that are otherwise crimes of violence. The applicability of § 3142(f)(1)(E), and the government's entitlement to a detention hearing under this section, therefore depends on whether the crimes

---

[9] The specific provisions of the Bail Reform Act at issue, namely 18 U.S.C § 3142(f)(1)(E) and (2)(A)-(B), provide that:

> (f) **Detention hearing.** The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of the person as required and the safety of any other person and the community
>
> (1) upon motion of the attorney for the Government, in a case that involves
>
> * * *
>
> (E) any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device (as those terms are defined in section 921) or any other dangerous weapon, or involves a failure to register under section 2250 of title 18, United States Code; or
>
> (2) upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves
>
> (A) a serious risk that the person will flee; or
>
> (B) a serious risk that the person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injury, or intimidate, a prospective witness or juror.

"involve[] a minor victim."[10] The government contends that the crimes involve a minor victim for two primary reasons: (1) there was a supposed minor in the vehicle that Abrego was driving when stopped by THP on November 30, 2022 and (2) Abrego is purported to have otherwise transported or had minors in the vehicle, including his own children, on other trips during the time he is alleged to have engaged in the charged conspiracy to transport undocumented persons.

The government's evidence of a minor in the vehicle specifically on November 30, 2022 consists of body camera footage of the THP stop and documentary evidence of a roster that a responding THP trooper obtained from the vehicle occupants. Additionally, Special Agent Joseph's testimony included restated testimony or interview statements of cooperating witnesses about other alleged instances involving minors. In a nutshell, the government contends that "involves" as used in § 3142(f)(1)(E) must be construed broadly and the evidence that minors were in vehicles operated by Abrego satisfies the broad component of involvement. The government further argues that any minor in a vehicle with Abrego when he was allegedly transporting undocumented persons was a victim due to what the government contends is the inherently dangerous nature of such transportation.

Abrego, not surprisingly, disagrees with what he characterizes as the government's impermissibly broad construction of the phrase "involves a minor victim" for purposes of § 3142(f)(1)(E) and argues that "involves" instead means "requires." Abrego essentially contends that, for a felony to involve a minor victim within the meaning of § 3142(f)(1)(E), harm to a minor must be a necessary circumstance, condition, or consequence of the crime. Abrego further argues that the government's theory of "victim" overreaches beyond the meaning of the statute to extend

---

[10] Although the government offered testimony regarding Abrego's alleged possession of firearms, the government did not seek a detention hearing on that basis.

to any minor who is merely exposed to a risk of harm because the government has neither alleged nor demonstrated that any minor suffered actual harm.

Before reaching the question of the meaning of "minor victim," the Court must determine the proper application of "involves" for purposes of § 3142(f)(1)(E). Neither party provided the Court with Sixth Circuit authority on the specific issue of what "involves" means as used in § 3142(f)(1)(E). Nor has the Court found any controlling authority. The government relies mainly on a case out of the Second Circuit that discussed this language as it relates to charges that "involve" the possession or use of a firearm. Abrego's opposition to a detention hearing rests primarily on a Sixth Circuit case discussing what "involves" means in the context of a statutory sentencing enhancement. Neither is a perfect fit here.

The government contends that the word "involves" as used in § 3142(f)(1)(E) "connotes a legitimate connection to risk to a child even if that risk is not the overriding purpose of the scheme." (Docket No. 14 at 7.) Simply put, in the government's estimation, smuggling of undocumented persons is so inherently dangerous that anytime a child is included in the alleged circumstances of human smuggling that offense "involves" a minor victim, warranting a detention hearing under § 3142(f)(1)(E). That argument is easily dispensed with.

There are no *per se* pretrial detention rules based on the alleged existence of a criminal enterprise. *See Stone*, 608 F.3d at 946 (recognizing individualized nature of detention inquiry and determinations); *United States v. Afyare*, No. 3:10-cr-00260, 2011 WL 1397820, at *3 n.2 (M.D. Tenn. Apr. 13, 2011) (Haynes, D.J.) ("A substantial amount of the Government's proof on the detention issue involves other defendants' acts and statements. To be sure, with a conspiracy charge, any act of one conspirator is attributable to another, but on a motion to detain the Court must consider the specific facts involving the individual defendant for whom detention is

sought."); *United States v. Cirillo*, 149 F. App'x 40, 43 (2d Cir. 2005) (detention determinations are individualized; no *per se* detention of even organized crime leaders). Detention decisions are fact-specific, individualized determinations. *Marroquin-Ramirez*, 2025 WL 1248652, at *3. "The [Bail Reform] Act instructs that release or detention must be based on the individual circumstances of each case and, indeed, each defendant." *Id*. The government's general reliance on the alleged existence of a human smuggling operation is therefore misplaced.

Nevertheless, the government's contention that "involves" allows consideration of alleged conduct specifically attributed to Abrego is not completely uncharted. The meaning of § 3142(f)(1)(E) urged by the government is supported by a decision of the Second Circuit in *United States v. Watkins*, 940 F.3d 152, 165–67 (2d Cir. 2019).[11] In *Watkins*, the Second Circuit held that, when analyzing whether the government is entitled to a detention hearing under § 3142(f)(1)(E) in a specific case, a court is not limited by the elements of the offense(s) charged and may consider the factual details surrounding the charged conduct. *Id*. at 166. *Watkins* has been relied on by several district courts, as described the government in its supplemental memorandum. (Docket No. 14 at 5–6.) While *Watkins* and the cases that followed provide one avenue to the meaning of "involves," that is not a road the Court is required to take.[12]

---

[11] Abrego argues the Second Circuit's discussion of § 3142(f)(1)(E) is dicta. (Docket No. 29 at 8.) However, it appears that the government asserted in the trial court in the *Watkins* case that a detention hearing was warranted under either § 3142(f)(1)(A) or § 3142(f)(1)(E). *See United States v. Watkins*, No. 18-CR-131, 2018 WL 4922135, at *1 (W.D. N.Y. Oct. 9, 2018). This suggests that the Second Circuit's determination of the scope of § 3142(f)(1)(E) is an alternative holding rather than dicta. Regardless, *Watkins*, for whatever instructive guidance it might provide, is not binding on this Court.

[12] Further, to the best of the Court's review, only one case adopting the reasoning of *Watkins* discussed the meaning of the language "involving minor victims," but in a different context, specifically the presumption of detention under § 3142(e)(3)(E). *United States v. Kirkpatrick*, No. 23-cr-40020-TC, 2023 WL 4846620 (D. Kan. Jul. 28, 2023).

It is also one fraught with potholes. If expanded as broadly as the government requests, § 3142(f)(1)(E) no longer fits within the limited traverse of the Bail Reform Act, but rather becomes a wide expanse of superhighway with on-ramps for almost any case to which a minor child has some incidental connection. What about a case in which the charge is that the defendant transported seafood fraudulently obtained in Oregon to Florida to resell at a profit in violation of 18 U.S.C. § 2314 with his children in a vehicle without seatbelts during the entire 42-hour trip with only infrequent stops? Does that "involve" a minor? Or a charge of interstate travel to evade a child support obligation greater than $5,000 that has remained unpaid for more than one year in violation of 18 U.S.C. § 228(a)(2)? Does that "involve" a minor? And are the minors victims? These are questions to which no answer is found in *Watkins*.

On the other hand, the *United States v. Fields* case, upon which Abrego primarily relies, is a Sixth Circuit decision construing the word "involving," and therefore offers at least a more well-lit path. 53 F.4th 1027 (6th Cir. 2022). There, the Sixth Circuit held that for an offense under state law to "involve" the manufacturing, distribution, or possession with intent to manufacture or distribute a controlled substance, the elements of the state offense must "necessarily entail" such conduct. *Id*. at 1045–49. However, the specific statutory language at issue in *Fields* was not the Bail Reform Act, but, rather, a sentence enhancement provision under 18 U.S.C. § 924(e)(2)(A) describing a "serious drug offense" as a state law offense "involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in [21 U.S.C. § 802]), for which a maximum term of imprisonment of ten years or more is prescribed by law. 18 U.S.C. § 924(e)(2)(A)(ii). *Id*. at 1031. Ultimately, the Sixth Circuit rejected its prior broad interpretation of "involving" to "require only that that a prior state offense 'relate to or connect with' the offenses listed in § 924(e)(2)(A)(ii)," *id*. at 1045, and adopted a narrower definition of

"necessarily entails." *Id*. at 1048. In so doing, the majority decision expressly noted with approval Judge Murphy's "thoughtful[]" explanation of this narrow construction in his separate concurring opinion as "the better understanding of the world 'involve.'" *Id*.

