IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA     )
                             )  Case No.
                             )  3:25-cr-00115
        v.                   )
                             )  District Judge Crenshaw
KILMAR ARMANDO ABREGO GARCIA )
                             )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE

DISTRICT JUDGE WAVERLY D. CRENSHAW, JR.

July 16, 2025

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

(APPEARANCES ON THE FOLLOWING PAGE)

PREPARED BY:
                LISE S. MATTHEWS, RMR, CRR, CRC
                    Official Court Reporter
                719 Church Street, Suite 2300
                     Nashville, TN 37203
                lise_matthews@tnmd.uscourts.gov

```
 1  APPEARANCES:

 2          For the Plaintiff:   Robert E. McGuire
                                 U.S. Attorney's Office
 3                               (Nashville Office)
                                 Middle District of Tennessee
 4                               110 Ninth Avenue, S
                                 Suite A961
 5                               Nashville, Tennessee 37203-3870

 6
            For the Defendant:   Sean Hecker
 7                               Jenna M. Dabbs
                                 Hecker Fink LLP
 8                               350 Fifth Avenue
                                 Suite 63rd Floor
 9                               New York, NY 10118

10                               Rascoe S. Dean
                                 Sherrard Roe Voigt & Harbison, PLC
11                               1600 West End Avenue
                                 Suite 1750
12                               Nashville, TN 37203

13
            Also Present:        Jason Harley
14                               Jeremy Franker

15

16

17

18

19

20

21

22

23

24

25
```

1                  **I N D E X**

2             Wednesday, July 16, 2025

3             INDEX OF WITNESSES

4

WITNESSES:                                  PAGE

5

6  PETER JOSEPH
          DIRECT EXAMINATION BY MR. MCGUIRE       11

7          CROSS-EXAMINATION BY MR. HECKER        50
          EXAMINATION BY THE COURT              78

8          EXAMINATION BY MR. MCGUIRE           83

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | PLAINTIFF'S EXHIBIT | MARKED FOR I.D. | RECEIVED IN EVD |
|---|---|---|---|
| 1 | CD containing body worn camera (BWC) footage and dash camera footage from the November 30, 2022, traffic stop | 12 | 12 |
| 2 | Photo of "roster" created by passengers during November 30, 2022, traffic stop | 16 | 16 |
| 3 | Photo of "roster" during traffic stop | 17 | 17 |
| 4 | Photo of phone number provided by defendant during traffic stop | 19 | 19 |
| 5 | Cell phone records for phone number ending in 5996 | 23 | 23 |
| 6 | Vehicle registration – Chevy Suburban | 14 | 14 |
| 7 | Judgment – CW-1 | 14 | 14 |
| 7A | **LATE-FILED** - Factual Basis | 16 | 14 |
| 8 | Record of Virginia Uniform Summons – July 24, 2021 | 25 | 25 |
| 9 | Order of protection petition 2020 | 85 | 85 |
| 10 | Order of protection petition 2021 | 85 | 85 |
| 11 | Snapchat messages from "soytugaa" | 32 | 32 |
| 13 | CAST report for number ending 5996 for November 29, 2022, to December 1, 2022 | 85 | 85 |
| 14 | Information regarding passengers on November 30, 2022 | 48 | 48 |
| 15 | Contact of "Kitmar Chofer" in CC-1 phone | 24 | 24 |

| DEFENDANT'S EXHIBIT (SEALED) | MARKED FOR I.D. | RECEIVED IN EVD. |
|---|---|---|
| 1  Homeland Security Investigation Report- Initial ROI Interview of CC-1, date approved 4/24/25; Reported by Waylon Hinkle | 89 | 89 |
| 2  Homeland Security Investigation Report Proffer Interview of CC-1, on April 24, 2025; reported by Waylon Hinkle | 89 | 89 |
| 3  Homeland Security Investigation Report Proffer Interview 2 of CC-1, date approved 4/29/25; Reported by Quardarius William | 89 | 89 |
| 4  Homeland Security Investigation Report Interview of CC-1, date approved 5/15/25; Reported by Peter Joseph | 89 | 89 |
| 5  Homeland Security Investigation Report Interview of CC-1, date approved 5/19/25; Reported by Peter Joseph | 89 | 89 |
| 6  Homeland Security Investigation Report Interview of CC-2, on May 5, 2025; Reported by Mitchell Lundquist | 89 | 89 |
| 7  Homeland Security Investigation Report Interview of CC-2, date approved 5/21/25; Reported by Peter Joseph | 89 | 89 |

 1          The above-styled cause came on to be heard on July

 2   16, 2025, before the Honorable Waverly D. Crenshaw, Jr.,

 3   District Judge, when the following proceedings were had,

 4   to-wit:

 5          THE COURT:  All right.  Be seated.

 6          All right.  Before we begin, I understand we have

 7   an interpreter somewhere.  So we -- I'll ask the courtroom

 8   deputy to swear in the interpreter.

 9          (Interpreters sworn.)

10          THE COURT:  All right.  We're here On Case Number

11   25-115, *United States of America versus Kilmar Armando Abrego*

12   *Garcia.*  And Mr. Garcia is here.  If counsel want to

13   introduce themselves on the record.

14          MR. MCGUIRE:  Good afternoon, Your Honor.  Rob

15   McGuire, Jeremy Franker and Jason Harley for the United

16   States, Your Honor.

17          MR. DEAN:  Good afternoon, Your Honor.  Rascoe

18   Dean, Jenna Dabbs and Sean Hecker on behalf of Mr. Abrego,

19   who is present in the court.

20          THE COURT:  All right.  So based on the prior

21   filings, I understand we're going to have one witness.  But

22   as a preliminary matter, the Court certainly wants to welcome

23   everyone here, appreciate the opportunity to be here.

24          Let me remind you that there is no cellphones

25   allowed within the courtroom.  And if the marshals were to

1  see a cellphone, they're authorized to confiscate that cell

2  phone.  We don't allow any recordings or videos of the -- of

3  such here in the courtroom.

4            Also, I understand some people may need to come in

5  and out.  If you're one of those people, I would appreciate

6  it if you would sit on the last row.  It just makes it less

7  distracting when people come in and out of the courtroom.

8            Additionally, the Court wants to put on the record

9  that I had a chambers conference with counsel for the

10  government, Mr. McGuire, and Mr. Dean, and at that time --

11  the Court, after talking to counsel, is going to set a trial

12  date for January the 27th, 2026, at 9 a.m.  I'm told that the

13  defendant has filed a speedy trial waiver, and that's going

14  to be part of the record here.

15            Additionally, I'm going to ask counsel to meet and

16  confer and present me with a scheduling order.  And I have a

17  sample scheduling order I want to share with you.

18            So I'll let you all study that and meet about it.

19  But what I would like to do is get a proposed date for you to

20  submit that to the Court, so we can do our paperwork to get

21  the case on the calendar.

22            Just tell me, when do you all want to do that?

23            MR. MCGUIRE:  I would say two weeks?

24            THE COURT:  Okay.

25            MR. DEAN:  That makes sense from Mr. Abrego's

1  perspective, Your Honor.

2          MR. MCGUIRE:  And if we can do it quicker, Your

3  Honor, we will submit it quicker.

4          THE COURT:  July 30th?

5          MR. MCGUIRE:  Yes, sir.

6          THE COURT:  Okay.  And that is only a sample.  If

7  counsel believes we need to include other things in there,

8  feel free to add that.

9          You'll see that I've -- I would like to have at

10 least two in-person status conferences that occur -- one in

11 October maybe, and then another one in December.  And prior

12 to the status conference, say about three to five days, file

13 a joint status report that covers the defendant's review of

14 discovery that's been produced by the government, any

15 anticipated motions, any impediments to trial, an assessment

16 of communications between the defendant and his lawyers, and

17 then anything else the lawyers want to bring to my attention;

18 if we need to have an in-person conference or not.

19         All right.  So we're here on the government's

20 de novo request to review the decision on detention.

21         In preparation, I've read Judge Holmes's opinion.

22 I've read the transcript created between -- before Judge

23 Holmes.  I've also read your briefs, and look forward to

24 discussing those with you.

25         I do want the record to reflect that I've read the

1  grand jury testimony of who I believe is female cooperator

2  number 1?

3          MR. MCGUIRE:  That's Correct, Your Honor.

4          THE COURT:  Good.

5          I've also reviewed the body cam video by the

6  Tennessee Highway Patrol person on November the 30th.  So

7  I've reviewed that.  I've looked at all the exhibits before

8  Judge Holmes, and hope we might talk about that.  And then

9  I -- I took a peek at some of the exhibits anticipated today.

10  And maybe we'll get to it, or we can just cover it now.

11          I see that there is -- Government's Exhibit Number

12  7, which appears to be a criminal judgment?

13          MR. MCGUIRE:  That's correct, Your Honor.

14          THE COURT:  And appears to be conduct that

15  occurred within the conspiracy alleged here?

16          MR. MCGUIRE:  That's correct, Your Honor.

17          THE COURT:  And I think I would like to see the

18  factual basis for the plea.

19          MR. MCGUIRE:  I don't have that, but I can get it,

20  Your Honor.

21          THE COURT:  Okay.  If you could late file that --

22          MR. MCGUIRE:  Yes, sir.

23          THE COURT:  -- I would appreciate it.

24          So with that, I'll turn to the parties.

25          Before we get started, anything, preliminary

1  matters?

2          MR. MCGUIRE:  No, Your Honor.

3          THE COURT:  From the defense?

4          MR. DEAN:  No, Your Honor.

5          THE COURT:  All right.  Let's call your first

6  witness.

7          MR. MCGUIRE:  We would call Agent Joseph, Your

8  Honor.

9          COURT DEPUTY:  If you'll stop here at the podium

10 to be sworn in.

11         Please raise your right hand.

12

13                  PETER JOSEPH,

14 called as a witness by Plaintiff, was duly sworn and

15 testified as follows:

16

17         COURT DEPUTY:  Please state your full name for the

18 record.

19         THE WITNESS:  Peter T. Joseph.

20         COURT DEPUTY:  You can have a seat at the witness

21 stand, and watch the ramp.

22         MR. MCGUIRE:  And, Your Honor, I -- I know the

23 Court has read the transcript, as the Court said, and

24 reviewed the -- the exhibits.

25         So, Your Honor, my -- the focus of my presentation

1  is really going to be on -- at a pretty high level and just
2  covering the things that maybe weren't covered in front of
3  Judge Holmes or had some --
4          THE COURT:  And I assume there's no objection.
5  I'm going to rely upon the transcript before Judge Holmes to
6  make a decision on the motion here for a de novo review.
7          MR. HECKER:  Yes --
8          THE COURT:  Okay.
9          MR. HECKER:  -- I think that's fine, Your Honor,
10 with one caveat, which is that in discovery there are certain
11 reports of interviews of some of the same witnesses who Agent
12 Joseph testified about on the 13th --
13         THE COURT:  Uh-huh.
14         MR. HECKER:  -- that defense counsel didn't have
15 at that hearing.  So we may wish to explore those prior
16 interviews today.
17         THE COURT:  In your cross-examination?
18         MR. HECKER:  Yes, Your Honor.
19         THE COURT:  Okay.  And you have copies for me?
20         MR. HECKER:  I will, Your Honor.
21         THE COURT:  Good.
22                      DIRECT EXAMINATION
23 BY MR. MCGUIRE:
24 Q.    And, sir, you are Agent P. Joseph with Homeland Security
25 Investigations; is that correct?

1  A.   Yes, sir.

2  Q.   And were you assigned to investigate a potential human

3  smuggling event that occurred in Putnam County, Tennessee on

4  November 30th, 2022?

5  A.   Yes, sir.

6  Q.   And when did you first become assigned that matter?

7  A.   On or about April 28th of 2025.

8  Q.   And as a part of your investigation, did you review body

9  camera footage from one of the troopers involved?

10 A.   Yes, sir.

11 Q.   And since then, have you -- since the time of the

12 detention hearing, have you now been able to interview all of

13 the troopers who responded that night?

14 A.   Yes, sir.

15          MR. MCGUIRE:  Your Honor, at this time I would

16 admit Exhibit 1, which is that body-worn camera footage.

17          THE COURT:  All right.  Without objection --

18          MR. HECKER:  No objection.

19          THE COURT:  -- admitted.

20          (Whereupon Plaintiff Exhibit 1 was marked for

21 identification and received in evidence.)

22          MR. MCGUIRE:  And, Your Honor, at this point we

23 would have played what is at section 1 minute and 10 seconds

24 to 3 minutes and 43 seconds, which is on the body cam.  But

25 the Court's reviewed the body cam, so --

1          THE COURT:  So I looked at all of it.  So if you
2     want -- if there's some particular part you want to make sure
3     I pay attention to -- it doesn't sound like it will be that
4     long, if you want to play it.  Otherwise --
5          MR. MCGUIRE:  It's not that long, Your Honor, but
6     I think it's fairly made out by the proof.
7          THE COURT:  Okay.  That's fine.
8     BY MR. MCGUIRE:
9     Q.   Agent Joseph, did the trooper later determine who the
10    car was registered to?
11    A.   Yes, he did.
12    Q.   And who was that person?
13    A.   Jose Hernandez Reyes.
14    Q.   And at the time, in 2022, did Mr. Hernandez Reyes have a
15    conviction for alien smuggling?
16    A.   He had.
17    Q.   There should be a notebook next to you.  If you would
18    turn to Tabs 6 and 7 in that notebook.  And once you're at
19    Exhibit 6, do you recognize what's depicted there?
20    A.   This is a picture of the vehicle registration that was
21    driven by the defendant.
22    Q.   And that's the car the defendant was driving that night?
23    A.   That's correct.
24    Q.   And it depicts Mr. Hernandez Reyes as the registered
25    owner; is that a fair statement?

1  A.    Correct.

2         MR. MCGUIRE:  Your Honor, I would ask that Exhibit

3  6 be admitted.

4         THE COURT:  Without objection, admitted.

5         (Whereupon Plaintiff Exhibit 6 was marked for

6  identification and received in evidence.)

7  BY MR. MCGUIRE:

8  Q.    And under Tab 7, is that a copy of the criminal

9  conviction and that the Court actually referenced earlier?

10  A.    That's correct.

11         MR. MCGUIRE:  Your Honor, I'd ask that be made

12  Exhibit 7.

13         THE COURT:  Admitted.

14         (Whereupon Plaintiff Exhibit 7 was marked for

15  identification and received in evidence.)

16         MR. MCGUIRE:  And I will file something,

17  late-filed, per the Court's request.

18         THE COURT:  Okay.  Why don't we make that

19  late-filed exhibit -- although this is against my rule -- 7A.

20         MR. MCGUIRE:  I won't tell anybody, Judge.

21         THE COURT:  Thank you.

22         (Whereupon Plaintiff Exhibit 7A was designated to

23  be received in evidence upon receipt.)

24  BY MR. MCGUIRE:

25  Q.    Agent Joseph, in your review of the body cam and

1    interview with the troopers, did the troopers observe any

2    luggage or construction tools in the vehicle with the

3    passengers?

4    A.    No, sir.

5    Q.    And as the traffic stop unfolded, did other troopers

6    arrive?

7    A.    They did.

8    Q.    And on the body cam, and in your interview with them,

9    did they notice anything unusual about the Suburban's seats?

10   A.    They noticed that there was an added fourth row.

11   Q.    And can that be seen on the body cam?

12   A.    It can be.

13   Q.    And the officer whose body cam it is, did he remark,

14   both on the body cam and in an interview with you, that that

15   was unusual?

