**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

UNITED STATES OF AMERICA

v.

KILMAR ARMANDO ABREGO GARCIA,

*Defendant.*

No. 3:25-cr-115

Judge Waverly D. Crenshaw, Jr.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**KILMAR ARMANDO ABREGO GARCIA'S MOTION TO**
**DISMISS FOR VINDICTIVE AND SELECTIVE PROSECUTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ......................................................................................................................... 3

    I.   Mr. Abrego's History and Background .......................................................... 3

    II.  Mr. Abrego Is Illegally Seized and Removed to El Salvador ........................ 4

    III. Mr. Abrego Challenges His Removal and the Government Responds with a
          Retribution Campaign ................................................................................... 5

ARGUMENT ............................................................................................................................. 13

    I.   Applicable Law ............................................................................................ 13

          A.  Vindictive Prosecution ..................................................................... 13

          B.  Selective Prosecution ....................................................................... 14

    II.  The Government's Prosecution of Mr. Abrego Is Vindictive ....................... 15

          A.  Objective Evidence Establishes the Government's Actual Vindictiveness ........... 15

          B.  There Is a Realistic Likelihood of Vindictiveness .......................... 17

    III. The Government's Prosecution of Mr. Abrego Is Selective .......................... 22

    IV. At a Minimum, Discovery and a Hearing Are Required ............................... 24

CONCLUSION .......................................................................................................................... 26

## TABLE OF AUTHORITIES

**CASES**

*Abrego Garcia v. Noem,*
    No. 25 Civ. 951 (D. Md.) ........................................................................... 3, 4, 5, 7, 8

*Abrego Garcia v. Noem,*
    777 F. Supp. 3d 501 (D. Md. 2025) ................................................................ 3, 4, 5, 9

*Abrego Garcia v. Noem,*
    No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025) .................................... 9, 18

*Abrego Garcia v. Noem,*
    No. 25-1404, 2025 WL 1135112 (4th Cir. Apr. 17, 2025) .................................... 18

*Blackledge v. Perry,*
    417 U.S. 21 (1974) ................................................................................... 19, 20, 21

*Bordenkircher v. Hayes,*
    434 U.S. 357 (1978) ........................................................................................ 13

*Bragan v. Poindexter,*
    249 F.3d 476 (6th Cir. 2001) ...................................................................... 15, 19

*Cal. Motor Transp. Co. v. Trucking Unlimited,*
    404 U.S. 508 (1972) ........................................................................................ 18

*Dixon v. District of Columbia,*
    394 F.2d 966 (D.C. Cir. 1968) .......................................................................... 21

*Gable v. Lewis,*
    201 F.3d 769 (6th Cir. 2000) ............................................................................ 21

*Graham v. Nat'l Collegiate Athletic Ass'n,*
    804 F.2d 953 (6th Cir. 1986) ............................................................................ 18

*In re Aiken County,*
    725 F.3d 255 (D.C. Cir. 2013) .......................................................................... 15

*Noem v. Abrego Garcia,*
    145 S. Ct. 1017 (2025) ...................................................................................... 9

*United States v. Adams,*
    870 F.2d 1140 (6th Cir. 1989) ........................................................... 15, 20, 24, 25

*United States v. Armstrong*,
  517 U.S. 456 (1996) .................................................................. 14, 15, 24

*United States v. Berrios*,
  501 F.2d 1207 (2d Cir. 1974) ............................................................ 15

*United States v. Correa-Gomez*,
  160 F. Supp. 2d 748 (E.D. Ky. 2001) .................................................. 23

*United States v. Correa-Gomez*,
  328 F.3d 297 (6th Cir. 2003) ............................................................ 23

*United States v. Dupree*,
  323 F.3d 480 (6th Cir. 2003) ............................................................ 15

*United States v. Falk*,
  479 F.2d 616 (7th Cir. 1973) ............................................................ 23

*United States v. Goodwin*,
  457 U.S. 368 (1982) .................................................................. 14, 15

*United States v. Hazel*,
  696 F.2d 473 (6th Cir. 1983) ....................................................... 15, 22

*United States v. Heidecke*,
  900 F.2d 1155 (7th Cir. 1990) .......................................................... 24

*United States v. Hollywood Motor Car Co.*,
  646 F.2d 384 (9th Cir. 1981) ............................................................ 16

*United States v. Howell*,
  17 F.4th 673 (6th Cir. 2021) ............................................................ 14

*United States v. Jamison*,
  505 F.2d 407 (D.C. Cir. 1974) .......................................................... 21

*United States v. Jenkins*,
  504 F.3d 694 (9th Cir. 2007) ............................................................ 22

*United States v. Johnson*,
  171 F.3d 139 (2d Cir. 1999) ......................................................... 15, 16

*United States v. Koh*,
  199 F.3d 632 (2d Cir. 1999) ............................................................ 15

*United States v. LaDeau*,
734 F.3d 561 (6th Cir. 2013) .................................................................. *passim*

*United States v. Mansoor*,
77 F.3d 1031 (7th Cir. 1996) .......................................................................... 15

*United States v. Roach*,
502 F.3d 425 (6th Cir. 2007) .......................................................................... 20

*United States v. Schmucker*,
815 F.2d 413 (6th Cir. 1987) .......................................................................... 24

*United States v. Steele*,
461 F.2d 1148 (9th Cir. 1972) ........................................................................ 24

*United States v. Suarez*,
263 F.3d 468 (6th Cir. 2001) .......................................................................... 21

*United States v. Velsicol Chem. Corp.*,
498 F. Supp. 1255 (D.D.C. 1980) .............................................................. 16, 22

*United States v. Wood*,
36 F.3d 945 (10th Cir. 1994) .......................................................................... 22

*United States v. Zakhari*,
85 F.4th 367 (6th Cir. 2023) .............................................................. 13, 14, 25

*Warmus v. Hank*,
48 F.3d 1220, 1995 WL 82061 (6th Cir. 1995) .............................................. 21

*Wayte v. United States*,
470 U.S. 598 (1985) ........................................................................................ 14

**FEDERAL STATUTES**

8 U.S.C. § 1231 ................................................................................................. 4

8 U.S.C. § 1324 ........................................................................................... 12, 23

**FEDERAL RULES**

Fed. R. Crim. P. 12 ........................................................................................... 2

**FEDERAL REGULATIONS**

8 C.F.R. § 208.24 ............................................................................................. 4

## OTHER AUTHORITIES

Alan Feuer, *Judges Openly Doubt Government as Justice Dept. Misleads and Dodges Orders*, N.Y. Times (Aug. 4, 2025), https://www.nytimes.com/2025/08/04/us/politics/trump-justice-department-judges-courts.html ................................................................... 25

Amanda Friedman, *Trump says he's 'not defying the Supreme Court' amid standoff over wrongly deported man*, Politico (Apr. 25, 2025), https://www.politico.com/news/2025/04/25/trump-supreme-court-deportation-00309305 .... 17

*Attorney General Bondi News Conference*, C-SPAN (June 6, 2025), https://www.c-span.org/program/news-conference/attorney-general-bondi-news-conference/660932 .......... 12

Attorney General Pamela Bondi (@AGPamBondi), X (Apr. 16, 2025, at 9:42 P.M.), https://x.com/AGPamBondi/status/1912682960156795369 ................................................... 10

*DHS Releases Bombshell Investigative Report on Kilmar Abrego Garcia Suspected Human Trafficking Incident*, Dep't of Homeland Sec. (Apr. 18, 2025), https://www.dhs.gov/news/2025/04/18/dhs-releases-bombshell-investigative-report-kilmar-abrego-garcia-suspected-human ................................................................................. 11

Forbes Breaking News, *Bondi Asked Why Abrego Garcia Must Stay in Foreign Prison If Admin Admitted Deportation Was Mistake* (YouTube Apr. 8, 2025), https://www.youtube.com/watch?v=MXh4lmUAKZA ........................................................... 8

