## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:25-CR-00115** |
| | ) | |
| **KILMAR ARMANDO ABREGO** | ) | |
| **GARCIA,** | ) | |
| | ) | |
| **Defendant.** | | |

## UNITED STATES RESPONSE TO DEFENDANT'S MOTION TO DISMISS FOR VINDICTIVE AND SELECTIVE PROSECUTION

Comes now the Plaintiff, The United States of America, by and through Robert E. McGuire, Acting United States Attorney, and Jacob Warren, Christopher Eason, Jeremy Franker, and Jason Harley, United States Department of Justice, Joint Task Force Vulcan, and makes the following response to the defendant's Motion to Dismiss for Vindictive and Selective Prosecution and the supplemental filings. (Docs. No. 104, 113).

"In our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607, 105 S. Ct. 1524, 1530, 84 L.Ed.2d 547 (1985) (citing *United States v. Goodwin,* 457 U.S. 368, 380, n. 11, 102 S. Ct. 2485, 2492, n. 11, 73 L.Ed.2d 74 (1982); accord, *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 248, 100 S. Ct. 1610, 1616, 64 L.Ed.2d 182 (1980)). "As a result, '[t]he presumption of regularity supports' prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" *United States v. Armstrong*, 517 U.S. 456, 464, 116 S. Ct. 1480, 1486, 134 L.Ed.2d 687 (1996) (quoting *United States v. Chemical Foundation, Inc.,* 272

U.S. 1, 14–15, 47 S. Ct. 1, 6, 71 L.Ed. 131 (1926)). Generally, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S. Ct. 663, 668, 54 L.Ed.2d 604 (1978). Because a claim of vindictive prosecution "asks a court to exercise judicial power over a 'special province'" of the prosecutor, courts must begin from a presumption that the government has properly exercised its constitutional responsibilities to enforce the nation's laws. *United States v. Armstrong,* 517 U.S. 456, 464, 116 S. Ct. 1480, 134 L.Ed.2d 687 (1996) (quoting *Heckler v. Chaney*, 470 U.S. 821, 832, 105 S. Ct. 1649, 84 L.Ed.2d 714 (1985)). This "presumption of regularity" in prosecutorial decision making can only be overcome by "clear evidence to the contrary." *Id*.(quoting *United States v. Chemical Foundation* 272 U.S. 1, 71 L.Ed. 131 (1926)). The standard of proof "is a demanding one." *Id*. at 463.

Undersigned counsel, in his capacity as the Acting United States Attorney for the Middle District of Tennessee, decided to seek an Indictment against the defendant because he believed, pursuant to a properly predicated investigation conducted in an appropriate manner by law enforcement, the United States Attorney's Office for the Middle District of Tennessee, and Joint Task Force Vulcan, that the defendant had committed a serious federal crime and because he believed that he could prove that case beyond a reasonable doubt to a jury. The allegation that a criminal Indictment in Tennessee was sought to punish the defendant for his assertions in a civil case in Maryland is not true and cannot be established. The defendant's argument, while high on rhetoric, lacks the basic facts to succeed. Moreover, the defendant's position is contrary to relevant Sixth Circuit law and what he urges would require this Court to substantially expand the law on

this issue far broader than the Sixth Circuit has contemplated. Therefore, and for the reasons below, the defendant's motion must be denied.

## I. The prosecution in this case was not vindictive.

The defendant's vindictive prosecution claim fails because there is no evidence whatsoever that the prosecutors responsible for this criminal case have been motivated by a desire to punish or retaliate against the defendant for seeking immigration relief. The defendant has provided no evidence that the prosecutors involved have a stake in the defendant's immigration proceeding, such that they would seek to deter the defendant from seeking immigration relief from the courts. Nor is there any evidence in the form of statements made by the prosecutors or actions taken by the prosecutors suggesting that the Indictment in this case was intended to punish or retaliate against the defendant for actions he has taken in his civil matter.

At the outset, the defendant's vindictive prosecution claim is already rare among the rarest of defense motions. Almost all of the "vindictive prosecution" cases in the Sixth Circuit and elsewhere, involve scenarios where a defendant has *already* been criminally charged, exercises some right within the context of that criminal case (makes a motion to dismiss for a Speedy Trial Act violation, files a motion to suppress, etc.) and, after the defendant's exercise of that right, the government seeks to increase the defendant's potential punishment by superseding the indictment or adding charges on re-indictment. *See e.g. United States v. Moon*, 513 F.3d 527 (6th Cir. 2008). Here, the defendant alleges that the criminal charges themselves—and not the adding of charges by superseding the indictment or seeking subsequent criminal charges after an acquittal—are vindictive and motivated by revenge.

Indeed, it is exceedingly rare for a court to consider an allegation of vindictive prosecution where, as here, the defendant alleges that he is being vindictively criminally prosecuted because

3.

he previously filed a lawsuit against some other part of the government. The Supreme Court has already held: "[w]e fully agree with the district court's thought that the mere filing of a lawsuit against an agency of the federal government does not give anyone a license to break the law and insist that any ensuing prosecution be quashed as retaliatory. The Constitution confers no such immunity from prosecution." *United States v. Adams*, 870 F.2d 1140, 1145 (6th Cir. 1989) (citing *Wayte v. United States*, 470 U.S. 598, 614, 105 S. Ct. 1524, 1534, 84 L.Ed.2d 547 (1985)). The scarcity of claims like the defendant's do not, however, make them more compelling. The case law, both in the Sixth Circuit and elsewhere, is decidedly stacked against him.

In the Sixth Circuit, a defendant can make a showing of prosecutorial vindictiveness in only two ways. Either a defendant must show "actual vindictiveness," by producing "objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights." Or a court can find a presumption of vindictiveness by applying the "realistic likelihood of vindictiveness" standard which focuses on the prosecutor's "stake" in deterring the exercise of a protected right and the unreasonableness of his actions. *United States v. Poole*, 407 F.3d 767, 774 (6th Cir. 2005); *United States v. Dupree*, 323 F.3d 480, 489 (6th Cir. 2003) (citing *Bragan v. Poindexter*, 249 F.3d 476, 481–82 (6th Cir. 2001)). The defendant fails under either theory.

*A. The defendant cannot demonstrate any actual vindictiveness.*

A defendant can establish a vindictive prosecution by making a showing of "actual vindictiveness" on the part of the prosecutor. "[A] defendant may demonstrate 'actual vindictiveness,' *i.e.,* he may establish through objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights. This showing, however, is 'exceedingly difficult to make.'" *Bragan v. Poindexter*, 249 F.3d 476, 481 (6th Cir. 2001); *United States v.*

*Meyer,* 810 F.2d 1242, 1245 (D.C. Cir.1987) (citing *Goodwin,* 457 U.S. at 380-81, 384 & n. 19, 102 S. Ct. at 2492, 2494 & n. 19).

At core, the defendant alleges "actual vindictiveness" not by the prosecutors responsible for his prosecution but by the "Executive Branch" writ large. DE # 105 at 15. Indeed, the defense appropriately noted that the Acting United States Attorney—who both authorized seeking the charges, presented the case to the grand jury, and presently serves as the lead prosecutor—has not "done anything to display personal animus towards [the defendant]." DE # 105 at 15, n. 27. This concession is fatal to the defendant's "actual vindictiveness" theory: the defendant concedes that the lead prosecutor handling this case has not acted vindictively toward him.

Instead, the defendant wishes to proceed on the theory that the Executive Branch (as a whole) acted vindictively by causing or prevailing upon the local prosecutor to bring these charges. That theory fails as a matter of law and has no factual support.