The Court finds persuasive Judge Murphy's encyclopedic discussion of the origin, dictionary definitions, and legal usage of "involve." As Judge Murphy elucidates, the word "involve" can mean several things, some of which, like "implicate" or "related to," are broad and others of which, like "include," are narrow. *Id*. at 1055–58 (Murphy, J. concurring). *See also United States v. Schuetz*, No. 12-MJ-3046, 2012 WL 2923171, at *4 (C.D. Ill. July 18, 2012) (phrase "involves a minor victim" is a categorical term that refers to the category of crimes that harm children). Further, this narrow application of "involves" respects the recognized construct of the Bail Reform Act as a carefully limited exception to an individual's constitutional right to liberty pending trial. *Salerno*, 481 U.S. at 755.[13]

While the Court finds merit in the argument that "involves" can mean "necessarily entails," limiting the route to a detention hearing under § 3142(f)(1)(E) solely to that construction is not without its own fault lines. Including, especially, because this restriction may result in denial of detention hearings in cases in which there is some concrete, attendant consequence of harm to a minor child, which is inconsistent with the amendments to the Bail Reform Act added in the early 2000s specifically to expand protection of children. *See, e.g.*, *United States v. Kirkpatrick*, No. 23-cr-40020-TC, 2023 WL 4846620, at *10–12 (D. Kan. Jul. 28, 2023) (in-depth discussion of addition to Bail Reform Act of phrase "involving a minor victim" by Prosecutorial Remedies and

---

[13] The dissenting admonitions of Justices Marshall and Stevens in *United States v. Salerno* against expansion of pretrial detention for novel purposes also provide a cautionary brake on veering too far from the limited purposes and constraints of the Bail Reform Act. 481 U.S. 739, 756–69 (1987).

Other Tools to End the Exploitation of Children Today Act of 2023 ("PROTECT Act") and Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act")).

Still, just because "involves" as used in § 3142(f)(1)(E) may have a broader reach than categorical crimes against children does not make it as expansive as "related to." Perhaps the better approach is that utilized by the Southern District of Indiana in denying the government's request for a detention hearing under § 3142(f)(1)(E) because the allegations that the defendant used or possessed a firearm were superfluous to the charged offense of making a false statement to acquire a firearm in violation of 18 U.S.C. § 922(a)(6). *United States v. Hart*, No. 1:20-mj-00791-DLP-01, 2020 U.S. Dist. LEXIS 174639, at *1 (S.D. Ind. Sept. 23, 2020).

In short, the question of what Congress meant by "involves" in § 3142(f)(1)(E) has no obvious or easy answer. In the Court's view, "involves" as used in § 3142(f)(1)(E) means something more than "related to" and something less than "necessarily entails." Put another way, § 3142(f)(1)(E) is not limited to only those cases in which the offense charged is a crime against children. "Involves" is at least broad enough to allow a court to consider the conduct of the offense charged in the case. But neither is "involves" so expansive that it includes cases in which minor children might have some incidental connection to the circumstances or consequences of the alleged crime. Where precisely the line of § 3142(f)(1)(E) falls is not a decision the Court must make under the circumstances here, however, because the Court finds the government's evidence fails under either the broader or narrower construction of § 3142(f)(1)(E).[14]

There is no dispute the offenses of which Abrego is charged are not crimes against children and the involvement of a minor child is not an element of the charged offenses. The government

---

[14] This individualized assessment is, as discussed above, required by the Bail Reform Act. This further highlights the reasonableness, if not necessity, of an actual hearing to determine whether this is a detention-eligible case under § 3142(f)(1)(E) or (f)(2).

generally argues in its papers that "it is well understood that conspiracies to smuggle illegal aliens regularly involve the smuggling of unaccompanied minors" (Docket No. 14 at 3) and that "for the reasons described by the Ninth Circuit in *Miguel*, it is reasonable for this Court to consider minor children transported as part of an alien smuggling scheme as 'victims' of the scheme" (*id*. at 7 (citing *United States v. Miguel*, 86 F. App'x. 342 (9th Cir. 2004)). In other words, that human smuggling necessarily entails the transportation of minor victims. The government cites as examples sentencing guidelines and enhanced sentences for members of conspiracies that transport unaccompanied minor immigrants. (*Id*.) The .

*First*, the Court finds it problematic to resort to post-conviction sentencing guidelines and sentencing decisions to *restrict* pretrial release. By definition, decisions under the Bail Reform Act occur in the earliest days of the prosecution, when the person is only accused, not convicted, of federal criminal offenses, and throughout which, by the express language of the Bail Reform Act, the protection of the presumption of innocence remains without modification or limitation. 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence.") *Second*, this kind of *per se* rule that a particular pretrial detention outcome is dictated by the alleged existence of a criminal enterprise is contrary to the language and purposes of the Bail Reform Act, which direct that release or detention must be based on the individual circumstances of the person charged. *See Afyare*, 2011 WL 1397820, at *3; *Marroquin-Ramirez*, 2025 WL 1248652, at *3.

Nor is the government's contention borne out by its own statistics. According to data published by the United States Sentencing Commission, in fiscal year 2024, "13.2% of alien smuggling offenses involved an unaccompanied minor." UNITED STATES SENTENCING COMM'N, *Alien Smuggling*, https://www.ussc.gov/research/quick-facts/alien-smuggling. While reasonable

minds can differ as to what constitutes "regularly," the Court does not find that 13.2% is a regular occurrence. Further, the Court cannot find from the evidence presented by the government that unaccompanied minors, even when smuggled, are inextricably "victims" within the meaning of § 3142(f)(1)(E). The Court supposes – or at least hopes – that if children are victimized as part of their undocumented entry into this country, the government would pursue appropriate human trafficking charges against the human traffickers.

The government also relies on a line of cases deciding that "involving a minor victim" as used in § 3142(e)(3)(E) (rebuttable presumption of detention) extends to conduct directed by defendants unknowingly at adult undercover law enforcement agents if the defendant intended to victimize a person under the age of 18. (Docket No. 14 at 6.) The government argues that "[i]f an offense that categorically, by its own facts, did not involve an actual minor was held to 'involve a minor' under § 3142(f)(1)(E), surely an offense that did involve actual minors was a part of a larger smuggling conspiracy should as well." (*Id.*) *See Kirkpatrick*, 2023 WL 4846620, at *6 (collection of cases). The problem with the government's argument is multi-fold.

*First*, the government fails to recognize that the mere alleged existence of a smuggling conspiracy does not meet the requirement for an individualized determination under § 3142(f)(1)(E), as discussed above. *Second*, the offenses charged in the *Kirkpatrick* line of cases were undisputedly crimes against children. *Third*, contrary to the government's characterization of *Kirkpatrick*, the central issue in that case was not a § 3142(f)(1)(E) determination but was instead the language used in § 3142(e)(3)(E) to define presumptive detention cases. While the Court does not disagree with the outcome of the precise issue in *Kirkpatrick*, the Court finds it does not provide helpful guidance here because of its different context and purposes.

The essence of the government's proof that this case involves a minor child is (1) an individual who occupied the vehicle driven by Abrego on November 30, 2022 was allegedly a minor at the time and (2) the testimony of Special Agent Joseph of hearsay statements of cooperating witnesses that Abrego typically travelled with his own children when allegedly transporting undocumented persons from Texas to other parts of the country. Special Agent Joseph testified that, during the traffic stop on November 30, 2022, one of the responding THP troopers obtained from all the individuals in the vehicle their name and date of birth.[15] A photograph of this roster was admitted as the government's exhibit. Each individual added their own name and date of birth to the roster. One individual's date of birth is listed as follows:



If accurate, this would mean that the individual was born in 2007 and had turned 15 shortly before the November 3, 2022 traffic stop.

Although the ordinary rules of evidence, including hearsay, generally do not apply in the detention hearing context, the Court must still assess the nature, quality, accuracy, and overall reliability of the information in considering the weight to be given to the evidence.[16] In the Court's

---

[15] Body camera footage of the traffic stop was also admitted as an exhibit and selected excerpts were played during the detention hearing. The audio stops at 1:08:11 of the admitted video, and never resumes.