16   A.    He did.

17   Q.    At some point did the trooper and other troopers attempt

18   to get information from the occupants of the vehicle?

19   A.    Yes, sir.

20   Q.    And how was that accomplished?

21   A.    One of the troopers had some functional Spanish and was

22   able to pass around what looked like a legal pad from the

23   front of the car to the rear of the car, asking the occupants

24   to put their names, dates of birth, and destination.

25              MR. MCGUIRE:  And, Your Honor, that would be at 53

1   minutes and 40 seconds to 1 hour, 3 minutes and 14 seconds.

2   And I'm using the timer at the very bottom of the screen of

3   the body cam, the counter for the video itself.

4            And, Your Honor, that's about ten minutes, and I

5   would just proffer to the Court -- I know the Court's watched

6   it.  You can see the trooper handing the -- what looks like a

7   clipboard from front to back, and all the passengers are

8   filling it out.

9            THE COURT:  Okay.

10  BY MR. MCGUIRE:

11  Q.   If you could turn to Tab 2 in your notebook, please.

12           After that portion of the body cam, did one of the

13  troopers take a picture of the paper that was produced?

14  A.   Yes, sir.

15  Q.   And is what's behind Tab 2, is that that photograph?

16  A.   That's the photograph.

17           MR. MCGUIRE:  Your Honor, I would ask that Exhibit

18  2 be admitted.

19           THE COURT:  Without objection, admitted.

20           (Whereupon Plaintiff Exhibit 2 was marked for

21  identification and received in evidence.)

22  BY MR. MCGUIRE:

23  Q.   And during your review of the body cam, can you see that

24  piece of paper being used by the troopers?

25  A.   Yes, sir.

1  Q.    If you could turn to Tab 3.  And what is behind Tab 3?

2  A.    This is a shot -- a screenshot off of the body-worn

3  camera of one of the officers holding the identification

4  sheet.

5              THE COURT:  Is this on the video?

6              THE WITNESS:  It's from the video, yes, sir.

7              THE COURT:  Okay.

8              MR. MCGUIRE:  It's just a screenshot.

9              THE WITNESS:  It's a still.

10             THE COURT:  It's not a very good picture, but it

11  is what it is.

12  BY MR. MCGUIRE:

13  Q.    The --

14             MR. MCGUIRE:  I think it's supposed to be

15  representative, Your Honor.  You can see it, from our

16  perspective, on the body cam.  And I would ask it be made

17  Exhibit 3.

18             THE COURT:  Admitted.

19             (Whereupon Plaintiff Exhibit 3 was marked for

20  identification and received in evidence.)

21  BY MR. MCGUIRE:

22  Q.    From your review of the body cam for Exhibits 2 and 3,

23  does Exhibit 2 appear to be the same piece of paper that the

24  passengers filled out?

25  A.    Yes, sir, it does.

1  Q.    Does the body camera later show the trooper interacting

2  with the defendant and appear to get a phone number?

3  A.    Yes, sir.

4  Q.    How does that --

5              MR. MCGUIRE:  And that occurs, Your Honor,

6  approximately 1 hour, 18 minutes and 30 seconds to one hour,

7  19 minutes and 24 seconds.

8  BY MR. MCGUIRE:

9  Q.    How does that happen?  What happens on the body cam

10  there?

11  A.    As you said, it was late in the traffic stop.  The audio

12  was off on the body-worn camera.  You can't hear anything.

13  But you can see the officer corresponding with the defendant

14  and then he wrote down the defendant's phone number on that

15  same sheet of paper.

16  Q.    Are -- is it fair to say that the only two people that

17  are around are the defendant and the trooper?

18  A.    That's -- that's what it looks like.

19  Q.    If you can turn to Exhibit 4 or Tab 4.

20              And what is that a picture of?

21  A.    That's a picture of the identity sheet containing the

22  phone number of the defendant that the officer wrote down.

23  Q.    And is that another picture that the troopers on the

24  scene would have taken?

25  A.    That's correct.

1  Q.   In sequence would that picture have been taken after the
2  picture that's portrayed in Exhibit 2?
3  A.   Yes.
4  Q.   It's sequentially in time, as well, in the body cam?
5  A.   That's right.
6  Q.   And does that number end in 5996?
7  A.   Yes, sir.
8  Q.   And I would ask that that be made -- Exhibit 4 be
9  admitted, Your Honor.
10            THE COURT:  Without objection, admitted.
11            (Whereupon Plaintiff Exhibit 4 was marked for
12  identification and received in evidence.)
13  BY MR. MCGUIRE:
14  Q.   Now, Agent Joseph, I want to turn to some people that
15  were interviewed as part of this investigation.
16            In April of 2025, were agents of HSI alerted to an
17  individual who might have information about a human smuggling
18  ring involving the defendant?
19  A.   Yes, sir.
20  Q.   And at that time was that person in federal custody?
21  A.   He was.
22            MR. MCGUIRE:  Your Honor, this is the person that
23  we described in the transcript as the first cooperator.
24            THE COURT:  All right.
25  BY MR. MCGUIRE:

1   Q.   And, Agent Joseph, this person had been convicted of

2   immigration felonies, been moved to a halfway house, and had

3   been granted deferred action so he could be available at

4   trial; is that a fair statement?

5   A.   Yes, sir.

6   Q.   But you've interviewed him personally?

7   A.   I have.

8            MR. MCGUIRE:  And again, Your Honor, I know the

9   Court's read the transcript.  So I really want to focus on

10  exhibits that might not have been available before Judge

11  Holmes.

12  BY MR. MCGUIRE:

13  Q.   During the traffic stop that's depicted on the body cam,

14  is there a portion where the defendant describes wanting to

15  call his boss?

16  A.   Yes, sir.

17  Q.   Did you then obtain, at least some phone records, for

18  the phone number ending in 5996?

19  A.   We did.

20  Q.   And were those phone records from the period of November

21  29th, 2022 to December 1st, 2022?

22  A.   Yes, sir.

23  Q.   And if you could turn to Exhibit 5 in your binder,

24  please.  And do you recognize what's behind there?

25  A.   Yes, sir.  These are those telephone tolls that we

1  received, call detail records.

2  Q.   And who is that phone number registered to?

3  A.   Jennifer Vasquez.

4  Q.   And who do you know that person to be in relation to the

5  defendant?

6  A.   The defendant's wife.

7  Q.   At the time the defendant -- on the body cam --

8  approximately 8 p.m. or so -- that the defendant says he's

9  calling his boss, does he call a number that was of interest

10  to your investigation?

11  A.   Yes, sir.

12  Q.   And who did that number belong to?

13  A.   That number belonged to cooperator 1.

14  Q.   And was that conversation for about ten minutes?

15  A.   Yes, sir.

16  Q.   And were there -- were there phone calls between the

17  number ending in 55 -- excuse me -- 5996 and that same number

18  both before and after the traffic stop?

19  A.   Yes, sir.

20  Q.   Incidentally, are there listings on that phone record

21  that relate to where the calls were placed?

22  A.   Yes, sir.

23  Q.   Both incoming and outgoing; is that a fair statement?

24  A.   It is.

25  Q.   Are there any calls on that documentation related to

```
 1   St. Louis, Missouri?
 2   A.    No, sir.
 3   Q.    Are there calls that occur in Texas?
 4   A.    There are.
 5   Q.    And Arkansas?
 6   A.    Yes.
 7   Q.    There are calls that are in Missouri, but not close to
 8   St. Louis?
 9   A.    That's right.
10   Q.    Fair statement?
11   A.    That's right.  That's fair.
12   Q.    Did the first cooperator also have an old iCloud backup?
13   A.    Yes.
14            THE COURT:  So let's go back to 5.
15            THE WITNESS:  Yes, sir.
16            THE COURT:  Can you identify the call that you
17   said he made to cooperating witness number 1?
18            THE WITNESS:  Yes, sir.  It was about two-thirds
19   down the page, November 30th, 8:01 p.m.  It was a call placed
20   from Cookeville, Tennessee.
21            THE COURT:  I see it.  Go ahead.
22            THE WITNESS:  To a number in Houston, Texas.
23            THE COURT:  For ten minutes?
24            THE WITNESS:  Yes, sir.
25            THE COURT:  Okay.
```

```
 1              MR. MCGUIRE:  And, Your Honor, if I didn't admit
 2   Exhibit 5, I want to do that.  I just don't remember if I
 3   did.
 4              THE COURT:  Without objection, admitted.
 5              MR. DEAN:  No objection.
 6              (Whereupon Plaintiff Exhibit 5 was marked for
 7   identification and received in evidence.)
 8              THE COURT:  And I guess since we're there, just so
 9   we don't have to come back to it, look like -- did he call
10   that same number again at 9:27 p.m.?
11              THE WITNESS:  At 9:27?  Yes, sir, it would appear
12   so.
13              THE COURT:  Okay.  CW -- cooperating witness
14   number 1?
15              THE WITNESS:  Yes, sir.
16              THE COURT:  All right.  For three minutes?
17              THE WITNESS:  Yes, sir.
18              THE COURT:  Okay.
19   BY MR. MCGUIRE:
20   Q.   And I believe there were even calls earlier the morning
21   of November 30th?
22   A.   There were.
23   Q.   Between those same numbers?
24   A.   Yes, sir.
25   Q.   Okay.  The iCloud backup that we just described for
```

1  cooperator 1, was there a contact for someone labeled as

2  Kitmar, K-i-t-m-a-r, and then the word Chofer, C-h-o-f-e-r?

3  A.   Yes, sir.

4  Q.   If you could turn to Tab 15, please.  And do you see

5  that -- is that a copy -- or one page of that iCloud backup?

6  A.   It is.

7  Q.   And can you see the contact for Kitmar Chofer?

8  A.   Yes, sir.

9  Q.   And I don't think you speak Spanish; is that a fair

10 statement?

11 A.   I do not.  No, sir.

12 Q.   Are you familiar with the word chofer, c-h-o-f-e-r, in

13 Spanish?

14 A.   Well, the Latin base is similar to English, what I would

15 assume to be a synonym of chauffeur, driver.

16        MR. MCGUIRE:  Okay.  And, Your Honor, I would ask

17 that Exhibit 15 be admitted.

18        THE COURT:  Without objection, admitted.

19        (Whereupon Plaintiff Exhibit 15 was marked for

20 identification and received in evidence.)

21 BY MR. MCGUIRE:

22 Q.   Other than in Tennessee, did the first cooperator say

23 whether the defendant had been stopped during the conspiracy

24 at other times?

25 A.   He knew that he had received a ticket or had been

1   stopped in Virginia.

2   Q.   And, specifically, was there a road or some other

3   identifier about Virginia?

4   A.   It was Interstate 81.

5   Q.   And are you familiar generally with that area?

6   A.   A little bit, yes, sir.  Spent a little bit of time in

7   Virginia -- or northern Virginia.

8   Q.   After you got that statement, did you then -- you and

9   other investigators look for a copy of that citation?

10   A.   Yes, sir.

11   Q.   And did you find one?

12   A.   We did.

13   Q.   If you could turn to Tab 8.  And do you recognize that?

14   A.   That's the citation that we recovered.

15   Q.   And does it bear the defendant's name?

16   A.   It does.

17   Q.   And does it appear that he was driving some kind of SUV?

18   A.   Yes, sir.

19         MR. MCGUIRE:  Your Honor, I ask that Exhibit 8 be

20   admitted.

21         THE COURT:  Admitted.

22         (Whereupon Plaintiff Exhibit 8 was marked for

23   identification and received in evidence.)

24   BY MR. MCGUIRE:

25   Q.   Did the first cooperator describe a discussion between

```
1    the co-conspirators during the conspiracy about the treatment
2    of females transported during the conspiracy?
3    A.    Yes, sir.
4    Q.    And what did he describe?
5    A.    He told us that he had received a complaint from a
6    source of supply of humans that the defendant had acted
7    inappropriately towards some of the females and the minor
8    females.
9    Q.    And why did he describe that being an issue between the
10   co-conspirators?
11   A.    Well, because co-conspirator 1 was very much a
12   businessman, and this affected his business.
13   Q.    So it wasn't an altruistic desire to help these females;
14   is that a fair statement?
15   A.    No, sir.  Because the person that was complaining was
16   his primary source of supply.
17            MR. MCGUIRE:  I want to move to, Your Honor, who
18   we previously described as the second cooperator.
19            THE COURT:  So when this conversation came up
20   about inappropriate -- alleged inappropriate activity toward
21   females and -- how did -- how did that happen?  Did you
22   prompt him?  Did he volunteer it?  How did it happen?
23            THE WITNESS:  I'm not -- I don't totally exactly
24   remember how it came up.  I don't think -- we didn't -- we
25   didn't have any basis to ask that.  So he would have
```

1  volunteered it at the time.

2           THE COURT:  Okay.

3           All right.  Go ahead.

4  BY MR. MCGUIRE:

5  Q.    The second cooperator, that would have been an interview

6  that happened after you had interviewed the first cooperator?

7  A.    That's right.

8  Q.    In mid-May did you speak to that individual that we've

9  described as the second cooperator?

10 A.    Yes, sir.

11 Q.    And did the second cooperator describe whether he saw

12 the defendant engaged in alien smuggling activities, as well?

13 A.    He did.

14 Q.    Did the second cooperator describe whether the

15 defendant's family members traveled with the defendant during

16 some of these smuggling (indiscernible)?

17 A.    He stated that he would -- I believe what I wrote --

18 typically travel with his family.

19 Q.    And when that travel involved the defendant's minor

20 children, how did he describe they were transported?

21 A.    Said on return trips they were forced to ride on the

22 floorboard of the vehicle to create more room for clients.

23 Q.    Did the second cooperator talk about whether the

24 conspiracy at large transported undocumented, unaccompanied

25 children?

1  A.    He said they did.

2  Q.    And how did he describe -- well, what was the volume --

3  or how did that work?

4  A.    He personally was responsible for driving what he

5  estimated was ten or less Ecuadorian minors.

6              THE COURT:  Who is "he"?

7              THE WITNESS:  Co-conspirator 2.  Cooperator 2.

8              MR. MCGUIRE:  The second cooperator.

9              THE COURT:  So he took responsibility for the ten

10 or more children?

11             THE WITNESS:  He personally -- from what I

12 remember, he drove -- he physically drove those children.

13             THE COURT:  Right.

14             THE WITNESS:  Yes, sir.

15 BY MR. MCGUIRE:

16 Q.    And that was during the time of this conspiracy?

17 A.    It was part of the conspiracy, part of the

18 transportation company, that he was a part of.

19 Q.    Did the second cooperator describe some of the same

20 interactions between the defendant and adult and minor

21 females that the first cooperator had described?

22 A.    Yes, sir.

23 Q.    And how did he describe that?

24 A.    He described that the source -- the main source of

25 supply complained to the transportation company that a

1  female -- minor females and adult females were sexually acted

2  toward inappropriately.

3  Q.   By who?

4  A.   By the defendant.

5  Q.   And what was the reaction of the other co-conspirators?

6  A.   Well, again, it affected their business, so they were

7  not -- not pleased with it.

8  Q.   And do you recall if the second cooperator described

9  confronting the defendant about these activities?

10 A.   That's right.

11 Q.   And how did -- how did he tell you the defendant had

12 reacted, or do you remember?

13 A.   It was not well received.  It was. . .

14 Q.   By who?

15 A.   By the defendant.

16         MR. MCGUIRE:  Your Honor, I was going to move to

17 the person we've described as female witness NV.

18         THE COURT:  All right.

19 BY MR. MCGUIRE:

20 Q.   Did you interview someone -- or were you -- participate

21 in an interview with someone who described some of the same

22 behavior relating to minor females that the first and second

23 cooperator described?