Hamed Aleaziz & Alan Feuer, *How Trump Officials Debated Handling of the Abrego Garcia Case: 'Keep Him Where He Is*,' N.Y. Times (May 21, 2025), https://www.nytimes.com/2025/05/21/us/politics/trump-abrego-garcia-el-salvador-deportation.html ............................................................................................................. 6

Homeland Security (@DHSgov), X (May 14, 2025, at 11:17 A.M.), https://x.com/DHSgov/status/1922672678340555173 ......................................................... 10

*How It's Going*, U.S. Dep't of Homeland Sec., https://www.dhs.gov/medialibrary/assets/video/59108 ..................................................... 10

James Hill et al., *Justice Department Investigating 2022 Abrego Garcia Traffic Stop: Sources*, ABC News (May 6, 2025), https://abcnews.go.com/Politics/justice-department-investigating-2022-abrego-garcia-traffic-stop/story?id=121492776 ...................................... 11

James Morley III, *Homan to Newsmax: Abrego Garcia Has Himself to Blame*, Newsmax (Apr. 11, 2025), https://www.newsmax.com/newsmax-tv/homan-abrego-garcia/2025/04/11/id/1206624/ ..................................................................................... 8

JD Vance (@JDVance), X (Apr. 1, 2025, at 12:58 A.M.),
https://x.com/JDVance/status/1906934067607556440 ............................................................ 7

July 1, 2025 Addendum to June 24, 2025 Protected Whistleblower Disclosure of Mr. Erez
Reuveni Submitted Pursuant to 5 U.S.C. § 2302 and 5 U.S.C. § 1213, S. Comm. on the
Judiciary (July 10, 2025), https://www.judiciary.senate.gov/imo/media/doc/07-01-2025_-
_reuveni_batch_1_index_and_evidence_redacted_final.pdf ................................................. 6, 7

*Karoline Leavitt talks Kilmar Abrego Garcia at White House briefing*, Fox 9 (YouTube Apr.
16, 2025), https://www.youtube.com/watch?v=c6j4_DT73vM ................................................. 10

Katherine Faulders et al., *Kilmar Abrego Garcia brought back to US, appears in court on
charges of smuggling migrants*, ABC News (June 6, 2026),
https://abcnews.go.com/US/mistakenly-deported-kilmar-abrego-garcia-back-us-
face/story?id=121333122 ..................................................................................................... 12

*Kilmar Abrego Garcia was indicted on 'very serious' charges, US deputy attorney general
says*, Fox News (June 6, 2025), https://www.foxnews.com/video/6373969491112 ......... 13, 16

Letter from Dana L. Gold, Gov't Accountability Project, et al. to Michael E. Horowitz,
Inspector Gen., U.S. Dep't of Just., et al. (June 24, 2025),
https://www.judiciary.senate.gov/imo/media/doc/06-24-2025_-
_Protected_Whistleblower_Disclosure_of_Erez_Reuveni_Redacted.pdf ........................ 6, 8, 9

Mark Swanson, *Kristi Noem to Newsmax: Man Deported in Error 'Very Dangerous,'*
Newsmax (Apr. 4, 2025), https://www.newsmax.com/newsmax-tv/kristi-noem-deported-
kilmar-abrego-garcia/2025/04/04/id/1205764/ .......................................................................... 8

Nayib Bukele (@nayibbukele), X (Feb. 3, 2025, at 9:44 P.M.),
https://x.com/nayibbukele/status/1886606794614587573 ......................................................... 9

Rapid Response 47 (@RapidResponse47), X (May 27, 2025, at 1:57 P.M.),
https://x.com/RapidResponse47/status/1927423875828056513 .............................................. 10

*Remarks: Donald Trump Holds a Bilateral Meeting with Nayib Bukele of El Salvador*, Roll
Call (Apr. 14, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-
bilat-nayib-bukele-el-salvador-april-14-2025/ ......................................................................... 9

Robert H. Jackson, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology 3 (1940) .................. 1

Sarah Fortinsky, *Rubio to Van Hollen: We deported gang members, 'including the one you
had a margarita with,'* Hill (May 20, 2025), https://thehill.com/homenews/senate/5310018-
rubio-van-hollen-trump-administration-deportations/............................................................... 10

Stephen Miller (@StephenM), X (June 6, 2025, at 5:26 P.M.),
https://x.com/StephenM/status/1931100469515993431 ....................................................... 10

Tricia McLaughlin (@TriciaOhio), X (May 3, 2025, at 10:45 A.M.),
    https://x.com/TriciaOhio/status/1918678209475887560 ........................................................ 10

WAAY 31 News, *Donald Trump on Kilmar Abrego Garcia: DOJ made the decision*
    (YouTube June 6, 2025), https://www.youtube.com/watch?v=AmFoHqCnse4 ................ 13, 16

## PRELIMINARY STATEMENT

"The prosecutor has more control over life, liberty, and reputation than any other person in America." Robert H. Jackson, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology 3 (1940). But prosecutorial power, though vast, is not unlimited. It cannot be used to punish someone for exercising his constitutional rights. Yet that is exactly what has happened here. Kilmar Abrego Garcia has been singled out by the United States government. It is obvious why. And it is not because of the seriousness of his alleged conduct. Nor is it because he poses some unique threat to this country. Instead, Mr. Abrego was charged because he refused to acquiesce in the government's violation of his due process rights. The government unlawfully removed him to El Salvador, an action it subsequently admitted was a mistake. Predictably, once in El Salvador, Mr. Abrego was incarcerated at the notorious Terrorism Confinement Center ("CECOT"), where he was beaten and otherwise subjected to inhumane conditions. Mr. Abrego responded to the government's shocking, illegal conduct by filing a lawsuit. Rather than fix its mistake and return Mr. Abrego to the United States, the government fought back at every level of the federal court system. And at every level, Mr. Abrego won. This case results from the government's concerted effort to punish him for having the audacity to fight back, rather than accept a brutal injustice.

The central event alleged in the Indictment happened in 2022. At the time, Mr. Abrego was living in the United States lawfully: he had secured an order from an immigration court prohibiting his removal to El Salvador, the country of his birth and citizenship, to protect him from gang violence he feared if returned there. In November 2022, Mr. Abrego was pulled over, allegedly for speeding, while driving an SUV with nine passengers through Putnam County, Tennessee. Federal authorities were informed of the relevant facts and declined to investigate or prosecute Mr. Abrego. He was sent on his way without so much as a traffic ticket.

1

Three years later, unrelatedly, the government picked Mr. Abrego up off the street—along with others with similar immigration status—as part of a shock-and-awe immigration enforcement push. Over three days, the government whisked him from one detention facility to another, in a deliberate effort to keep Mr. Abrego, his loved ones, and his attorneys guessing about his whereabouts. Then, the government forced him onto an airplane bound for El Salvador—where the government was legally prohibited from sending him. Mr. Abrego was detained there without any charges, at CECOT, where he was tortured.

While Mr. Abrego was being tortured in El Salvador, his lawyers filed a lawsuit on his behalf in the United States. That suit contested his removal and sought an order returning him to the status quo ante—his ordinary life in Maryland, where he lived with his wife and children, all U.S. citizens. Even as government officials recognized both publicly and privately that Mr. Abrego's removal to El Salvador had been a serious mistake, the government responded not with contrition, or with any effort to fix its mistake, but with defiance. A group of the most senior officials in the United States sought vengeance: they began a public campaign to punish Mr. Abrego for daring to fight back, culminating in the criminal investigation that led to the charges in this case.

Federal Rule of Criminal Procedure 12(b)(3)(A)(iv) authorizes motions to dismiss an indictment for "selective or vindictive prosecution." Those motions are infrequently made and rarely succeed. But if there has ever been a case for dismissal on those grounds, this is that case. The government is attempting to use this case—and this Court—to punish Mr. Abrego for successfully fighting his unlawful removal. That is a constitutional violation of the most basic sort. The Indictment must be dismissed.