This expansive position on "actual vindictiveness" has no support in the relevant case law either in the Sixth Circuit or elsewhere. Every case to consider an "actual vindictiveness" claim focuses exclusively on the vindictive motivations of the *actual* prosecutor bringing the charges. Here, the defendant appropriately recognizes that there is no evidence to establish that the Acting United States Attorney brought the charges out of actual vindictiveness, and, to preserve his claim, attempts to establish that some alleged animus by the Executive Branch trickles down to the Tennessee prosecutor. This is a theory of "actual vindictiveness" that, if adopted by this Court, would be the first time it has been adopted by any Court anywhere.

For example, the defendant cited the Second Circuit case of *United States v. Koh*, 199 F.3d 632 (2d Cir. 1999). (DE # 105, PageID # 1252-53.) Yet, the Second Circuit in *Koh* specifically noted that to prevail on an actual vindictiveness claim, such a claim requires "direct evidence, such

5.

as a statement *by the prosecutor* evidencing the vindictive motive….In order to prevail on his claim, Koh must show that (1) *the prosecutor* harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) he would not have been prosecuted except for the animus." *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999) (emphases added) (internal quotations omitted).

The defendant appropriately concedes that the Acting United States Attorney harbors no genuine animus towards the defendant. However, under *Koh,* even if the defendant could show that the Acting United States Attorney was "prevailed upon" to bring charges by "another with animus"—which there is no evidence of and which there is evidence against as detailed below — the Second Circuit requires a showing that that the prosecution of the defendant would *not have been brought* "except for the animus." *Id.* at 640. In short, if the prosecutor—here the Acting United States Attorney—brought a charge of alien smuggling for a legitimate, public safety purpose (even if there were evidence of him being "prevailed upon") the defendant's ability to show actual vindictiveness would fail the "but for" test the Second Circuit described in *Koh*. Even in *Koh,* the Second Circuit noted that despite the influence of a prominent member of the legal community, and a former AUSA in that office, the decision to prosecute Koh still lay exclusively with that prosecutor's office. *Id.* at 640.

A Seventh Circuit case that the defendant hopes to rely on for this expansive theory of "actual vindictiveness", *United States v. Monsoor*, 77 F.3d 1031 (7th Cir. 1996) offers no support to his theory. The Seventh Circuit, like the Second Circuit in *Koh*, noted that the animus of others must exclusively motivate the prosecution within the prosecutor who brings the charges:

6.

Monsoor presented no evidence suggesting that the United States Attorney or any of her assistants harbored animus against him or acted with vindictive motives in pursuing the prosecution. Indeed, he admits that they did not. Instead, the United States was culpable only indirectly under Monsoor's theory, implicated by having "accept[ed] recommendations for prosecutions referrals motivated by special agents for illegitimate reasons." But the animus of a referring agency is not, without more, imputed to federal prosecutors. A defendant must show that the ill will, whoever its bearer, actually motivated his prosecution. Thus, to connect the animus of a referring agency to a federal prosecutor, a defendant must establish that the agency in some way prevailed upon the prosecutor in making the decision to seek an indictment.

*Monsoor*, 77 F.3d at 1034–35.

Therefore, even under the most expansive "actual vindictiveness" cases cited by the defendant, the buck still stops with the prosecutor on the case. Indeed, under *Monsoor*, the defendant must show that "ill will" (even if fomented by others or for their benefit) *actually motivated* the prosecution. *Id.* Here, there is evidence before the Court that the lead prosecutor has previously and personally prosecuted several of these kinds of cases before (even through jury trial), which shows that he views prosecuting such cases (when supported by the evidence) to be in the interest of justice. Even if others in the Executive Branch have alleged ill will towards the defendant, there is nothing before the Court to establish that such alleged ill will actually motivated the prosecution team to bring the charges and not a desire to hold human smugglers accountable for their serious criminal conduct.

Here in the Sixth Circuit, "actual vindictiveness" must be similarly localized to the prosecutor bringing the charges. It must be demonstrated by objective evidence that "a prosecutor" (not the Executive Branch writ large) acted "in order to punish the defendant for standing on his legal rights." *United States v. Roach*, 502 F.3d 425 (6th Cir. 2007). Indeed, the Sixth Circuit has taken an even narrower view. The Sixth Circuit, unlike the Second Circuit or the Seventh Circuit, has not expanded the waterfront for "active vindictiveness" by showing that it may be committed

by proxy or based upon the influence of others. The United States respectfully submits that, within Sixth Circuit jurisprudence, the recognition that objective evidence must show that "a prosecutor" acted in order to punish the defendant for standing on his legal rights communicates a specific idea: that the only motivations of the specific prosecutor bringing the charges matters in evaluating an "actual vindictiveness" claim. Here, the defendant appropriately concedes that there is no such animus with the prosecutor who actually brought the charges, the Acting United States Attorney, nor is there any evidence, or even any allegation, of such animus from the other members of the prosecution team. Because the Sixth Circuit's approach focuses on the prosecutor, and because even the other circuits who expanded the "actual vindictiveness" prong to theoretically include others did not expand that prong to the dramatic extent that defendant now urges, the Court should deny the defendant's claim of "actual vindictiveness".

> B. *There is no realistic likelihood of vindictiveness but, if a presumption exists, it is sufficiently rebutted.*

The second way that a defendant may establish prosecutorial vindictiveness is that there existed a "realistic likelihood of vindictiveness" for the prosecutor's action. *Bragan v. Poindexter,* 249 F.3d 476 (6th Cir. 2001). A prima facie case of vindictive prosecution requires allegations of fact showing "(1) exercise of a protected right; (2) a prosecutorial stake in the exercise of that right; (3) unreasonableness of the prosecutor's conduct; [and] (4) the intent to punish the defendant for exercise of the protected right." *United States v. Suarez,* 263 F.3d 468, 479 (6th Cir.2001). "Presumably, if the first three elements are present, this may help establish grounds to believe the fourth is present, that there is the required 'realistic likelihood of vindictiveness,' which the government would have to rebut." *Id.* Here, while the Government concedes that the defendant's lawsuit against the Secretary of Homeland Security for what he alleged was unlawful deportation

8.

to El Salvador was the exercise of the protected right, the defendant fails to show the remainder of the elements to establish as "realistic likelihood of vindictiveness".

      i.    <u>The defendant's Maryland lawsuit gives no "stake" to the prosecutors for the criminal case in the Middle District of Tennessee.</u>

The defendant claims that the prosecution had a "stake" in the defendant's civil lawsuit in Maryland by, again, conflating the prosecution team with the entire Executive Branch. DE # 105 at 18. It is only through this obfuscation of what constitutes "the prosecutor" that the defendant is able to even make his claim that the prosecution had a "prosecutorial stake" in the defendant's civil lawsuit. This expansion by the defendant is completely unsupported in the case law. Indeed, the defendant's position asks this court to ignore binding precedent, assume the position of the Supreme Court, and create new case law. In every vindictive prosecution case, the courts have considered the "stake" of prosecutors who were *actually* prosecuting the case as opposed to "the Government or Executive Branch" writ large.

Consider for example, the seminal Sixth Circuit case of *Bragan v. Poindexter*, 249 F.3d 476 (6th Cir. 2001). The defendant cites *Bragan* for the proposition that the prosecutors had a "stake" in deterring Bragan's First Amendment rights because Bragan had made widely publicized statements that were "highly critical of the prosecutors." *Id*. at 483. (DE # 105, PageID #: 1256.) This is correct, for as far as it goes. What is most important is that Bragan's comments about "the prosecutors" were, in fact, the prosecutors who had *actually handled* his earlier matter and were the *same prosecutors* who later re-instated previously dismissed murder charges against him. *Id*. at 478-79. Importantly, the Sixth Circuit analyzed the prosecutor's "stake" as a personal one: "Considering that the prosecutors had a *significant and very personal stake* in deterring the exercise of rights in this case, as opposed to, for example, the stake in deterring routine invocations

of procedural rights, Petitioner has fulfilled his burden of establishing a reasonable likelihood of vindictiveness." *Id.* at 484 (emphasis added). Similarly important to this Court's analysis, the Sixth Circuit contrasted the Bragan prosecutor's "significant and very personal stake" in prosecuting him to a more general stake and found that comparison important in the overall analysis. Therefore, a demonstrated lack of a "significant" and "personal" stake in a particular prosecution is critical— even decisive—under the relevant Sixth Circuit analysis. Indeed, in *Bragan*, the defendant's statements were made at a time when 'a disciplinary charge was pending against the prosecutors based on conduct which occurred at Petitioner's original trial.' The *Bragan* prosecutors thus had very clear personal incentives "in preventing Petitioner's exercise of his First Amendment rights." Nothing comparable exists in this case.