[16] As a general matter, the Court notes the government's efforts to establish reliability of the cooperating witnesses' statements. Some of the witnesses gave grand jury testimony. However, other than the statements of one female cooperating witness whose grand jury testimony was the sole source of Special Agent Joseph's testimony, it was not clear from Special Agent Joseph's testimony which of the other witness statements were under oath, as the witnesses were also interviewed, sometimes multiple times. Special Agent Joseph also testified to corroboration of isolated statements of the cooperating witnesses through public records and Abrego's phone

view, there is a direct correlation between the importance of the evidence and the level of reliability. The more critical the evidence is, the more demanding the measure of reliability.

Here, the Court finds that the origination of the roster and the circumstances surrounding its creation are so remote and attenuated from Special Agent Joseph's testimony that it cannot be given the conclusive weight for which it is offered by the government. The exhibit on which the government relies is a photograph taken by THP Trooper Foster, not by Special Agent Joseph – first layer of hearsay – of a document prepared at the request of THP Trooper Foster – second layer of hearsay – by the occupants of the vehicle driven by Abrego – third layer of hearsay. While the body camera footage – which is itself hearsay – includes the passing around of a piece of paper among the vehicle occupants at the direction of a THP trooper on the scene, the detail of the roster is visible only briefly in the body camera footage. A still shot of the roster detail from the body camera footage was also admitted as a government exhibit.

Clearly, the most reliable evidence of the accuracy of the information in the roster would be the testimony of the individual who wrote down that information. Special Agent Joseph testified that, although HSI has identified and located six of the nine other people in the vehicle driven by Abrego on November 30, 2022, they have not located the individual who is purported to have provided a birth year of 2007. Absent that individual's testimony, the next most reliable source about the accuracy of the roster information would be the testimony of THP Trooper Foster. If subject to examination, THP Trooper Foster could be asked whether he considered the 2007 birth year to be reasonable based on his observation of the individual who provided the information.

---

records. In assessing the reliability of the cooperating witnesses' statements, the Court has taken into consideration the extent of independent corroboration.

Did the passenger look like a 15-year-old? Was he shaving yet? Was he slight of build? But THP Trooper Foster was not offered as a witness.

According to Special Agent Joseph, THP Trooper Foster's body camera footage was purged and is no longer available. Special Agent Joseph additionally testified that THP Trooper Foster took photographs of the passports of the occupants of the vehicle, which would have confirmed the accuracy of the 2007 birthdate. However, even though the photograph of the roster was produced, the photographs of the passports cannot be located, according to Special Agent Joseph's testimony.[17]

Additionally, defense counsel argued at the detention hearing that the 7 in the written birth year of 2007 appears to have been modified from a 1. That is not entirely without foundation, as there does appear to be some overwriting of the 7. Further, there is a question about whether the 7, even if not edited, is a number seven (7) or a number one (1). If a number one (1), then the individual with that birth date was born in 2001, not 2007. The number one (1) and the number seven (7) are among the letters, symbols, and numbers sometimes described as visually ambiguous characters because they can be indistinguishable in many types of print and especially in handwriting. *See, e.g.*, Leslie Proctor, *Misidentification of Alphanumeric Symbols*, Patient Safety & Quality Healthcare (Inst. for Safe Med. Prac.) (Aug. 11, 2014) (collecting references) https://www.psqh.com/analysis/misidentification-of-alphanumeric-symbols/. A careful review of

---

[17] According to Special Agent Joseph, THP Trooper Foster also stated he is almost 100% certain that none of the vehicle occupants' passports had stamps from port of entry. However, the body camera footage, which the Court fully reviewed, does not show THP Trooper Foster taking any passport photographs or even that he was provided with passports. The Court recognizes that the footage is not from THP Trooper Foster's body camera. The footage does, however, appear to show THP Trooper Foster's entire interaction with the vehicle occupants.

the entire roster reveals that another birthdate, 04 April 1998 or 1999, includes a handwritten 1 that also resembles a 7:



If the individual was born in 2001, rather than 2007, he was not a minor at the time of the November 30, 2022 traffic stop.

The photograph of the roster is crucial evidence of the government's contention that the offense of which Abrego is charged involved a minor victim, which necessitates a high level of reliability. *See, e.g.*, *Baldinger*, 1985 WL 2043, at *7 n.9 (use of exclusively hearsay testimony carries risk of failing to meet evidentiary standards, particularly the more removed the testimony is from its original source). The government's entire argument that Abrego transported a minor on November 30, 2022 depends on the last digit in the birth year being 7 rather than 1. That the roster photograph invites this kind of scrutiny and supposition to resolve any doubts diminishes its reliability. The Court cannot find that the photograph is sufficiently reliable to satisfy the government's burden of showing that this case involves a minor victim for purposes of § 3142(f)(1)(E) without some other corroboration such as the missing photograph of the individual's passport, which THP Trooper relayed to Special Agent Joseph exists (or perhaps at least existed).

Nor is the government's request for a detention hearing saved by the other evidence upon which it relies, namely, the statements of cooperating witnesses that Abrego's own minor children typically accompanied him on his alleged cross-country transport of undocumented individuals. Again, because this evidence is crucial to the government's case, its reliability is weighed that much more carefully.

Special Agent Joseph testified that the first and second (male) cooperators testified or stated in interviews that Abrego typically took his children with him on trips during which he was allegedly smuggling undocumented people from one place to another. The first female cooperator testified to also having knowledge of this alleged conduct. Importantly, each cooperating witness upon whose statements the government's argument for detention rests stands to gain something from their testimony in this case.

The first cooperator, who provided interview statements and grand jury testimony, has two prior felony convictions, has previously been deported five times, and was released early from a 30-month federal prison sentence for human smuggling as part of his cooperation in this case. He is the purported domestic leader of the human smuggling organization in which Abrego is accused of participating. He has been granted deferred action on deportation in exchange for his testimony. Special Agent Joseph acknowledged on cross-examination that the first cooperator will likely be granted work release as part of the conditions of the halfway house in which he currently resides following his early release from prison.

The second cooperator is also an avowed member of the human smuggling organization and is presently in custody charged with a federal crime for which he hopes to be released in exchange for his cooperating grand jury testimony. He has also been previously deported and has requested deferred action on deportation in exchange for his cooperation. The second cooperator is a closely related family member of the first cooperator.

The first female cooperator is also closely related to the first and second male cooperators. She testified before a federal grand jury in Texas about the investigation of Abrego and has requested deferred action on deportation in exchange for her cooperation. Special Agent Joseph did not personally interview this first female cooperator.

The Court gives little weight to this hearsay testimony – double hearsay through Special Agent Joseph's testimony – of the first male cooperator, a two-time, previously-deported felon, and acknowledged ringleader of a human smuggling operation, who has now obtained for himself an early release from federal prison and delay of a sixth deportation by providing information to the government. Nor do the hearsay statements of the second male cooperator on this issue fare any better, as his requested release from jail and delay of another deportation depends on providing information the government finds useful. Even without discounting the weight of the testimony of the first and second male cooperators for the multiple layers of hearsay, their testimony and statements defy common sense.

Both male cooperators stated that, other than three or four trips total without his children, Abrego typically took his children with him during the alleged smuggling trips from Maryland to Houston and back, some 2,900 miles round-trip, as often as three or four times per week. The sheer number of hours that would be required to maintain this schedule, which would consistently be more than 120 hours per week of driving time, approach physical impossibility. For that additional reason, the Court finds that the statements of the first and second male cooperators are not reliable to establish that this case "involves a minor victim."

Further, the Court cannot extrapolate a finding that this case involves minor victims based on Special Agent Joseph's hearsay testimony about other hearsay testimony of the first female cooperator regarding her general observation that Abrego took his children with him during the activities of which he is accused in this case. That is simply too incidental to fall inside the line of "involves," wherever that might be. Nor does this general, non-descriptive double hearsay testimony provide a factual basis from which the Court can find that any minors were "victims" within the meaning of § 3142(f)(1)(E).