24 A.   Yes, sir.

25         THE COURT:  So what were -- this was not your

```
 1  interview?
 2          THE WITNESS:  No -- I was in part -- yes, I was in
 3  the interview with her.
 4          THE COURT:  Right.  But you didn't organize the
 5  interview?
 6          THE WITNESS:  I did not.
 7          THE COURT:  You sat in on it?
 8          THE WITNESS:  Yes, sir.
 9          THE COURT:  By whom?
10          THE WITNESS:  Who was present for the interview?
11          THE COURT:  Well, who called the interview, said
12  let's. . .
13          THE WITNESS:  It was. . .
14          MR. MCGUIRE:  I think it was me, Your Honor.
15          THE COURT:  Okay.
16          THE WITNESS:  It was before -- I don't want to say
17  grand jury.
18          THE COURT:  Okay.  So it was done here in the
19  Middle District?
20          THE WITNESS:  Yes, sir.  She was with her
21  controlling officer.  She's an informant.
22          THE COURT:  Okay.  And you sat in on that
23  interview --
24          THE WITNESS:  Yes, sir.
25          THE COURT:  -- with Mr. McGuire?
```

```
 1              THE WITNESS:  Yes, sir.
 2              THE COURT:  Okay.
 3    BY MR. MCGUIRE:
 4    Q.    And this person described in the detention hearing as NV
 5    has no criminal record, she was not a part of this
 6    conspiracy, and is an American citizen; is that a fair
 7    statement?
 8    A.    All that is true.
 9    Q.    And did she describe communications between herself and
10    the defendant over a period of time?
11    A.    Yes, sir.
12    Q.    And how did they communicate?
13    A.    Social media.
14    Q.    Specifically, what --
15    A.    I think it was Snapchat.
16    Q.    Okay.  That's the application they used --
17    A.    Yes, sir.
18    Q.    -- is that right?
19    A.    Snapchat was the application.  Yes, sir.
20    Q.    And did he have a handle that you later connected to the
21    defendant?
22    A.    Yes, sir, we did.
23    Q.    And if you could turn to Exhibit 11, please.
24              And do you recognize what's in Exhibit 11?
25    A.    Yes, sir.
```

1  Q.   And is that one of the handles that the defendant used?
2  A.   Yes, sir.
3           MR. MCGUIRE:  And for the purpose of the record,
4  Your Honor, it's S-o-y-t-u-g-a-a.  I don't know if you
5  pronounce that Soytugaa.  That's how we've been pronouncing
6  it, but that's --
7  BY MR. MCGUIRE:
8  Q.   Is that the handle you're describing, Agent Joseph?
9  A.   Yes, sir.
10          MR. MCGUIRE:  Your Honor, I ask that Exhibit 11 be
11 admitted.
12          THE COURT:  Admitted.
13          (Whereupon Plaintiff Exhibit 11 was marked for
14 identification and received in evidence.)
15 BY MR. MCGUIRE:
16 Q.   As part of this interview that you participated in, did
17 the witness describe actions the defendant had taken?
18 A.   Yes, sir.
19 Q.   What did she tell -- what did she say that he had -- he
20 had wanted her to do?
21 A.   He had wanted to have naked pictures of her.
22 Q.   And at the time that he solicited those images, how old
23 did she say she was?
24 A.   15 years old.
25 Q.   Did you recover, as a part of Exhibit 11, Snapchat

1  messages from 2020?

2  A.    Yes, sir.

3  Q.    I should have asked this before.  How old is the witness

4  now?

5  A.    She's 20 -- well, she's 20.  20 years old.

6  Q.    So when she was 15, that would have been in the year

7  2020?

8  A.    2020.

9  Q.    So the Snapchat messages in Exhibit 11, are they from

10  2020?

11  A.    They are.

12  Q.    And in that -- at least some of the Snapchat messages

13  that we've provided, is there a -- is there a reference that

14  was of interest?

15  A.    There was some pictures that were sent.

16  Q.    And what kind of pictures were they?

17  A.    They were adult pornography.

18  Q.    And was there a reference to OnlyFans?

19  A.    There was.

20  Q.    And do you know what OnlyFans is?

21  A.    I have learned what OnlyFans is, yes, sir.

22  Q.    And just generally what is it?

23  A.    It's an adult website for sexually-based type material.

24  Q.    Okay.  And the -- was the message about the witness

25  having an OnlyFans account?

1  A.   He asked if she had an OnlyFans account.

2           MR. MCGUIRE:  Your Honor, next I would turn to

3  female cooperator 1.

4  BY MR. MCGUIRE:

5  Q.   And, Agent Joseph, during the detention hearing do you

6  recall testifying about female cooperator 1?

7  A.   Yes, sir.

8           MR. MCGUIRE:  However, Your Honor, we filed

9  documentation as to female cooperator 1's statement on Monday

10  under seal.  And we would submit that that is the most

11  appropriate information for --

12           THE COURT:  All right.  Do we want to identify

13  that for our record?

14           MR. MCGUIRE:  I don't have the docket entry.  I'm

15  sorry, Your Honor.  But -- but we filed it on Monday.

16           THE COURT:  And that -- that -- I think I

17  referenced that I've read it.

18           MR. MCGUIRE:  Yes, sir.  That's the same -- the

19  same transcript.

20           THE COURT:  All right.  I know it has a docket

21  number.  And the number is 88.

22           MR. MCGUIRE:  Thank you very much, Your Honor.

23           Thank you.

24  BY MR. MCGUIRE:

25  Q.   And then, Agent Joseph, I want to turn to who we

1  described as female cooperator 2.

2  A.    Okay.

3  Q.    During that detention hearing, do you recall discussing

4  a second female cooperator?

5  A.    Yes, sir.

6  Q.    Now, at the time of the detention hearing before Judge

7  Holmes, had you personally interviewed the second female

8  cooperator?

9  A.    No, sir.

10  Q.    And had someone from the FBI interviewed the second

11  female cooperator?

12  A.    Yes.

13  Q.    But you weren't there?

14  A.    I was not there.

15  Q.    And prior to your testimony at the detention hearing,

16  did you attempt to review some handwritten notes from that

17  interview, which would have been in May of 2025?

18  A.    I did.

19          MR. MCGUIRE:  And, Your Honor, that -- this is at

20  page 75 and 76 and 95 and 96 on the transcript.  You can kind

21  of see how that breaks out.

22  BY MR. MCGUIRE:

23  Q.    But ultimately were you able to really decipher any of

24  that?

25  A.    I couldn't understand the notes.

1  Q.    Okay.  After the detention hearing, though, did the FBI

2  agent who had participated in that May 2025 interview of the

3  second female cooperator then complete a 302 report?

4  A.    He did.

5  Q.    And did you review that?

6  A.    I have.

7  Q.    But you hadn't -- it wasn't even completed at the time

8  of the first detention hearing?

9  A.    It had not been completed.

10  Q.    Okay.

11  A.    To my knowledge.

12  Q.    And then since -- also since the time of the detention

13  hearing, have you had a chance to personally interview the

14  second female cooperator?

15  A.    Yes, sir.

16  Q.    Is she a permanent legal resident of the United States?

17  A.    She is.

18  Q.    And did she describe to you whether she had participated

19  in this smuggling conspiracy involving the defendant?

20  A.    Yes, sir.

21  Q.    And from approximately when to when?

22  A.    2016 to 2019.

23  Q.    And how did she first get into the conspiracy?

24  A.    Through a romantic relationship with cooperator 1.

25  Q.    And what was the nature of her interaction with the

 1  defendant between 2016 and 2019?

 2  A.   Well, other than being in a -- somewhat of a romantic

 3  relationship, she was --

 4  Q.   Sorry.  I meant --

 5  A.   Specifically the business?

 6  Q.   Hang on.  The defendant.

 7  A.   Oh, the defendant.  I'm sorry.

 8  Q.   That's okay.

 9  A.   I apologize.

10  Q.   That's okay.

11          What was the nature of her interaction with the

12  defendant between --

13          THE COURT:  She did not suggest a romantic

14  relationship --

15          THE WITNESS:  No.  No, sir.

16          THE COURT:  Okay.  Good.

17          THE WITNESS:  No, sir.  I apologize.

18          She -- the cooperator was involved in the

19  transportation business, and she knew the defendant to be one

20  of their drivers.

21          THE COURT:  Did she ride with him?

22          THE WITNESS:  Not that I'm aware of.

23  BY MR. MCGUIRE:

24  Q.   Was her role somewhat akin to a dispatcher?

25  A.   Very much so.

1  Q.   Did she also handle financial transactions within the

2  operation?

3  A.   Yes, sir.  And other logistical needs.

4          THE COURT:  Would she assign him work to do?

5          THE WITNESS:  Yes.  That's exactly how it worked.

6  To my understanding.

7  BY MR. MCGUIRE:

8  Q.   In 2017, where was she living?

9  A.   She was living in -- I believe she was in Texas.

10 Q.   And who was she living with at the time?

11 A.   So cooperator 1.

12 Q.   They were still in a romantic relationship in 2017?

13 A.   They were.

14 Q.   They're not any longer, though; is that a fair

15 statement?

16 A.   They are not.

17 Q.   And haven't been for some time?

18 A.   No, sir -- yes, sir.

19 Q.   Did she describe whether other members of the smuggling

20 group also stayed at that apartment in addition to her and

21 the first cooperator?

22 A.   Yeah, she said that it was a three bedroom apartment and

23 often drivers would say between trips at that apartment with

24 her and cooperator 1.

25 Q.   Because this conspiracy had more than just the defendant

1 as a driver; is that a fair statement?

2 A.    Certainly.

3 Q.    According to what she told you?

4 A.    Yes, sir.

5 Q.    But was the defendant among the people who stayed at

6 that Houston apartment from time to time?

7 A.    Yes, sir.

8 Q.    And did she see him regularly during this period?

9 A.    Yes, sir.

10 Q.    Were there times where she would cook for the men who

11 were staying at the apartment?

12 A.    Yes, sir.

13 Q.    Did she describe dinners where all of them would eat

14 together?

15 A.    Yes, sir.

16 Q.    Was there a dinner where the defendant described to her

17 how and why he had first come to the United States?

18 A.    There was an occasion where she mentioned where the

19 defendant stated he fled El Salvador because he had taken

20 part in the murder of a rival gang member's mother.

21 Q.    Now, according to the female cooperator, did the

22 defendant ever talk about this again?

23 A.    No.

24 Q.    Did the defendant ever provide any more details about

25 this to her?

1  A.    No.

2  Q.    And were there potentially other people around when this

3  statement was made?

4  A.    There were other -- another driver and potentially

5  cooperator 1.

6  Q.    But have you heard any -- have you gotten any

7  information, similar information, from anyone else about this

8  statement?

9  A.    No, sir.

10 Q.    And are you attempting to corroborate the statement by

11 the defendant?

12 A.    We're trying.

13 Q.    And what makes that complicated?

14 A.    The alleged murder took place in El Salvador.

15 Q.    And do you know exactly when it would have occurred?

16 A.    We don't have a date, region.  And obviously there were

17 a lot of murders that took place in El Salvador over the last

18 decade or so.

19 Q.    And have you attempted to determine if there's even an

20 unsolved murder that would sort of fit this framework?

21 A.    We've looked -- we're looking into it.

22 Q.    But have you been able to corroborate this statement --

23 A.    No, sir.

24 Q.    -- that the defendant allegedly made?

25 A.    No, sir, we have not.

1  Q.   All right.  Basically, she made the statement, you noted
2  it, but you're trying to follow-up on it?
3  A.   As best we can.
4  Q.   Okay.  You testified that all you had previously at the
5  detention hearing was just the notes?
6  A.   That's right.
7  Q.   But since then you've received a 302 of the May 2025
8  interview?
9  A.   That's right.
10 Q.   And that you didn't participate in?
11 A.   That's correct.
12 Q.   Does this statement that we just discussed also appear
13 in that 302?
14 A.   It does.
15          MR. MCGUIRE:  And, Your Honor, for purpose of the
16 record we've provided that to the defense.
17          THE COURT:  All right.
18          MR. MCGUIRE:  We only recently received it.  Or I
19 did at least.
20 BY MR. MCGUIRE:
21 Q.   But you didn't have that 302 when you first testified?
22 A.   No, sir.
23 Q.   And you hadn't interviewed her personally?
24 A.   I had not.
25 Q.   During your interview with her, did she say anything

1   about the transportation of minors?

2   A.   She did.

3   Q.   Okay.  And do you recall how she described whether

4   minors were transported?

5   A.   She cited an occasion where the company transported

6   some -- some minors that were very poor health, very sick,

7   injuries from the transportation.

8   Q.   And was she able to tell you whether those minors were

9   unaccompanied or with family members?

10  A.   I'm not -- I don't totally remember.

11  Q.   Okay.  But is it fair to say she didn't say they were

12  all unaccompanied?

13  A.   I don't -- that would have stuck out.

14  Q.   Okay.  Just that -- that the conspiracy transported

15  children at some point?

16  A.   That's correct.

17          THE COURT:  Did she single out the defendant as --

18          THE WITNESS:  No, sir.

19          THE COURT:  So no reference to the defendant?

20          THE WITNESS:  Not to that -- not to that specific

21  instance of those children that were in poor health and with

22  injuries.

23  BY MR. MCGUIRE:

24  Q.   So this is just the conspiracy sort of writ large?

25  A.   Yes, sir.

```
 1   Q.    And, Agent Joseph, are you and other agents still
 2   pursuing leads in this investigation?
 3   A.    Absolutely.
 4   Q.    And do you recall testifying about the passengers in the
 5   vehicle, talking about on November 30th, 2022 --
 6   A.    Yes, sir.
 7   Q.    -- at the detention hearing?
 8   A.    Yes, sir.
 9   Q.    Do you recall testifying about that?
10   A.    I do.
11   Q.    Could you turn to Exhibit 14 in your binder.  And do you
12   recognize those documents?
13   A.    Yes, sir.
14   Q.    All right.  The roster that is Exhibit 2, where the
15   passengers wrote their names down, did you try to
16   cross-reference that list with any data that Homeland or
17   Border Patrol had?
18   A.    Yes, sir.
19   Q.    And is what -- in Exhibit 14, is that the result?
20   A.    That's exactly what we found.
21   Q.    So of the nine passengers, how many could you connect to
22   existing records maintained by Homeland and Border Patrol?
23   A.    Six of nine.
24   Q.    On the --
25              THE COURT:  And they were all adults?
```

```
 1              THE WITNESS:  One appears to be a minor, sir.
 2              THE COURT:  Oh.  In Exhibit 14?  Which one?
 3              THE WITNESS:  No.  No.  I'm sorry.  Of the six of
 4    the nine, yes, sir, they are adults.
 5              THE COURT:  I'm talking about --
 6              THE WITNESS:  The three that are outstanding, one
 7    of those appears to be a minor.
 8              THE COURT:  Right.  But that's not reflected in --
 9              THE WITNESS:  No, sir.  Correct.  I apologize.
10    BY MR. MCGUIRE:
11    Q.   Yeah.  The six that you've identified are adults?
12    A.   Yes, sir.
13    Q.   Okay.  And we're going -- the Court anticipated one of
14    my questions, so I'll just ask it now.  Are you still looking
15    for the individual who listed a birth year of 2007?
16    A.   Yes, sir.
17    Q.   And that person is still a minor as of today; is that a
18    fair statement?
19    A.   That's correct.
20    Q.   And you have not been able to locate that person?
21    A.   No, sir.
22    Q.   But of the six that you were able to sort of
23    cross-reference between the roster and records, are those the
24    ones reflected in Exhibit 14?
25    A.   Yes, sir.
```

Q.   All right.  The very first record is a person with the
first name Brayan, B-r-a-y-a-n.
A.   Yes, sir.
          MR. MCGUIRE:  And, Your Honor, I don't know if the
exhibit that we had contains a picture.  It should be the
very last -- like, maybe five pages in.  Some of them came
through and some of them didn't.  If it didn't, I have a
picture for the Court.
          THE COURT:  The only pictures I have are toward
the end of Exhibit 14.
          MR. MCGUIRE:  Okay.  We had some technical
difficulties in printing the pictures.  I think the defense
has a picture.  It's basically five pages in.  I'll show it.
          MR. HECKER:  Yeah.  I got it.
          MR. MCGUIRE:  Your Honor, I'm just going to pass
forward what is essentially that -- the same copy of that
record.  It has a picture on page 5.
          THE COURT:  5 of 5?
          MR. MCGUIRE:  Yes, sir.  Page 5 of 5 of that very
first --
          THE COURT:  Yeah, mine is empty.  It references a
photograph, but there is none.
          MR. MCGUIRE:  We had some technical difficulties
with that.  So I just want to pass that to the Court.
BY MR. MCGUIRE:

1  Q.   So what we've been talking about --

2            MR. MCGUIRE:  And, Your Honor, could I just maybe

3  substitute that as part of Exhibit 14?