## BACKGROUND

### I.       Mr. Abrego's History and Background

Mr. Abrego is a citizen of El Salvador, but for more than a decade, he has lived in the United States. (D. Md. Am. Compl. ¶¶ 43, 47-48).[1] He came to this country as a teenager, sometime around 2011, to flee gang violence. (*Id.* ¶¶ 47-48). Barrio 18, a notorious Salvadoran gang, used Mr. Abrego "as a pawn" in its repeated efforts to extort his parents, who, "[t]o protect Abrego," "ultimately sent him to the United States to live with his older brother, a U.S. citizen, in Maryland." *Abrego Garcia v. Noem*, 777 F. Supp. 3d 501, 507 (D. Md. 2025). In December 2018, Mr. Abrego, by then an adult, moved in with his now-wife and her two children, all likewise American citizens. (D. Md. Am. Compl. ¶¶ 48-50). In 2019, Mr. Abrego and his wife had a son, who is also a citizen of this country. (*Id.* ¶ 68).

Although Mr. Abrego first entered the United States without inspection, his presence in this country has been lawful since 2019, when he secured an order (the "Withholding Order") from an immigration court granting him withholding of removal to El Salvador. (*Id.* ¶¶ 1, 48, 70-72; *see also* Compl. Ex. B (Withholding Order)). The underlying immigration proceedings began in March 2019, when officers from the Prince George's County Police Department arrested Mr. Abrego and three other day laborers as Mr. Abrego waited for work outside a Home Depot in Hyattsville, Maryland. (D. Md. Am. Compl. ¶¶ 51-53). Mr. Abrego was never charged with a crime. (*Id.* ¶ 53). Instead, officers asked Mr. Abrego whether he was a gang member—he told them he was not—

---

[1] "Dkt." refers to entries on this Court's docket for this case; "D. Md. Dkt." refers to entries on the docket in Mr. Abrego's immigration-related civil lawsuit against the government in the United States District Court for the District of Maryland, *Abrego Garcia v. Noem*, No. 25 Civ. 951 (D. Md.); "D. Md. Am. Compl." refers to the First Amended and Supplemental Complaint for Injunctive Relief and Declaratory Judgment Mr. Abrego has requested leave to file in that lawsuit (D. Md. Dkt. 211-3); "Compl. Ex. _" refers to the exhibits to the Amended Complaint, labeled A through R (D. Md. Dkt. 211-6 to 211-23); "Ex. _" refers to an exhibit to this brief. Unless otherwise noted, case text quotations omit internal quotation marks, citations, alterations, and footnotes.

and pressured him to cooperate; when he refused, he was transferred into the custody of United States Immigration and Customs Enforcement ("ICE"), which detained him and commenced removal proceedings. (*Id.* ¶¶ 54-56). Those proceedings continued until October 10, 2019, when an immigration judge issued the Withholding Order, concluding that Mr. Abrego had "established past persecution based on a protected ground" and a "well-founded fear of future persecution" if removed to El Salvador. (Compl. Ex. B at 13-14 (granting Mr. Abrego's application for withholding of removal pursuant to 8 U.S.C. § 1231(b)(3))).

From that point forward, the government was prohibited from removing Mr. Abrego to El Salvador, except by commencing proceedings to reopen his case or terminate withholding of removal. *See* 8 C.F.R. § 208.24(c), (f). ICE did not appeal the Withholding Order, nor did ICE ever seek to reopen the removal proceedings or rescind the order. (D. Md. Am. Compl. ¶¶ 71-72). Instead, Mr. Abrego was released from ICE detention on supervised release and received authorization to work in the United States. (*Id.* ¶¶ 71, 73, 77). For the ensuing six years, Mr. Abrego lived in Maryland with his wife and their children. (*Id.* ¶ 73). "He complied fully with all directives from ICE, including annual check-ins, and," until this case was filed, he had "never been charged with or convicted of any crime." *Abrego Garcia*, 777 F. Supp. 3d at 508.

## II.    Mr. Abrego Is Illegally Seized and Removed to El Salvador

After six years of living and working in the United States lawfully, the government inexplicably upended Mr. Abrego's life. On March 12, 2025, "while driving home from work with his young son in the car," Mr. Abrego was pulled over by ICE agents. *Id.* The arresting agents "had no warrant for his arrest and no lawful basis to take him into custody; they told him only that his 'status had changed.'" *Id.* Over the ensuing three days, Mr. Abrego was shuttled from jurisdiction to jurisdiction, from one ICE detention facility to another, with stops in Maryland, Louisiana, and Texas. *Id.* On March 15, 2025, "without any notice, legal process, or hearing, ICE

4

forcibly transported [Mr. Abrego] to the Terrorism Confinement Center ('CECOT') in El Salvador, a notorious supermax prison known for widespread human rights violations." *Id.* at 509.

While at CECOT, Mr. Abrego was tortured. Starting immediately upon his arrival, he was repeatedly beaten. When he first got to CECOT, he was given prison clothing and then "kicked in the legs with boots and struck on his head and arms to make him change clothes faster." (D. Md. Am. Compl. ¶ 120). Once he was dressed, his head was shaved and he was frog-marched to a cell, "being struck with wooden batons along the way." (*Id.*). The physical torture continued thereafter. Mr. Abrego and others were deprived of sleep by being forced to kneel throughout the night—from 9:00 p.m. to 6:00 a.m.—and prison guards would "strik[e] anyone who fell from exhaustion." (*Id.* ¶ 121). Mr. Abrego was denied access to a bathroom and soiled himself. (*Id.*). Mr. Abrego was also effectively starved while at CECOT: during his first two weeks there, he lost approximately 31 pounds. (*Id.* ¶ 126).

## III. Mr. Abrego Challenges His Removal and the Government Responds with a Retribution Campaign

On March 24, Mr. Abrego challenged his unlawful removal to El Salvador, filing a lawsuit against various government officials in the District of Maryland, alleging that his removal violated the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3)(A), the Due Process Clause of the Fifth Amendment, and the Administrative Procedure Act. (D. Md. Dkt. 1 ¶¶ 72-95). Mr. Abrego also sought a temporary restraining order requiring the government to return him to the United States. (D. Md. Dkt. 2). Even though the government confessed, relatively promptly, that its removal of Mr. Abrego was in error, the government did not take steps to fix its mistake. Instead, in response to his lawsuit—and to the substantial publicity it received—the government undertook a wide-ranging and unprecedented retribution campaign against Mr. Abrego. This criminal case is part of that campaign.

5

Initially, the government scrambled to respond to Mr. Abrego's unlawful removal. That scramble is reflected in documents disclosed in a whistleblower complaint by Erez Reuveni, the former Acting Deputy Director of the Office of Immigration Litigation at the Department of Justice who represented the government in Mr. Abrego's Maryland case.[2] Those documents show that the government quickly latched onto unsubstantiated claims of Mr. Abrego's affiliation with MS-13 to justify its mistake. Within days of Mr. Abrego's complaint, on March 27, officials discussed the possibility of requesting his return from El Salvador; they also discussed the possibility of claiming that he was a member of MS-13.[3] But ICE officials struggled to provide evidence supporting that claim.[4] Indeed, when an official from the State Department remarked that records purportedly supporting ICE's MS-13-affiliation claim contained "a lot of info on that incident being pulled over in Tennessee that led to no citation, and very little on why he's believed to be a member of MS-13," an ICE official responded "I think this may be all they have."[5]

On March 31, the Senior Counselor to the Secretary of Homeland Security—who reportedly conceded in an email the day before that Mr. Abrego's removal "was an administrative error…(Not that we should say publicly)"[6]—proposed that the government call Mr. Abrego "a

---

[2] *See generally* Letter from Dana L. Gold, Gov't Accountability Project, et al. to Michael E. Horowitz, Inspector Gen., U.S. Dep't of Just., et al. (June 24, 2025), https://www.judiciary.senate.gov/imo/media/doc/06-24-2025_-_Protected_Whistleblower_Disclosure_of_Erez_Reuveni_Redacted.pdf (the "Reuveni Disclosure"); July 1, 2025 Addendum to June 24, 2025 Protected Whistleblower Disclosure of Mr. Erez Reuveni Submitted Pursuant to 5 U.S.C. § 2302 and 5 U.S.C. § 1213, S. Comm. on the Judiciary (July 10, 2025), https://www.judiciary.senate.gov/imo/media/doc/07-01-2025_-_reuveni_batch_1_index_and_evidence_redacted_final.pdf (the "Reuveni Exhibits").