In *United States v. Simpson*, 226 F. App'x 556 (6th Cir. 2007), Simpson had previously filed a civil lawsuit against a county jailer alleging civil rights violations from when he had been an inmate in that jail. Later, the jailer's son—who was an Assistant U.S. Attorney—was involved in the investigation of Simpson who was later prosecuted on federal drug charges. *Id.* at 558. Simpson alleged that his prosecution was vindictive and that the act of bringing the charge was actually revenge for Simpson's civil lawsuit against an AUSA's father. However, the Sixth Circuit held that, because the prosecution of Simpson was functionally driven by other prosecutors in the same office, even the potential conflict with AUSA Smith [the jailer's son] did not constitute a sufficient "stake" in the prosecution to give rise to a supportable vindictiveness claim. *Id.* at 561. ("In this case, it is undisputed that supervising AUSA Hatfield made the initial decision to prosecute Simpson and that AUSA West approved the indictment and presented the case to the grand jury. Like the prosecutor pro tempore in *Bragan,* neither of these prosecutors shared Smith's alleged stake in the prosecution.")

10.

The *Simpson* case is substantially analogous to the facts here. Notably, it is an exceptionally relevant Sixth Circuit case that the defendant failed to cite despite its clear resonance with the facts presently before the Court. In this case, the defendant previously sued the United States who was not represented by any of the undersigned counsel in that lawsuit, the lawsuit did not occur in this district, and related to immigration matters as opposed to a criminal case. The defense claims that because "the Government" includes both federal civil lawyers in Maryland and federal criminal prosecutors in Tennessee, all who work for the Department of Justice, the prosecutors in Tennessee took vindictive action based on the result of the Maryland lawsuit. However, this is (albeit, on a different scale) substantially the allegation made in *Simpson*: Simpson claimed that because Smith had a "stake" in the unrelated civil lawsuit (involving his father), that "stake" carried over to the other prosecutors in his same office. However, in *Simpson* there was even an allegation that Smith had personally participated in at least one investigative step in a criminal prosecution of Simpson. *Id*. at 558.

Here, there is no such allegation: no attorney who defended the United States in the defendant's civil lawsuit in Maryland, had any participation in the criminal investigation in Tennessee or even contact with the Tennessee prosecutors until well after the case was charged and in court. The Acting United States Attorney and the Joint Task Force Vulcan prosecutors had no participation in the Maryland civil lawsuit whatsoever. In *Simpson,* the Sixth Circuit determined that attorneys in the *same* U.S. Attorney's Office, in the *same* district, were determined not to have a "stake" in each other's actions. Therefore, in this case, *Simpson* would stand for the proposition that to the extent that the Civil Division of the Department of Justice—which represented the United States in the defendant's lawsuit in Maryland—had a "stake" in the defendant's

11.

prosecution, that stake did not carry over to the U.S. Attorney's Office for the Middle District of Tennessee simply because all involved work for the Department of Justice.[1]

While most of the vindictive prosecution cases involve superseding an indictment, other circuits (as the Sixth Circuit did in *Simpson*) have also considered the idea of whether the act of a prosecutor bringing an indictment can be vindictive. In *United States v. Esposito*, 968 F.2nd 300, 302 (3d Cir. 1992), a jury acquitted Esposito in a RICO case which had alleged several predicate drug trafficking crimes (though the indictment did not charge Esposito with those stand-alone offenses). Six months after his acquittal (and over four years after the events themselves), the government charged Esposito with the drug trafficking offenses which were the RICO predicates. *Id.* On appeal, Esposito alleged that his subsequent indictment, after an acquittal on substantially related charges, was vindictive and had been sought as punishment for his earlier acquittal. *Id*. at 303. However, the Third Circuit held: "The evil that a presumption of vindictiveness seeks to eradicate is the threat of retaliation when an accused exercises a right in the course of the prosecution. Where, however, the prosecutor has done nothing to deter the exercise of one's right during the case or proceeding, and the prosecution has come to a natural end, no presumption of vindictiveness applies." *Id*. at 303-04 (citing *United States v. Goodwin,* 457 U.S. 368, 376, 102 S. Ct. 2485, 2490 (1982)). Here, the criminal prosecution did nothing to deter the defendant's right to sue the government for his return to the United States from El Salvador. Indeed, the defendant was returned from El Salvador to the United States and has now been placed in the position he was

---

[1] Of note, in *Simpson* the criminal case was opened by AUSA Martin Hatfield who apparently supervised both Smith *and* the attorneys who prosecuted Simpson in the London, Kentucky branch of the U.S. Attorney's Office. Therefore, the defense argument that a "shared [and higher up the chain, not a direct] supervisor" of both the Civil Division and the U.S. Attorney's Office for the Middle District of Tennessee (i.e. senior leadership in the Department of Justice) allowed the "stake" in the defendant's claim to transfer from one to another does not hold water under *Simpson* because that fact was more on point in that case.

in prior to that deportation, and the defendant continues to vigorously contest his deportation from the United States. Therefore, *Esposito* stands for the proposition that no presumption of vindictiveness should apply.

The Ninth Circuit came to a similar conclusion when considering a scenario where a defendant was charged with making false statements to a federal agent in Arizona after his acquittal on other charges in Colorado. *United States v. Martinez*, 785 F.2d 663 (9th Cir. 1986). Some five years after making false statements to an immigration officer in Arizona, and just six weeks after his acquittal on charges in Colorado, Martinez was indicted for making false statements in Arizona. *Id.* at 664-665. The Ninth Circuit, however, held: "Martinez could have exercised no right in the Colorado trial that would have affected the Arizona indictment. Assuming, *arguendo,* that the sole motive for bringing the Arizona indictment was the Colorado acquittal, the decision in *Allen* demonstrates that such a motive should not raise the presumption of vindictiveness. It is a legitimate prosecutorial consideration. The absence of actual vindictiveness, therefore, becomes decisive." *Id*. at 670 (citing *United States v. Allen*, 699 F.2d 453 (9th Cir. 1982)). In reversing the district court's dismissal of the indictment, the Ninth Circuit went on to instruct about the delay between the offense and the indictment—something the defense has obliquely raised in this case— holding:

> This conclusion is not impaired by the fact of the long delay between the original Arizona indictment and the indictment dismissed by the trial court in this case…The Supreme Court has indicated that prosecutors are entitled to great leeway in their reasons for investigative delay. *See United States v. Lovasco,* 431 U.S. 783, 792–96, 97 S. Ct. 2044, 2049–52, 52 L.Ed.2d 752 (1977). We see no reason in this case to set time limits for prosecutorial investigations beyond the limits that are already established by statutes of limitations.

*Martinez*, 785 F.2d at 670.

As in *Martinez*, the defendant's assertion of his rights in a civil immigration case in Maryland did not affect the prosecution of his criminal acts in Tennessee. Therefore, it should not be used to raise the specter of the presumption of vindictiveness.