27

The same is true for Special Agent Joseph's testimony, based on multiple layers of hearsay, about alleged complaints made to the second male cooperator by some other unidentified person at some unknown time about Abrego's supposed but undescribed inappropriate behavior toward minor females during transports. The Sixth Circuit recently rejected a district court's use of unreliable hearsay in the context of a sentencing determination, for which the rules of evidence are also relaxed. *Black*, 2025 WL 1356614, at *3–4 ("The unreliable nature of this police report is evident from its multiple layers of hearsay."). As in *Black*, the unreliability of the information here is evident from its multiple layers of hearsay. The lack of any specific details further adds to the unreliability of this testimony, which diminishes the weight it carries in the Court's assessment of the issues.[18]

For purposes of the determination of whether this case involves a minor victim, the Court finds that Special Agent Joseph's testimony regarding the roster from the THP traffic stop and the roster itself simply do not carry the conclusive weight necessary to support the government's contention that this case "involves a minor victim." Nor is Special Agent Joseph's testimony of the hearsay statements or testimony of the cooperating witnesses sufficiently reliable to afford it the weight necessary to satisfy the preponderance of the evidence showing required for a detention hearing under § 3142(f)(1)(E).

Finally, the Court finds no merit in the government's argument that minors are always "victims" in the context of a human smuggling case. The cases relied upon by the government, both of which involved sentencing determinations do not change this outcome. (Docket No. 14 at

_____

[18] The government seemed to suggest in its closing argument that the Court cannot find evidence unreliable for purposes of detention decisions without some "meaningful challenge" by the defense. The Court disagrees. At any rate, defense counsel adequately raised issues of reliability throughout Special Agent Joseph's testimony and in argument.

6-7 citing *United States v. Miguel*, 86 F. App'x 342, 344-45 (9th Cir. 2004) and *United States v. Dock*, 426 F.3d 269 (5th Cir. 2005)). As already stated, the Bail Reform Act precludes a blanket pretrial detention determination based on the alleged existence of a common enterprise. In fact, the Bail Reform Act requires just the opposite – individualized assessment of individual circumstances. In that respect, pretrial detention decisions may differ from sentencing determinations.[19]

For all these reasons, the Court finds the government has not shown that this case "involves a minor victim" under § 3142(f)(1)(E). The government is therefore not entitled to a detention on that basis.

### 2. Does the case involve a serious risk of flight within the meaning of § 3142(f)(2)(A)?

What constitutes a "serious risk of flight" for purposes of § 3142(f)(2)(A) is one that requires some precision of thought:

> It well may be that someone can pose a risk of "non-appearance" without posing a risk of "flight." The latter term seems to connote intentional and active movement to put oneself beyond the supervision of the court and the reach of criminal proceedings; this connotation is not inherent in the notion of "non-appearance," a term broad enough to cover negligent or other unintentional, and not just active and intentional, failures to appear. It would seem that "risk of flight" is a subset of "risk of non-appearance"—meaning that, depending on the circumstances suggesting a

---

[19] Further, unlike the phrase "involves a minor victim," in § 3142(f)(1)(E), which is undefined, the commentary to the sentencing guidelines provides a specific description of the term "vulnerable victims" as used in the sentencing enhancements in both *Miguel* and *Dock*:

> For purposes of subsection (b), "vulnerable victim" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable . . . and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.

U.S. SENT'G GUIDELINES MANUAL § 3A1.1 Note 2 (U.S. SENT'G COMM'N 2023). Moreover, and importantly, application of the "vulnerable victims" enhancement in *Dock* was based on actual, documented, horrific harm to immigrants. There is no such evidence here.

serious risk of non-appearance, a risk of non-appearance may not entail a risk of
flight.

*White*, 2021 WL 2155441, at *8. If Congress had intended "serious risk of flight" in §
3142(f)(2)(A) to be used interchangeably with a risk of nonappearance that cannot be remediated
by conditions of release under § 3142(g), it would have used the same language in both parts of
the statute, but it did not. *Id*. at *6–11. *See also United States v. Cobix-Espinoza*, 655 F. Supp. 3d
584, 587–94 (E.D. Ky. 2023) (collection of cases); *United States v. Runsdorf*, No. 9:22-08015-
WM, 2022 WL 303548, at *4 (S.D. Fla. Jan. 24, 2022) ("And, the question whether there is a
serious risk that the defendant will 'flee' is also distinct from the later inquiry whether conditions
of release will reasonably assure the defendant's 'appearance' as required."); *United States v.
Gibson*, 384 F. Supp. 3d 955, 965 (N.D. Ind. 2019) ("While Congress chose to use 'serious risk of
flight' in subsection (f)(2)(A) to describe th[e] limited scenario under which a defendant will face
a detention hearing, Congress settled on very different language when describing the analysis
courts must undertake once a detention hearing goes forward."). Put another way, "serious risk of
flight" is what allows the government to move for detention in the first place and risk of
nonappearance is taken into consideration only if a case is detention eligible.

 The *White* decision adopts this definition of risk of flight: *a risk that the defendant will
intentionally avoid appearing in court as required*. 2021 WL 2155441, at *10. See also *United
States v. Rodriguez-Fuentes*, No. 5:24-CR-00122-KKC-MAS, 2025 WL 711955, at *2 (E.D. Ky.
Mar. 5, 2025) ("[R]isk of flight connotes *intentional* evasion of prosecution, as opposed to risk of
nonappearance, which may stem from various factors, including negligence, logistical issues, or
misunderstanding of court obligations.") (citing *White*, 2021 WL 2155441, at *8). The Court
agrees with the well-reasoned explanation in *White*, finds no need to restate it here, and will simply
apply the definition as articulated.

To support its position that a detention hearing is required in this case because there is a serious risk that Abrego will flee, the government makes three main arguments: (1) Abrego is more likely to flee because he faces a "potentially lengthy sentence" if convicted; (2) assuming Abrego is released and not immediately placed in the custody of ICE, Abrego is more likely to flee to avoid being deported from the United States; and (3) Abrego is a gang member who is "used to living in the shadows," and therefore has more resources to aid him in fleeing. Even though this case, like every other case, involves some risk of flight, the Court finds that the government did not meet its burden of showing a "serious" risk of flight as required to obtain a detention hearing under § 3142(f)(2)(A).

The severity of a potential sentence is not a determinative consideration in whether § 3142(f)(2)(A) applies to permit a detention hearing. In the context of "serious risk of flight,"

> federal crimes are generally serious with serious penalties, and yet under the Bail Reform Act release is generally favored in federal criminal cases—as it should be, since locking up persons prior to conviction should be something of a last resort.

*White*, 2021 WL 2155441, at *13.[20] By extension, a "serious risk of flight" requires something more, some extraordinary potential outcome. Yet here, as in *Whit*e, the seriousness of the offenses charged "by no means stand[] out." *Id*. In the scheme of federal crimes, transportation of undocumented immigrants is not among the charges that might immediately come to mind as a serious charge. As described by ICE, human smuggling is a transportation-based crime, often involving people who are voluntarily undertaking the risk of entering and moving about this country without documentation. *See* The Cornerstone Report, *Human Trafficking vs Human Smuggling*, Vol. XIII, No. 1, Summer 2017, p.1.

---

[20] The defendant in *White* was charged with bank larceny and conspiracy to commit bank larceny. 2021 WL 2155441, at *13.

The offenses of which Abrego is charged carry a statutory penalty "for each alien in respect to which such a violation occurs." 8 U.S.C. § 1324(a)(1)(A)(i) and (B)(i). While the government contends that the potential penalty in this case is up to 90 years in prison, the cases relied on the by the government do not support that Abrego faces a sentence of that magnitude. In fact, those cases appear to suggest that the entire penalty provision reads as a single sentence (through its various fragmentary subparagraphs), making it clear that the "for each alien" and the "first or second violation" provision are to be read together. *United States v. Ortega-Torres*, 174 F.3d 1199, 1200–02 (11th Cir. 1999). *See also United States v. Bethel*, No. 22-14025, 2023 WL 7436912, at *1–2 (11th Cir. Nov. 9, 2023). It therefore appears that a single transaction involving three aliens (as that reference is used in the statute) may count as a first, second, and third violation, thus triggering the mandatory minimum 5-year prison sentence. However, the maximum sentence is 15 years, not 10 years per undocumented individual. *Id.* at *1 ("Under 8 U.S.C. § 1324(a)(2)(B), a person who smuggles illegal aliens into this country for commercial advantage or private financial gain will be fined or imprisoned based 'each alien in respect to whom a violation of this paragraph occurs' and 'in the case of a first or second violation of subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years'").