4            THE COURT:  Sure.

5            MR. MCGUIRE:  I think the defense has the

6  picture --

7            THE COURT:  All right.

8            MR. MCGUIRE:  That's the --

9            THE COURT:  We'll make it part of 14.

10           MR. MCGUIRE:  Thank you, Your Honor.  I appreciate

11  it.

12           THE COURT:  Does the clerk have a copy?  Is this

13  my copy?

14           MR. MCGUIRE:  I'll make sure she does, Your Honor.

15           THE COURT:  Okay.

16           MR. MCGUIRE:  That was something I realized this

17  morning after all the copies had been made.

18  BY MR. MCGUIRE:

19  Q.   The photograph of that young person, that would have

20  been -- he would have been the second name on Exhibit 2; is

21  that correct?

22  A.   That's right.

23  Q.   The name that's in that record is the same name as the

24  second person on the roster?

25  A.   I believe -- let me turn --

1  Q.    And so where -- on the body cam, where would that person

2  have been sitting?

3  A.    Directly behind the front passenger seats.

4  Q.    So on the passenger side, closest to the door, on the

5  first row of passenger seats?

6  A.    That's my understanding.

7  Q.    And have you been able to review the portion of the body

8  cam where the trooper is interacting with that person?

9  A.    Yes, sir.

10  Q.    And based on --

11          MR. MCGUIRE:  And, Your Honor, that occurs --

12  well --

13          THE COURT:  I think I saw it.

14          MR. MCGUIRE:  Okay.

15  BY MR. MCGUIRE:

16  Q.    Basically, does that -- the person on the body cam

17  appear to fit the exact same physical description up to and

18  including his nose as the person that's depicted in that

19  picture?

20  A.    Yes, sir.

21          THE COURT:  And he would have been 18 in 2022?

22          THE WITNESS:  This one?  If that's what the -- if

23  that's how it reads, yes, sir.

24          MR. MCGUIRE:  And, Your Honor, I want to make

25  Exhibit 14 an exhibit if I haven't done that already.

```
 1              THE COURT:  Okay.  Without objection, admitted.
 2              (Whereupon Plaintiff Exhibit 14 was marked for
 3    identification and received in evidence.)
 4              MR. MCGUIRE:  If I can have one moment, Your
 5    Honor.
 6              Your Honor, those are our questions.
 7              THE COURT:  All right.  Cross.
 8              MR. HECKER:  Your Honor, on one issue may we
 9    approach first?
10              (Bench conference outside the hearing of the
11    public.)
12              THE COURT:  Sure.  Just be sure you talk into
13    that.
14              MR. MCGUIRE:  Going to overwhelm you.
15              THE COURT:  (Indiscernible.)
16              MR. HECKER:  Your Honor, I just wanted to flag one
17    issue so that I'm careful in my questioning about how I refer
18    to three of the cooperating witnesses --
19              THE COURT:  Okay.
20              MR. HECKER:  -- who have familial relationships.
21              THE COURT:  Sure.
22              MR. HECKER:  It -- to our view -- to our view,
23    it's quite relevant --
24              THE COURT:  Okay.
25              MR. HECKER:  -- that cooperating witness 2 is the
```

1  son of cooperating witness number 1.

2          THE COURT:  Okay.

3          MR. HECKER:  And cooperating witness number 3 is

4  the mother of cooperating witness number 2 and the ex-wife of

5  cooperating witness number 1.

6          THE COURT:  Okay.

7          MR. HECKER:  And I don't know if the Court was

8  aware of that, but I just wanted that to be --

9          THE COURT:  I was aware of the family

10 relationship.

11         Now, Mr. Tennent referred to a cooperation witness

12 number 3, but I decided that was error.

13         MR. MCGUIRE:  It was.

14         THE COURT:  So cooperating witness number 3 is who

15 now?

16         MR. HECKER:  I think she is -- her a/k/a is now

17 female cooperating witness number 1.

18         THE COURT:  Oh, okay.  Go ahead.

19         MR. HECKER:  Yes.

20         THE COURT:  And she's related to what now?

21         MR. HECKER:  She's the mother of cooperating

22 witness number 2.

23         THE COURT:  Okay.

24         MR. HECKER:  And she's the ex-wife of cooperating

25 witness number 1.

```
1              MR. MCGUIRE:  That's correct, Your Honor.
2              MR. HECKER:  And so I just wanted to make sure the
3    Court's aware of it as we --
4              THE COURT:  Yeah, I picked that up.
5              MR. HECKER:  Okay.  All right.  Thank you.
6              MR. FRANKER:  (Inaudible) grand jury.
7              (Court reporter interruption for clarification.)
8              MR. MCGUIRE:  The grand jury transcript is the one
9    of female cooperator 1.  And she describes that relationship
10   in her transcript, I believe.
11             Thank you.
12             (In open court.)
13             THE COURT:  All right.  Let's go ahead.
14             MR. HECKER:  May I inquire, Your Honor?
15             THE COURT:  Yes.
16
17                     CROSS-EXAMINATION
18   BY MR. HECKER:
19   Q.   Good afternoon, Agent Joseph.
20   A.   Good afternoon.
21   Q.   My name is Sean Hecker, and I'm one of Mr. Abrego's
22   counsel.  I would like to ask you some questions.
23   A.   Certainly.
24   Q.   Now, you testified on June 13th that your first
25   interview of cooperating witness number 1 took place on May
```

1  7th of this year; is that correct?
2  A.    I believe that's correct.  It's reflected in the report
3  of investigation.
4  Q.    And you also confirmed at that time that he had -- that
5  cooperating witness number 1 had previously been interviewed
6  by other HSI agents, correct?
7  A.    I believe that's true, yes, sir.
8  Q.    And, in fact, HSI agents met with cooperator number 1 on
9  three occasions prior to your meeting with him, correct?
10  A.    I don't know how many occasions they met.
11  Q.    Well, before you participated in his interview on May
12  7th, did you review the reports that had been prepared of the
13  prior interviews conducted by the other HSI agents?
14  A.    No, sir.
15  Q.    Why not?
16  A.    I -- just didn't occur to me.  It's not that it didn't
17  occur to me.  I just didn't -- I wanted to go into the
18  interview fresh and I wanted to hear what he had to say.
19  Q.    Well, you've been an HSI agent for over two decades,
20  correct?
21  A.    Yes, sir.
22  Q.    And one of your jobs -- tell me if this is correct -- is
23  to try to assess the credibility of people who are trying to
24  convey information to you --
25  A.    That's right.

1   Q.    -- is that fair?

2   A.    That's right.

3   Q.    And one of ways in which you assess credibility is

4   whether someone is telling you a story that is consistent or

5   inconsistent with things they've said in the past; is that

6   fair?

7   A.    Sure.

8   Q.    And here you had someone who had met with three -- on

9   three prior occasions with other HSI agents and talked about

10  the same subject you were going to be inquiring about, true?

11  A.    Sir, I don't even know if I had the reports then.

12  Q.    Well, do you --

13  A.    I'm not even sure I have them now.

14  Q.    As you sit here today you have not reviewed the reports

15  of the prior interviews of cooperator 1?

16  A.    No, sir.

17  Q.    They weren't provided to you?

18  A.    I don't know if they were or they weren't.

19  Q.    Are you -- are you curious what cooperator 1 said when

20  he was interviewed by fellow agents of Homeland Security?

21  A.    No.  I was interested in what he said when he talked to

22  me.

23  Q.    Well, would it concern you if what he told other agents

24  of Homeland Security was inconsistent with what he told you?

25  A.    It would be a concern, but I really was more interested

1  in what he was going to say to me.
2  Q.   As you sit here now are you a little bit curious about
3  whether he told fellow agents of Homeland Security a story
4  that was different than what he told you?
5  A.   It's relevant.  But again, I was interested in what he
6  said in front of me, because I had the firsthand experience
7  of sitting across from him asking him questions and hearing
8  what he had to say.
9  Q.   Do you know the circumstances of the prior interviews?
10  A.   I really don't.
11  Q.   Are you aware that he was interviewed on the first
12  occasion on April 22nd while at FCI Alabama?
13  A.   No, sir.  I didn't know the dates.  I'm unfamiliar with
14  these reports.  If they exist.
15  Q.   Did you speak with Special Agent Hinkle or HSI Task
16  Force Officer Malpica, about their interviews of cooperating
17  witness number 1 before or after you interviewed him?
18  A.   I don't know either of those names.
19  Q.   Do you have any understanding of what promises were made
20  to cooperating witness number 1 when he was sitting at FCI
21  Alabama on the first or second or third occasion in which he
22  was interviewed?
23  A.   No, sir.
24  Q.   Are you aware that he was promised that he would be
25  released to a halfway house from his federal sentence for

1  illegal reentry into the United States?

2  A.   Sir, I'm aware of what he was provided.  I was not

3  aware -- to answer your question -- of what he was promised

4  or assured of on those interviews.

5  Q.   When you testified on June 13th, were you aware that, in

6  fact, he had three prior felony convictions at the time you

7  interviewed him?

8  A.   I think I was aware of the two.

9  Q.   You've subsequently seen reports that there was a third

10 felony conviction in -- in state court in Texas for drunkenly

11 shooting up a Houston neighborhood?

12 A.   I was informed of that, yes, sir.

13 Q.   Have you reviewed information relating to that arrest?

14 A.   No.

15 Q.   Were you aware that he did two years in state custody in

16 Texas before being sent to FCI Alabama to serve time on his

17 federal illegal reentry claim?

18 A.   No, sir.

19 Q.   Are you aware that when cooperating witness number 1 was

20 arrested he had been -- sorry -- when you interviewed him, he

21 had been deported on five prior occasions?

22 A.   I -- I'm not aware of five, sir.  I have not queried it

23 and looked at it.  I'm aware of two.

24 Q.   You testified on June 13th that he was released to a

25 halfway house and your understanding was that he was close in

1  time to when he otherwise would have been released to a

2  halfway house; is that correct?

3  A.    Could you rephrase that question?

4  Q.    Sure.  When you testified on June 13th, do you recall

5  testifying that he was going to be released to a halfway

6  house and that he was nearing the end of his sentence where

7  he was close to being eligible for that downgrade?

8  A.    Yes, sir.

9  Q.    Now, in your experience, is someone who's in the country

10  illegally, who's been deported multiple times, who's serving

11  a sentence for illegal reentry, that they're released to a

12  halfway house toward the end of their federal sentence, as

13  opposed to being sent to ICE custody and deported?

14  A.    No, sir, that would be atypical.

15  Q.    So was your testimony incorrect about that assumption of

16  him being near a time when he was going to otherwise be

17  released to a halfway house?

18  A.    No.  I'm saying that that's exactly what happened, but

19  I'm saying that the nature of that happening was atypical.

20  Q.    It was atypical because it was part of the benefit he

21  was provided in exchange for his testimony in his case,

22  correct?

23  A.    I think the Bureau of Prisons moved him to that halfway

24  house because he had been outed in a national media outlet as

25  a cooperator in this case.

1  Q.   What's -- what's your basis for that understanding?
2  A.   The Bureau of Prisons.
3  Q.   And you're saying that the Bureau of Prisons, unrelated
4  to any benefits being provided to him in connection with
5  testifying in this case, decided to send cooperating witness
6  number 1 to a halfway house because of -- for security
7  reasons?
8  A.   It would only be assumption on my part.  I wasn't a part
9  of any of that.
10  Q.   So you don't know that?
11  A.   I was not part any of the benefits he received, nor the
12  moving to a halfway house.
13  Q.   Were you aware that the first time that HSI agents met
14  with the coop- -- first cooperating witness, that he said he
15  wouldn't talk to them until he got a lawyer and some paper?
16  A.   Sir, I'm not familiar with the first time.  I believe
17  I've stated that multiple times now.
18        MR. HECKER:  Your Honor, I think it probably makes
19  sense for the record to be complete that I share with the
20  Court the report of interview -- report of investigation that
21  was produced to us last week that counsel did not have in
22  advance of the prior hearing.
23        MR. MCGUIRE:  Your Honor, I would just
24  respectfully submit that the witness has been asked if he had
25  knowledge about this, and he said multiple times that he

hasn't. So I'm not sure what the relevance is for this
witness on the issue of whether the defendant should be
detained.

MR. HECKER: Well, whether or not this witness has
seen it, it goes to the credibility of the witness that this
witness is relying upon in -- in arguing for detention in
this case.

THE COURT: Right. I think your cross-examination
has very well made that point.

MR. HECKER: Okay. Would the Court like me to
produce to the Court the ROIs that reflect the prior
interviews before this witness met with --

THE COURT: Yeah. If you want to make those
exhibits, go ahead.

MR. HECKER: Okay. We'll supplement the record
with those.

MR. MCGUIRE: Your Honor, I just would ask that
those be placed under seal.

THE COURT: I'm going to do it now. But I need
all of you all to be sensitive to the Sixth Circuit's
position on that. I think it's justified here, but I'm not
inclined just to put something under seal without something
on the record to show we're complying with Sixth Circuit law.

MR. MCGUIRE: Yes, sir.

BY MR. HECKER:

1   Q.   One of the things you testified on June 13th about, was
2   this idea that cooperating witness number 1 suggested to you
3   that when transporting folks drivers would collect their
4   phones at the beginning of a trip and only return them after;
5   do you recall that?
6   A.   Yes, sir.
7   Q.   And you testified that was a way of exercising a measure
8   of control over those who were being transported?
9   A.   Yes, sir.
10  Q.   Sir, were you aware that in prior interviews cooperating
11  witness number 1 told agents that he had received calls from
12  everyone who was in the car during the traffic stop that
13  you've testified about today?
14  A.   Well, I haven't seen these reports you're referencing,
15  so the answer would be no.
16  Q.   Well, have you looked at phone records reflecting the
17  phone that was used by cooperating witness number 1 as of
18  November 30, 2022?
19  A.   No, sir.
20  Q.   You haven't looked at those phone records?
21  A.   I have not looked at those phone records.
22  Q.   And you testified earlier about the phone number that
23  you believed was connected to Mr. Abrego that reflected some
24  phone calls on November 30, 2022, correct?
25  A.   Yes, sir.