[3] *See* Reuveni Exhibits at 46-66 (March 27 and 28, 2025 email chain among DOJ, DHS, and State Department officials).

[4] The government's struggles to muster any meaningful evidence of Mr. Abrego's gang membership persisted over the ensuing months—this Court recently described the evidence as "slim" and the claimed gang affiliation as "border[ing] on fanciful." (Dkt. 95 at 32).

[5] Reuveni Exhibits at 48-49.

[6] Hamed Aleaziz & Alan Feuer, *How Trump Officials Debated Handling of the Abrego Garcia Case: 'Keep Him Where He Is,'* N.Y. Times (May 21, 2025),

leader of MS-13."[7] An ICE official responded that they "have found 'verified member'" but "have not found anything indicating 'leader.'"[8] Yet that day, the government filed a sworn declaration from an ICE official averring that Mr. Abrego was arrested on March 12 because of his "prominent role in MS-13" and was removed in "good faith" based on his "purported membership in MS-13." (D. Md. Dkt. 11-3 ¶¶ 11, 15).

That declaration also conceded that Mr. Abrego was removed to El Salvador "[t]hrough administrative error." (*Id.* ¶ 15). The government confessed that ICE was aware that Mr. Abrego was subject to withholding of removal to El Salvador when it flew him to that country. (*Id.* ¶ 13). The government also admitted that sending Mr. Abrego to El Salvador was not something the government had long planned: he was not on the initial manifest for the deportation flight, but he was eventually assigned to the flight after other passengers were removed from the list.[9] (*Id.* ¶ 14).

Even as some parts of the government were recognizing that Mr. Abrego's removal was wrongful, others were beginning to take steps seemingly calculated to deter Mr. Abrego from pursuing his case and calling attention to the government's errors. On April 1, Vice President J.D. Vance falsely proclaimed that Mr. Abrego "was a convicted MS-13 gang member with no legal right to be here."[10] That kicked off the government's public campaign to get back at Mr. Abrego

---

https://www.nytimes.com/2025/05/21/us/politics/trump-abrego-garcia-el-salvador-deportation.html.

[7] Reuveni Exhibits at 38.

[8] *Id.* at 34.

[9] This admission contradicts public claims DHS made even long after this declaration was filed. DHS spokeswoman Tricia McLaughlin, for instance, claimed that Mr. Abrego was deported in "a highly sensitive counterterrorism operation with national security implications." Aleaziz & Feuer, *supra* note 6. Incredibly, none of the DHS, ICE, Department of State, or DOJ officials involved in the case who extensively discussed Mr. Abrego's removal in the Reuveni Exhibits mentioned this supposed counterterrorism operation.

[10] JD Vance (@JDVance), X (Apr. 1, 2025, at 12:58 A.M.), https://x.com/JDVance/status/1906934067607556440.

in earnest. Other Executive Branch officials soon joined the Vice President's effort to discredit Mr. Abrego, claiming publicly that he was violent, a gang member, and a terrorist.[11]

Meanwhile, even after the commencement of the government's retribution campaign, Mr. Reuveni continued to press for Mr. Abrego's prompt return—suffering grave career consequences as a result. In the days leading up to an April 4 hearing on Mr. Abrego's motion for a temporary restraining order in the District of Maryland, Mr. Reuveni requested updates from DHS and the State Department about securing Mr. Abrego's return to the United States.[12] He also raised concerns about the sufficiency of the evidence supporting Mr. Abrego's supposed gang affiliation. Senior leaders at DOJ rebuffed Mr. Reuveni, instructing him to not make requests of DHS and the State Department or any "asks" of El Salvador.[13]

At the April 4 hearing, Mr. Reuveni conceded—consistent with the declaration and brief the government had already filed—that Mr. Abrego "should not have been removed" and the government had "nothing to say on the merits." (D. Md. Dkt. 33 at 19, 25). Minutes after the hearing, Mr. Reuveni's supervisor questioned why he did not argue that Mr. Abrego's membership in a terrorist organization nullified his withholding of removal. Mr. Reuveni told his supervisor that those arguments had no legal or factual basis.[14] When Mr. Reuveni refused to sign an appeal

---

[11] *See, e.g.*, Mark Swanson, *Kristi Noem to Newsmax: Man Deported in Error 'Very Dangerous,'* Newsmax (Apr. 4, 2025), https://www.newsmax.com/newsmax-tv/kristi-noem-deported-kilmar-abrego-garcia/2025/04/04/id/1205764/ (Noem: "[H]e was a gang member, violent criminal, definitely a member of one of these terrorist organizations and did not belong in this country and needed to face consequences."); Forbes Breaking News, *Bondi Asked Why Abrego Garcia Must Stay in Foreign Prison If Admin Admitted Deportation Was Mistake* (YouTube Apr. 8, 2025), https://www.youtube.com/watch?v=MXh4lmUAKZA (Bondi: "[H]e is a known gang member."); James Morley III, *Homan to Newsmax: Abrego Garcia Has Himself to Blame*, Newsmax (Apr. 11, 2025), https://www.newsmax.com/newsmax-tv/homan-abrego-garcia/2025/04/11/id/1206624/ (Homan: "He's a MS-13 gang member, according to our intelligence and even the intelligence of El Salvador.").

[12] Reuveni Disclosure at 23.

[13] *Id.*

[14] Reuveni Disclosure at 24-25.

brief reiterating those same arguments later that day, he was placed on leave and then fired for purportedly failing to zealously advocate for the government.[15]

After the hearing, Mr. Abrego obtained an injunction requiring the United States to seek his return. *See Abrego Garcia*, 777 F. Supp. 3d at 519. He then successfully defended that ruling on appeal. *Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *1 (4th Cir. Apr. 7, 2025) (order denying stay pending appeal); *see also id.* (Thacker, J., concurring) ("The United States Government has no legal authority to snatch a person who is lawfully present in the United States off the street and remove him from the country without due process. The Government's contention otherwise, and its argument that the federal courts are powerless to intervene, are unconscionable."); *see id.* at *6 (Wilkinson, J., concurring) ("There is no question that the government screwed up here."). On April 10, 2025, the Supreme Court agreed that Mr. Abrego was "improperly sent to El Salvador," and ordered the government to "facilitate" his "release from custody in El Salvador." *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025).

In the immediate aftermath of the Supreme Court's order, the government did not facilitate Mr. Abrego's release. Far from it. Instead, just days after the order, President Trump hosted Salvadoran President Nayib Bukele in the Oval Office, where he met with, among other officials, Attorney General Pamela Bondi. At that meeting, the Attorney General and President Bukele mused about defying the Supreme Court's order, trading flip remarks about how neither had the power to return Mr. Abrego to the United States.[16]

---

[15] *Id.* at 25.

[16] *Remarks: Donald Trump Holds a Bilateral Meeting with Nayib Bukele of El Salvador*, Roll Call (Apr. 14, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-bilat-nayib-bukele-el-salvador-april-14-2025/ (Bondi: it is "up to El Salvador if they want to return him. That's not up to us." Bukele: "How can I smuggle a terrorist into the United States? I don't have the power to return him to the United States."). The Attorney General's assertion conflicted with public statements indicating that the government's agreement with El Salvador involved "outsourc[ing] part of the [United States'] prison system" to that country. Nayib Bukele

Shortly after that meeting, and for months thereafter, Attorney General Bondi and other federal officials attacked Mr. Abrego publicly. As detailed in a prior defense motion, officials variously labelled Mr. Abrego a "gangbanger," "monster," "illegal predator," "illegal alien terrorist," "wife beater," and "human trafficker."[17] (*See* Dkt. 69 at 1, 3-5).