In *United States v. Jarrett*, 447 F.3d 520 (7th Cir. 2006), the Seventh Circuit considered a scenario where a defendant had "embarrassed" a group of state prosecutors who had to dismiss a case against him and then claimed that a subsequent federal prosecution of him for the same offenses was vindictive. The district court found the federal prosecution was vindictive, but the Seventh Circuit reversed that decision holding: "…we cannot simply presume bad motives by the government. The Supreme Court has admonished that courts should not 'assume that a prosecutor's probable response to [pretrial] motions is to seek to penalize and to deter.'... "The timing of [a] federal prosecution, alone, cannot change [a] legitimate exercise of normal prosecutorial discretion into a vindictive prosecution." *Id*. at 528 (quoting *Goodwin,* 457 U.S. at 381, 102 S. Ct. 2485, *and United States v. Dickerson,* 975 F.2d 1245, 1251 (7th Cir. 1992)). Here, the defendant alleges a similar motivation and a similar action: the defendant, according to him, "embarrassed" some aspect of the Government by winning a positive result in his immigration lawsuit and, therefore, his subsequent prosecution (by an Acting U.S. Attorney wholly uninvolved in his immigration lawsuit) is vindictive. However, as these cases—both from the Sixth Circuit and other circuits— the defendant has not (and cannot) point this Court to a single case anywhere where any defendant has ultimately succeeded on a similar claim.[2]

Perhaps the most analogous non-Sixth Circuit case to the present facts is the Fourth Circuit's case of *United States v. Wilson*, 262 F.3d 305 (4th Cir. 2001). In that case, Wilson had

---

[2] As noted, Jarrett won relief at the district court, but the district court's finding of vindictive prosecution was reversed on appeal.

been prosecuted for a South Carolina firearms charge and was sent to a Bureau of Prisons facility in North Carolina. *Id.* at 309. However, while in North Carolina, Wilson was sent by BOP to another state to resolve an unrelated state charge, was erroneously released, and escaped to California. *Id.* He was later captured in January 1999. *Id.* In March 2000, over a year after the actions that constituted his escape, Wilson received a favorable opinion from the Fourth Circuit invalidating his South Carolina firearms conviction. *Id.* at 310. A few days after the opinion was released, the U.S. Attorney in South Carolina emailed the U.S. Attorney in North Carolina requesting that Wilson be prosecuted in that district for escape. *Id.* Wilson was federally indicted for escape in North Carolina and claimed the prosecution was vindictive and only motivated by the fact that he had successfully pressed his rights in the South Carolina case. *Id.* at 311. The district court found that the prosecution was vindictive but was reversed by the Fourth Circuit. *Id.* at 321. In reversing the district court, the Fourth Circuit found:

> Finally, but not the least important is the fact that the prosecutor charged with vindictiveness in this case was different—indeed, she is in a different office—from the prosecutor who brought the charge that Wilson successfully appealed. Even if a presumption of vindictiveness could have attached on these facts to a charging decision made by the U.S. Attorney for the District of South Carolina, we could not, on this record, impute the improper motivation to the U.S. Attorney for the Eastern District of North Carolina…We see no reason to assume that this legitimate prosecutorial motive was not taken at face value. Even if we were to assume that any motive could have been "transferred" by an e-mail request, we could only assume that the motive "transferred" was the one expressed, rather than an improper motive, not evidenced by the e-mail. Moreover, the fact that there was no connection between the South Carolina case successfully appealed by Wilson and the North Carolina escape prosecution can only lead to the conclusion that the attorneys in the North Carolina office had "no 'personal stake' [in Wilson's successful appeal] ... and thus no reason to engage in 'self-vindication.'

*Id.* at 319–20 (internal citations omitted).

Just as the U.S. Attorney's Office in North Carolina had no stake in Wilson's successful appeal, the U.S. Attorney's Office of the Middle District of Tennessee had no stake in the

defendant's civil immigration case. In *Wilson*, the fact that both prosecution offices were under the broad umbrella of the Department of Justice (or even the "Executive Branch") was of no constitutional moment. The same applies here: a claimed loss by the Civil Division in the defendant's immigration cases do not transfer to the United States Attorney's Office for the Middle District of Tennessee. In *Wilson*, the leader of the "losing" agency (the U.S. Attorney's Office in South Carolina) even recommended prosecution to the other agency (the U.S. Attorney's Office in North Carolina); even under those circumstances, the Fourth Circuit declined to find a vindictive prosecution. Here, there is no similar recommendation or request before this Court from the Civil Division or anyone else in the Justice Department or the Executive Branch.

ii.  The defendant's Maryland immigration case placed no "burden" on the Tennessee prosecutors in the Tennessee criminal case.

Similarly and relatedly, the defendant seeks to extend the "burdens" placed on the prosecution—expanding on the idea described by the Sixth Circuit in *United States v. LaDeau*, 734 F.3d 561,569 (6th Cir. 2013), that "the likelihood that a defendant's exercise of his rights will spur a vindictive prosecutorial response is indexed to the burden that the defendant's conduct has placed on the prosecution"—to the entire Executive Branch. This also would be an extraordinary expansion of the law on this point and would force this Court to plow new ground that is far removed from the well-settled Sixth Circuit precedent on this issue. After all, in *LaDeau*, the prosecutor who superseded the indictment after LaDeau won a critical suppression motion, was the *same* prosecutor who had charged the case to begin with. *Id.* at 564-565. When the Sixth Circuit recognized the "significant burden" that LaDeau's successful suppression motion created for "the Government", that burden was entirely localized to that specific criminal case and the assigned prosecutor who lost the suppression motion.

16.

The defendant seeks to extend this increased "burden" to the prosecution team in this case by arguing that the defendant's legal results in his immigration-related lawsuit "inflicted a mortal blow on the government's removal of him." (DE # 105, PageID # 1257) (internal quotations omitted). Even if that were the case, the defendant's removal from the United States under the prevailing immigration laws has nothing to do with his criminal prosecution for alien smuggling, an offense where illegal aliens and natural-born citizens alike can be prosecuted. The Sixth Circuit in *LaDeau* noted that a prosecutorial "stake", and elucidation of the consequent prosecutorial burden, can be shown where the government "is forced to do over what it thought it had already done correctly." *LaDeau,* 734 F.3d at 569-70. But in the criminal case, the government has to do nothing "over" in the sense that the defendant was—unlike in *LaDeau*—not previously charged and his indictment superseded. In fact, the defendant was not previously charged at all; there was nothing to "do over" in this case. There was no additional burden in the vein of answering pre-trial motions, going to trial, or dealing with an adverse suppression ruling; there was no burden on the United States Attorney's Office for the Middle District of Tennessee *at all*. Rather, the defendant was charged because the prosecutor determined that, in his judgment, the defendant had committed a serious crime that could be proven beyond a reasonable doubt.

iii.    The prosecutor's conduct was reasonable.

In this case, there is no allegation that the Acting United States Attorney has acted unreasonably in prosecuting the defendant. Rather, the defendant alleges that the entire Executive Branch's orientation toward the defendant is unreasonable. Again, and for the reasons described above, this argument misses the point. The defendant cannot point this Court to a case where someone *else's* alleged animus or reason to prosecute a given defendant has been "transferred" to a prosecutor who does not share that alleged animus. The defendant attempts to argue that the new

17.

prosecution is "ante-upping" but, respectfully, attempts to use legal slight-of-hand when making this argument. (DE # 105, PageID # 1258). The concept of "ante-upping", and the cases that defendant cites for that proposition—*Blackledge, Suarez,* and *LaDeau*—all involve cases where a superseding indictment was sought in an already pending case. The idea in those cases is that for a defendant who is *already* being prosecuted for a charged offense but asserts a right (i.e. by filing a suppression motion) and then faces a superseding indictment or punishment enhancement that increases his exposure court's must evaluate if government has "upped the ante" wrongfully. Those are simply not the facts here; there is no superseding indictment, and the cases are sufficiently disconnected in location, subject matter, and even type: civil vs. criminal.