Further, of the approximately 14 convictions of human smuggling in this district since May 2005,[21] the sentences ranged from time served or probation up to 64 months, with an average sentence of 12 months. This is consistent with data published by the United States Sentencing Commission showing that in FY 2024 the "average sentence for alien smuggling was 15 months."

---

[21] The Court indicated in the detention hearing that it was unable to find any other human smuggling cases in this district. However, a better refined CM/ECF search located 13 cases, with a total of 20 individual defendants charged with human smuggling. Of these individual prosecutions, 2 resulted in acquittals, 2 were dismissed upon the government's request, and 2 were transferred out-of-district under Fed. R. Crim. P. 20.

UNITED STATES SENTENCING COMM'N, *Alien Smuggling*, https://www.ussc.gov/research/quick-facts/alien-smuggling. The Court is unconvinced that the potential sentence Abrego faces if convicted as charged is so extraordinary as to compel finding that this case involves a serious risk of flight for purposes of § 3142(f)(2)(A). *White*, 2021 WL 2155441, at *13.

This is further bolstered by the testimony of Special Agent Joseph that the first male cooperator was serving a 30-month sentence for human smuggling. Additionally, the statutory factors to be considered in imposing a sentence following conviction of a federal crime also direct that "[t]he court shall impose a sentence sufficient, but not greater than necessary . . . [and] in determining the particular sentence to be imposed, shall consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). From all of this, the Court is unable to find that the possible sentence Abrego faces if convicted is so severe that it engenders a serious risk that Abrego will intentionally flee.

Otherwise, the Court finds nothing in Abrego's history to suggest that he is a flight risk for purposes of § 3142(f)(2)(A). There is no allegation, much less evidence, that he has intentionally failed to appear in court in the past. While Abrego lacks community ties specifically in this district, that circumstance "may be probative of his risk of unintentional non-appearance in this district, but it is not very probative of whether he would intentionally not show up here and instead choose the path of a fugitive." *White*, 2021 WL 2155441, at *13. Overall, the government simply has not shown a serious risk that Abrego will intentionally avoid appearing as required.

Nevertheless, the government further contends that Abrego poses a serious risk of flight because of his immigration status, even while acknowledging that he will, if released, "likely be placed" in ICE custody. (Docket No. 14 at 9.) The government speculates that, if Abrego is not

immediately taken into ICE custody, he would have "enormous reason to flee" because a conviction in this case jeopardizes his immigration status. (*Id.* at 9.) Abrego argues in his papers that he may now have stronger bases against deportation. (Docket No. 29 at 12.)

The extent to which district courts take into consideration the existence of concurrent immigration proceedings in connection with detention decisions under the Bail Reform Act varies. Some courts treat the existence of an ICE detainer[22] as completely irrelevant, at least as to preemption or preclusion of application of the Bail Reform Act, reasoning that no such automatic exception to the Bail Reform Act exists. *See, e.g.*, *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019) ("A defendant's immigration detainer is not a factor in this analysis, whether as evidence for or against a finding that the defendant poses a risk of nonappearance [under § 3142(g)]."); *United States v. Barrera-Omana*, 638 F. Supp. 2d 1108, 1111 (D. Minn. 2009) (allowing ICE detainer exception negates clear statutory language of the Bail Reform Act that requires an individualized assessments of individuals before the court); *Marroquin-Ramirez*, 2025

_____

[22] An authorized immigration officer may issue an ICE detainer, which "serves to advise another law enforcement agency that the Department [of Homeland Security, or DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). The detainer is a "request that such agency advise [DHS], prior to release of the alien, in order for [DHS or ICE] to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." *Id.* This regulation further provides that "such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department." 8 C.F.R. § 287 .7(d).

This regulation, 8 C.F.R. § 287.7, "requires only that the official upon whom [ICE] has served a detainer hold the alien, who could otherwise no longer be lawfully detained, for up to 48 hours in order to permit [ICE] to assume custody of him." *Rivas v. Martin*, 781 F. Supp. 2d 775, 782 (N.D. Ind. 2011) (citing *Royer v. INS*, 730 F.Supp. 588, 591 (S.D.N.Y. 1990); *Moreno Escobar v. U.S. Dep't of Justice*, No. Misc. 05–0048, 2005 WL 1060635, at *1 (E.D. Pa. 2005)). In other words, the existence of an ICE detainer is not custody. *United States v. Aleman-Duarte*, No. 3:19-CR-149-PLR-DCP, 2020 WL 236870, at *3 (E.D. Tenn. Jan. 15, 2020). Rather, a detainer is merely a request by ICE for the court to hand over the defendant when the court's business with that defendant is concluded. *Id.* (citation omitted).

WL 1248652, at *5 ("As distinct from a defendant's connections to a foreign country, likelihood of deportation, fear of deportation, previous deportations, or other similar factors, an immigration detainer's appropriate role in deciding whether to order a detention hearing, or to order detention, is as follows: none."); *United States v. Montoya-Vasquez*, No. 4:08CR3174, 2009 WL 103596, at *5 (D. Neb. Jan. 13, 2009) (" . . . it would effectively mean that no aliens against whom an ICE places a detainer could ever be released on conditions. Such a harsh result in nowhere expressed or even implied in the [Bail Reform Act].") This Court likewise declines to abandon the individualized assessment mandated by the Bail Reform Act and does not find that an ICE hold on the person will always preclude a detention hearing under § 3142(f)(2)(A).

In this particular case, the Court finds that the undisputed ICE detainer obviates any serious risk of flight because there is no suggestion that, if Abrego is released, the action taken by the government will be anything other than detaining him in ICE custody pending further removal proceedings. In a case similar to this, a sister court in Tennessee held that when there is undisputedly an ICE hold against a defendant, the government cannot satisfy its threshold burden under § 3142(f)(2)(A) to show that there is a serious risk the defendant will flee because "[a]s long as [a defendant] remains in the custody of the executive branch, albeit with ICE instead of the Attorney General, the risk of his flight is admittedly nonexistent." *Mendoza-Belleza*, 420 F. Supp. 3d at 718. The same is true here.

To the extent the government asserts that Abrego is a flight risk under § 3142(f)(2)(A) because he may be deported and then unable to appear, the Court finds no merit in that argument. A person's likely removal from the jurisdiction of this Court against his will is not a risk that he will flee. Flight, for purposes of § 3142(f)(2)(A) requires a volitional act on the person's part. *See United States v. Ailon-Ailon*, 875 F.3d 1334, 1349 (10th Cir. 2017) (the risk of flight under §

3142(f)(2)(A) does not, as matter law, include "the risk that ICE will involuntarily remove the defendant"); *United States v. Martinez*, No. 1:25-CR-00142-BMB, 2025 WL 1295180, at *2 (N.D. Ohio May 5, 2025) ("[A]s a number of courts have held, the concept of 'flight' involves a volitional act on the part of the defendant."); *White*, 2021 WL 2155441, at *12 (risk of flight is intentionally not appearing in court as required).[23]

Although the government alleges that Abrego's "new-found prominence puts him in a unique (and unignorable) position to potentially use the sympathy of misguided strangers to further his evasion of the United States government, were he to be released" (Docket No. 14 at 11), the government offered no evidence from which the Court can conclude or even assess the likelihood that Abrego would actually do so. *Id.* at *13. Of equal consideration are the arguments of Abrego's counsel that he is one of the most recognizable people in the news right now and that he is just as likely to be turned in as to be given refuge. In the absence of specific, concrete evidence, the Court declines to overlook the requirements of the Bail Reform Act in speculation of the impact of Abrego's current notoriety.

For all these reasons, the government has not, in the Court's view, shown a risk of flight that, by a preponderance of the evidence, rises to the level of "serious" to entitle the government to a detention hearing under § 3142(f)(2)(A).

---

[23] The Court recognizes that some courts have employed a multi-factor test in determining risk of flight of undocumented persons when the charge is illegal reentry in violation of 8 U.S.C. § 1326. *United States v. Figueroa-Alvarez*, 681 F.Supp.3d at 1139-40 (citing *United States v. Santos-Flores*, 794 F.3d 1088, 1092 (9th Cir. 2015). Because this is not an illegal reentry case, the Court finds those factors do not apply here.