1 Q.    And I believe the import of your testimony was that

2 there was, in fact, a call from that phone number to

3 cooperating witness number 1 that lasted ten minutes that

4 day, correct?

5 A.    Yes, sir.

6 Q.    There were also other phone calls listed on that list of

7 calls, correct?

8 A.    There were.

9 Q.    And a couple were from Missouri, true?

10 A.    They hit off a Missouri tower, yeah.

11 Q.    So someone traveling through Missouri?

12 A.    I'm not an expert on cellular analysis, but it would

13 stand to reason that it would hit off of a tower that was

14 based in Missouri.

15 Q.    Okay.  So when you testified earlier that there was no

16 mention of St. Louis, Missouri, there is a mention of a

17 different city in Missouri on which this phone pinged a

18 tower?

19 A.    That's correct.

20 Q.    Okay.  And there are also pings from other places,

21 correct?

22 A.    Plenty of them.  Yes, sir.

23 Q.    Were you aware that when cooperating witness number 1

24 was interviewed on April 24th, that after his recorded

25 interview agents said that he spontaneously uttered that

1  what he wanted --

2          MR. MCGUIRE:  Your Honor, I would object --

3          MR. HECKER:  -- was -- if I could finish the

4  question?

5          THE COURT:  Why don't you all approach.  Just you

6  two.

7          (Bench conference outside the hearing of the

8  public.)

9          THE COURT:  Let him finish the question so I know

10 what y'all are talking about.

11         MR. MCGUIRE:  Yes, sir.

12         MR. HECKER:  So in the interview that was

13 conducted on April 24th -- it was a recorded interview.  And

14 the report of the investigation and of that interview says

15 that cooperating witness number 1 spontaneously uttered that

16 he wanted protection for him and his family as part of his

17 attempt to cooperate.  And given that cooperating witness

18 number 2 is his son, and his son was later identified,

19 arrested, because cooperating 1 made him available to the

20 government, I think it's relevant that cooperating witness

21 number 1 is not only getting protection for himself but for

22 his son.  And when he describes his family, it's relevant

23 that cooperating witness number 3 is his ex-wife and the

24 father of his son -- mother of his son.

25         Your Honor, if this witness doesn't know that, I

understand. But it's certainly relevant to the credibility
of the information that the government is putting on in the
detention hearing.

THE COURT: What do you say?

MR. MCGUIRE: That's my argument, Your Honor, is
that he's established that he didn't look at these. He
wasn't a part of it and he didn't participate in these
interviews. And so I don't think it's appropriate for the
defense to then just read into the record the points that
they think they want to make, when they know that the witness
is not going to be able to confirm or deny those points.

MR. HECKER: Well, Your Honor, the difficulty we
have is these documents were produced 30 minutes after our
brief on this motion. And so we haven't had an opportunity
to even present this information to the Court. So I guess
what we would ask, if we can't do it this way, that we be
given an opportunity to supplement the record that identifies
these obviously relevant considerations on credibility.

THE COURT: Oh, you might be able just to do an
agreed proffer that that occurred.

MR. MCGUIRE: I mean, I don't have a problem with
a proffer.

THE COURT: If that's correct.

MR. MCGUIRE: I mean, you know, we've obviously
talked about how we think proffers are appropriate. So I

1  can't necessarily deprive Mr. Hecker of that.  But what I
2  would say is I don't think he can ask the witness --
3              THE COURT:  Right.
4              MR. MCGUIRE:  -- about stuff he doesn't know
5  about.
6              THE COURT:  Well, I think you've made a point he
7  doesn't know a lot about what happened earlier.  But I guess
8  I'm not quite getting your point.  It's clear that
9  cooperating 1, 2, and the female got benefits.  Okay.  I've
10 got it.  I've got it.
11             MR. HECKER:  Well, I think it's striking that the
12 case agent, who's being put forward by the government, was
13 not provided the information about what the witnesses said --
14             THE COURT:  And I'm going to let you make of that
15 at closing whatever you want to.
16             MR. HECKER:  Okay.
17             THE COURT:  And I've got that, too.  I agree.
18 That's --
19             MR. HECKER:  Okay.  I appreciate that, Your Honor.
20             MR. MCGUIRE:  Thank you, Your Honor.
21             (In open court.)
22             THE COURT:  All right.  Anything else?
23             MR. HECKER:  Yes, Your Honor.
24 BY MR. HECKER:
25 Q.   Agent Joseph, am I correct that cooperating witness

1   number 2 is expecting early release and at least deferment of

2   deportation as part of his cooperation?

3   A.    He has requested that through his counsel.

4   Q.    And is he expecting to receive that?

5   A.    I don't know if he's going to -- he's in a different

6   district.  I'm not a part of that.

7   Q.    Who is?

8   A.    I would assume somebody in the district where he's

9   presently at.

10  Q.    And same for female cooperating witness number 1?

11  A.    The same what?

12  Q.    She was picked up and processed because she was in the

13  country illegally, correct?

14  A.    I'm not sure of the circumstances of that.

15  Q.    Were you aware that cooperating witness number 3 was in

16  the country illegally at the time that she was picked up and

17  interviewed by --

18  A.    Yes --

19            THE COURT:  Hold on.  You're talking about female

20  cooperating number 1?

21            MR. HECKER:  Yes.  I apologize.

22            THE COURT:  Let's keep our record straight.

23            THE WITNESS:  Yes, I reviewed the testimony.

24  BY MR. HECKER:

25  Q.    And my question is whether she, too, expects not to be

1   deported as part of her --

2   A.   I remember reading that in the transcript.

3   Q.   Okay.  So that's her expectation?

4   A.   That's what she said in the transcript.

5   Q.   Do you know -- are you involved in the decision by the

6   government about whether to offer someone deferment of

7   deportation?

8   A.   No, sir.

9   Q.   Who is?

10  A.   That would come above my chain of command.  Higher-ups

11  within Homeland Security Investigations, as well as

12  collaboration with the U.S. Attorney's office.

13  Q.   So some combination of the U.S. Attorney's office, the

14  Department of Justice and Homeland Security make decisions

15  about whether someone's deportation could be deferred because

16  of their involvement in a criminal case; is that fair?

17  A.   That's my understanding.

18  Q.   Okay.  Now, you interviewed cooperating witness number 1

19  here in Nashville on May 7th, correct?

20  A.   That's right.

21  Q.   And who attended that interview with you?

22  A.   It would be written in the ROI.  I believe -- from my

23  recollection, it was myself and our analyst Gabe Inman, and

24  then it was United States Attorney Rob McGuire.  Jeremy

25  Franker was there.  And I believe there was another attorney

1   there.

2   Q.    Was the other attorney --

3   A.    I think --

4   Q.    -- United States Attorney Ben Schrader?

5   A.    Ben Schrader.  Yeah, that's the name.

6   Q.    And what was his role in connection with the

7   investigation?

8   A.    That's a great question.  I don't know the answer to

9   that.

10  Q.    Did he participate in any subsequent interviews?

11  A.    No, sir.

12  Q.    Do you know why not?

13  A.    I don't.

14  Q.    Now, on May 7th, cooperating witness number 1 was

15  asked --

16          MR. HECKER:  And I'll represent to the Court not

17  for the first time.

18  BY MR. HECKER:

19  Q.    -- whether Mr. Abrego was a member of MS-13.  Do you

20  recall that?

21  A.    Vaguely, yes, sir.

22  Q.    And he said -- not for the first time -- that he did not

23  observe any signs or markings that indicated Mr. Abrego was

24  MS-13, correct?

25  A.    I believe that's what he said in that interview.

1 Q.   And he had said that previously, right?

2 A.   Well, I don't know, because that was the first time I

3 talked to him.

4 Q.   You -- let me ask you this.  You understood that

5 cooperating witness number 1 had claimed that he had had a

6 relationship with Mr. Abrego Garcia that dated back to 2015

7 or 2016, correct?

8 A.   I think that's correct.

9 Q.   And they had developed a friendly relationship,

10 according to cooperating witness number 1?

11 A.   I'm not sure he ever used the word friend.

12 Q.   They had interacted on multiple occasions over an

13 extended period of time, correct?

14 A.   Yeah.  That's fair.

15 Q.   And cooperating witness number 1 was from El Salvador,

16 correct?

17 A.   Yeah, that's correct.

18 Q.   And at some point he suggested to you that he had some

19 ability to suss out whether there might be people who were in

20 gangs who were being transported as part of his smuggling

21 operation, correct?

22 A.   Yes.

23 Q.   So he had some ability to discern who might be in a gang

24 and who wasn't, right?

25 A.   That's right.

1  Q.   But he told you that with respect to Mr. Abrego he did
2  not observe any signs or markings that indicated he was
3  MS-13, correct?
4  A.   He did say that, but he also followed up that it was --
5  it would be a very dangerous thing to ask.
6  Q.   Now, you testified to that on June 13th, too, right?
7  A.   I don't recall testifying to that.  But if that's in the
8  transcript then, of course, it's true.
9  Q.   You did.  You used those exact words, actually.
10         My question for you is did you prepare the report
11  of investigation that -- that is -- that is the written work
12  product from that May 7th interview?
13  A.   Yes.
14  Q.   And when you prepared it, did you prepare it close in
15  time to when you participated in the interview?
16  A.   Most likely.
17  Q.   And did you attempt to write down all the information
18  that you thought was relevant from the interview?
19  A.   Yes, sir, as best I could.
20  Q.   You didn't knowingly leave out anything that would be
21  important to someone trying to suss out what this guy was
22  saying, right?
23  A.   Certainly not intentionally.
24  Q.   Okay.  Would it surprise you that if one were to look at
25  the May 7th report of investigation there is no mention

1    whatsoever of this idea that he said that it would be a
2    dangerous thing to ask about, after saying that he saw no
3    signs?
4    A.    Well, then it came in the subsequent interview.
5    Q.    Would it surprise you if that is also not in your report
6    of investigation?
7    A.    I'm certainly sure I've read it in one of the two.
8    Q.    Now. . .
9    A.    I'm by no means making it up.
10   Q.    You did interview him again on May 15th, correct?
11   A.    Yes, sir.
12   Q.    That was in Houston, Texas; is that right?
13   A.    That's right.
14   Q.    And on that day you also interviewed cooperating witness
15   number 2, correct?
16   A.    That's right.
17   Q.    Those were back-to-back interviews?
18   A.    They were.
19   Q.    By the way, in your investigation, did you come to
20   understand that cooperating witness number 1 and cooperating
21   witness number 2 were in communication with one another
22   between the time that cooperating witness number 1 was first
23   approached by Homeland Security about cooperating in this
24   case and the time of that May 15th interview?
25   A.    I don't believe so.

1  Q.    Are you aware that during the time that cooperating

2  witness number 1 was in FCI Alabama that he was making phone

3  calls to other witnesses in this case?

4  A.    No, sir.

5  Q.    You're not aware of that?

6  A.    I'm not.

7  Q.    Did you ever seek to pull recorded phone calls from the

8  time in which cooperating witness number 1 was in custody at

9  FCI Alabama?

10  A.    No, sir.

11  Q.    You're aware that those calls would be recorded, yes?

12  A.    They would be.

13  Q.    You do recall that on May 15th cooperator number 1 told

14  you that he could easily identify gang members by their

15  clothes, tattoos and behavior, correct?

16  A.    If that's what it says in the report, yes, sir.

17  Q.    Do you recall that?  That he said that, according to

18  your notes?

19  A.    If that's what's in the report, then that's what he

20  said.  I write the report so I don't have to remember

21  everything that he said.

22  Q.    Understood.

23        Am I correct that in the interview you conducted

24  of cooperating witness number 1 on May 15th in Houston, that

25  cooperating witness number 1 admitted to you that he had been

 1  threatened with an order of protection by female cooperating
 2  witness number 1 because he had previously assaulted her?
 3  A.   I don't know the specifics of it, but, yes, I recall
 4  that he said that she submitted an order of protection
 5  against him.
 6  Q.   Well, do you recall that female cooperating witness
 7  number 1 told you that she left a relationship because she
 8  had been beaten up by her ex?
 9          MR. MCGUIRE:  Your Honor, I guess I would object.
10  I think the testimony has been that he didn't interview --
11  Mr. Hecker asked that female cooperator 1 told the agent.
12  And I think the testimony has been he didn't interview -- he
13  never interviewed her.  That's why we submitted the
14  transcript.
15          MR. HECKER:  It's a follow-up question about
16  whether he was also told by --
17          THE COURT:  Overruled.  I'm going to let you
18  inquire to it.
19  BY MR. HECKER:
20  Q.   So the question I'm asking you is whether you learned
21  separately from female cooperating witness number 1 that she
22  had been physically assaulted by cooperating witness number
23  1?
24  A.   I don't specifically recall that.  I didn't interview
25  her.  But if it's in the grand jury testimony, then certainly

1  that's -- if that's the case.  I can't affirm or deny that
2  it's -- it was said.  If it's in the grand jury testimony,
3  then that's what she said.
4  Q.    Just so the record's clear, on May 15th you interviewed
5  both cooperating witness number 1 and cooperating witness
6  number 2, correct?
7  A.    Yes.
8  Q.    They had a very, very close familial relationship,
9  correct?
10 A.    Yes, sir.  Close is -- yes.  The right word's familial.
11 Q.    And you wrote the report of investigation of those
12 interviews close in time to those interviews, correct?
13 A.    Yes, sir.
14 Q.    And am I correct that when you wrote up your report of
15 the interview of cooperating witness number 2, you wrote that
16 he told you that Mr. Abrego and people that cooperating
17 witness number 2 claims were gang members, quote, greeted
18 each other in a familial manner; do you recall writing that?
19 A.    Yes.
20 Q.    And your testimony is that those were his words?
21 A.    It was.
22 Q.    Exactly that phrase?
23 A.    Familial, yes, sir.
24 Q.    "Greeted each other in a familial manner"?
25 A.    That's what he said.

1  Q.    Now, was there an interpreter at that interview?

2  A.    There was.

3  Q.    Would -- is that fact reflected in your report of

4  investigation, as well?

5  A.    I probably didn't include that he was in the room as

6  well.

7  Q.    So that phrase was a translation of something?

8  A.    It was a translation.  It was.

9  Q.    Okay.  That wasn't your characterization of what was

10  said, right?

11  A.    I don't believe so.  From what I recall, that stuck out

12  to me.  So that's what I wrote down.

13  Q.    Well, on that -- on the interview that you conducted of

14  cooperating witness number 1 on that same day, your report

15  includes a note in the report of that interview that

16  cooperating witness number 1 said that gang members and

17  Mr. Abrego greeted each other in a familial way, that exact

18  phraseology.

19         Is it your testimony that both cooperating witness

20  number 1 and cooperating witness number 2 used that exact

21  phrase in describing --

22  A.    If that --

23  Q.    -- in describing their belief that Mr. Abrego could

24  recognize gang members and greet them familially?

25  A.    Greet them familially?

1  Q.    In a familial manner.

2  A.    If that's what's written in the report, that's what I

3  recorded at the time.

4  Q.    That's what each of them said, they used that phrase,

5  "greet each other in a familial manner"?

6  A.    As I previously stated, if that's what they said, that's

7  what I wrote and that's what went in the report.

8  Q.    Was that a question put to them:  Did you see instances

9  in which Mr. Abrego was with people who you thought were gang

10 members, in which he greeted them in a familial manner?  Or

11 did they just each happen to describe it using those exact

12 words?

13 A.    I don't remember the line of questioning.

14 Q.    Is it possible you cut and pasted what one of them said

15 and put it in the other report?

16 A.    No, sir.  Not on the content of -- of a -- of a ROI.

17 Maybe with the exception of like an agent's note specifying a

18 location or address or the identity of a person, would never

19 cut and paste into the body of an ROI.