While the government waged this public campaign to discredit and punish Mr. Abrego, it also sought to use its criminal investigative authority for the same purpose. In late April 2025, the government opened a new criminal investigation into Mr. Abrego, the better to support its arguments against him in the court of public opinion.[18]

The investigation began by focusing on a 2022 traffic stop of Mr. Abrego that, at the time, led to neither charges nor a citation. That stop took place on November 30, 2022, when Mr. Abrego was pulled over by the Tennessee Highway Patrol ("THP"), allegedly for speeding, while he was driving nine passengers in a Chevy Suburban in Putnam County, Tennessee. (Dkt. 61 at 13:7-15:18). Mr. Abrego was neither ticketed nor charged; he and his passengers were allowed to

---

(@nayibbukele), X (Feb. 3, 2025, at 9:44 P.M.), https://x.com/nayibbukele/status/1886606794614587573; *see How It's Going*, U.S. Dep't of Homeland Sec., https://www.dhs.gov/medialibrary/assets/video/59108 (Noem: "This facility is one of the tools in our toolkit that we will use").

[17] *See, e.g.*, Attorney General Pamela Bondi (@AGPamBondi), X (Apr. 16, 2025, at 9:42 P.M.), https://x.com/AGPamBondi/status/1912682960156795369; *Karoline Leavitt talks Kilmar Abrego Garcia at White House briefing*, Fox 9 (YouTube Apr. 16, 2025), https://www.youtube.com/watch?v=c6j4_DT73vM; Rapid Response 47 (@RapidResponse47), X (May 27, 2025, at 1:57 P.M.), https://x.com/RapidResponse47/status/1927423875828056513; Sarah Fortinsky, *Rubio to Van Hollen: We deported gang members, 'including the one you had a margarita with,'* Hill (May 20, 2025), https://thehill.com/homenews/senate/5310018-rubio-van-hollen-trump-administration-deportations/; Stephen Miller (@StephenM), X (June 6, 2025, at 5:26 P.M.), https://x.com/StephenM/status/1931100469515993431; Tricia McLaughlin (@TriciaOhio), X (May 3, 2025, at 10:45 A.M.), https://x.com/TriciaOhio/status/1918678209475887560; Homeland Security (@DHSgov), X (May 14, 2025, at 11:17 A.M.), https://x.com/DHSgov/status/1922672678340555173.

[18] At the June 13 detention hearing before Magistrate Judge Holmes, Special Agent Peter Joseph testified that he joined the investigation of Mr. Abrego on April 28. *See* Dkt. 61 at 12:19-25. DHS records produced in discovery, which the defense can provide to the Court upon request, provide a case-opening date of April 23, 2025.

leave the scene; and THP conducted no additional investigation. A THP spokesperson confirmed as much in a May 2025 statement explaining that THP consulted with federal authorities before deciding to release Mr. Abrego, explaining that "the Biden-era FBI…made the decision not to detain him."[19] Despite the FBI's decision, the traffic stop took on new importance for the government in April and early May of this year, when it had the newfound desire to punish Mr. Abrego. Thus, it became the centerpiece of the government's fledgling investigation: in May, "sources familiar with the investigation" leaked to the press that the government was "quietly investigating" the traffic stop,[20] even though weeks earlier DHS had released a purported "bombshell" report about the 2022 traffic stop alleging that Mr. Abrego was a gang member.[21]

The government has gone to extreme lengths to make a criminal case against Mr. Abrego. The government located and sought cooperation from multiple alleged co-conspirators who have already been sentenced, and who are cooperating down on Mr. Abrego, allegedly a mere driver in a smuggling conspiracy. The government's star cooperator is a convicted leader of a human smuggling business who has three other felony convictions and was deported five times; the government arranged for him to be released early from a 30-month sentence to a halfway house, notwithstanding his five prior deportations, and to receive work authorization, all as an inducement to cooperate against Mr. Abrego, an alleged subordinate. (Dkt. 61 at 33, 35, 80-81). The government also lined up several of that cooperator's relatives and paramours—who sought similar benefits—to purportedly corroborate his testimony. (*See, e.g.*, Dkt. 99 at 36, 71).

---

[19] *See* James Hill et al., *Justice Department Investigating 2022 Abrego Garcia Traffic Stop: Sources*, ABC News (May 6, 2025), https://abcnews.go.com/Politics/justice-department-investigating-2022-abrego-garcia-traffic-stop/story?id=121492776.

[20] *Id.*

[21] *DHS Releases Bombshell Investigative Report on Kilmar Abrego Garcia Suspected Human Trafficking Incident*, Dep't of Homeland Sec. (Apr. 18, 2025), https://www.dhs.gov/news/2025/04/18/dhs-releases-bombshell-investigative-report-kilmar-abrego-garcia-suspected-human.

11

On May 21, 2025, relying on this heavily incentivized downward cooperation, the government secured an indictment against Mr. Abrego, charging him with transporting undocumented aliens and a conspiracy to commit that offense under 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(I). (Dkt. 3). The indictment was riddled with inflammatory, irrelevant—and, it has turned out, thinly supported—allegations. (*See* Dkt. 3 ¶¶ 5-7, 11, 18 (repeated references to alleged MS-13 membership); *id.* ¶¶ 14-15 (transporting illegal firearms and narcotics); *id.* ¶ 27 (abusing female undocumented aliens)). The day the indictment was returned, the then-Chief of the Criminal Division of the U.S. Attorney's Office that charged Mr. Abrego abruptly resigned, reportedly over concerns that the case was being pursued for "political reasons."[22]

Only after returning the indictment did the government—many weeks belatedly—take any steps that could be construed as complying with court orders requiring that it facilitate Mr. Abrego's return to the United States. The government presented the indictment and arrest warrant to the government of El Salvador, and on June 6, Mr. Abrego arrived in this District. (*See* Dkt. 9).

The government's statements that day make plain that this case was initiated to punish Mr. Abrego for challenging his removal and to support high-ranking government officials' false claims that deporting him to El Salvador had been the right thing to do. Attorney General Bondi, who called a press conference to announce the charges, gloated that "[t]his is what American justice looks like," and unethically opined that Mr. Abrego would be found guilty, sentenced, and then "returned to his home country of El Salvador."[23] Deputy Attorney General Todd Blanche

---

[22] *See* Katherine Faulders et al., *Kilmar Abrego Garcia brought back to US, appears in court on charges of smuggling migrants*, ABC News (June 6, 2026), https://abcnews.go.com/US/mistakenly-deported-kilmar-abrego-garcia-back-us-face/story?id=121333122 ("sources briefed on Schrader's decision" stated that "Schrader's resignation was prompted by concerns that the case was being pursued for political reasons").

[23] *Attorney General Bondi News Conference*, C-SPAN (June 6, 2025), https://www.c-span.org/program/news-conference/attorney-general-bondi-news-conference/660932.

went on television to say that the government began "investigating" Mr. Abrego only after "a judge in Maryland…questioned" the government's decision to deport him, found that it "had no right to deport him," and "accus[ed] us of doing something wrong."[24] He added: "[T]he reason [Mr. Abrego] was returned and the facilitation that brought him back here is not a Judge; it's an arrest warrant issued by a grand jury."[25] President Trump chimed in as well, lauding DOJ for its "decision" to prosecute Mr. Abrego and characterizing the government's motive: "[M]aybe they just said, look…these judges they want to try and run the country…. I could see a decision being made—bring him back, show everybody how horrible this guy is. And frankly we have to do something because the judges are trying to take the place of a President that won in a landslide."[26]

## ARGUMENT

### I.  Applicable Law

### A.  Vindictive Prosecution

"The Fifth Amendment forbids the government from punishing defendants for exercising their constitutional and statutory rights." *United States v. Zakhari*, 85 F.4th 367, 379 (6th Cir. 2023); *see also Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort…and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is patently unconstitutional."). This "restrain[t]" on federal prosecutors' otherwise "broad discretion in deciding whom to prosecute" is enforced through motions to dismiss an indictment "on grounds of prosecutorial vindictiveness." *United States v.*

---

[24] *Kilmar Abrego Garcia was indicted on 'very serious' charges, US deputy attorney general says*, Fox News (June 6, 2025), https://www.foxnews.com/video/6373969491112.
[25] *Id.*
[26] WAAY 31 News, *Donald Trump on Kilmar Abrego Garcia: DOJ made the decision* (YouTube June 6, 2025), https://www.youtube.com/watch?v=AmFoHqCnse4.