The defendant argues that the delay in his prosecution somehow makes the prosecution unreasonable. It is undisputed that the charges were brought against the defendant within the five-year statute of limitations. 18 U.S.C. § 3282(a). The Supreme Court has cautioned that prosecutors are entitled to great leeway in their reasons for investigative delay. *See United States v. Lovasco,* 431 U.S. 783, 792–96, 97 S. Ct. 2044, 2049–52, 52 L.Ed.2d 752 (1977). To make the argument, the defendant relies on the fact that the defendant was released from the scene in Tennessee on November 30, 2022, without charges. (DE # 105, PageID # 1258.) However, the facts of the traffic stop were never presented to any prosecutor until late April 2025. Undersigned counsel, despite being the most relevant contact for those kinds of charges in 2022, as the Immigration Crime Coordinator for the U.S. Attorney's Office, was not presented with any of the facts of the stop, and there is no record that anyone in the U.S. Attorney's Office for the Middle District of Tennessee was either. (*See* Exhibit 1, Prosecutors' Affidavit.) There is no record that, to the extent that agents of the Department of Homeland Security followed up on the traffic stop, the matter was presented to any prosecutor in Maryland or anywhere else. In other words, the first opportunity

that any prosecutor had to consider the facts of the traffic stop was in late April 2025. Once presented with those facts and based on subsequent information discovered during the course of the investigation, there was no substantial delay and the defendant was indicted a few weeks later.

Timing of prosecutorial action, even timing of actions that increase punishment that occur after long delays, generally does not form a legal basis for a vindictive prosecution motion. Courts in this District (including this Court) have previously held that even the exceptionally late filing of a third superseding indictment—on the eve of trial but for events that occurred years earlier—does not rise to the level of vindictive prosecution. *United States v. Johnson*, 299 F.Supp.3d 909, 918-920 (M.D. Tenn. 2018, J. Crenshaw); *see also United States v. Haji-Mohammed,* 533 F.Supp.3d 598 (M.D. Tenn. 2021, J. Trauger) (charging a defendant with a twenty-seven-month-old assault just days after his filing of a § 2255 petition was not vindictive).

Had undersigned counsel been briefed on the traffic stop in late 2022 or early 2023 and declined prosecution at that time, only to revive it later, this Court would perhaps be justified in asking what had changed and probing to see if there was an unreasonable or impermissible reason in the change. But the fact is that undersigned counsel first learned of the Tennessee traffic stop on April 27, 2025. Undersigned counsel then sought to learn more facts through a fulsome investigation and, once confident that the defendant had committed a serious crime that could be proven beyond a reasonable doubt, acted in accordance with his responsibilities to the public. "As a result, '[t]he presumption of regularity supports' prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" *United States v. Armstrong*, 517 U.S. 456, 464, 116 S. Ct. 1480, 1486, 134 L. Ed. 2d 687 (1996) (quoting *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S. Ct. 1, 6, 71 L.Ed. 131 (1926)). "[S]o long as the prosecutor has probable cause to believe that the accused

committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher* 434 U.S. at 364.

Finally, the charges in this case are serious and supported by the facts and the case law. These types of charges are regularly pursued by federal prosecutors throughout the country and have been personally pursued by the Acting United States Attorney in this case multiple times in the recent past. This case bears no resemblance to other instances where courts found that the prosecutors went out of their way to "up the ante" and bring unusually harsh (or unusually trivial) charges that smack of personal animus or some other improper motive. It is in the public interest to prosecute individuals like the defendant who are engaging in the human smuggling of hundreds of illegal aliens across the United States, including unaccompanied minors. The seriousness of the charges here and the strength of the evidence is strong proof that demonstrates that a hypothetical vindictive motive is not the "but for" cause of this prosecution. The defendant is not being prosecuted in federal court in Tennessee because he filed a civil lawsuit against the United States in Maryland. He is being prosecuted in federal court because the Government's investigation revealed compelling evidence that he is an instrumental member of a transnational human smuggling conspiracy.

    iv.    There was no intent to punish the defendant for impermissible purposes.

The last element the defense must establish to obtain a rebuttable presumption of vindictiveness is that there was an "intent to punish the defendant for exercise of the protected right." *United States v. Suarez,* 263 F.3d 468, 479 (6th Cir. 2001). Here, again, the defendant ascribes that intent to the Executive Branch rather than the prosecutor on the case. The defendant cites multiple public comments by senior government leaders about the defendant, the threat he

poses to public safety, and their desire that he face justice for his crimes. (DE # 105, PageID # 1247). However, even that intent—as unattributed as it is to the prosecutors of record on the case—does not assist the defendant. Indeed, a desire to punish a person who one believes is a human smuggler, a gang member, and a domestic batterer are all legitimate reasons to seek to prosecute an evidence-based crime. These reasons, borne out of a desire to protect the public, consistent with Department of Justice Policy, would undermine the idea that the motivating purpose to prosecute the defendant was his success in his Maryland lawsuit. As the Fourth Circuit noted in *Wilson*, multiple motivations for prosecution (which include non-vindictive ones) is a circumstances that cuts against a finding of vindictiveness: "In the face of strong probable cause that Wilson committed the crime of escape, judicial intervention should not deny the community the benefit of a prosecution unless Wilson can show that he would not have been prosecuted for escape *but for* the vindictive motive of prosecutors to punish him for successfully exercising his right of appeal in the firearm-possession case. Wilson has not carried this heavy burden." *Wilson*, 262 F.3d at 317.

Two important points to make here. Even if the statements of public officials allegedly and arguably conveyed significant animus about the defendant, there is no evidence before this Court that any of that alleged animus carried over to the prosecutor who made the decision to bring the charges. The defendant has already appropriately conceded that the Acting United States Attorney did not have such animus. And second, conversely and assuming the prosecutor had such animus or was prevailed upon (which it is not accurate), the defendant cannot show that "but for" a vindictive motive by the prosecutor, the defendant would not have been charged. The facts are that the prosecutor who brought the charges has no such motive. Nor is there any evidence that the Acting United States Attorney or any of the other prosecutors in this case initiated this prosecution

at the behest of Executive Branch officials who were acting with a vindictive motive. *See e.g.*
*United States v. Avenatti*, 433 F.Supp.3d 552, 574-575 (S.D.N.Y. 2020).[3]

Because the defendant cannot establish the elements necessary to establish a "realistic
likelihood of vindictiveness", the defendant's motion must be denied.

      v.     <u>Even if a realistic probability of vindictiveness is raised, it is rebutted</u>.

Even if the defendant were to establish "a realistic probability of vindictiveness" under
these facts which, as the United States has shown, he cannot, this does not end the inquiry. Then,
the United States would have the opportunity to rebut the presumption of vindictiveness. To that
end, the United States has submitted an affidavit from the Acting United States Attorney to rebut
any potential presumption of vindictiveness. (*See Exhibit 1*.)

In the affidavit, the Acting United States Attorney offers an "on the record" statement
regarding what motivated him and what did not to seek the instant charges. Specifically, the lead
prosecutor describes the reasons that he sought the charges against the defendant as follows:
"because I believed that all the competent evidence showed that he had committed a serious federal
crime, that I believed that I could prove that he committed that offense beyond a reasonable doubt,
and I believed it was appropriate to charge Abrego given all of the circumstances." *Id.* Further, the
affidavit explains that the prosecutor did not know about any of the facts and circumstances of the
November 30, 2022, traffic stop prior to April 27, 2025. *Id*. The affidavit also lists substantial new
evidence in the case that was not obtained until after April 27, 2025 to include: a) the statement of

---

[3] "Avenatti also points out that in September and October 2018 tweets, President Trump referred to Avenatti as 'a total low-life,' and 'a third rate lawyer' who makes 'false accusations.' Acknowledging the animosity between Avenatti and President Trump, Avenatti has not proffered evidence suggesting that this prosecution was initiated at President Trump's behest, or that U.S. Attorney Berman brought this prosecution out of animus or malice towards Avenatti… Although Avenatti has proffered ample evidence of the animosity President Trump feels towards him, Avenatti has not offered any evidence suggesting that that animosity played any role in the U.S. Attorney's decision to prosecute him."