**3. Does the case involve a serious risk that Abrego will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror, within the meaning of § 3142(f)(2)(B)?**

The government is entitled to detention hearing under § 3142(f)(2)(B) if it can establish by a preponderance of the evidence that this case involves a serious risk that Abrego will obstruct justice or threaten, injure, or intimidate a witness, or will attempt to take any of those actions. The government contends that Abrego's alleged association with the MS-13 street gang, known for its "unequivocal and extensive history for violence, intimidation, and obstruction" (Docket No. 14 at 14), and his alleged participation in the charged smuggling conspiracy, including alleged intimidating interactions with cooperating witnesses, establish a serious risk of conduct that falls within the scope of § 3142(f)(2)(B). The government also argues that the allegations in connection with two temporary orders of protection obtained by Abrego's wife, Jennifer Vasquez, in August 2020 and May 2021 demonstrate that Abrego is the kind of person who would have little compunction about trying to obstruct justice. The Court is not convinced.

The key question under § 3142(f)(2)(B) is whether the person will attempt to interfere with the integrity of a specific judicial proceeding, not the broader scope of the person's past conduct. *United States v. Lamar*, 600 F. Supp. 3d 714, 722 (E.D. Ky. 2022) ("The Court perceives a critical distinction between efforts to conceal ongoing criminal activity and an attempt to obstruct justice or otherwise interfere with the integrity of a judicial proceeding once instituted.") (citing *United States v. DeGrave*, 539 F. Supp. 3d 184, 199–200 (D.D.C. 2021) (collecting cases)). *See also United States v. Demmler*, 523 F. Supp. 2d 677, 683 (S.D. Ohio 2007) ("[T]he Court will not assume that just because [a defendant] has been charged with . . . obstruction of justice, he is likely to commit these same offenses again during the course of these proceedings. Indulging such an assumption would be tantamount to creating a per se rule of detention in cases involving witness

tampering and obstruction."); *United States v. LaLonde*, 246 F. Supp. 2d 873, 875–76 (S.D. Ohio 2003) (vacated magistrate's judge's order detaining the defendant, even though, in past prosecutions, the defendant had contacted witnesses and had used a private investigator to learn the identities of potential witnesses against him). This limited approach is the most intellectually and jurisprudentially consistent with the construct of the Bail Reform Act.

It is well-established that preventive detention is not authorized by the Bail Reform Act unless one of the § 3142(f) conditions for holding a detention hearing exists. *Ploof*, 851 F.2d at 10-11. Even when a person might otherwise have engaged in dangerous or obstructive acts, if unrelated to the federal prosecution that conduct alone is an insufficient basis for a detention hearing under § 3142(f)(2)(B). *Id*. *See also Twine*, 344 F.3d at 987 (Bail Reform Act does not allow for a detention hearing simply because a defendant is alleged to be a danger); *Byrd*, 969 F.2d at 110 ("[A] defendant's threat to the safety of other persons or to the community, standing alone, will not justify pre-trial detention."); *Romero-Martinez*, 2024 WL 965150, at *4) (quoting *United States v. Dillard*, 241 F.3d 88, 96 (2d Cir. 2000) (question of whether the defendant poses a danger to the safety of the community "cannot be considered unless the defendant is found to be eligible for detention under § 3142(f)).

The government cannot simply rely on the general reputation of a particular street gang to satisfy its burden under § 3142(f)(2)(B). *See* 18 U.S.C. § 3142(f)(2)(B) (government must show a serious risk that "the person" will obstruct justice or attempt to obstruct justice); *Ploof*, 851 F.2d at 10-11 (evidence of dangerousness unrelated to pending federal prosecution does not satisfy § 3142(f)(2)(B); *White*, 2021 WL 2155441, at *13 (analogously declining to find sufficient for purposes of § 3142(f)(2)(A) some generally alleged disrespect for the law by the defendant). Nor is a person's alleged involvement in a gang sufficient in itself to show a serious risk of obstructive

behavior that entitles the government to a detention hearing.[24] While gang membership may properly be considered for purposes of § 3142(f)(2)(B), the government must, in this context in this particular case, present specific evidence of Abrego's gang membership and of actions taken by Abrego that demonstrate a serious risk of obstructive conduct as it relates to the instant proceeding.

The government's evidence that Abrego is a member of MS-13 consists of general statements, all double hearsay, from two cooperating witnesses: the second male cooperator and N.V. Those statements are, however, directly inconsistent with statements by the first cooperator. In interviews, the second male cooperator, whose general unreliability the Court addressed above, stated broadly to Special Agent Joseph that Abrego was "familial" with purported gang members. Other than this vague statement, there is no evidence of when these interactions occurred or in what context (other than as general greetings), how the second male cooperator determined those

---

[24] The Court notes that it finds little usefulness in the string of cases cited by the government in its supplemental memorandum. (Docket No. 14 at 13.) Only one of the cases – *Heffington* – addresses gang membership specifically in the context of § 3142(f)(2)(B) standards. No. 1:08-cr-0024-OWW, 2009 WL 113275 (E.D. Cal. Jan. 15, 2009). The facts of the *Heffington* case are clearly distinguishable, including that the defendant in that case was an admitted member of Hell's Angels outlaw motorcycle club, with a history of maintaining violent behavior in obstruction of ongoing felony criminal proceedings. *Id.* at *4-5. The other cases, if referring to gangs at all, reference gang membership only in assessment of § 3142(g) release conditions or whether alleged gang involvement is an indicator of continuing behavior for some other purpose, but not in an analysis of § 3142(f)(2)(B). Although § 3142(f)(2)(B) is alleged as an alternative basis for a detention hearing in some of the cases, that determination was not critical to those courts' determinations and § 3142(f)(2)(B) was noted only in a footnote or by passing reference and not otherwise discussed. In some cases, the other bases for a detention hearing included categorical crimes under § 3142(f)(1) or implicated a presumption of detention under § 3142(e)(3), neither of which support the government's request for a detention hearing in this case. Because the Court finds the cases to be of little assistance, it does not take the time here to discuss each one in detail.

other unidentified individuals to be known gang members, or precisely how some perceived interaction between Abrego and other unidentified individuals substantiates gang membership.

Cooperating witness N.V. stated to Special Agent Joseph that she "believed" Abrego to be a member of MS-13. N.V. is a 20-year-old female individual who gave interview statements, but not sworn testimony, of her interactions with Abrego from more than five years earlier, when she was 14 or 15 years old. She has been previously compensated for providing information to law enforcement but is not receiving compensation in this case. NV's family is also affiliated with the 18th Street or 18 Barrio gang. Other than N.V.'s general belief about Abrego's gang membership, no other testimony was offered of when, in what context, how, or why N.V. came to arrive at that belief.

Contrary to the statements of the second cooperator and NV, the first male cooperator told Special Agent Joseph that, in ten years of acquaintance with Abrego, there were no signs or markings, including tattoos, indicating that Abrego is an MS-13 member. This statement specifically repudiates any outward indicia that Abrego belongs to MS-13, in stark contrast to the non-specific second cooperator's and N.V.'s feelings that Abrego may belong to MS-13. Given these conflicting statements, the government's evidence of Abrego's alleged gang membership is simply insufficient.

Further, the evidence upon which the government relies as suggesting some pattern of intimidating or threatening conduct by Abrego is similarly lacking. The hearsay statement of the second male cooperator to Special Agent Joseph was generally that during some confrontation with Abrego on some unspecified date, Abrego did not take well to being counseled or scolded, which made the second male cooperator feel intimidated. Special Agent Joseph offered no other

details of when this argument occurred, the specific language purportedly used, or any other conduct of Abrego from which an objective assessment of serious risk of intimidation can be made.