20 Q.    And as you sit here now, you don't know whether

21 cooperating witness number 1 and cooperating witness number 2

22 had an opportunity to compare notes about what the government

23 might be curious about in connection with this interview?

24 A.    Leading up to the interview or --

25 Q.    Correct.

1    A.    -- that day?

2    Q.    Yeah.

3    A.    Which yeah?

4    Q.    Either.

5    A.    I don't -- I don't know if they had an opportunity or

6    did correspond before.  And that day, the answer would be no.

7    There was -- not been the occasion for them to have talked

8    between interviews.

9    Q.    And would it surprise you that that interview on May

10   15th was the first time, in a total of five interviews with

11   Homeland Security agents, where there's any suggestion from

12   cooperating witness number 1 that Mr. Abrego would be even

13   familial -- would be able to relate to someone in a familial

14   manner who was in a gang; that surprise you?

15   A.    Not a whole lot surprises me with this.

16   Q.    Do you think -- do you think he was asked about that

17   before May 15th, whether Mr. Abrego might be connected to

18   MS-13?

19   A.    I don't know the answer to that.

20   Q.    Now, you testified about some Snapchat correspondence

21   between -- oof -- female cooperating witness number 2?

22   A.    No.  I think we call her --

23              MR. MCGUIRE:  Female, I think, NV.

24              MR. HECKER:  Female NV?

25              MR. MCGUIRE:  That's the Snapchat.

1  BY MR. HECKER:

2  Q.    Female NV, that's someone you interviewed, correct?

3  A.    Yes, sir.

4  Q.    And your claim was that she told you that there was

5  sexual innuendo --

6              THE COURT:  Just so my record's clear.  My notes

7  indicate that that's someone who he sat in on the interview

8  that I now know Mr. McGuire was at.  So let's --

9              MR. HECKER:  That's helpful.

10              THE COURT:  Okay.  Okay.

11  BY MR. HECKER:

12  Q.    I believe you testified that, in what was Government

13  Exhibit 11, that this account -- at the top says Tuma

14  Soytugaa -- was somehow associated with Mr. Abrego; do you

15  recall that testimony?

16  A.    Yes.

17  Q.    And am I correct that the association with Mr. Abrego is

18  exclusively that an IP address connected to that account came

19  from a home where he had at one point lived; is that right?

20  A.    I believe -- so I did not personally run this down.  But

21  my belief of this -- this investigative finding was that this

22  account shared an IP address with another known account of

23  the defendant's.

24  Q.    Well, do you see at the top of the page, in looking at

25  Government's Exhibit 11, there's a date there, November 26th,

1  and it's got a balloon next to it?

2  A.   Yes.

3  Q.   Am I right to assume that purports to be a birth date?

4  A.   I don't know what that is.  I'm not familiar with this

5  application.  And this was provided to us from the

6  cooperator.

7  Q.   You're aware that Mr. Abrego was -- was born in --

8       THE COURT:  So Exhibit 11 came from female NV?

9       THE WITNESS:  Yes, sir.

10      THE COURT:  Okay.

11 BY MR. HECKER:

12 Q.   And you don't know that November 26th purports to be a

13 birth date?

14 A.   I'm unfamiliar with this application.

15 Q.   You know Mr. Abrego's birth date is in July, right?

16 A.   I do not know his birth date.

17 Q.   Okay.  And you didn't explore the question of whether

18 this might relate to some other person who --

19      THE COURT:  All right.  So let's move along.

20      MR. HECKER:  Okay.

21      THE COURT:  If he doesn't know the birth date --

22      MR. HECKER:  All right.

23      THE COURT:  That's -- we're not going to get there

24 here.

25      MR. HECKER:  All right.

1           Let me have one moment, Your Honor.

2  BY MR. HECKER:

3  Q.   Oh.  Let me -- let me go to this just quickly.

4           I believe you testified about a purported

5  confession that Mr. Abrego made at a dinner party, at which

6  one of the witnesses you spoke to attended; is that fair?

7  A.   Yes, sir.

8  Q.   And she testified that cooperating witness number 1 was

9  there, too, right?

10 A.   She did.

11 Q.   Did you ever go back to cooperating witness number 1 and

12 say, hey, do you recall Mr. Abrego confessing to a murder

13 when he was -- I don't know -- 14 or 15 in El Salvador?

14 A.   I haven't had the occasion to do that yet.

15 Q.   You haven't gotten on that yet?

16 A.   I just interviewed her.

17           MR. HECKER:  Oh, I see.

18           THE COURT:  What do you mean just --

19           THE WITNESS:  Monday.

20 BY MR. HECKER:

21 Q.   And we don't have a report of that interview yet,

22 correct?

23 A.   I have a draft that's close to being completed.  It

24 hasn't been approved by my supervisor yet.

25           MR. HECKER:  Okay.  May I have one moment, Your

1   Honor?

2           THE COURT:  Sure.

3           MR. HECKER:  No further questions at this time,

4   Your Honor.

5           THE COURT:  Any redirect?

6           MR. MCGUIRE:  I don't have any redirect, Your

7   Honor.

8           THE COURT:  So how long have you been with the

9   current agency you're with?

10          THE WITNESS:  23 years in November, sir.

11          THE COURT:  And during those 23 years, have you

12  ever -- and I'm not meaning to embarrass you, but it's

13  important for me to know.  Have you ever been disciplined?

14          THE WITNESS:  No, sir.

15          THE COURT:  And that's been 23 years of continuous

16  service?

17          THE WITNESS:  I had a four-year temporary

18  promotion in the middle of that where I went to work for the

19  Office of Professional Responsibility.  That's our internal

20  affairs.

21          THE COURT:  Okay.  And how long did you hold that

22  position?  Four years?

23          THE WITNESS:  Four years, sir.

24          THE COURT:  And I gather you were not -- did you

25  apply to be the permanent?

1    THE WITNESS:  No.  It was -- always a temporary

2 position.  There's some complications why I didn't fully

3 promote.  Personal -- family reasons type things.

4    THE COURT:  Have you testified in court before?

5    THE WITNESS:  Yes, sir.

6    THE COURT:  I would assume many times?

7    THE WITNESS:  Yes, several times.

8    THE COURT:  And, as you know, credibility of

9 witnesses is one of the things I have to, and every judge has

10 to deal with.

11    THE WITNESS:  Certainly.

12    THE COURT:  Has any judge ever questioned your

13 credibility?

14    THE WITNESS:  No, sir, never.

15    THE COURT:  Has there been any complaints filed

16 internally about your performance within the agency?

17    THE WITNESS:  No, sir.

18    THE COURT:  Any code of conduct complaints or

19 anything like that?

20    THE WITNESS:  Absolutely not.

21    THE COURT:  So make sure I'm clear.  Female

22 witness NV was not part of the conspiracy?

23    THE WITNESS:  She was not.  That's correct, sir.

24    THE COURT:  And you don't -- you personally don't

25 have any information otherwise?

```
 1                    THE WITNESS:  That's correct.
 2                    THE COURT:  And by being part of the conspiracy, I
 3       mean she was not part of any smuggling -- human smuggling
 4       activity?
 5                    THE WITNESS:  No, sir.
 6                    THE COURT:  Now, I think Mr. -- I'm sorry.  Your
 7       name?
 8                    MR. HECKER:  Hecker, Your Honor.
 9                    THE COURT:  -- Hecker was trying to make sure I
10       understand that cooperating witness number 1, cooperating
11       witness number 2 and female NV are related?
12                    THE WITNESS:  No, sir.  NV --
13                    THE COURT:  No.  I'm sorry.  Female cooperating
14       number 1?
15                    THE WITNESS:  That's correct.
16                    THE COURT:  Okay.  Those three are related?
17                    THE WITNESS:  They are.
18                    THE COURT:  And you were aware of that?
19                    THE WITNESS:  I'm aware of that.
20                    THE COURT:  During your investigation?
21                    THE WITNESS:  During the investigation, yes, sir.
22                    THE COURT:  So, just to go to the endpoint, at any
23       time in your investigation, did you ever have reason to
24       believe that those three had gotten together on their
25       testimony?
```

 1                    THE WITNESS:  It's -- it's always a possibility,

 2    of course.  I mean, they're family.

 3                    THE COURT:  Yeah.

 4                    THE WITNESS:  But to this point in the

 5    investigation, I've treated each person as an individual,

 6    wrote a report and --

 7                    THE COURT:  Well, like you said, they're family.

 8    Family talk.  Did you ever -- did you ever discern any reason

 9    to believe they had gotten together on their testimony?

10                    THE WITNESS:  No, sir.

11                    THE COURT:  Did you ask them have you all talked

12    about --

13                    THE WITNESS:  I have -- I didn't ask that

14    question.  I instructed cooperator 1 to not communicate with

15    anyone in his family.

16                    THE COURT:  Oh.  Did you do that for 2, as well as

17    female cooperator 1?

18                    THE WITNESS:  I was never with female cooperator

19    number 1.  I most likely said it to 2, as well, but I

20    certainly said it to 1.

21                    THE COURT:  That would be part of your regular

22    spiel?

23                    THE WITNESS:  Sure.

24                    THE COURT:  Sure.

25                    THE WITNESS:  Just to maintain the integrity of

1  the investigation.

2          THE COURT:  And I guess, Mr. -- Heckler -- is

3  going to provide it to me.  I guess your 301 reports --

4          THE WITNESS:  The 302 from the FBI.

5          THE COURT:  All of those --

6          THE WITNESS:  That was the one that was in

7  question.  The -- that counsels were talking about, yes, sir.

8          THE COURT:  To the best of your knowledge, those

9  reflect everything that was said during those interviews?

10          THE WITNESS:  During those interviews?  Yes, sir.

11          THE COURT:  But you --

12          THE WITNESS:  I wasn't present for the -- for the

13  one.

14          THE COURT:  And you've not read it?

15          THE WITNESS:  I did read it.

16          THE COURT:  Oh, you did?

17          THE WITNESS:  Yes, sir.  And I've since

18  reinterviewed her and written a report myself, which will

19  also be provided.

20          MR. MCGUIRE:  Your Honor, I want to make sure

21  we're talking about the same -- the same 302.

22          THE COURT:  Okay.

23          MR. MCGUIRE:  I think what Agent Joseph is

24  referencing is the 302 related to female cooperator 2.

25          THE COURT:  Oh.  Okay.

1          MR. MCGUIRE:  I think that's what he's talking

2    about.

3          THE WITNESS:  That's right.

4          MR. MCGUIRE:  My concern is that I think the Court

5    was asking a question about another individual.

6          THE COURT:  Right.

7          MR. MCGUIRE:  And I want to make sure we're all on

8    the same --

9          THE COURT:  Female cooperator 1.

10          THE WITNESS:  If there is a report written that's

11    furnished by our agency, then, yes, sir, we will furnish it.

12          THE COURT:  Have you read it?

13          THE WITNESS:  I have not.

14          THE COURT:  Okay.

15          THE WITNESS:  I've only read the grand jury

16    testimony.

17          THE COURT:  All right.  Any other questions

18    from --

19          MR. MCGUIRE:  May I follow-up briefly on something

20    the Court raised?

21          THE COURT:  Sure.

22                              EXAMINATION

23    BY MR. MCGUIRE:

24    Q.   Agent Joseph, did you receive information about the

25    level of relationship, or for lack of a better term,

1  affection between -- or -- cooperator 1 and female cooperator

2  1?

3  A.    Repeat that for me, please.

4  Q.    Yeah.  Sorry.

5         Do you have an understanding of -- that they share

6  a relationship.  But are they in active communication?  Do

7  they like each other?  Do you know anything about that?

8         MR. HECKER:  Objection, Your Honor.  Foundation.

9  This witness testified he didn't read the prior reports of

10 investigation relating to the interviews of those two

11 witnesses.

12        MR. MCGUIRE:  That's fine, Your Honor.

13        THE COURT:  All right.

14        MR. MCGUIRE:  I can let it go.

15        THE COURT:  All right.  Anything else,

16 Mr. Heckler?

17        MR. HECKER:  No, Your Honor.

18        THE COURT:  All right.  You can step down.

19        THE WITNESS:  Thank you, sir.

20        MR. MCGUIRE:  Your Honor, may Agent Joseph be

21 excused?

22        THE COURT:  Sure.

23        THE WITNESS:  Stay here?

24        THE COURT:  No.  You can leave.  That stays there.

25        THE WITNESS:  Yes, sir.  Thank you.

1          (Witness excused.)

2          THE COURT:  All right.  Any other witnesses?

3          MR. MCGUIRE:  I don't have any other witnesses,

4     Your Honor.  I just want to proffer a couple of exhibits.

5          THE COURT:  Sure.

6          MR. MCGUIRE:  Your Honor, we had previously marked

7     and submitted to the Court Exhibits 9 and 10.

8          For purposes of the record, Exhibit 9 is an order

9     of protection petition that was taken out against the

10    defendant by his wife in 2020.  And Exhibit 10 is an order of

11    protection petition taken out by her in 2021.

12         The last exhibit I would proffer, Your Honor, is

13    Exhibit 13, which is a CAST report that was prepared by the

14    FBI for the number ending in 5996 for the period of November

15    29th, 2022 to December 1st, 2022.  And I would proffer

16    Exhibits 9, 10 and 13 to the Court, and ask they be admitted.

17         THE COURT:  All right.  Admitted.

18         (Whereupon Government's Exhibits 9, 10, 13, were

19    marked for identification and received in evidence.)

20         THE COURT:  Now, what do you want me to make of

21    13?

22         MR. MCGUIRE:  In terms of what -- how I want the

23    Court to consider it?

24         THE COURT:  Yes.

25         MR. MCGUIRE:  Your Honor, what I would submit that

the CAST report establishes, or just illustrates, is the sort
of path of the defendant's -- of the phone ending in 5996
during the relevant period.  And it appears to -- to travel
really nowhere close to St. Louis, which is probative because
the defendant describes that's where he's coming from, and
also appears to embrace Texas and Arkansas.  Certainly parts
of Missouri, I think.  But that's the upshot, Your Honor, is
that, from our perspective, corroborates the statements of
the cooperators in terms of the breadth of the conspiracy.
And it also establishes, Your Honor, that the defendant lied
to the trooper about where he was coming from to try to, from
our perspective, hide his criminal activity, which goes to
his amenability for conditions, as it relates to conditions
of release.

        THE COURT:  All right.

        MR. MCGUIRE:  That's our position on that.

        THE COURT:  Okay.

        MR. MCGUIRE:  And, Your Honor, just as a final --
we've marked the transcript of the detention hearing as
Exhibit 12.  I'm not going to seek to admit that, Your Honor.
That's -- that's already in the record as --

        THE COURT:  And I've read it and relied upon it.

        MR. MCGUIRE:  Yes, sir.  It's Docket Entry 61.  So
I just wanted to clean that up.

        MR. DEAN:  Your Honor, may Mr. McGuire and I

1 approach real fast?

2          THE COURT:  Sure.

3          (Bench conference outside the hearing of the

4 public.)

5          MR. DEAN:  Can we take a brief recess?  The

6 defendant really needs to go to the bathroom.

7          THE COURT:  Okay.  And now what are we going to do

8 after this?

9          MR. MCGUIRE:  We'll rest --

10          THE COURT:  You don't have any proof?

11          MR. HECKER:  I just will want to make sure the

12 record is clear that we submit to you the reports of those

13 prior investigations --

14          THE COURT:  Sure.

15          MR. HECKER:  -- that I assumed he had read.

16          THE COURT:  So let's get a label on those so that

17 it will be part of the record.