*LaDeau*, 734 F.3d 561, 566 (6th Cir. 2013).

A defendant can prevail on a vindictive-prosecution challenge in two ways. First, a defendant can show "actual vindictiveness—that is, objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights." *Id.* Second, a defendant can show that, "in the particular factual situation presented, there existed a realistic likelihood of vindictiveness for the prosecutor's action," *id.*, which requires establishing that "(1) the prosecutor has some stake in deterring the defendant's exercise of his rights and (2) the prosecutor's conduct was somehow unreasonable," *United States v. Howell*, 17 F.4th 673, 687 (6th Cir. 2021). Upon such a showing, "the district court…may presume an improper vindictive motive," which the government then "bears the burden of rebutting." *Id.*; *see also United States v. Goodwin*, 457 U.S. 368, 373 (1982) ("Motives are complex and difficult to prove. As a result, in certain cases in which action detrimental to the defendant has been taken after the exercise of a legal right, the Court has found it necessary to presume an improper vindictive motive."). Where a defendant "show[s] enough to presume vindictiveness," the government must do more than merely *offer* explanations rebutting the presumption: it is an abuse of discretion for a trial court to "fail[] to require the government to *substantiate* its explanations." *Zakhari*, 85 F.4th at 381 (emphasis added).

## B. Selective Prosecution

Although prosecutors enjoy "broad discretion to enforce the Nation's criminal laws," *United States v. Armstrong*, 517 U.S. 456, 464 (1996), that discretion is not unfettered. One important constraint on prosecutorial discretion is the prohibition on "selective prosecution" that is "imposed by the equal protection component of the Due Process Clause of the Fifth Amendment." *Id.*; *see also Wayte v. United States*, 470 U.S. 598, 608 (1985) ("[s]electivity in the enforcement of criminal laws is…subject to constitutional constraints," including that the decision to prosecute cannot be based on "the exercise of protected statutory and constitutional rights"). "If

14

the Executive selectively prosecutes someone based on impermissible considerations, the equal protection remedy is to dismiss the prosecution…." *In re Aiken County*, 725 F.3d 255, 264 n.7 (D.C. Cir. 2013). To prove selective prosecution, a defendant must establish two elements: first, that the decision to prosecute had a "discriminatory purpose," and second, that it had a "discriminatory effect." *Armstrong*, 517 U.S. at 465. Put another way, a defendant must show, "at least prima facie," "(1) that while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution," and "(2) that the government's discriminatory selection of him has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent the exercise of his constitutional rights." *United States v. Hazel*, 696 F.2d 473, 474-75 (6th Cir. 1983) (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974) (emphasis omitted)).

## II. The Government's Prosecution of Mr. Abrego Is Vindictive

### A. Objective Evidence Establishes the Government's Actual Vindictiveness

Although it is "exceedingly difficult" to establish "actual vindictiveness," a defendant can prevail by producing "objective evidence" that the prosecutor's actions were designed to punish him for asserting his legal rights. *Bragan v. Poindexter*, 249 F.3d 476, 481 (6th Cir. 2001); *accord United States v. Dupree*, 323 F.3d 480, 489 (6th Cir. 2003). Because it is "complex and difficult" to determine a prosecutor's motives, *Goodwin*, 457 U.S. at 373, "only in a rare case" is there *direct* evidence of "actual vindictiveness," *United States v. Johnson*, 171 F.3d 139, 140-41 (2d Cir. 1999) (first quotation quoting *Goodwin*). This is that case.

Here, the Executive Branch has brought a case for avowedly vindictive reasons.[27] Indeed,

---

[27] We should be clear that Mr. Abrego has no basis to allege that Acting United States Attorney McGuire, who has been handling day-to-day proceedings in this case, has done anything to display

high ranking Executive Branch officials have made perfectly clear the motivations behind this case in repeated public statements. *See United States v. Velsicol Chem. Corp.*, 498 F. Supp. 1255, 1265-66 (D.D.C. 1980) (finding actual vindictiveness where prosecutor "clearly expressed his intent and motivation" in bringing charges); *United States v. Hollywood Motor Car Co.*, 646 F.2d 384, 388 (9th Cir. 1981) ("express threat" supported actual vindictiveness), *rev'd on other grounds*, 458 U.S. 263 (1982); *Johnson*, 171 F.3d at 140 ("direct evidence" includes "evidence of a statement by the prosecutor"). The Deputy Attorney General—the second highest-ranking official in the DOJ—publicly proclaimed that this investigation was commenced because a Judge in Maryland had "questioned" the government and "accus[ed] us of doing something wrong," and that the case was brought so that Mr. Abrego would be returned to this country "not [because of] a Judge," but because of "an arrest warrant."[28] President Trump likewise characterized the case as a rebuke for the fact that a Judge had granted Mr. Abrego relief.[29] After Mr. Abrego filed his lawsuit challenging his unlawful removal—but, notably, before the criminal investigation was opened—a litany of high-ranking federal officials, including Homeland Security Secretary Kristi Noem, who leads the agency responsible for this investigation, began attacking him for his purported criminality, which is further evidence of the government's motive in this case. (*See*

---

personal animus towards him. That, however, does nothing to ameliorate the vindictiveness here. *See, e.g.*, *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999) (vindictive prosecution claim can be asserted where either the prosecutor himself "harbored genuine animus" or "was prevailed upon to bring the charges by another" who did); *United States v. Mansoor*, 77 F.3d 1031, 1035 (7th Cir. 1996) ("animus of a referring [law enforcement] agency" may be "imputed to federal prosecutors" where it "actually motivated [the] prosecution"); *United States v. Adams*, 870 F.2d 1140, 1146, 1148 (6th Cir. 1989) (vacating defendant's conviction and granting her request for discovery on the question of whether "the EEOC, acting on an improper motive, induced the Department of Justice to institute a prosecution that would not otherwise have been undertaken"). The allegations of vindictiveness leveled here focus on higher-ranking officials in the DOJ, DHS, and the White House, who have made public statements making clear the purpose of this case.

[28] Fox News, *supra* note 24.

[29] WAAY 31 News, *supra* note 26.

16

*supra* note 11).

The unprecedented public pronouncements attacking Mr. Abrego for his successful exercise of constitutional rights by senior cabinet members, leaders of the DOJ, and even the President of the United States, make this the rare case where actual vindictiveness is clear from the record. Mr. Reuveni's disclosures and evidence of the government's hunt for unsubstantiated allegations of gang affiliation—which this Court has called "fanciful" (Dkt. 95 at 32)—confirm that the government's motive has been to paint Mr. Abrego as a criminal in order to punish him for challenging his removal, to avoid the embarrassment of accepting responsibility for its unlawful conduct, and to shift public opinion around Mr. Abrego's removal, including "mounting concerns" with the government's compliance with court orders.[30] Because the record reflects an Executive Branch that was actually vindictive in opening the investigation that led to this case, the Indictment must be dismissed.