Jose Hernandez Reyes, a convicted human smuggler, as the owner of the vehicle the defendant was driving on November 30, 2022; b) the statements of other co-conspirators and witnesses to federal law enforcement and federal grand juries; c) the phone records and license plate reader data that conclusively established the defendant had not traveled from St. Louis as he claimed to law enforcement proving he lied to the trooper and, therefore, possessed guilty knowledge; and d) the official confirmation that several of the passengers as individuals in the vehicle that night had been previously deported from the United States and were thus illegally in the United States at the time the defendant transported them. *Id.* The criminal referral in this case came from the Special Agent-in-Charge of Homeland Security Investigations (HSI) for this district. Even if there was any animus against the defendant by the Department of Homeland Security such animus cannot be simply imputed to the HSI SAC or the case agent in this case. *See e.g. United States v. Ji,* 662 F.Supp.3d 424, 435-436 (E.D.N.Y. 2023). ("Regardless, the case law is clear that any animus held by an investigator cannot automatically be attributed to the prosecution team.") *See Koh*, 199 F.3d at 640 (holding that even if a "quasi-investigator for the government" or "an agent of the U.S. Attorney's Office" held animus against a defendant, courts cannot grant evidentiary hearings where "there was no evidence that the decision to prosecute was the result of his allegedly improper motives"); *United States v. Hommosany*, No. 99-1534, 2000 WL 254050, at *2 (2d Cir. Mar. 3, 2000) ("It was not improper for the District Court to refuse to impute to the ultimate prosecutors the motives of agency investigators." (collecting cases)); *cf. United States v. Hastings*, 126 F.3d 310, 314 (4th Cir. 1997) ("We will not impute the unlawful biases of the investigating agents to the persons ultimately responsible for the prosecution."), *cert. denied*, 523 U.S. 1060, 118 S. Ct. 1388, 140 L.Ed.2d 648 (1998)).

In *Bragan*, the Sixth Circuit held that "governmental discovery of previously unknown evidence" would suffice to rebut a finding of realistic likelihood of vindictiveness. *Bragan,* 249 F.3d at 482 (citing *United States v. Andrews*, 633 F.2d 449, 456 (6th Cir. 1980)). While the United States respectfully submits that the defendant has not made anything approaching the showing he would need to establish a "realistic likelihood of vindictiveness", even if he has, this Court can conclude that the evidence offered has rebutted that claim. "If the government produces evidence to rebut the presumption, the defendant must prove that the offered justification is pretextual and that actual vindictiveness has occurred." *Id*.

## II.    The prosecution in this case was not selective.

Similarly, the defendant's selective prosecution claim fails here because he cannot satisfy his heavy burden of showing that the Government has not brought similar charges against similarly situated defendants in the past. The defendant has also not come close to proving that the defendant's prosecution was based on a desire to prevent him from exercising constitutional rights. In *United States v. Armstrong,* 517 U.S. 456, 463–64, 116 S. Ct. 1480, 1486, 134 L.Ed.2d 687 (1996) the Supreme Court held: "A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution. Our cases delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one…that the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims."

The Sixth Circuit has described the burden of establishing a selective prosecution claims as "heavy" and outlined the following factors necessary to establish a *prima facie* case:

Accordingly, it has been held that a defendant asserting selective prosecution:... bears the heavy burden of establishing, *at least prima facie,* (1) that while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, *and* (2) that the government's discriminatory selection of him has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent the exercise of his constitutional rights.

*United States v. Hazel*, 696 F.2d 473, 474 (6th Cir. 1983) (citing *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974)).

The Sixth Circuit was careful to state that the notoriety that one's case receives does not make a selective prosecution more likely: "Stated differently, even if Hazel and Lott had conclusively proven their charge that the Government initiated prosecution because of the great notoriety of their protests, that fact would not, as a matter of law, be an impermissible basis for prosecution." *Hazel*, 696 F.2d at 475. However, it is exactly the defendant's notoriety that he claims makes his prosecution selective. To make his point, the defendant submits that the delay in the time between the traffic stop and his charging indicates that the prosecution was selective. Respectfully, that is not a metric that *Hazel* described in the straightforward prongs of establishing a *prima facie* case for selective prosecution. The defendant needs to show that others "similarly situated have *generally not been proceeded against*" by the government. *Id*. (emphasis added). However, showing that it took longer for the defendant to be prosecuted than the average timeframe within the circuit does not show that others similarly situated were not proceeded against at all; it only shows they were proceeded against faster. Nor has the defendant shown that his prosecution was either "discriminatory" or in "bad faith".

The defendant argues: "the only possible explanation for the timing of the charges here is that the government chose to use this prosecution to punish Mr. Abrego for exercising his right to challenge the violations of due process that led to his unconstitutional deportation" (DE 105,

25.

PageID # 1261.) Not so. In fact, as described earlier in this brief, a major reason that the current case was not prosecuted for over two years was that undersigned counsel didn't know it existed. Undersigned counsel first learned of the facts of this case on April 27, 2025, and sought an indictment a few weeks later. The delay in charging between November 2022 and May 2025 is substantially and exclusively attributable to the fact that the prosecutor didn't know about the events of November 2022 until April 2025—not any improper motives.

The lead prosecutor on this case has himself prosecuted this same kind of offense on several occasions throughout his tenure in this district and has tried a strikingly similar alien smuggling case to a jury before this Court in the past. *See e.g. United States v. Mateo-Lucas*, Case No. 3:17-cr-00079. This kind of history belies the idea of selective prosecution for this defendant, because this prosecutor has prosecuted this kind of crime before against similarly situated defendants based on similar facts. As noted at various points in this brief, there is no evidence that the undersigned prosecutor bears any ill-will towards the defendant or has chosen to prosecute him for any other impermissible reason. In short, the defense has nothing to offer this Court under the strictures of *Hazel* and *Armstrong*.

### III.   The Defendant's Supplemental Filing and Response to the Government's Request for an Extension are Misleading as Whole and Contain Multiple False Statements.

As previewed for the Court in the Government's motion for an extension of time to file this response (DE # 114), the Government was shocked to see the Supplemental Filing by the defense on August 23, 2025.  Not only was it a breach of trust—inserting plea negotiations that the Government had engaged in, at the request of the defendant, in good faith to resolve the case—but it also contained

a number of statements which appeared to be designed to mislead this Court and the court of public opinion.[4]   The true facts, supported by evidence, are as follows.