By comparison, for example, in a similar consideration of the showing required under § 3142(f)(2)(B), this Court, in another case, found that the government met its burden with "strong evidence." *United States v. Busbin*, No. 3:23-CR-00182, 2024 WL 1313880, at *2–4, 6–7 (M.D. Tenn. Mar. 27, 2024). That evidence, which was collected from the publicly accessible social media accounts of the defendant, his spouse, and his brother, specifically targeted individuals who were "instrumental" to the government's prosecution with the express purpose of "injuring the professional reputation of, causing fear in, and/or intimidating [those] individuals," and which continued after judicial proceedings were initiated against the defendant. *Id.*

Here, the government's evidence of hearsay testimony of a cooperating witness's general feeling of intimidation without any description of specific language used or actions taken by Abrego is not enough to establish by a preponderance that Abrego poses a serious risk of obstructing justice within the meaning of § 3142(f)(2)(B).[25]

Nor does the Court find that the circumstances of the temporary orders of protection obtained by Ms. Vasquez carry the day. The Court is neither diminishing the seriousness of those allegations nor condoning any of the behavior alleged. Nor is the Court suggesting that Ms. Vasquez was not truthful or not justified in her request for the orders of protection. The Court must simply consider the context and the purposes for which the evidence is now offered. *See Zhang*, 55 F.4th at 149–50 (considerations under Bail Reform Act may be assessed differently and may

---

[25] Given the volume of resources committed to the government's investigation of Abrego since April 2025, according to Special Agent Joseph, the Court supposes that if timely, more specific, concrete evidence exists of Abrego's alleged MS-13 gang membership or a consistent pattern of intentional conduct designed to threaten or intimidate specific individuals, the government would have offered that evidence at the detention hearing.

41

carry different weight depending on purposes). The orders of protection were based on events that, according to the supporting affidavits, occurred in 2020 and 2021. Both petitions were dismissed within one month of issuance without a final evidentiary hearing. There is no evidence that Abrego violated either order of protection – in other words that he interfered with the judicial proceeding – during the time the orders of protection remained in effect. There is no evidence of any similar occurrences since 2021. Nor any evidence that Ms. Vasquez is anything other than fully supportive of Abrego, as evidenced by her appearance at the detention hearing. The Court simply cannot find that *ex parte* temporary orders of protection from more than four years ago, without something more, rise to the level of "serious" risk of intimidation.[26] *See Ploof*, 851 F.2d at 11 ("[W]e do not think that the preventive detention provisions of the Bail Reform Act were meant to be invoked in order to safeguard a state domestic relations proceeding unrelated to the federal proceeding that has given rise to the defendant's bail hearing."); *White*, 2021 WL 2155441, at *13 (uncharged conduct and pending criminal charges carry little weight in assessment of § 3142(f)). In sum, the government's evidence does not establish, by a preponderance, that Abrego poses a serious risk of obstruction or intimidation.

For all these reasons, the Court finds that government failed to demonstrate a sufficiently supported basis for a detention hearing under § 3142(f). For that reason, Abrego must be released. Nevertheless, for the reasons discussed below, the Court finds that, even if the government were entitled to a detention hearing, there is insufficient basis upon which to detain Abrego.

---

[26] Additionally, as discussed in more detail below, even if this evidence were sufficient to warrant a detention hearing under § 3142(f)(2)(B), the Court can impose conditions of release to reasonably assure the safety of Ms. Vasquez and her children.

**B.     Are there conditions of release that will reasonably assure the appearance of the defendant and the safety of the community?**

Notwithstanding the conclusion that this is not a detention-eligible case, the Court has also considered the evidence for purposes under § 3142(g) and finds that there are conditions of release that can be imposed to reasonably assure Abrego's appearance in court and to reasonably assure the safety of other persons and the community. *See* 18 U.S.C. § 3142(e)(1) (detention permitted only if "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community"). To prevail, the government must show likelihood of nonappearance by a preponderance of the evidence and must present clear and convincing evidence of dangerousness. *Hinton*, 113 F. App'x at 77; *Stone,* 608 F.3d at 946 (citing 18 U.S.C. § 3142(f)). Upon consideration of the totality of the circumstances, the weight of the factors set forth in § 3142(g) compels Abrego's release, but upon certain conditions.[27]

**1.     Nature and circumstances of offenses charged**

The first consideration for the Court under § 3142(g) is the nature and circumstances of the offenses charged. 18 U.S.C. § 3142(g)(1). As noted by the Sixth Circuit, for purposes of the Bail Reform Act, Congress thought it was especially significant if the nature and circumstances of the offense charged involve a minor child. *Stone*, 608 F.3d at 947. *See also* 18 U.S.C. § 3142(g)(1). This is notably distinct from the language of § 3142(f)(1)(E), which does not expressly direct consideration of the circumstances of the offense.

---

[27] The Court will not again recite the deficiencies in the government's evidence and will, instead, simply state that the lack of reliability and specificity are of at least equal significance in consideration of § 3142(g) likelihood of nonappearance and even more compelling when considered under the clear and convincing evidentiary standard required for a § 3142(g) finding of dangerousness.

Abrego is charged with human smuggling, not human trafficking, which the Court finds noteworthy for purposes of all the § 3142(g) factors, including this one. While the Court must consider whether the circumstances of the human smuggling charges involve minor victims for purposes of § 3142(g)(1), for the reasons discussed above, the Court gives little weight to the government's evidence of the involvement of minor victims.

The government additionally elicited hearsay testimony from Special Agent Joseph that cooperating witnesses described complaints from other sources about Abrego's alleged inappropriate conduct toward minor females during transportation.[28] The Court gives no weight to this evidence. Although the second male cooperator testified before the grand jury, the original complaints apparently came from someone else, which makes the testimony at least three, if not four or more, levels of hearsay. That the level of hearsay cannot even be determined renders the evidence patently unreliable. In addition, the source of the original complaints was not identified. Nor were any details provided about the specifics of the complaints, including what happened, when it happened, where it happened, or any other context. Essentially, the testimony is completely lacking in any who, what, when, where, or how. The bounds of reliable evidence simply do not extend that far.

The government also offered evidence, through Special Agent Joseph's testimony, of various general allegations by the first and second male cooperators of Abrego's access to firearms and drugs. The first cooperator, the leader of the human smuggling operation, in a changed statement from his initial interview, stated that he was a collector and buyer and seller of guns, that he would regularly give guns to his drivers, and that he gave one or two to Abrego, who took them

---

[28] The government also offered this as evidence of Abrego's alleged dangerousness under § 3142(g)(2) and (4).

back to Maryland during transports.[29]  The second cooperator made similar statements about witnessing Abrego purchase and transport guns.

If truthful, these circumstances are concerning. However, the reliability of the evidence is questionable, which detracts from the weight it will be given. The first cooperator only provided this information in a second interview, described in Special Agent Joseph's testimony as "different or evolved" from the first interview.  Further, there is no other evidence of Abrego possessing firearms. He has no criminal history that involve firearms. Nor do either of the affidavits submitted by Ms. Vasquez in support of orders of protection indicate Abrego possessed or had access to guns. These circumstances contradict the cooperating witness statements. Even if this evidence slightly weights this factor in favor of detention, given that is the only evidence of firearms, the Court finds it can impose conditions of release to remediate against any danger by prohibiting Abrego from possessing any firearms, ammunition, or other dangerous weapons and directing a third-party custodian to monitor his compliance.

Special Agent Joseph also testified that the second cooperator observed Abrego at least once transporting drugs. No other detail was provided. The Court notes, however, that during the November 30, 2022 traffic stop, the THP utilized a trained canine that did not alert to the possibility of any drugs in the vehicle. And there is no evidence that Abrego has any history of drug use or drug charges. These together refute the second cooperator's hearsay statements. Further, the Court can impose mitigating conditions of release, such as random drug testing and a third-party custodian.

---

[29] The first cooperator's admitted prior criminal history at least suggests that he might be prohibited from possessing firearms. If so, it is unclear whether the first cooperator is receiving immunity from prosecution or some other concession for this information.

Otherwise, the human smuggling is, by ICE's own description, a transportation-based offense. That the specific incident of which Abrego is charged occurred more than two and a half years ago further weights this factor in favor of release. Overall, the Court finds that the nature and circumstances of the offenses charged here support release.

### 2. Weight of evidence

The weight of the evidence is not of Abrego's guilt, but, rather, evidence of dangerousness and of the likelihood that he will not appear as required. *Stone*, 608 F.3d at 948. In weighing the strength of the evidence, the Court may not modify or limit the presumption of innocence. 18 U.S.C. § 3142(j).

The government's evidence of dangerousness, which must be clear and convincing, consists primarily of: (1) his alleged interactions with minor females during transports (as discussed above); (2) general testimony about a mass casualty occurring outside the United States not involving Abrego; (3) general allegations of Abrego's propensity for guns and drugs (as also discussed above); and, (4) his interactions with N.V. For the reasons discussed above in consideration of other factors, the Court gives no weight to the government's evidence of alleged interactions between Abrego and minor females during transports because it is simply too unreliable.