18          MR. HECKER:  Will do.

19          THE COURT:  And I assume you all want to argue

20 just a little bit?

21          MR. HECKER:  Sure.

22          MR. MCGUIRE:  I mean, I won't if Mr. Hecker

23 doesn't but. . .

24          THE COURT:  Well, I've got questions for both of

25 you.

1           MR. MCGUIRE:  Thank you, Your Honor.

2           MR. HECKER:  Thank you.

3           (In open court.)

4           THE COURT:  So we'll take a -- we're going to take

5    about a five-minute recess, refresh ourselves, and come back

6    and complete the hearing.

7           Thanks.

8           (Recess.)

9           THE COURT:  All right.  Be seated.

10          Okay.  So I think I asked the defense.  Do you all

11   have any witnesses?

12          MR. HECKER:  No witnesses, Your Honor.

13          THE COURT:  But you have some exhibits?

14          MR. HECKER:  We do.  Thank you.

15          THE COURT:  Let's do those.

16          MR. HECKER:  They've been marked as Defendant's

17   Exhibits 1 through 7.

18          THE COURT:  Okay.

19          MR. HECKER:  And they consist of the report of

20   investigation of all of the interviews conducted of

21   cooperating witnesses numbers 1 and 2.

22          THE COURT:  Okay.

23          MR. HECKER:  And we --

24          THE COURT:  Any objection?

25          MR. MCGUIRE:  No objection, Your Honor.

1            We would just, again, ask that they be placed

2    under seal --

3            THE COURT:  All right.

4            MR. MCGUIRE:  -- because it involves

5    cooperating --

6            THE COURT:  I'll do that.

7            MR. MCGUIRE:  -- statements.

8            Thank you, Your Honor.

9            (Whereupon (Sealed) Defendant Exhibits 1, 2, 3, 4

10   5  6  7 were marked for identification and received in

11   evidence.)

12           THE COURT:  All right.  So are we ready for

13   argument?

14           MR. MCGUIRE:  Your Honor, I know the Court has

15   reviewed all the briefing.  And to the extent that I have

16   good arguments, I've already written them down, and I know

17   the Court's read them.  But I'm happy to try to answer

18   whatever questions I can that the Court may have about our

19   positions or the proof.

20           THE COURT:  So obviously the Court's going to look

21   at both issues before the Court.  One, is the government

22   entitled to a detention hearing.  And assuming I rule in your

23   favor on that, I am having a hard time understanding your

24   argument that there are no conditions by clear and convincing

25   evidence.

1              And we found a Sixth Circuit that said (as read):

2              Generally when clear and convincing evidence is

3    required juries should be instructed that they must be

4    persuaded that the truth of the contention is highly

5    probable, as opposed to more likely than not.

6              That's a pretty high standard, but that's the

7    standard that Congress has imposed upon the Court.

8              So I think I understand what your argument is.  I

9    think it's in your brief.  And we can go over those points.

10   But how does the government get to by clear and convincing

11   evidence there are no conditions?

12             MR. MCGUIRE:  So, Your Honor -- I would submit,

13   Your Honor, we have to establish by clear and convincing

14   evidence that the defendant is a danger and can't be

15   controlled by conditions, but only flight risk by a

16   preponderance.

17             THE COURT:  Right.

18             MR. MCGUIRE:  And so I would submit, Your Honor,

19   as to the danger, where we are is we've presented

20   corroborated statements to the Court that the defendant was

21   in a years' long criminal conspiracy that involved the

22   transportation of humans, which is a dangerous proposition.

23             THE COURT:  And that's -- that's strong proof on

24   Count One in the indictment, which I'm not ruling on, and as

25   best as I can determine really not part of the analysis.

```
 1              MR. MCGUIRE:  Well, I think it goes to whether
 2   that there are -- whether there's danger such that can be
 3   controlled by conditions.
 4              THE COURT:  Right.
 5              MR. MCGUIRE:  And I think a person's participation
 6   in a dangerous conspiracy is something the Court can
 7   consider.
 8              THE COURT:  Okay.  And Judge Holmes -- and I've
 9   only peeked at those, because she's going to be the one to
10   enforce it if we go forward.  She's got a lot of conditions
11   on his home detention.
12              MR. MCGUIRE:  That's true, Your Honor.  The other
13   thing that I would note, and I raised this, that the Court
14   will probably remember, at the detention hearing is --
15              THE COURT:  I don't think I was at the detention
16   hearing.
17              MR. MCGUIRE:  Well, I guess I meant the
18   transcript, Your Honor.
19              THE COURT:  Okay.  Oh, all right.
20              MR. MCGUIRE:  That the Court reviewed.  I should
21   have been more clear.
22              The petitions that we've offered as Exhibits 9 and
23   10 -- domestic violence is very difficult to control with
24   conditions.  The two orders of protection petitions.  And I
25   submit, Your Honor, I believe those statements.
```

1          THE COURT:  So I get that point.  I've read the

2    protective orders, 20 -- 2020 and 2021.

3          MR. MCGUIRE:  Yes, sir.

4          THE COURT:  And I do note that one was voluntarily

5    dismissed.  That doesn't say anything about the allegations.

6    It simply says it was dismissed.  And the second, 2021, no

7    one appeared.  So it was just dismissed.  And neither one of

8    those speak to the underlying allegations, I guess as to your

9    point.

10          MR. MCGUIRE:  I don't disagree, Your Honor.  What

11    I would submit, Your Honor, is that I believe that the

12    defendant's wife accurately described the --

13          THE COURT:  But even if that's true, that's 2021.

14    How do I go from 2021 to 2026 and say he's a danger?

15          MR. MCGUIRE:  From my perspective, Your Honor, and

16    this is the argument that I made, those characteristics don't

17    change.  And we have no real proof of any kind of intervening

18    cause that would cause them to change.  To the contrary,

19    after 2021, we have the defendant hip deep in a traffic stop

20    in Tennessee where he's lying to the officer, driving nine,

21    what appear to be at least six of them are undocumented,

22    illegal aliens, as a part of a long running conspiracy.  So

23    that would be an indicator that his criminality did not

24    change after 2021.  But I would submit, Your Honor, there's

25    really nothing before the Court that would give the Court any

1 comfort that the person that his wife described him to be in
2 2020 and 2021 is somehow different in 2025.
3                Judge Newbern had previously ruled, and I think it
4 makes a lot of sense, that domestic violence is difficult to
5 control with conditions, if not impossible, because it
6 happens at home; it is often something that happens in
7 secret.  And I would submit that the two domestic violence
8 incidences that the defendant's wife describes is the shark
9 fin.  It's the tip of the iceberg.  It's the part that she
10 allowed us to see.  That's of great concern to the United
11 States.
12                You know, there's obviously discussions in the --
13 in the detention hearing about the defendant potentially
14 trafficking -- or driving guns and drugs as a part of this
15 conspiracy.  And I understand the proof is what it is on that
16 point, Your Honor.  I'm not trying to overhype it, but it is
17 grist for the mill.  It is not something that I think the
18 Court can just --
19                THE COURT:  So let's go through your list.
20                The proof on the MS-13 in and of itself does not
21 meet the clear and convincing standard.
22                MR. MCGUIRE:  What I would submit, Your Honor, is
23 we've placed the evidence before the Court that we have about
24 those things.
25                THE COURT:  All right.

1          MR. MCGUIRE:  And I would submit that to the

2    Court, that obviously -- I don't think I need to convince the

3    Court that MS is a dangerous gang, but the affiliation the

4    defendant has, we've submitted that proof.

5          THE COURT:  So also in your brief you talk about

6    the seatbelts.  We don't have to waste time there.

7          But then you've got motivation to flee from ICE --

8    the ICE detainer.  Expand on that.

9          MR. MCGUIRE:  So it's a strange situation, Your

10   Honor, because the practicality of the situation is the

11   defendant does have an ICE detainer.  And it is more likely

12   than not that he is going to be detained.

13         However, the way the Sixth Circuit has sort of set

14   up that analysis, is the Court almost has to suspend your --

15   your disbelief and consider the defendant as if that was not

16   a possibility, that you would be releasing him to the

17   community.  And so within that --

18         THE COURT:  So I don't know if I can even consider

19   this factor.

20         MR. MCGUIRE:  I think you can consider the fact

21   the defendant's facing deportation.

22         THE COURT:  Okay.

23         MR. MCGUIRE:  Because that is true and would be

24   true whether he was at liberty or in custody.

25         THE COURT:  Right.

 1          MR. MCGUIRE:  And because he's facing deportation,

 2    that is an enormous incentive to flee, because if he was

 3    convicted of this offense his deportation becomes easier.

 4          THE COURT:  But then aren't I doing what the Sixth

 5    Circuit said I should not do?

 6          MR. MCGUIRE:  I think the distinction is, Your

 7    Honor, the Sixth Circuit counsels that the Court can't use

 8    the detainer as a way to say, well, he obviously can't flee

 9    because he's going to be detained by ICE.  Frankly, we don't

10    know what's going to happen in that regard.  And I think

11    that's the point the Sixth Circuit is making.  But the larger

12    point that the defendant is facing deportation is a unique

13    circumstance to him that, from our perspective, influences

14    the Court's flight calculus, which we only have to establish

15    by a preponderance of the evidence, if the defendant is at

16    liberty, he would have an enormous reason to flee.

17          THE COURT:  And that I might -- I might give more

18    weight to it if there was anything -- there's nothing in the

19    pretrial services report that suggests he's missed a court

20    appearance or he's violated probation or that -- I don't have

21    anything in the preservice report that even suggests any

22    disrespect to the law.  Now it's a thin -- it's a thin

23    report, mind you, but I just don't have it.  And I didn't

24    read anything before Judge -- was there anything before Judge

25    Holmes that supports that he's likely to do that?  I -- I can

1  make an inference, but I can only make an inference from
2  facts.
3           MR. MCGUIRE:  Your Honor, I would submit that the
4  facts that are most relevant to that inference don't come
5  from the pretrial services report, but come from the fact the
6  defendant was in a years' long criminal conspiracy operating
7  in secret, and when he was confronted about it by law
8  enforcement he lied about it.
9           In other words, you have to determine whether
10  those conditions will be effective.  Not just that they
11  exist, but will the defendant abide by them.
12           THE COURT:  Well, if he's on home detention he
13  can't get in a car and bring people back and forth --
14           MR. MCGUIRE:  I guess I always think when -- when
15  we consider conditions like electronic monitoring or home
16  detention, something that Judge Brown used to say, which was,
17  you know, sometimes that is only as good -- it will tell us
18  where he was when he cuts it off.  And that's probably a
19  little cute.  Judge Brown sort of had that way about him.
20  But I guess all I would say is, Your Honor, you have to have
21  some confidence the defendant is going to follow those
22  conditions.  Well, the one time that's in front of this Court
23  that he's been confronted by law enforcement, he lies.
24  Immediately.  You know, the police officer asks him where are
25  you coming from and he says St. Louis.  And that's just not

true.  And I would submit the reason he says that is because
he knows if he says he's coming from Houston with the folks
in his car, with no luggage, it makes it look like what it
really is, which is alien smuggling.

THE COURT:  What do you make of all the calls to
the boss?

MR. MCGUIRE:  I think that, you know, he was kind
of letting the other co-conspirators know this is what's
going on.  Because it's also --

THE COURT:  Why?

MR. MCGUIRE:  Money.

THE COURT:  Money?

MR. MCGUIRE:  Money.  This is their business.  In
other words --

THE COURT:  Right.  But for the people in that
car.  But that's not going to stop the next ten cars coming.

MR. MCGUIRE:  It's not, Your Honor.  But those
people have all paid --

THE COURT:  Right.

MR. MCGUIRE:  -- the conspiracy.

THE COURT:  Yeah.

MR. MCGUIRE:  So if for some reason those nine
people are then taken into custody by ICE or whoever --

THE COURT:  Oh, it's going to hurt the business.

MR. MCGUIRE:  It's going to hurt the business.

```
 1              THE COURT:  Oh, it's going to hurt the business.
 2              MR. MCGUIRE:  And so that's something they would
 3    alert the co-conspirators about.  And then you see the call
 4    at 9:30 --
 5              THE COURT:  Then why does he call them while the
 6    police are still there?  Why wouldn't I wait until I get to
 7    the hotel room and call boss man and say we've got a problem?
 8              MR. MCGUIRE:  It's a great answer -- or great
 9    question, Your Honor.  I don't have the answer to that, other
10    than that's clearly what the evidence shows that he did.
11    Maybe it's because -- you know, he calls the boss because
12    he's in the boss's car.  And, you know, he's -- I don't know.
13    But I mean -- I can't tell you what motivated the defendant
14    in that moment.  I can only tell you what it looks like the
15    evidence shows he did.
16              THE COURT:  So it's the combination of all this --
17              MR. MCGUIRE:  Yes, sir.
18              THE COURT:  -- that the government says it's clear
19    and convincing?
20              MR. MCGUIRE:  Clear and convincing as to danger.
21              THE COURT:  That he's a danger.
22              MR. MCGUIRE:  And preponderance as to flight.  And
23    I think those are two different standards and it's important
24    to distinguish between the two.  Because is it more likely
25    than not that if he's at liberty he's at risk of flight.  And
```

1   I think --

2           THE COURT:  Even with all of Judge Holmes's

3   conditions?

4           MR. MCGUIRE:  Again, Your Honor, the position that

5   we've taken is there aren't conditions that would

6   sufficiently provide for those --

7           THE COURT:  Right.

8           MR. MCGUIRE:  -- interests.

9           THE COURT:  Okay.

10          MR. MCGUIRE:  Thank you, Your Honor.

11          THE COURT:  So, Mr. Heckler, my problem is your

12  brief that just doesn't give due respect to *United States*

13  *versus Watkins*.

14          First year law students are taught look for a case

15  on all fours.  *Watkins* has got at least two or three legs.

16          MR. HECKER:  Your Honor, two things.  Start with,

17  I've been called much worse than Heckler, but it's Hecker.

18          THE COURT:  Oh.  Oh, I'm sorry.

19          MR. HECKER:  That okay.  That's okay.

20          Your Honor, we're certainly familiar with *U.S. v.*

21  *Watkins.*  That's --

22          THE COURT:  And other courts have said it's very

23  persuasive.

24          MR. HECKER:  Second Circuit case.  But we think

25  that the Sixth Circuit's decision in *Fields* --

1          THE COURT:  Why would I go to a case that doesn't

2     even address -- or even say the words Bail Reform Act and

3     that's the statute I'm under?

4          MR. HECKER:  But -- the narrow question under the

5     Bail Reform Act is what the meaning of "involves in" when

6     trying to determine whether --

7          THE COURT:  And *Watkins* does that in the context

8     of that.

9          MR. HECKER:  It does.  But we think that *Watkins*

10    is both wrong, and that if you look at *Watkins, Watkins*

11    interprets "involves" differently, the use of "involves in"

12    in 3142(f)(1) versus 3142(f)(1)(E), despite applying the

13    categorical approach to every other section of (f)(1).

14         THE COURT:  Because Congress wanted to expand the

15    protections -- and then don't -- and I'm going to -- I'll

16    tell you where you lose me.  You can equate it to firearms.

17         So if you look at it in its context, a felony

18    that's not a crime of violence, but you use a firearm, then

19    it's much more likely, or it's a high probability, violence

20    is going to occur.  And same thing here.  If you involve a

21    minor victim then -- our society gives much protection to

22    minors under all circumstances.  So even if it's a felony

23    that's not a crime of violence, if you involve a minor,

24    you -- you're going to get sentencing enhancements and you

25    need to get a -- potentially, and you should get a hearing, a

1  detain- --

2          MR. HECKER:  Yeah.  Look, I think there are a

3  couple pieces to that.  One is let's just not lose sight of

4  the fact that even on the government's theory that there were

5  people who were minors who were on trips from Houston to

6  other places, it's not obvious to me that that makes them

7  victims of a smuggling operation.