### B. There Is a Realistic Likelihood of Vindictiveness

Even if there were less evidence that high-ranking Executive Branch officials are retaliating against Mr. Abrego for fighting his removal and winning, this case would still warrant a presumption of vindictiveness. *See LaDeau*, 734 F.3d at 566 ("[A]llowing for a presumption of vindictiveness…safeguards a defendant's due process rights by eliminating apprehension of prosecutorial retaliation where circumstances reasonably indicate retaliation, even if there is no direct evidence that the prosecutor was in fact improperly motivated."). Such a presumption arises—or, put another way, there is a "realistic likelihood of vindictiveness"—where the defendant exercises his rights, the government "has some stake in deterring" that exercise of rights,

---

[30] Amanda Friedman, *Trump says he's 'not defying the Supreme Court' amid standoff over wrongly deported man*, Politico (Apr. 25, 2025), https://www.politico.com/news/2025/04/25/trump-supreme-court-deportation-00309305.

and the government's conduct is "somehow unreasonable." *Id.*

*First*, there is no question that Mr. Abrego exercised constitutionally protected rights in seeking redress for his unlawful removal. It is well established that the First Amendment protects the right to petition the government for redress of grievances including through access to the courts. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Graham v. Nat'l Collegiate Athletic Ass'n*, 804 F.2d 953, 958-59 (6th Cir. 1986). And the Fifth Amendment guarantees Mr. Abrego's right to due process: as both concurrences in the Fourth Circuit's stay denial explained, Mr. Abrego filed his lawsuit to vindicate his due process rights after they were flagrantly violated by the government. *Abrego Garcia*, 2025 WL 1021113, at *6 (Thacker, J., concurring) (describing the district court's order in Mr. Abrego's favor as "upholding constitutional rights"); *id.* (Wilkinson, J., concurring) ("I think it legitimate for the district court to require that the government 'facilitate' the plaintiff's return to the United States so that he may assert the rights that all apparently agree are due him under law."); *accord Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *1 (4th Cir. Apr. 17, 2025) (denying stay and mandamus, after Supreme Court's remand, explaining that Mr. Abrego was "entitled to due process").

*Second*, the government plainly had a "stake" in Mr. Abrego's exercise of rights because he directly—and publicly—challenged the government's unlawful conduct. The significance of that stake is made clear by the continuous, evidently outraged statements that numerous Executive Branch officials have made about Mr. Abrego and his legal claims over a sustained period. The heads of the DOJ and DHS, and even the President, have openly complained about and criticized Mr. Abrego's legal challenge. (*See supra* nn. 11, 15-16, 24, 26). Those officials attacked Mr. Abrego and the judges who granted him relief in response to substantial criticism leveled at the government by courts and the press. That is more than enough to establish a prosecutorial stake in

18

this Circuit. In *Bragan v. Poindexter*, the Sixth Circuit affirmed a district court's finding of a reasonable likelihood of vindictiveness, in part because it was clear that prosecutors had a "stake in deterring Petitioner's exercise of his First Amendment rights" where he had made widely publicized statements that were "highly critical of the prosecutors." 249 F.3d at 483.

The significant burdens that Mr. Abrego's court victories placed on the Executive Branch underscore the government's stake in deterring Mr. Abrego from vindicating his rights. The Supreme Court has long recognized the "uncontroversial premise" that "the likelihood that a defendant's exercise of his rights will spur a vindictive prosecutorial response is indexed to the burden that the defendant's conduct has placed on the prosecution." *LaDeau*, 734 F.3d at 569 (citing *Blackledge v. Perry*, 417 U.S. 21, 27 (1974)). In *LaDeau*, the Sixth Circuit affirmed dismissal based on a likelihood of vindictiveness where a defendant who had been charged with a child pornography offense won a suppression motion, and the government responded by charging him with a more serious offense that it could have charged at any time during the 13-month pendency of the case. *Id.* at 564-65. In analyzing the government's "stake," the Sixth Circuit recognized the "significant" burden that the successful suppression motion put on the government: the defendant "succeeded in suppressing crucial evidence and thereby eviscerated the government's possession case," which "saddled" the government with the need to restart the prosecution "from scratch." *Id.* at 568-69.

And in *Blackledge*, a defendant was convicted of a misdemeanor, appealed, and obtained a new trial, after which the prosecution indicted him for a felony based on the same facts. Even in the absence of any evidence that the prosecutor had "acted in bad faith or maliciously," the Supreme Court found a potential for vindictiveness, concluding that the prosecutor "clearly ha[d] a considerable stake" in deterring such an appeal, which would "clearly require increased

19

expenditures of prosecutorial resources," and could "even result in a formerly convicted defendant's going free." *Blackledge*, 417 U.S. at 27-29. Consistent with *Blackledge*, courts recognize that the requisite prosecutorial "stake" can be demonstrated where the government "is forced to do over what it thought it had already done correctly." *LaDeau*, 734 F.3d at 569-70 (quoting *United States v. Roach*, 502 F.3d 425, 444 (6th Cir. 2007)).

Here, the burden Mr. Abrego placed on the government far exceeded the burden imposed in *Blackledge*. There, the government was merely forced only to retry a case it had previously won. Here, by contrast, the government was directed by multiple courts, including the Supreme Court, to remedy a grave error it had committed—causing a diplomatic incident and significant embarrassment to the government. As was true of the suppression motion in *LaDeau*, Mr. Abrego's legal victories "inflicted a mortal blow" on the government's removal of him. *Id.* at 569. The significant burdens placed on the government by Mr. Abrego's immigration case victory establish that the government had a stake in deterring him from vindicating his rights.

*Third*, the government's conduct in charging this case is "unreasonable." Cases in which the government brings a criminal case as retaliation for a prior civil lawsuit are not wholly unprecedented. In *United States v. Adams*, 870 F.2d 1140 (6th Cir. 1989), the defendant filed a vindictive-prosecution challenge where she was charged for tax crimes after filing a lawsuit against the EEOC, her employer. *Id.* at 1141. Although the district court denied the motion and refused to grant discovery, the Sixth Circuit reversed her conviction and remanded for discovery and a hearing on the motion, recognizing that "if the EEOC was able to prevail upon the Department of Justice to institute a prosecution that would not have been undertaken but for Ms. Adams' exercise of her statutory right to sue, it does not seem to us that EEOC's motivation is irrelevant." *Id.* at 1146. This demonstrates one—maybe obvious—way Mr. Abrego's indictment is unreasonable: it

20

was filed as revenge against a defendant who previously sued the government. Indeed, such retaliation for exercising the right of access to the courts is itself unconstitutional. *See Warmus v. Hank*, 48 F.3d 1220, 1995 WL 82061, at *10 (6th Cir. 1995); *Gable v. Lewis*, 201 F.3d 769, 772 (6th Cir. 2000); *see also Dixon v. District of Columbia*, 394 F.2d 966, 968 (D.C. Cir. 1968) ("The Government may not prosecute for the purpose of deterring people from exercising their right to protest official misconduct and petition for redress of grievances.").

The government's naked ante-upping against Mr. Abrego—confirmed in the public statements of numerous high-ranking officials—underscores the unreasonableness of its conduct. More commonly, vindictive prosecution claims arise where a defendant's protected conduct—in the form of a pretrial motion or appeal—prompts a superseding indictment "upping the ante" in retribution for the exercise of rights. *Blackledge*, 417 U.S. at 27-28. In that context, to be "unreasonable," the new indictment "must add additional charges or substitute more severe charges based on the same conduct charged less heavily in the first indictment." *United States v. Suarez*, 263 F.3d 468, 480 (6th Cir. 2001); *accord, e.g.*, *LaDeau*, 734 F.3d at 570-71 (unreasonable for government to bring new charges that carried greater sentencing exposure); *United States v. Jamison*, 505 F.2d 407, 413, 417 (D.C. Cir. 1974) (charge increase that is not "justified by intervening events" can establish vindictive prosecution).

Here, the retributive ante-upping is even clearer than in the superseding-indictment context. In 2022, Mr. Abrego was pulled over, and the FBI learned of the traffic stop and decided not to pursue it. Mr. Abrego was released without charges. The facts about Mr. Abrego's alleged criminal conduct did not change in the intervening three years. What did change was that the government unlawfully renditioned Mr. Abrego to El Salvador, and he challenged that illegal conduct. As a matter of timing, it is clear that it was that lawsuit—and its effects on the government—that

prompted the government to reevaluate the 2022 traffic stop and bring this case. (And the government has publicly said as much.) Courts have found such suspicious timing to be evidence of apparent vindictiveness. *See Velsicol Chem. Corp.*, 498 F. Supp. at 1264-65 ("When, as in this case, the government chooses not to lodge charges for a period of time and then makes the decision to prosecute so close after a defendant elects to exercise his rights in the face of prosecution opposition, apparent vindictiveness is clearly established."); *United States v. Jenkins*, 504 F.3d 694, 697, 700 (9th Cir. 2007) (holding that timing of charges created appearance of vindictiveness where defendant could have been prosecuted for alien smuggling before she testified in her defense at separate trial); *United States v. Wood*, 36 F.3d 945, 947 (10th Cir. 1994) (affirming finding of reasonable likelihood of vindictiveness where charging decision was made two years later, was not based on new evidence or change in circumstances, and was made "soon after Defendant exercised a legal right to the government's disadvantage"). If it is unreasonable to up the ante by adding charges in an already pending case, it is equally if not more unreasonable to bring entirely new charges, in a brand-new case, based on conduct that previously resulted in no federal law enforcement interest.