On July 13, 2025, the Government sent an email to defense counsel with prospective trial dates, an update on discovery, and an offer to engage in plea negotiations, which as indicated in the email is standard practice in this District.[5]   After the bail hearing before the Court on July 16, 2025, Mr. McGuire spoke in person with defense counsel about his offer to engage in plea negotiations.[6] Two days later, on July 18, 2025, defense counsel emailed the Government requesting to engage in plea negotiations.[7]   Specifically, the full text of the defense's email stated (emphasis added):

> Hi Rob,
>
> I am writing to follow up on your offer to engage in plea discussions regarding Mr. Abrego's case. Mr. Abrego is willing to discuss a potential plea with the government. **However, Mr. Abrego is only interested in a plea deal that also resolves his outstanding immigration issues by ensuring that upon the completion of his sentence, he is deported to a Spanish-speaking third country in North or Central America—like**

---

[4]     See *e.g.* Alan Feuer, N.Y. Times, *Abrego Garcia Detained Again After Government Signaled It Would Re-Deport Him*, (Aug. 25, 2025), https://www.nytimes.com/2025/08/25/us/politics/kilmar-abrego-garcia-arrested-ice-deportation.html ("One of Mr. Abrego Garcia's lawyers, Sean Hecker, said after the detention that the threat of deportation came even as Costa Rica was willing to take him in as a refugee. 'The government's campaign of retribution continues because Mr. Abrego refuses to be coerced into pleading guilty to a case that never should have been brought,' he said.") Ximena Bustillo, NPR (Aug. 23, 2025), *Kilmar Abrego Garcia released from federal custody pending trial*, https://www.npr.org/2025/08/22/nx-s1-5511177; ("One of his attorneys, Sean Hecker, said Abrego Garcia was now en route back to his family in Maryland, 'after being unlawfully arrested and deported, and then imprisoned, all because of the government's vindictive attack on a man who had the courage to fight back against the Administration's continuing assault on the rule of law.'"); Julia Ainsley, NBC News (Aug. 23, 2025) *Kilmar Abrego Garcia notified by ICE that he may be deported to Uganda*, https://www.nbcnews.com/news/us-news/kilmar-abrego-garcia-may-be-deported-uganda-rcna226756; Ben Johansen & Kyle Cheney, Politico, *Kilmar Abrego Garcia says Trump administration using threatened deportation to Uganda to coerce guilty plea*, (Aug. 23, 2025) https://www.politico.com/news/2025/08/23/kilmar-abrego-garcia-deportation-00521576; Eduardo Cuevas, USA Today, *Trump admin. wants to send Kilmar Abrego Garcia to Uganda, filings show*, (Aug. 25, 2025), https://www.usatoday.com/story/news/nation/2025/08/23/trump-administration-kilmar-abrego-garcia-uganda/85796904007/.

[5]     *See* Exhibit 2, July 13, 2025, email from Mr. McGuire to defense team.

[6]     *See* Exhibit 1, paragraph 21.  During those discussions Mr. Hecker indicated that finding an acceptable third country for the defendant post-sentencing was an important part of any plea negotiations and Mr. Hecker specifically mentioned Mexico as an acceptable destination.

[7]     *See* Exhibit 3, July 18 - 19, 2025, emails between Mr. Dean and Mr. McGuire regarding plea discussions and a stay to continue plea negotiations.

**Mexico—where he can live freely and safely without the specter of refoulement to El Salvador**.

If you and your colleagues are willing to work with Mr. Abrego to resolve his case along those lines, we welcome plea discussions. We only ask that our plea negotiations be kept completely confidential. Please let us know at your earliest convenience whether the government is interested in discussing a plea along these lines.

Thanks,
Rascoe

The Government had not offered to the defense a plea agreement that contemplated a plea of guilty in exchange for the resolution of the defendant's immigration case and a deportation to a particular third-party country of his choosing.[8] Nonetheless, at defense counsel's specific request and taking defense counsel at their word that the plea negotiations would remain confidential, the Government agreed to proceed with plea negotiations on the defendant's own terms: resolving his outstanding immigration case in conjunction with a plea of guilty in the criminal case. The defense knew these basic facts when it made the Supplemental Filing on August 23, 2025 (DE # 113) but neglected to tell the Court about them.

On July 18, 2025, the Government also emailed defense counsel about a joint stay for 30 days to engage in plea negotiations, which defense counsel agreed made sense.[9] On July 25, 2025, the Government sent defense counsel a proposed plea agreement.[10] On July 29, 2025, the defense counsel emailed back their redline changes to the plea agreement and included in the body of their email a list of four points summarizing the changes defense counsel made to the plea agreement.[11] The Government responded the next day, on July 30, 2025, requesting that defense counsel provide the

---

[8] *See* Exhibit 1, at paragraphs 22-26. Normally, the Government would not discuss plea discussions with the Court and never intended to. However, the defendant's filings have left the Government with no other choice but to attempt to set the record straight before this Court about how plea discussions proceeded.
[9] *See* Exhibit 3.
[10] *See* Exhibit 4, email from Mr. McGuire to defense team with plea agreement attached.
[11] *See* Exhibit 5, email from Mr. Dean with redlined plea agreement attached.

Government with a list of the defendant's preferred third-party countries.[12] Defense counsel responded back the same day stating that they hoped to provide a list of preferred countries by the end of the week. *Id.* On Saturday, August 2, 2025, the defense emailed the Government a list of preferred third-party countries, stating specifically "Mr. Abrego's preferred third countries are Mexico, Costa Rica, and Panama." *Id.*

Throughout August, Mr. McGuire and Mr. Dean had numerous phone calls regarding plea negotiations as their parties' respective representatives from the prosecution team and defense team.[13] As part of plea negotiations, the defense insisted that the Government provide some documentary proof from the third country that the defendant would be accepted, be at liberty, and not be refouled to El Salvador.[14] Obtaining this document from a foreign government was not easily obtained and took multiple weeks, a fact that Mr. McGuire communicated to the defense on several occasions. *Id.*

Based on Mr. McGuire's conversations with Mr. Dean as well as in public filings and statements on the record at hearings, it was well known by the defense that the defendant faced deportation to a country not of his choosing were he to be released from BOP custody. Indeed, in the Government's filing on the public docket regarding his impending release on August 20, 2025, the Government stated: "the United States would note that, should the Defendant be removed from the United States to another country via deportation, the United States would no longer be in a position to facilitate the Defendant's access to his attorneys at that point." D.E. # 108. Judge Holmes then appropriately cabined the release order regarding access to counsel should the defendant be in ICE custody. D.E. # 112. In other words, all parties, as well as the Court, knew that the defendant

---

[12] *See* Exhibit 6, July 30 and August 2 emails about third country deportation.
[13] *See* Exhibit 1, Prosecutors' Affidavit at paragraphs 26 – 28.
[14] *See* Exhibit 1, Prosecutors' Affidavit at paragraphs 29 – 30.

29.

faced a final order of removal from the United States and was subject to removal when released from BOP custody. At various points, Mr. Dean expressed that finding an acceptable third country for the defendant to be deported to after serving his sentence was the most important part of the plea negotiation from the defendant's perspective.[15]

On August 19, 2025, the defense filed a motion to dismiss for vindictive prosecution and a motion to schedule the defendant's release. D.E. # 104. However, Mr. McGuire and Mr. Dean, as their parties' representatives, were still discussing a potential plea agreement even after these motions were filed.[16] On August 21, 2025, Mr. McGuire sent the defense a letter from the Costa Rican government that the defense had insisted on obtaining before finalizing a plea agreement. *Id.* The letter indicated that Costa Rica—a country identified by the defendant as an acceptable country for him to be deported to—would accept the defendant, keep him at liberty, provide him some status and not refoul him to El Salvador. *Id.* All of these points were ones that the defense explicitly requested as a necessary component of any plea agreement. *Id.*

At the time the Costa Rica letter was sent to the defense, the Government believed the negotiations were far from preliminary but, instead, they were concluded, and that the Costa Rica letter was the culmination of over a month of good faith plea negotiations. *Id.* On Friday, August 22, 2025, Mr. McGuire went to the Putnam County Jail to meet with Mr. Dean who, in turn, was meeting with the defendant prior to his release from federal custody. *Id.* During that meeting Mr. McGuire had a copy of the draft plea agreement in its final form. *Id.* Mr. Dean informed Mr. McGuire that while the defendant wanted to be released that day, and that he hoped to consider the plea agreement "in the future." *Id.* At no time did Mr. Dean ever express that the defendant felt coerced by the plea

_____

[15] *See* Exhibit 1, Prosecutors' Affidavit at paragraphs 30 – 31.
[16] *See* Exhibit 1, Prosecutors' Affidavit at paragraphs 32, 37.