The government relies heavily on the orders of protection against Abrego obtained by Ms. Vasquez. The circumstances upon which the orders of protection were based are serious and not taken lightly by the Court. There is however no evidence of any similar conduct by Abrego in the last four years. The underlying petition for the August 2020 protective order was dismissed in September 2020. The Court also notes that Ms. Vasquez requested recission of the August 2020 order of protection shortly after its issuance because Abrego agreed to continue counseling. The second petition, upon which the May 2021 protective order was based, was dismissed in June

46

2021. The Court can require, as a condition of release, that family and other mental health or anger management counseling resume.

To the extent that the safety of N.V. is a continuing concern, which is not apparent from the evidence, the Court can also restrict Abrego from any contact with her. The government's evidence suggests that Abrego has not had any communication with N.V. in the last five years. Notably, Abrego is not charged with any crime related to his prior interactions with N.V. Even in a case in which a person is actually charged with serious crimes against minors, unless the government carries its burden of showing dangerousness by clear and convincing evidence, the Bail Reform Act allows release with specific conditions to address any ongoing concerns. 18 U.S.C. § 3142(c). The attenuated alleged circumstances between Abrego and N.V. upon which the government relies as evidencing that Abrego is generally dangerous simply do not rise to the level necessary to find by clear and convincing evidence that he must be detained.

Overall, the Court cannot find from the evidence presented that Abrego's release clearly and convincingly poses an irremediable danger to other persons or to the community. The Court can impose the conditions described above. Specifically, the Court can restrict Abrego from any contact with the cooperators to address the government's stated concerns about their safety. To the extent necessary, the Court can also fashion conditions of Abrego's contact with Ms. Vasquez and his children.

Nor is there preponderating evidence for purposes of § 3142(g) that Abrego would be unlikely to appear to avoid prosecution. The Court can limit Abrego's travel within Maryland and to necessary trips to the Middle District of Tennessee for court appearances and attorney meetings. Along with a third-party custodian requirement, the Court can also impose home restrictions and location monitoring.

The Court finds unavailing the government's argument that Abrego must be detained to assure his appearance in this proceeding because he might otherwise be deported.  Nothing in the plain language of the Bail Reform Act excludes removable immigrants from consideration for pretrial release. Even though Congress established a rebuttable presumption that certain defendants should be detained, it did not include removable immigrants in that list. *See* 18 U.S.C. § 3142(e)(3). Under the government's argument, the carefully crafted individualized considerations required by the Bail Reform Act would be simply overruled by an ICE detainer, an outcome this Court is unwilling to adopt. To the extent any conflict exists regarding whether to prosecute or remove Abrego, "it is a matter for the Executive Branch to resolve internally." *Ailon-Ailon*, 875 F.3d at 1339.  *See United States v. Villatoro-Ventura*, 330 F. Supp. 3d 1118, 1132 (N.D. Iowa 2018) ("[I]n the absence of clear authority otherwise, [the court does] not find it appropriate for the federal courts to step in and save the Executive Branch from its own, baffling decisions.")

Because the Court can impose conditions to address any safety concerns or risk of nonappearance, the Court finds that the weight of the evidence of dangerousness and likelihood of nonappearance favor release.

### 3.    History and characteristics

The history and characteristics of the defendant within the meaning of the statute include "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). Also included is whether the person was on probation or parole at the time he committed the offense. 18 U.S.C. § 3142(g)(3)(B).

The general details of Abrego's personal history and characteristics were provided to the Court by Pretrial Services, as part of their statutory duties. Abrego has strong family ties, as

evidenced by the family members who attended the detention hearing. He also has strong ties to his community in Maryland, where he has lived for the past 13 years.

The Court recognizes there is some disagreement about whether the "community" in 18 U.S.C. § 3142(g)(3)(A) refers to the district of prosecution or some other community to which the person might have ties. *Compare United States v. Townsend*, 897 F.2d 989, 995 (9th Cir.1990) ("we hold that 'community' in this section of the statute embraces both the community in which the charges are brought and also a community in the United States to which the defendant has ties") *and United States v. Garcia*, 801 F.Supp. 258, 263 (S.D. Iowa 1992) ("While the Defendant has no ties to any community within the Southern District of Iowa, he clearly has substantial ties to Tucson, Arizona.") *with United States v. Alverez–Lopez*, No. 2:14–cr–45–FtM–38CM, 2014 WL 2882906, at *3 (M.D. Fla. June 25, 2014) (rejecting notion that ties to any community in the United States are sufficient, as opposed to community of prosecuting district). To the best of the Court's determination, the Sixth Circuit has not directly adopted either approach. Sister courts in this circuit have found that a person's lack of community ties to the prosecuting district favors detention. *United States v. Bucio*, No. 5:17-055-DCR, 2019 WL 4397334, at *3 (E.D. Ky. Sept. 13, 2019) (citing *United States v. Koubriti*, No. 01-CR-80778, 2001 WL 1525270, at *6 (E.D. Mich. Oct. 16, 2001)).

The Court does not disagree that lack of ties to the prosecuting district can weigh in favor of detention. That is particularly so, when as here, the person charged was only incidentally in the prosecuting district. That circumstance therefore weights this factor against release. Nevertheless, the Court finds that Abrego's strong ties to his Maryland community counterbalance his lack of

ties to the Middle District of Tennessee, and the strength of his other personal history and characteristics overcome any weight that his lack of local community ties adds to this factor.[30]

Prior to Abrego's removal to El Salvador in March of 2025, he was employed as a sheet metal apprentice and is a member of the Sheet, Metal, Air, Rail, and Transportation ("SMART") union. SMART is willing to continue Abrego's apprenticeship and assist him with finding employment. CASA, which is an advocacy and resources membership organization that, according to the letter admitted as a defense exhibit, provides wrap-around services for immigrant communities and others, is available to provide employment, healthcare, and other social support services to Abrego. Abrego has no demonstrated history of physical, substance abuse, or mental health issues. Further, CASA has pledged to help with reestablishment of primary health care and mental health services for Abrego, if necessary.

The government alleges that Abrego is a long-time, well-known member of MS-13, which the Court would expect to be reflected in a criminal history, perhaps even of the kind of violent crimes and other criminal activity the government describes as typically associated with MS-13 gang membership. But Abrego has no reported criminal history of any kind. And his reputed gang membership is contradicted by the government's own evidence as discussed above. While lack of a prior criminal history is not determinative, that fact weighs heavily in favor of release in this case given the claims of Abrego's gang membership.

The Court does not find that these circumstances, when considered together, compel a determination that Abrego poses a risk of danger to the community or has the proclivity and incentive to flee rather than face prosecution of this case. Further, the Court is persuaded that there

---

[30] While Abrego is originally from El Salvador, there was no evidence offered that he has any current ties to that country. There is also an immigration court order for withholding of his removal to El Salvador.

are conditions of release that will sufficiently regulate his conduct and that his strong family and community support will be motivation to successfully remain on pretrial release. For these reasons, this factor overall also weighs in favor of release.

4.    **Nature and seriousness of danger upon release**

Lastly, the Court considers the potential danger that Abrego poses to any person or the community under 18 U.S.C. § 3142(g)(4) if he is released. For all the reasons stated above, the Court finds that this factor likewise supports release on conditions.

Upon review of the evidence and taking all these factors into consideration, the Court finds the government failed to meet its burden of showing a properly supported basis for detention on grounds that Abrego poses an irremediable danger to the community or is likely not to appear. Rather, the Court finds that it can impose conditions of release to reasonably assure the safety of others and the community and Abrego's appearance. Ultimately, conditions of release are not intended to guarantee community safety or ensure a defendant's appearance, but rather serve to reasonably mitigate the risk of dangerousness and likelihood of nonappearance.

A hearing will be set by separate order to review conditions of release with Abrego and to provide for his release.

## VI.    CONCLUSION

For the reasons detailed above, the government's motion for detention (Docket No. 8) is **DENIED**. A separate order will enter, following hearing, directing Abrego's release on conditions.

**FURTHER**, the United States is advised of its right to seek review of this Order pursuant to 18 U.S.C. § 3145.

It is SO ORDERED.

BARBARA D. HOLMES
United States Magistrate Judge