8          The victim of a smuggling operation is the

9  Department of Homeland Security which has been rendered

10 unable to identify people who are traveling in the United

11 States without documentation.  It really -- I mean, it's a

12 remarkable notion that the people who paid money to come into

13 the United States and then travel within the United States

14 are victims of the smuggling operation.

15         THE COURT:  So let's say Mr. Dean and I are --

16 we're money launderers, and we've got a lot of money we've

17 made in a way that we don't really want to discuss.  And we

18 want to -- we want to engage in -- we want to clean it up.

19 And we find a way that John, or somebody else -- we find a

20 way that if we can get it to John we can launder this money

21 and we're going to all -- we're going to both be happy.  And

22 Mr. Dean and I decide, well, let's use a minor.  And we use

23 that minor to give some of that -- to transport some of the

24 money to be laundered, to John, and we get caught, whatever.

25 Now, is that minor involved in our money laundering scheme?

1          MR. HECKER:  Involved.  I'm not sure if they're a

2   victim of it.  Maybe they would be a victim of it in --

3          THE COURT:  So I didn't ask about the victim yet.

4   But the minor is involved?

5          MR. HECKER:  Under the *Watkins* interpretation of

6   involved, yes, not the one -- not under the interpretation

7   we've advanced, because it wouldn't be a necessary

8   requirement of a money laundering --

9          THE COURT:  And if the law is people should not

10  launder ill-gotten gains, that prohibition would protect that

11  minor and we should be held accountable for using a minor in

12  our money laundering scheme.

13         MR. HECKER:  It would.  It would be a pretty vast

14  expansion of the entitlement to a detention hearing if a

15  crime that involved a -- in that case, the minor is being

16  used as a pawn for the money laundering scheme.

17         THE COURT:  And the minor should not have been

18  used in that way.

19         MR. HECKER:  We could consent -- we agree.  We

20  would stipulate to that.

21         THE COURT:  So is the minor a victim?

22         MR. HECKER:  Maybe under a colloquial definition

23  of it, in that context.

24         THE COURT:  It's certainly somebody under the

25  protection of the Act.

1          MR. HECKER:  Understood.  I don't think, though,

2     when you're talking about the smuggling charges here that a

3     minor, if -- if smuggled -- and I would say that the evidence

4     on this is remarkably thin.  What we have is a roster with a

5     number, as Magistrate Judge Holmes noted, looks like it was a

6     1, and then it became a 7, but the government,

7     notwithstanding now weeks of investigation, hasn't identified

8     a human being of that name, with a birth date that's

9     indicated as a 7 or a 1.

10          That's the only concrete evidence that we have of

11    someone --

12          THE COURT:  -- female cooperator number 1 said the

13    smuggling included minors as cover and for transportation.

14          MR. HECKER:  I mean, I just think that -- that

15    that is not a reliable piece of testimony.

16          THE COURT:  Because they're all related to each

17    other?

18          MR. HECKER:  Because she was never even claiming

19    to have been on one of these trips with Mr. Abrego.

20          THE COURT:  Right.  But as you point out, they're

21    all family.  We know family talks so. . .

22          MR. HECKER:  Understood.  But --

23          THE COURT:  -- if others who were directly

24    involved in the -- in the conspiracy.

25          MR. HECKER:  It's a general statement about the

1  conspiracy writ large, that cooperating witness number 1

2  apparently ran.  When he was in prison, according to the

3  collection of materials we've submitted -- although it hasn't

4  come out in testimony --

5          THE COURT:  Yeah, I didn't hear that.

6          MR. HECKER:  -- cooperating witness number 2

7  apparently took over that operation when he was in prison.

8  And she's testifying as a gen- --

9          THE COURT:  On the Mississippi charge?  He was in

10  prison on the Mississippi conviction?

11          MR. HECKER:  Initially, yes.

12          I think she's testifying as a general proposition

13  that there were minors used, but I don't think she had

14  specific information about --

15          THE COURT:  Right.  But I'm on a preponderance

16  standard.  I don't -- there is no direct evidence.

17  Everything here is circumstantial.  But we tell juries all

18  the time you can rely upon circumstantial evidence.

19          MR. HECKER:  Understood.  I just think it's not

20  reliable evidence.

21          THE COURT:  So you just want me to tell the Second

22  Circuit they got it wrong?

23          MR. HECKER:  Well, I think even if you followed

24  *Watkins*, I still think you don't have evidence of minor

25  victims in this case that is reliable evidence entitling the

1    government to a detention hearing.

2           I think Magistrate -- the magistrate judge got

3    that correct.  Even assuming you applied *Watkins*, they

4    don't -- they haven't provided sufficient evidence.

5           THE COURT:  So that was -- I guess I hear you just

6    say *Watkins* is wrongly decided.

7           MR. HECKER:  We are respectfully suggesting that

8    *Watkins* was wrongly decided.

9           THE COURT:  Okay.

10          MR. HECKER:  But even if you followed *Watkins*, as

11   Magistrate --

12          THE COURT:  There's not proof here?

13          MR. HECKER:  There's not sufficient reliable proof

14   entitling the government to a detention hearing that there

15   are -- that this was an offense involving minors, in the way

16   suggested even by *Watkins*, where they would be victims.

17          The only way I think you could get there is if you

18   found reliable evidence that minors were used in the offense

19   in some way involuntarily, as a cover, I could see that you

20   could potentially get there, but I don't think they put on

21   reliable evidence that that happened here --

22          THE COURT:  Sure, but --

23          MR. HECKER:  -- (Indiscernible) their clients.

24          THE COURT:  -- some evidence that he allegedly

25   used his own children as cover.  That's --

1          MR. HECKER:  I think that evidence is --

2          THE COURT:  And as the government points out, I do

3    have to look at all the evidence as a whole.  I can't just --

4          MR. HECKER:  We don't have a single witness who

5    saw his minor children in a car, traveling across state

6    lines.  Not a single one.  And it's implausible for all the

7    reasons Magistrate Judge Holmes found it was, that he had

8    three children, two autistic, traveling 24 hours across

9    country as a cover.  There's just no evidence that happened.

10   There really isn't.  And it doesn't make a lot of sense.

11         THE COURT:  I don't know if I need to make an

12   inference that far.

13         MR. HECKER:  I don't know that you do either.

14         THE COURT:  If I find that it's more likely than

15   not it did occur then that satisfies the preponderance

16   standard.

17         MR. HECKER:  Look, I think -- I would also just

18   like to speak briefly to the issue that the Court inquired of

19   the government, which is about the notable release conditions

20   that Magistrate Judge Holmes proposed here, which included no

21   contact with any victims, witnesses, co-conspirators or

22   cooperators; anger management counseling and treatment, in

23   addition to mental health counseling; no weapons; no use of

24   alcohol; no drugs.

25         THE COURT:  So you know the way it works here --

1  and it's worked very well -- is that pretrial the magistrate
2  judge does the conditions and enforces the -- now, if you all
3  are not happy, you can always bring that to me, but that
4  rarely happens.  And then, you know, I take it over at trial.
5          I had not planned to opine on these conditions.
6  But I'll tell you that I do have concern about trusting a
7  third-party custodian who's not -- if he were here, I would
8  have questions for him.  But I'm going leave that to Judge
9  Holmes because she -- she does that better than I.  So, I
10 mean unless you tell me otherwise, I'm just going to rule on
11 whether the government was entitled to a detention hearing
12 under the statute.  And if so, can -- you know, have they
13 satisfied their burden by clear and convincing evidence that
14 there are no conditions acceptable.
15          MR. HECKER:  Understood, Your Honor.
16          THE COURT:  Okay.  Now -- oh, I'm sorry.  I didn't
17 mean to cut you off.
18          MR. HECKER:  No.  Go ahead, Your Honor.
19          THE COURT:  Oh, I was getting ready to wrap up.
20          MR. HECKER:  Okay.  I'll let you wrap up.
21          THE COURT:  No.  No.  You keep going.
22          MR. HECKER:  No, I think we're good.  I mean, the
23 only thing I would say on the risk of flight, it really --
24 the government's argument here is really divorced from the
25 unusual context of this case.

1          So Mr. Abrego, as everyone in this room knows, was

2   unlawfully sent to a torture facility in El Salvador and only

3   brought back by the government when they were able to obtain

4   an indictment in this case.

5          MR. MCGUIRE:  I don't know that I agree with that

6   statement.

7          THE COURT:  Well, I think Judge Xinis had

8   something to do with it but. . .

9          MR. HECKER:  Understood.

10          THE COURT:  But I'm not going down that rabbit

11   trail because I don't think I can.  But if I were to go down

12   that rabbit trail, as I've expressed, given what happened to

13   him when he was taken to El Salvador, a lay person could

14   reasonably say, well, maybe I need to get out of the way here

15   before they take me someplace else.  So. . .  But that's not

16   before me.  That's not before me.

17          MR. HECKER:  Well, it's relevant to thinking about

18   whether this is someone who with reasonable conditions would

19   be in a position to somehow -- somehow flee without detection

20   under the specific circumstances of this unusual case.

21          THE COURT:  So let's talk about your late -- no.

22   Let's see.  There is a late-filed exhibit, the factual basis.

23          MR. MCGUIRE:  And I'll find that, Your Honor.  I

24   wrote a note to myself during this hearing to get that to the

25   Court.

1          THE COURT:  And what do you want me to make of

2    your exhibits?  I haven't read them.  So --

3          MR. HECKER:  Well, I would urge the Court to look

4    at them.

5          THE COURT:  And what conclusions, or how is that

6    going to be helpful to me?

7          MR. HECKER:  Because in evaluating the strength of

8    the government's evidence relating to purported

9    dangerousness, particularly as it relates to allegations of

10   guns or of familiarity with MS-13 gang members, I'd urge the

11   Court to look at cooperating witness number 1's first set of

12   interviews, at which he answered questions on -- on those

13   topics pretty definitively with respect to gang membership.

14   And the mention of guns didn't show up until interview 4, at

15   which point the evidence was that he said he may have either

16   given or sold one or two firearms to Mr. Abrego.

17         THE COURT:  So you've read them.  I haven't read

18   them.  I will read them.

19         Does -- do any of those exhibits address

20   whether -- the involvement of minors, either as cover or as

21   transportation?  Is there anything in there?

22         MR. HECKER:  Your Honor, I don't believe that. . .

23         THE COURT:  Okay.

24         MR. HECKER:  Cooperating witness number 1

25   suggests -- I don't want to misstate it.  I don't believe. . .

1          MR. MCGUIRE:  I think there are, Your Honor.

2          MR. HECKER:  I would urge the Court to look at it.

3          THE COURT:  I will.

4          MR. HECKER:  But I don't think that they change

5    the analysis that we've been discussing.

6          The other piece, of course, was the evolution of

7    cooperating witness number 1's testimony and lining it up

8    with alleged statements of cooperating witness number 2,

9    given their relationship.

10         There's also evidence in the early reports of

11   interview of cooperating witness number 1 that are relevant

12   both to his motivation and his communication with cooperating

13   witness number 2, which, you know, the agent said he didn't

14   know anything about.  But it's obvious from reading the

15   transcript of the first interview that he contacted his son

16   and told -- let me strike that -- contacted the other witness

17   who was in hiding, and then arranged for him to be a

18   cooperating witness in this case.  So they had communication.

19   Which is certainly relevant to trying to figure out whether

20   the government got what they ultimately got because there had

21   been some discussion about what they were looking for in the

22   early interviews.

23         THE COURT:  But you admit -- you would have to

24   admit that for this -- purposes of this hearing, the only

25   credibility call I can make has to do with Mr. Joseph?

 1            MR. HECKER:  Well, no, Your Honor.

 2            THE COURT:  How am I going to read a document

 3    and -- I may find inconsistencies, but that's different than

 4    credibility.

 5            MR. HECKER:  Well, the testimony of Agent

 6    Joseph --

 7            THE COURT:  Right.

 8            MR. HECKER:  -- and the statements that he's

 9    making based on the interviews he did conduct --

10            THE COURT:  His credibility is fair game.

11            MR. HECKER:  Well, I'm -- he may have been telling

12    the truth about what he experienced in his investigation.

13    But not having looked at available information makes us

14    concerned that the information he's relying on is not

15    reliable.  And I don't know if that's his credibility or the

16    credibility of the evidence he's relying upon.  Either way,

17    it's the information that was presented to the Court as

18    evidence that the government claims proves dangerousness or

19    the involvement of children or flight risk.

20            THE COURT:  I think we're on the same page.

21            MR. HECKER:  I think so, too.

22            THE COURT:  The only person's whose eyes I could

23    look into were Agent Joseph.

24            MR. HECKER:  Agreed.

25            THE COURT:  I cannot look at CW1 or 2 or any of

1  the cooperators.

2          MR. HECKER:  They were not presented.

3          THE COURT:  I can see what they've said.  I can

4  look at inconsistencies.  I can look for consistencies.  I

5  can look for a story that makes sense and is plausible, but I

6  can't look at any of the cooperating witnesses and say, oh,

7  you're not telling the truth.

8          MR. HECKER:  Agree, Your Honor.

9          THE COURT:  Good.

10         MR. HECKER:  All right.  Thank you.

11         THE COURT:  So the Court will take it under

12  advisement.  I need to get the final exhibit.  And we'll work

13  hard to get a decision.

14         MR. MCGUIRE:  Your Honor, I think the Court had

15  discussed when you met with me and Mr. Dean that you just

16  wanted to make sure that whatever Judge Holmes was -- since

17  she hasn't officially issued a release order, that that order

18  would be stayed until the Court rules.

19         THE COURT:  Right.  Correct.

20         MR. MCGUIRE:  I just want to make sure that that

21  was clear on the record since we talked about it --

22         THE COURT:  And that's what the defense wants as

23  well?

24         MR. HECKER:  It is, Your Honor.

25         I would ask the Court whether they would inquire

1  of the government whether there's additional information

2  available about what happens if he is released into ICE

3  custody.  Because my understanding from the last time we were

4  here was there was a limited amount of information.  But I'm

5  guessing, given the possibility that the Court was going to

6  rule today, that they might have more information about what

7  the plan was, where he would be kept, where he would be sent.

8            THE COURT:  You should not expect a ruling this

9  week, but you should expect one next week.

10           MR. HECKER:  Understood.  I think coming here we

11  thought it was possible.

12           THE COURT:  That's because I typically rule from

13  the bench but I'm going to write on this one.

14           All right.  Thank you all.

15           (Court adjourned.)

16

17

18

19

20

21

22

23

24

25

1    REPORTER'S CERTIFICATE

2

3            I, Lise S. Matthews, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6            That I reported on the Stenograph machine the

7    proceedings held in open court on July 16, 2025, in the

8    matter of UNITED STATES OF AMERICA v. KILMAR ARMANDO ABREGO

9    GARCIA, Case No. 3:25-cr-00115; that said proceedings in

10   connection with the hearing were reduced to typewritten form

11   by me; and that the foregoing transcript (pages 1 through

12   113) is a true and accurate record of said proceedings.

13           This the 25th day of July, 2025.

14

15                                 /s/ Lise S. Matthews
                                   LISE S. MATTHEWS, RMR, CRR, CRC
16                                 Official Court Reporter

17

18

19

20

21

22

23

24

25