## III. The Government's Prosecution of Mr. Abrego Is Selective

Mr. Abrego has also been subjected to a selective prosecution, because he has been "singled out for prosecution" where "others similarly situated" have not, and where the government's disparate treatment was motivated by "the desire to prevent the exercise of his constitutional rights." *Hazel*, 696 F.2d at 474-75.

The government's desire to prevent Mr. Abrego from exercising his constitutional rights is outlined above. And the government's decision to charge this case two and a half years after the traffic stop that underpins it is sufficient to establish discriminatory effect. In total, it took the government 903 days after the traffic stop in this case—on November 30, 2022—to obtain an

indictment on May 21, 2025. The defense has attempted to catalogue every 8 U.S.C. § 1324(a)(1)(A)(ii) charge in this Circuit within the last 15 years that counsel could find to see if any other defendant had ever faced a similarly long delay between the traffic stop that supported the charge and the charge itself. We found none. We suspect it is because there are none. Although in a few outlier cases, the charge might have taken a few months to come, the average time between stop and charge was well under a month. (*See* Ex. A (list of cases)). But no similarly situated defendant—an alleged driver in an alien smuggling conspiracy—has ever had to wait two and a half *years* to be charged with a crime where the facts had not changed since the stop itself. Where, as here, no other similarly situated defendants have been prosecuted in a similar fashion, courts in this Circuit have properly found the requisite discriminatory effect. *See, e.g.*, *United States v. Correa-Gomez*, 160 F. Supp. 2d 748 (E.D. Ky. 2001) (dismissing indictment under Section 1324 against a Hispanic business owner for selective prosecution where no other business owners in the state had faced charges based on similar workplace raids), *aff'd*, 328 F.3d 297 (6th Cir. 2003).

Other courts have recognized similar delays—where no other defendant charged with the same crime had to wait half as long—as establishing discriminatory effect. In *United States v. Falk*, for example, the defendant, a conscientious objector, was charged for draft dodging in October 1970, even though the government was on notice of his violations starting in December 1967, when he returned his registration card. 479 F.2d 616, 622 (7th Cir. 1973). Only after the government caught onto Falk's "status as an active and vocal dissenter to United States policy with regard to the draft and the Vietnam War" was he charged. *Id.* at 623. That delay "add[ed] forceful weight to defendant's contention that the prosecution in this case was for the purpose of punishing Falk for his exercise of First Amendment rights." *Id.* at 622.

So too here. As in *Falk*, the government has not explained the two-and-a-half-year delay

between Mr. Abrego's traffic stop in Putnam County and his return to face charges in Tennessee earlier this year. And it cannot simply invoke general prosecutorial discretion. *See United States v. Steele*, 461 F.2d 1148, 1152 (9th Cir. 1972) ("The government offered no explanation for its selection of defendants, other than prosecutorial discretion. That answer simply will not suffice in the circumstances of this case."). Indeed, the only possible explanation for the timing of the charges here is that the government chose to use this prosecution to punish Mr. Abrego for exercising his right to challenge the violations of due process that led to his unconstitutional deportation, incarceration, and torture in El Salvador. This, coupled with the government's statements clearly showing the intent to retaliate against Mr. Abrego for pursuing civil remedies for his illegal deportation, unquestionably establishes discriminatory intent.

## IV.    At a Minimum, Discovery and a Hearing Are Required

At the very least, if the Court concludes that the extensive public statements by government officials are not sufficient to establish that Mr. Abrego is being vindictively and selectively prosecuted, then the Court should order discovery into the government's motives and an evidentiary hearing.[31] For a selective-prosecution motion, the defense must come forward with "some evidence tending to show the existence of the essential elements" of the claim. *Armstrong*, 517 U.S. at 468; *accord United States v. Schmucker*, 815 F.2d 413, 418 (6th Cir. 1987). On a vindictive-prosecution motion, discovery is required where a defendant makes even a "*prima facie* showing of a realistic likelihood of vindictiveness." *Adams*, 870 F.2d at 1146 (upon a *prima facie* showing, "it is incumbent upon the district court to conduct an evidentiary hearing where the government's explanations can be formally presented and tested"); *see also United States v. Heidecke*, 900 F.2d 1155, 1159 (7th Cir. 1990) ("Requiring the defendant to prove more than a

---

[31] Mr. Abrego already requested such discovery, in a discovery request letter sent to the government on July 13, 2025. The government has not responded to that letter.

colorable claim before compelling discovery might prematurely stifle a legitimate defense of vindictive prosecution for lack of evidence."). The evidence outlined above readily meets those standards.

Nor can the government escape Mr. Abrego's clear entitlement to discovery and a hearing by merely proffering non-vindictive or selective bases for the charging decision. In a recent case, *United States v. Zakhari*, the government added a child pornography count that increased the mandatory minimum by five years, after the defendant filed pre-trial motions and seven months after the initial indictment. 85 F.4th at 378-80. There, the government responded to the motion by "explaining its decision" by reference to factors that were not vindictive, and the district court denied the defendant's motion. *Id.* at 380. The Sixth Circuit reversed, concluding that the district court "abused its discretion in failing to require the government to *substantiate* its explanations."[32] *Id.* at 381 (emphasis added); *see id.* at 385 (Kethledge, J., concurring in part and dissenting in part) ("The prosecution is entitled to no deference on questions of fact. Instead, the prosecution must come forward with evidence—which the district court, in the first instance, can find credible or not."). Upon a sufficient preliminary showing, Mr. Abrego is entitled to discovery and a hearing even if the government explains itself—it is necessary for the defense, and the Court, to "test" any explanations the government may offer. *Id.* at 383 ("By relying on unsupported allegations without permitting Zakhari to test them, the court abused its discretion."); *accord Adams*, 870 F.2d at 1146 ("It may well be that no fire will be discovered under all the smoke, but there is enough smoke here, in our view, to warrant the unusual step of letting the defendants find out how this unusual prosecution came about.").

---

[32] The requirement that the government substantiate any explanations it may offer applies with particular force to this administration and in this case. *See* Alan Feuer, *Judges Openly Doubt Government as Justice Dept. Misleads and Dodges Orders*, N.Y. Times (Aug. 4, 2025), https://www.nytimes.com/2025/08/04/us/politics/trump-justice-department-judges-courts.html.

## CONCLUSION

For the foregoing reasons, Mr. Abrego respectfully requests that the Court dismiss this case.

Dated: August 19, 2025
      New York, New York

Respectfully submitted,

 /s/ Sean Hecker       
Sean Hecker*
Jenna M. Dabbs*
David Patton*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
shecker@heckerfink.com
jdabbs@heckerfink.com
dpatton@heckerfink.com

* admitted *pro hac vice*

Rascoe Dean (No. 034209)
SHERRARD ROE VOIGT & HARBISON PLLC
1600 West End Avenue, Suite 1750
Nashville, Tennessee 37203
Telephone: (615) 742-4200
Fax: (615) 742-4539
rdean@srvhlaw.com

*Counsel for Defendant Kilmar Armando Abrego Garcia*

26

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2025, I electronically filed the foregoing document with the clerk of the court by using the CM/ECF system, which will send a notice of Electronic Filing to the following: Acting United States Attorney, Robert E. McGuire, 719 Church Street, Suite 3300, Nashville, Tennessee 37203; Assistant United States Attorney, Jason Harley, 210 Park Avenue, Suite 400, Oklahoma City, Oklahoma 73102.

/s/ Sean Hecker_____