30.

offer. Mr. McGuire, for his part, stated he would keep the plea agreement offer open for at least the weekend given that the parties had been working on it for over a month. *Id.*

The prosecution team had no prior knowledge that the Department of Homeland Security (DHS) would order the defendant to report to an Immigration and Customs Enforcement office in Baltimore the following Monday, or that DHS would notify the defendant that he would potentially be deported to Uganda. *Id.* In fact, Mr. Dean told Mr. McGuire about both developments while they were still together at the Putnam County Jail. *Id.* The Government, as well as the defense based on public filings and conversations between Mr. McGuire and Mr. Dean, was, however, well aware that the defendant faced deportation to a third-party country not of his choosing if released from BOP custody. On Friday evening, the defense sent the Government an email confirming that the defendant was considering the Government's now allegedly coercive offer.[17] Even late that evening, after the email was sent, there was still a phone call between Mr. McGuire and Mr. Dean about potentially resolving the case.

On Saturday morning, August 23, 2025, the defense filed a supplement to their Motion to Dismiss claiming to the Court that the Government sought to coerce the defendant into accepting a plea agreement.  DE # 105.  Hours later, on Saturday afternoon, Mr. Dean contacted Mr. McGuire and inquired if the plea offer was still "open" because, according to Mr. Dean, the entire defense team, as well as the defendant's immigration attorneys, were recommending that the defendant accept the government's plea offer despite their filing earlier that morning.[18] Mr. McGuire informed Mr. Dean that the offer was still open but noted that this position was at odds with their filing earlier that

---

[17] *See* Exhibit 7, emails between Mr. McGuire and Mr. Dean on August 22, 2025. The email from Mr. Dean notes that that "We don't agree with your suggestion that this is the agreement Mr. Abrego 'wanted'—there are lots of things the government has been insisting on that he does not want." However, as of that Friday evening all of the negotiation points of the preceding weeks had been effectively resolved.
[18] *See* Exhibit 1, Prosecutors' Affidavit at paragraphs 36 – 40.

morning. *Id.* Mr. Dean agreed that the positions were inconsistent but stated that the defense still hoped to reach an agreement with the Government. *Id.*[19]

At no time during the weekend of August 23 – 25, 2025, did anyone on the defense, apart from the Saturday morning filing, express that the defendant felt coerced to take the Government's plea agreement. *Id.* Rather, the communications from the defense—through Mr. Dean to Mr. McGuire—was that the Government's offer was fair, reasonable, and in the defendant's best interest. *Id.* Moreover, as demonstrated in the attached exhibits, the prosecution team was anything but vindictive in its plea negotiations with the defense. The tenor and the tone of the emails negate any indicia of the Government seeking to punish the defendant. Instead, they demonstrate a great degree of good faith in dealing deal with the defendant on his own terms to reach a resolution that he found acceptable.

Based on the foregoing, there can be no dispute that the defense's supplemental filing was misleading as a whole and contained specific false statements within. From the outset, the supplemental filing is framed as events that transpired over the course of 48 hours. ("These recent developments, which occurred after the motion was filed, offer further support for the motion." DE # 113, PageID # 1290.) The truth is that plea negotiations were extensive and ongoing for more than a month, as detailed above and in the attached exhibits. However, based on the defendant's filing, the Court (and any other interested reader) could only be left with the impression that the plea negotiations were a last-minute effort by the Government to coerce the defendant into a plea. To leave no doubt, the defense characterized the Government's plea offer as "a last-ditch effort" by the

---

[19] This Court routinely asks defendants if they feel coerced during the Court's standard colloquy at a change of plea hearing. Presumably counsel was not urging the defendant to accept a coercive plea agreement knowing that: (1) the Court would later inquire about potential coercion on the record; (2) coercion would make the plea involuntary (*see United States. V. Boykin*, 395 U.S. 238, at 242–43, 89 S. Ct. 1709, 1712 (1969)); (3) it would be a violation of the professional rules of conduct, on multiple fronts; and (4) it would constitute ineffective assistance of counsel.

Government to coerce the defendant into taking a plea. *Id* at PageID # 1290. The only acknowledgement of plea negotiations from the defense came in a footnote:

> The defense has been engaged in preliminary plea discussions with the government, in which the government has proposed that Mr. Abrego plead guilty to all counts in exchange for a promise to be deported to a safe country in the Western Hemisphere where he would have status and be at liberty. Mr. Abrego has had little choice but to participate in those discussions, because of the fear that the government would do exactly what it has now expressly proposed to do, and deport him somewhere far more dangerous absent his agreement to plead guilty.

*Id* at FN 4, PageID #: 1292.

It is simply false to characterize the above plea negotiations as "preliminary" and there are multiple emails and phone calls that prove otherwise. The defense also painted the plea negotiations as forced upon them – "Mr. Abrego has had little choice but to participate in those discussions" – when it was defense counsel who initially tied the resolution of the criminal case to the defendant's immigration case and a third party country of his choosing.[20] Once the Government worked expeditiously to secure the country of the defendant's choosing—Costa Rica—the defense then painted the Government's action as procuring a placement to Costa Rica as the Government's own idea to coerce him into taking a plea. In truth, it was the *defendant* who chose Costa Rica and made the assurance from the Costa Rican government a necessary condition of the guilty plea.

When confronted with communications to the contrary in the Government's filing for an extension of time, the defense doubled down on their false statements. Instead of contrition and remorse for misleading the Court and the public, the defense stated:

> Critically, nowhere in the government's disparagement-laden submission is there any explanation for how its plea offer would be anything but coercive and, indeed, vindictive, given that it was hastily cobbled together at the eleventh hour when it became clear that Mr. Abrego would be exercising his legal right to pretrial release on Friday.

---

[20] *See* Exhibit 3 at pgs. 3 – 4.

33.

DE # 116 at 4, n. 10.

As demonstrated above and by the attached exhibits, to characterize the plea agreement as "hastily cobbled together at the eleventh hour" is simply a false statement. The defense knew that was a false statement when they made it to the Court in its filing given that the parties had been exchanging revised versions of a plea agreement for weeks at that point.

Ultimately, and based on the foregoing, the defense allegations regarding the parties' plea discussions do not and cannot lend any support for their larger allegations regarding a vindictive prosecution of the defendant. Rather, the record before the Court enhances the Government's arguments regarding the "presumption of regularity" that should be applied to this case. The Government's communications regarding plea discussions—none of which were expected to be filed before this Court when they were made—are not filled with invective nor are they aggressive in tone; to come from prosecutors allegedly hell-bent on vindictively punishing the defendant, the communications are strikingly professional, collegial, and reasonable. The plea negotiations in this case are of the standard kind that would accompany any case pending in this District. The record from the parties' plea discussions illustrates that the prosecutors in this case did not treat the defendant's case different from others. To that end, it stands as evidence against alleged vindictiveness.

## CONCLUSION

The United States Supreme Court held that "[a] prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution." *Goodwin,* 457 U.S. at 381–82, 102 S. Ct. 2485. Despite the defendant's rhetoric, the prosecution in this case was brought because the undersigned determined in May 2025 that the defendant had committed a serious federal crime and that sufficient evidence existed to prove that

34.

beyond a reasonable doubt and for no vindictive or nefarious purpose. The defendant is not able to show otherwise and his legal reasoning to try strains the bounds of all the relevant federal law on this issue.

The defendant's motion for to dismiss for vindictive or selective prosecution should be denied.

Respectfully Submitted,

/s/ Robert E. McGuire
Robert E. McGuire
Acting United States Attorney
719 Church Street, Suite 3300
Nashville, TN 37203

/s/ Jacob Warren
Jacob Warren
Co-Director, Task Force Vulcan

/s/ Christopher Eason
Christopher Eason
Co-Director, Task Force Vulcan

/s/ Jeremy Franker
Jeremy Franker
Deputy Director, Task Force Vulcan

/s/ Jason Harley
Jason Harley
Task Force Vulcan

35.