UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )     No. 3:25-cr-00115
                                   )
vs.                                )
                                   )
KILMAR ARMANDO ABREGO GARCIA,      )
                                   )
            Defendant.             )

BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE

TRANSCRIPT OF PROCEEDINGS

Thursday, February 26, 2026

_____

(APPEARANCES ON THE FOLLOWING PAGE)

_____

Lise S. Matthews, RMR, RPR, CRR
Official Court Reporter
719 Church Street, Suite 2300
Nashville, Tennessee 37203
lise_matthews@tnmd.uscourts.gov

APPEARANCES


For the Plaintiff:     Jason M. Harley
                       U. S. Attorney's Office (Nashville)
                       Middle District of Tennessee
                       719 Church Street
                       Suite 3300
                       Nashville, TN 37203


                       Stanley Edmund Woodward, Jr.
                       U.S. Department of Justice
                       Office of the Attorney General
                       950 Pennsylvania Ave NW
                       Washington, DC 20530


For the Defendant:     Rascoe S. Dean
                       Sherrard Roe Voigt & Harbison, PLC
                       1600 West End Avenue
                       Suite 1750
                       Nashville, TN 37203

                       Sean Hecker
                       David Patton
                       Jenna M. Dabbs
                       Nicole Ng
                       Hecker Fink LLP
                       350 Fifth Avenue
                       Suite 63rd Floor
                       New York, NY 10118


Also Present:          Jacob Warren
                       Jeremy Franker

I N D E X

Thursday, February 26, 2026

INDEX OF WITNESSES

WITNESSES:                                                    PAGE

RANA SAOUD

    DIRECT EXAMINATION BY MR. HARLEY                            8
    CROSS-EXAMINATION BY MR. DEAN                              23


ROBERT MCGUIRE

    DIRECT EXAMINATION BY MR. WOODWARD                         46
    CROSS-EXAMINATION BY MR. PATTON                            92
    REDIRECT EXAMINATION BY BY MR. WOODWARD                   160

EXHIBITS

| | | MARKED FOR I.D. | RECEIVED IN EVD. |
|---|---|---|---|
| DEFENDANT'S EXHIBITS | | | |
| **17** | HSI Baltimore ROI on Interview of KAG | **110** | **110** |
| **19** | ROI of First Interview of CC-1 | **112** | **112** |
| **30** | HSI Baltimore Report on Reopening of Investigation into KAG | **114** | **114** |
| **42** | Affidavit in Support of Response to Motion | **31** | **31** |
| **50** | (included in Govt Exh 1) Emails between A. Singh, R. McGuire et al. RE Hernandez-Reyes (Abrego-Garcia000003) | **121** | **121** |
| **51** | (included in Govt Exh 1) Emails between A. Singh, R. McGuire, and J. Warren RE Tennessee traffic stop (Abrego-Garcia000007-000009) | **125** | **125** |
| **66** | AG Memorandum – General Policy Regarding Zealous Advocacy on Behalf of the United States | **98** | **98** |
| **88** | (included in Govt Exh 1) Email from A. Singh to N. Ganjei, P.Escalona, R. McGuire, C. McDonald, and C. DeLorenz re: Jose Ramon Hernandez Reyes | **117** | **117** |

## EXHIBITS (continued)

|  | DEFENDANT'S EXHIBITS | MARKED FOR I.D. | RECEIVED IN EVD. |
|---|---|---|---|
| 93 | (included in Govt Exh 1) Emails between A. Singh, R. McGuire, and J. Warren Re: affidavit in support of criminal complaint (Kilmar Abrego Garcia) (DRAFT) – REM edits (jw).docx (Abrego-Garcia000010-000011) | 136 | 136 |

|  | GOVERNMENT'S EXHIBITS | MARKED FOR I.D. | RECEIVED IN EVD. |
|---|---|---|---|
| 1 | Various emails | 54 | 54 |
| 2 | Justice Manual 1-13.000Urgent Reports | 92 | 92 |
| 3 | Justice Manual 1-14.000 Notice to DAG Required for Certain Criminal and Affirmative Civil Resolutions | 92 | 92 |
| 4 | Justice Manual 3-1.000 Organization | 92 | 92 |

The above-styled cause came to be heard on February 26, 2026, before the Hon. Waverly D. Crenshaw, Jr., District Judge, when the following proceedings were had at 9:22 a.m., to-wit:

THE COURT:  All right.  Be seated.

All right.  We're here on Case Number 25-115, United States of America versus Abrego Garcia, and Mr. Garcia is in the courtroom.

Where is the interpreter?  If you'll stand and take the oath we can get started.

(Interpreters sworn.)

THE COURT:  All right.  If the lawyers can make their appearance on the record.

MR. WOODWARD:  Good morning, Your Honor. Stanley Woodward on behalf of the United States.  I'm joined -- with me at counsel table -- with my colleagues in the Joint Task Force Vulcan.

MR. WARREN:  Good morning.  Jacob Warren on behalf of the United States.

MR. FRANKER:  Good morning, Your Honor.  Jeremy Franker on behalf of United States.

MR. HARLEY:  Good morning, Your Honor.  Jason Harley on behalf of the United States.

MR. HECKER:  Good morning, Your Honor.  Sean Hecker on behalf of Mr. Abrego, who is seated to my left,

and I'm joined at counsel table by my colleagues David Patton, Rascoe Dean, Jenna Dabbs and Nicole Ng.

THE COURT: All right. Thank you.

So the Court certainly welcomes all members of the public. Let me just remind you there should be no cell phones in the courtroom. The marshals are authorized to confiscate any cell phones that are seen during the proceeding. And, of course, there's no recording of the proceedings in any way.

All right. Any preliminary matters before the government calls its first witness?

MR. WOODWARD: Your Honor, the parties had discussed exhibits and how to handle those.

THE COURT: Okay.

MR. WOODWARD: We have a few; they have a few more. We're amenable to addressing that at the end of the hearing on what actually gets admitted into the record, but defer to the Court.

THE COURT: Or we can do it as it comes up.

MR. WOODWARD: Very good, Your Honor.

THE COURT: All right. Anything else?

MR. HECKER: No, Your Honor.

THE COURT: Call your first witness.

MR. WOODWARD: Thank you, Your Honor.

MR. HARLEY: Your Honor, the United States

calls Rana Saoud.

COURT DEPUTY:  If you'll come to the podium to be sworn in.  Please raise your right hand.

RANA SAOUD,

called as a witness by Plaintiff, was duly sworn and testified as follows:

COURT DEPUTY:  Please state your full name for the record.

THE WITNESS:  Rana Saoud.

COURT DEPUTY:  And spell your first and your last name.

THE WITNESS:  R-A-N-A S-A-O-U-D.

COURT DEPUTY:  Thank you.  You can have a seat at the witness stand.  And there's a ramp.

THE COURT:  I'm going to get you to talk into that microphone as best you can.

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Go ahead.

MR. HARLEY:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. HARLEY:

Q.   Good morning, Ms. Saoud.

A.   Good morning.

Q.   Are you currently employed?

A.   Yes.

Q. Okay. Prior to your current employment, where -- did you once work for Homeland Security Investigations?

A. I did.

Q. Can you tell the Court about your time with Homeland Security Investigations?

A. Sure. I began my career in 1998 with the U.S. Customs Service, and then it evolved into Homeland Security Investigations, and I worked there until November of 2025, when I retired.

Q. So just shy of 30 years or so?

A. Yes, sir.

Q. All right. Now, in your job -- you guys sometimes go as -- by HSI, instead of the full name Homeland Security Investigations?

A. We do.

Q. All right. In your job with HSI, did you ever serve as the Special Agent in Charge of any region?

A. I did.

Q. And can you tell the Court about that?

A. I was the Special Agent in Charge for Homeland Security Investigations in Nashville from July of 2023 until I retired in November --

Q. All right.

A. -- '25. So almost three years.

Q. So for those of us who aren't familiar with kind of

the organizational structure of HSI, can you tell the Court how a SAC, or an S-A-C, fits into this structure here in Nashville?

A.   Sure.   There are 30 SACs throughout the country, and those individuals will report to our headquarters, which is in Washington D.C.   And then we have an Assistant Director for Domestic Operations, and then other assistant directors, but the Special Agents in Charge report to Domestic Operations.   And then there's a Deputy Executive Associate Director and an Executive Associate Director for our directorate.

Q.   So is it fair to say that there are multiple levels of leadership in HSI above you at the national level?

A.   Correct.

Q.   Now, let's go the other way.   Let's go down.   Tell the Court about what your local office looks like here in Nashville and throughout your region.

A.   So throughout the region -- this office covers two states, Kentucky and Tennessee.   I work with a Deputy Special Agent in Charge, four assistant special agents in charge, and multiple group supervisors, as well as intelligence analysts, special agents and support personnel.   So about 100-plus folks.

Q.   Okay.   So as the SAC, what kind of crimes are you charged with investigating here in this region?

A.    HSI covers a broad spectrum of investigations that involve crimes that entail contraband and people coming into and outside of the United States and through the United States.  And those crimes will include child exploitation, human trafficking, human smuggling, financial crimes, drug trafficking and smuggling, technology exploitation, weapons smuggling, as well as a myriad of others.

Q.    So it seems like HSI has a pretty law enforcement -- pretty prominent law enforcement footprint here in the region; is there any special reasoning for that?

A.    This office covers the three express consignment hubs, with FedEx, DHL and UPS, and they're international borders for -- so to speak, because of the fact that contraband can be smuggled in through express consignments, and that would be the first point of entry into the virtual borders.

Q.    Okay.  I want to shift gears a little bit and get into some more specifics.

In your role as the SAC for the Nashville region, did your office ever work on a case involving a man by the name of Kilmar Abrego Garcia?

A.    We did.

Q.    And can you tell the Court what kind of case that was?

A.   It was a human smuggling investigation.

Q.   Is that something your office routinely investigates here in this region?

A.   We do.   Because it falls under Title 8 and Title 18.

Q.   Okay.   I want to jump forward to April of 2025.

Now, fair to say you've been running this region for a little over two years around that time?

A.   Yes.

Q.   And during that timeframe, in April of 2025, did you ever hear about a traffic stop involving Mr. Abrego Garcia from November of 2022?

A.   I did.

Q.   Could you tell the Court how you heard about that.

A.   So I learned that there was a media article -- I think it was in the *Tennessee Star* -- that indicated the individual known as Abrego Garcia had been stopped in a vehicle with multiple individuals by the Tennessee Highway Patrol.

Q.   So the first time you ever heard about this case was in the media?

A.   Correct.

Q.   Is that pretty common for a person in your position, as -- as someone in charge of an entire region?

A.   It happens.

Q.   Okay.   So what do you do when you hear about

something like that in the news, where you might have a case that's in your district?

A.    So we would look into it.  The first thing I did was contact my team, my investigative team, and asked if they had heard of this investigation previously, and it had not come up on our radar in Tennessee.  And then I called the Tennessee Highway Patrol commander.

Q.    Before we get into that conversation, when you take over -- so you had been in this role about two months, right?

A.    Correct.

Q.    When you take over in early of 2023, do you sit down with your agents and do a scrub of all the open cases?

A.    Correct.

Q.    All right.  And if I understand correctly, are you saying that this case never came up when you sat down and looked at all the open cases in the region?

A.    It was not one of them.

Q.    All right.  So jumping back to April of 2025. You've learned about this case in the news, and you said you reached out to the Tennessee Highway Patrol.  Can you tell the Court about that?

A.    So I called Commander Perry, who was my equivalent over at the Tennessee Highway Patrol, and asked if he had heard of this investigation and this individual and was

he familiar with this traffic stop.

Q. Okay. And what did you learn from that conversation?

A. I learned that the trooper who made the stop had, in fact, contacted what they believed was the FBI tip line, or some sort of tip line for the FBI, that the information was passed to them, and that there may have been some contact with somebody at ICE, but we don't know which component, could not tell if it was Enforcement Removal Operations or HSI.

Q. So it sounds like you verified that the stop did, in fact, take place, that they might have contacted FBI. So what do you do next?

A. So my next course of action was to contact the U.S. Attorney for the Middle District of Tennessee, given that that is a partner who has been here a long time, and wondered if he had heard about this investigation or had done anything with it, considering that the lead had gone to the FBI -- as far as I understood.

Q. And who was the U.S. Attorney at that -- during April of 2025?

A. Robert McGuire.

Q. All right. And so based on your conversation with Mr. McGuire, did it appear that he had ever heard about this case?

A.    He had seen the article in the *Tennessee Star* but not previously -- had not -- it had not been prosecuted by this office.

Q.    Okay.  Fair to say it was never presented to the office?

A.    Correct.

Q.    So you called Mr. McGuire on the same day you heard about the case and you talked to the Tennessee Highway Patrol and you've seen the article.  What do you do next?

A.    So we tried to get the video of the traffic stop to ascertain the circumstances surrounding it.  And then when you -- I had called my headquarters to say this was something that had come up and we were going to look into this particular investigation, given the notoriety of the individual that was involved in the traffic stop.

Q.    Is that something that you routinely do, if you have a case that might draw national attention, is reach out to your headquarters?

A.    Absolutely.

Q.    All right.  And we'll get more into that later.

A.    Sure.

Q.    So now that you've contacted headquarters and you're starting to open the case, did you ever assign a case agent?

A.    That would be the first course of action that we

would do, yes.

Q. Okay. And who was that?

A. Peter Joseph.

Q. And to be clear, at this point, when you're just learning about this, are you formally opening a case or is this more of a preliminary stage?

A. At that point it was a preliminary stage of the investigation.

Q. Okay. And did you happen to know where Mr. Abrego Garcia was physically located at the time you're learning of these events?

A. I learned from the media that he was in El Salvador.

Q. Does that impact your decision to pursue an investigation in any way?

A. No.

Q. Why not?

A. Because media attention to an investigation does not deter us from investigating crimes that were committed in the United States. We're not swayed by political attention or political posturing or whatever the, you know, situation is at that time.

Q. But would HSI investigate a guy who is not even in the country?

A. We do that routinely.

Q. And so that had no impact on whether or not you

should start this investigation?

A.    No.  We have investigated, you know, Joaquin Guzman when he was in Mexico, and then I ran an extraterritorial strike force as a group supervisor in Tampa.  So we conducted investigations of individuals abroad all the time.

Q.    You briefly spoke about basically the national interest and that you were aware of who Mr. Kilmar Abrego was.  What do you mean by that?  Can you explain to the Court what you knew about him at the time you learned of this case?

A.    I mean, the -- his situation was consistently on TV, whether it was CNN or Fox News or any media that -- some congressmen had gone down there to interview him, to talk with him about his removal from the United States and what had transpired surrounding that, but that did not have anything to do with this district.

Q.    Was your office involved in any way in the deportation process?

A.    No.

Q.    Did you even -- were you even tracking what was going on in the legal realm as it regarded his legal process and deportation?

A.    No.  Only what I saw in the news.

Q.    Were you ever made aware that there was a prior

investigation regarding Mr. Abrego Garcia in Baltimore, Maryland?

A.   I learned that along the way.

Q.   And can you tell the Court -- well, let me back up a little bit.

As part of this, like, dual investigations, does your office reach out to Baltimore to kind of garner the facts of the case and see if there's overlap?

A.   I think they reached out to multiple offices because there was overlap with a few offices that had some ties to Mr. Abrego Garcia and his investigation.

Q.   And since you were the SAC for this region and you're tracking your agents' progress, what did you learn about their investigation there?  What kind of case was it?

A.   I learned that Baltimore had a case involving transnational gangs.

Q.   Okay.

A.   That Mr. Garcia may have been involved in some activity related to MS-13.

Q.   And was that different from what you guys were looking into down here?

A.   It was a completely separate case.

Q.   So given the fact that they're completely separate cases, does that impact what you do next in the local

case here?

A.   So, I had instructed the investigative team to start from the beginning, start from scratch and look at this organically in the human smuggling elements and not be swayed or concerned with the Baltimore investigation.

Q.   And to be clear, did your case here in the Nashville region have anything to do with his immigration case in Maryland?

A.   Nothing to do with it at all.

Q.   So let's talk a little bit about how the case progresses.  At some point you open this new case, like you said, started from new.  What did you eventually learn about the facts of the case?

A.   So, there were two things that we learned.  One is, from the video, that there were several individuals that were in the vehicle during the traffic stop, and then the second thing was there were some cooperating defendants in other districts in the United States that had come forward with information that that traffic stop was, in fact, related to a human smuggling load.

Q.   Is it fair to say that the evidence was getting stronger?

A.   It was.

Q.   All right.  So given your experience of nearly 30 years, and now as the leader of this region, what's going

through your mind as you're starting to see this new evidence come in?

A. It was becoming evident that the facts were leading us towards an individual who was involved in a human smuggling crime, that we had to continue to proceed and investigate, and present to the U.S. Attorney's office for potential prosecution.

Q. Okay. I want to jump back to the point when you talked about conversations with your leadership. As the SAC of a region, when you have a case that comes in that's going to draw national media, are you required to notify your national leadership?

A. I let them know about the inception of the case, but we don't have to keep them informed of the progress of the investigation.

Q. Okay. Is that pretty routine, just reaching out to them to let them know what's going on?

A. We do that all the time. We did it in the, you know, R. Kelly case and other cases around the country.

Q. And to be clear, during this time in early 2025, was this the only case you guys were working on?

A. No. We had hundreds of investigations.

Q. And did you reach out to talk to them in other cases, as well?

A. There were several other cases in this region of

national importance.

Q.   Now, let's talk about this notification to your leadership.  Do you remember who you talked to?

A.   We had a myriad of acting assistant directors, so I don't remember specifically who was in the seat back in April.  It could have been three or four individuals.

Q.   Okay.  But based on your conversations with these bosses, did anyone give you directives on how to proceed in this case?

A.   No.  They just said let us know when, you know, have an indictment or anything significant comes up.

Q.   And did anyone ever tell you to ensure that the case progressed towards prosecution?

A.   No.

Q.   So the case is progressing.  You've already described some of the new evidence that you've seen and that the case is getting stronger.  At some point did you ever sit down with the U.S. Attorney's office and present this case for prosecution?

A.   My agents did, yes.

Q.   Okay.  And did those same agents participate with the grand jury, as well?

A.   Yes.  They gathered evidence and they sat before a grand jury, and the true bill was returned I believe in May of 2025.

Q.   And during this timeframe, from when you first learned about the investigation, or all the way up to its presentation to grand jury, whether from DOJ or HSI, did anybody ever pressure you or tell you that you had to "make this case," if you will?

A.   No.   They had other priorities to call me about.

Q.   I want you to think back to this timeframe as you're going through progressing this case ultimately to a prosecution.   Was there anything that would have changed your mind on whether or not to move forward with this case?

A.   If the facts did not add up, then we would have ceased to move forward, but unfortunately the evidence kept getting stronger.

Q.   But let's say that the facts didn't add up like they ultimately did and someone wanted you to press forward with this prosecution, what would you have done?

A.   I would not have done it.

Q.   Okay.

        MR. HARLEY:  May I have one moment, Your Honor?

        THE COURT:  Sure.

        MR. HARLEY:  No further questions at this time, Your Honor.

        THE COURT: All right.  Cross.

///

CROSS-EXAMINATION

BY MR. DEAN:

Q.   Good morning, Ms. Saoud.  How are you?

A.   I'm well, sir.  How are you?

Q.   Good.  My name is Rascoe Dean.  I'm an attorney for Mr. Abrego.  I just have a couple questions for you.

A.   Sure.

Q.   You told the Court that you first learned of the Tennessee Highway Patrol's traffic stop involving Mr. Abrego via a *Tennessee Star* article, right?

A.   Correct.

Q.   Okay.  The *Tennessee Star* is a online publication that is local to Tennessee, right?

A.   Correct.

Q.   And it's a conservative publication, right?

A.   I don't know.

Q.   Local to Tennessee, though, right?

A.   It is local to Tennessee.

Q.   Okay.  And that article that you referenced was published on April 21st, wasn't it?

A.   Somewhere around there.

Q.   And you didn't know anything about the Tennessee Highway Patrol's traffic stop before April 21st; that's your testimony, right?

A.   That's correct.

Q.   Okay.   That's even though the Department of Homeland Security had issued press releases about the traffic stop on April 16th and 18th, right?

A.   I didn't see those.

Q.   Okay.   That's even though President Trump had referenced the traffic stop prior to April 21st, with the media, right?

A.   Correct.

Q.   That's even though the traffic stop had been referenced on CNN, Fox News, all sorts of national media outlets prior to April 21st, right?

A.   Because I stopped listening to the news at that point because I had other priorities to investigate and focus on for the office.

Q.   Right.   And it's your testimony that you stumbled on the fact of this traffic stop just by looking at the *Tennessee Star* on April 21st, right?

A.   I mean, somebody sent me the article.   I don't know who.   I don't remember who, to be fair.   But somebody said, hey, have you seen this article, and I looked at it, and I went from there.

Q.   And you never heard -- you never heard anything about the traffic stop prior to that date, right?

A.   Prior to that date, no.

Q.   Okay.   You told the Court that you became the

Special Agent in Charge of HSI-Nashville in July of 2023, right?

A.    January of 2023.

Q.    January of 2023.  I apologize.  All right.

And being the Special Agent in Charge is a big role, right?

A.    Correct.

Q.    Okay.  You oversee all HSI investigative and enforcement activities in both Tennessee and Kentucky, right?

A.    Yes, sir.

Q.    Okay.  And I'm -- correct me where I'm wrong here. You have a Deputy Special Agent in Charge who reports to you, four assistants who report to that deputy, right?

A.    Correct.

Q.    And then you supervise about 100 folks in total, right?

A.    Yes, sir.

Q.    Okay.  And your jurisdiction covers five separate U.S. Attorney's offices, right?

A.    Correct.

Q.    Okay.  And you told the Court that when you got to the office in 2023 you did a kind of sweep or review of every pending investigation HSI had with your folks, right?

A.    Every open investigation.

Q.    Every open investigation you had.

And you don't recall seeing any open investigation into Mr. Abrego, right?

A.    That's correct.

Q.    And that's because HSI-Nashville never opened an investigation into Mr. Abrego after that November 30th, 2022 traffic stop, right?

A.    That's correct.

Q.    Okay.  And for the record, that traffic stop occurred in Putnam County, Tennessee, right?

A.    Yes.

Q.    That's in your jurisdiction, right?

A.    That's correct.

Q.    Okay.  And it's also in the Middle District of Tennessee, right?

A.    Yes.

Q.    Okay.  You told the Court that THP may have referred information about that traffic stop to the FBI, right?

A.    That's correct.

Q.    Okay.  THP also referred information about that traffic stop to HSI, right?

A.    That's what I later learned.  I did not learn that immediately.

Q.    Okay.  In fact, one of the investigating troopers

sent an email to an HSI special agent that included pictures related to the traffic stop, right?

A. That's correct.

Q. That agent decided not to open an investigation, right?

A. As far as I know, that's exactly what happened.

Q. All right. You told the Court that you learned of the traffic stop in this district on April 21st, right?

A. Right after that. It wasn't on the 21st, but somewhere around then.

Q. Somewhere shortly after that?

A. Yeah.

Q. And HSI officially opened an -- HSI-Nashville officially opened an investigation into Mr. Abrego on May 2nd, 2025, right?

A. Correct.

Q. Okay. There was already an investigation involving Mr. Abrego that had been opened and closed in Baltimore, right?

A. Yes, sir.

Q. Okay. And that investigation involved allegations about human smuggling, right?

A. It involved allegations of gang activity. I don't know about a human smuggling element into that.

Q. As far as you know, it didn't involve any

allegations of human smuggling?

A.   As far as I know, no.

Q.   Okay.  And your testimony to the Court is your decision to open an investigation on May 2nd, 2025, was entirely independent of anything that had ever gone on in Baltimore; is that right?

A.   Yes, sir.

Q.   You didn't know anything about it?

A.   I knew there was a case, but I didn't know the particulars of that case.

Q.   You talked to Mr. McGuire about Mr. Abrego's case and this investigation prior to the case being opened on May 2nd, right?

A.   That's right.

Q.   Okay.  In fact, you talked to him on the evening of April 27th, right?

A.   Somewhere around there.  That would have -- if that was a Sunday or a Monday, that would be correct.

Q.   It would have been a Sunday, right?

A.   Yeah, then that was correct.

Q.   What time did you speak to him?  Do you recall?

A.   It would have been in the afternoon.  I was on a trip.  I remember packing and I was on the phone with him, but -- yeah.

Q.   Okay.  And you said the afternoon, right?

A.   I -- I believe that's when I called him.  It was either the afternoon or evening, but I'm not 100 percent certain on that.

Q.   All right.  Mr. Abrego was at CECOT in El Salvador on April 27th, right?

A.   I think so.

Q.   Okay.  He wasn't at large, right?

A.   I don't know.  Yeah, he was -- he -- he had been in custody, as far as I knew.

Q.   Okay.  And the investigation that you were speaking to Mr. McGuire about was in connection with the traffic stop that had occurred over two years earlier, right?

A.   Correct.

Q.   And despite all that, you called the chief law enforcement officer in this district about the investigation, right?

A.   He would be my equivalent, so that's who I would call.

Q.   Whenever HSI opens an investigation into a subject, are you always calling the U.S. Attorney in whatever district the investigation is being opened?

A.   Well, I called him because I didn't know if his office had previously prosecuted the case or heard of the case.  That was the first reason.  And then the second reason is I had asked him if there was any potential to

take this investigation, given that more information had come forward about human smuggling.

Q. Typically, when an investigation is opened by HSI and there's a communication with the United States Attorney's Office, a deputy or a case agent makes that outreach, right?

A. The special agent would call the U-S-A -- Assistant U.S. Attorney to take this case. But given the high profile nature of this case, I wanted to call the U.S. Attorney so we would have a conversation about this public safety threat that we needed to address.

Q. And -- and you said "high profile." What made it high profile?

A. Mr. Abrego was in the news all the time at that time point. He had been -- whatever had happened in Baltimore, a Maryland senator -- or a congressman went down to meet with him. And so I thought it would be -- the appropriate course of action was to call the U.S. Attorney to let him know that we were going to be pursuing an investigation.

Q. So HSI didn't handle this case like it handles most cases, right?

A. I do that routinely if it's a case that requires information that needs to go to the U.S. Attorney, and then he'll make the determination.

MR. DEAN: Can we please put Exhibit 42 on the screen.

(Whereupon, Defendant's Exhibit 42 was marked for identification and received in evidence.)

BY MR. DEAN:

Q. All right. Ms. Saoud, this is a document titled Affidavit in Support of Response to Motion. Do you see that?

A. Yes.

MR. DEAN: Can we please go to page 6 of this document.

BY MR. DEAN:

Q. All right. And do you see at the bottom of this document that it is signed by Mr. McGuire?

A. I do.

Q. Okay. And do you see it's dated September 15th, 2025?

A. Okay.

Q. Okay. And I would submit to you that this is an affidavit that was filed in this case.

A. Sure.

MR. DEAN: Okay. Can we go back to page 1, please.

BY MR. DEAN:

Q. All right. If we look down at paragraph 9.

A.   Uh-huh.

Q.   Tell me if I read this right (As read):  During November and December 2022, the procedure for any federal law enforcement agency wishing to have the United States Attorney's Office for the Middle District of Tennessee consider an immigration-related crime for prosecution was to present the case to Mr. McGuire as the General Crimes Unit Chief and Immigration Coordinator.  The investigation involving Mr. Abrego's conduct on --

MR. DEAN:  Can we go to page 2, please.

-- on November 30th, 2022 was never presented to Mr. McGuire during his tenure as the General Crime's Chief and Immigration Coordinator.

All right.  Did I read that right?

A.   That's what it says.

Q.   Okay.  And those are Mr. McGuire's words, right?

A.   I have never seen this document, so I'm going to take your word for it --

Q.   Sure.

A.   -- that it is.

Q.   Sure.

The policy of the United States Attorney's Office in this district is, if there is an immigration-related crime, the crime is referred to the General Crimes Deputy Chief, right? That's what the language says?

A. That's -- that would be the normal course of business.

Q. Sure. And you're not aware of any change from -- in that policy from 2022 or 2023 to 2025, right?

A. No. But to be fair, I never read the policy because as the Special Agent in Charge I go to the U.S. Attorney. That's my equivalent.

Q. Right. But you -- but that policy was not followed here, right?

A. I would say that I called him that day to ask -- to see if he had heard of that case, because during that timeframe he was General Crimes. So he would have knowledge if the case was ever referred from either HSI or FBI, whoever called. But he was the U.S. Attorney, so he's still my equivalent.

Q. But you didn't -- but, again, the General Crimes Chief at the time was never involved in this, right?

A. I don't know.

Q. Okay. Not by you, right?

A. Not by me.

Q.   Was -- it was your testimony that no one gave you any direction to open this case or open this investigation; is that right?

A.   That's correct.

Q.   Okay.  You told the Court that you did talk to national leadership about this investigation, right?

A.   I did.

Q.   And you told the Court you did that because it was a high profile or public facing case, right?

A.   Correct.

Q.   Who specifically in national leadership did you talk to?

A.   Whoever was acting as the Assistant Director for Operations.  And I don't remember specifically who it was at that time.  We've had several individuals acting in that role.

Q.   And you told the Court that is the person that you as the Special Agent in Charge reported to, right?

A.   Correct.

Q.   And it's your testimony that you never received any direction from anyone at DHS regarding this investigation?

A.   I wouldn't talk to anybody at DHS.  That's well above my level.

Q.   And no superiors at HSI?

A.   I would talk to superiors at HSI, but my immediate supervisor did not direct me to open this investigation.

Q.   Did anyone at HSI direct you to open this investigation?

A.   No, sir.

Q.   All right.  You told the Court that after you spoke to Mr. McGuire about this case being opened there was a case agent assigned, right?

A.   That's correct.

Q.   Okay.  And who was that case agent?

A.   Special Agent Peter Joseph.

Q.   All right.  And on May 2nd, when this case was opened, according to you, the goal was to investigate Mr. Abrego's alleged smuggling activities, right?

A.   Correct.

Q.   In this district, right?

A.   Correct.

Q.   Okay.  But you don't know what conversations had been happening at DHS headquarters about investigating or charging Mr. Abrego, right?

A.   I was not privy to any of those discussions.

Q.   As you said, that's way above where you sat in the hierarchy as the Special Agent in Charge, right?

A.   Correct.

Q.   Okay.  And -- so obviously you weren't involved in

those discussions, right?

A.   No.

Q.   You never spoke to Secretary Noem about this case, right?

A.   That would be highly inappropriate.  No.

Q.   Okay.  And you have no idea who Secretary Noem talked to about this case, right?

A.   I don't know.

Q.   You don't know if Corey Lewandowski was involved in this case?

A.   No.

Q.   You never discussed this matter with him?

A.   Oh, no.

Q.   Same thing for someone like Tom Homan?

A.   No, sir.

Q.   Stephen Miller?

A.   Stephen Miller would not talk to me.  He talks to somebody else at HSI.  Well above my pay grade.

Q.   And to the extent he discussed it, you just don't know?

A.   I don't know.

Q.   Okay.  You also don't know what if any conversations were happening within DOJ about this matter at the time you were opening the investigation, right?

A.   Correct.

Q. You never talked to senior DOJ officials about this case, right?

A. I did not.

Q. You don't know when senior DOJ officials first reached out to Mr. McGuire about this case, do you?

A. I do not know that.

Q. Never talked to Todd Blanche about this matter?

A. No, sir.

Q. No one at the Deputy Attorney General's Office, right?

A. No.

Q. And obviously, being the Special Agent in Charge, that's a powerful position, right?

A. Correct.

Q. But you don't make the final call on whether the person that HSI is investigating, that your agents are investigating, gets charged, right?

A. The charges come from the Department of Justice.

Q. Department the Justice makes the decision, right?

A. Correct.

Q. Okay. You don't draft or usually even review the indictment, right?

A. No.

Q. And you don't get to sign-off, even as the case agent, on the indictment before it's presented to the

grand jury, right?

A. Yeah. That goes from DHS or, you know, HSI to the U.S. Attorney's Office, and then that gets handled by the Department of Justice.

Q. You know Ben Schrader, right?

A. I know who he is.

Q. He's a former Criminal Chief in this district, right?

A. Yes.

Q. Were you aware that he drafted a memo recommending against charging Mr. Abrego with smuggling offenses?

A. I did not see that memo.

Q. Did you know that he resigned from the Department the day Mr. Abrego was charged with smuggling offenses?

A. I heard that.

Q. You didn't get a say in overruling Mr. Schrader's objection and proceeding with the indictment, right?

A. He is not in my chain of command.

Q. And you certainly didn't have a hand in passing any charging documents up the DOJ chain of command, right?

A. Correct.

Q. So at the end of the day, you don't have any knowledge as to why Mr. Abrego was charged in terms of DOJ's thinking, right?

A. I know why he was charged in the terms of the

investigation that we presented, that there was compelling evidence that there was investigation [sic] of a crime.

Q.   Sure.  That's your view as -- as a former HSI agent. But what I'm asking is, you don't have any insight into the DOJ deliberations and process in deciding to charge Mr. Abrego, right?

A.   I do not.

Q.   I want to go back.  You said that this was a high profile case, right?

A.   Yes.

Q.   And I think you said -- I don't want to mischaracterize your testimony.  But you said it was high profile in part because it was just in the news, right?

A.   Correct.

Q.   Local media, national media, President of the United States talking about it, right?

A.   Right.

Q.   The alleged conduct didn't make it high profile, right?

A.   No.

Q.   What made the case high profile was that Mr. Abrego was illegally sent from the United States and imprisoned at CECOT in El Salvador, right?

A.   According to the news media, that's what I learned.

Q.   That's the facts of what happened, right?

A.   I would not truthfully testify to that because I don't know.

Q.   And -- and what also made it high profile was that the Supreme Court ordered the Executive Branch to bring him back, right?

A.   That's correct.

MR. DEAN:  Your Honor, may I have a moment?

THE COURT:  Sure.

BY MR. DEAN:

Q.   Ms. Saoud, thanks for your patience with me.  Just a couple more questions.

A.   No problem.

Q.   As one of the 30 Special Agents in Charge you reported to an Assistant Director at HSI, right?

A.   Correct.

Q.   Okay.  And that person would be based in Washington, right?

A.   Yes, sir.

Q.   Remind me of the person's title one more time.

A.   Assistant Director for Domestic Operations.

Q.   Assistant Director for Domestic Operations.  Thank you.

And who was that person in April 2025?  Can you recall?

A.   Like I said, there were multiple individuals that were acting at the time.  It could be one of three or four individuals that I had spoken to.

Q.   Okay.  And you talked to that person about Mr. Abrego's case in this investigation, right?

A.   Correct.

Q.   You don't know who that assistant director was talking to in Washington about the investigation of the case, right?

A.   I'm sure he spoke to the other members of the leadership team with whom he worked.  But --

Q.   But you --

A.   -- the specific individual --

Q.   Right.

A.   -- no.

Q.   You would be speculating because you just weren't there?

A.   Correct.

        MR. DEAN:  Just one moment, Your Honor.

        No further questions.  Thank you.

        THE COURT:  All right.  Redirect.

        MR. DEAN:  No redirect, Your Honor.

        THE COURT:  Do you know who sent you the *Tennessee Star* article on or about April 21st?

        THE WITNESS:  Sir, I don't remember.  Somebody

that I know probably. (Indiscernible.)

THE COURT: I need you to be louder.

THE WITNESS: I'm sorry.

THE COURT: Was it a friend or a coworker?

THE WITNESS: I would think it was a coworker, but I also got it from a friend who lived in another state, and several individuals had gotten ahold of that article at that point.

THE COURT: But the person who sent it to you was a friend or coworker?

THE WITNESS: Either a colleague or a friend. I don't recall who, sir. And I turned in --

THE COURT: Well, a colleague can be a friend, too?

THE WITNESS: Correct.

THE COURT: But you're sure it was somebody who was in your department?

THE WITNESS: I don't know for sure. I don't have my phone any more. I turned it in. And so I couldn't go back to look to see who sent it to me.

THE COURT: Well, was it a person you knew?

THE WITNESS: It was a person I knew.

THE COURT: Somebody you trusted?

THE WITNESS: Somebody I know. Somebody I've worked with.

THE COURT: Okay. And I assume somebody you trusted?

THE WITNESS: I mean, most of the people I talk to I trust in general circumstances.

THE COURT: And your coworkers?

THE WITNESS: Correct.

THE COURT: Correct me if I'm wrong, but I think you used the phrase that the defendant was a public safety threat. Why did you believe that?

THE WITNESS: Human smuggling poses a threat to public safety when individuals are brought in without a first encounter with somebody from U.S. Customs and Border Protection. So a lot of times we've identified individuals involved in human smuggling that leads to human trafficking and potentially other crimes.

THE COURT: Did you think he was a public safety threat when you were working this case?

THE WITNESS: Yes, sir.

THE COURT: Why?

THE WITNESS: There were allegations that there was potentially harmful acts done to some of the individuals that were smuggled.

THE COURT: In November of 2022?

THE WITNESS: Correct.

THE COURT: Did you think he was still a public

safety threat in April of 2025?

THE WITNESS: Individually --

THE COURT: I'm going to get you to say "yes", "no" or you don't know.

THE WITNESS: Well, I have to clarify that, sir.

THE COURT: Okay. And I'll let you clarify it, but I want to know the answer to the question.

THE WITNESS: At the moment that we decided to prosecute the case?

THE COURT: In April of '25 when you got --

THE WITNESS: He was in custody, so, no, he was not a public safety threat at that moment.

THE COURT: Now you can explain yourself. Go ahead.

THE WITNESS: So, sir, a lot of times with human smuggling organizations, what happens is that they are tied to other individuals still involved in crime. So while Mr. Abrego was involved in that traffic stop, there may have been other individuals or a conspiracy by a larger group to continue to smuggle individuals into the United States.

THE COURT: So you wanted to find out what happened in November of 2022?

THE WITNESS: Correct.

THE COURT: All right. Any questions from counsel?

MR. HARLEY: No, Your Honor.

THE COURT: Mr. Dean?

MR. DEAN: No, Your Honor.

THE COURT: All right. You can step down.

(Witness excused.)

THE COURT: All right. Call your next witness.

MR. WOODWARD: Your Honor, the United States calls Robert McGuire.

THE COURT: Just a minute.

All right.

COURT DEPUTY: Please raise your right hand.

ROBERT MCGUIRE,

called as a witness by Plaintiff, was duly sworn and testified as follows:

COURT DEPUTY: Please state your full name for the record.

THE WITNESS: Rob McGuire.

COURT DEPUTY: And spell your last name.

THE WITNESS: M-C-G-U-I-R-E.j

COURT DEPUTY: And you can have a seat at the witness stand.

///

///

DIRECT EXAMINATION

BY MR. WOODWARD:

Q.    Mr. McGuire, what was your title in April of 2025?

A.    I was the Acting United States Attorney for the Middle District of Tennessee.

Q.    Same question, May of 2025.

A.    I was still the Acting United States Attorney in the Middle District of Tennessee.

Q.    All right.  I would like to get right to the heart of the matter everyone is here for.

Who made the decision to seek an indictment of Mr. Abrego?

A.    I did.

Q.    Did Deputy Attorney General Todd Blanche direct you to do so?

A.    No.

Q.    Ask you to do so?

A.    No, sir.

Q.    Insinuate you should do so?

A.    No, sir.

Q.    Did anyone in the office of the Deputy Attorney's General's office ask you to seek an indictment of Mr. Abrego?

A.    No, sir.

Q.    Anyone in Main Justice?

A.   No, sir.

Q.   What about the White House?

A.   Absolutely not.

Q.   Same question for the Department of Homeland Security?

A.   No, sir.

Q.   Okay.  Let's step back and speak about how we got here.

How long have you been a prosecutor?

A.   I've been a federal prosecutor for almost eight years.  Before that I was an Assistant District Attorney in Nashville for about 13 years.  So overall over 20 years.

Q.   And how long have -- did you serve as the Acting United States Attorney in this district?

A.   Almost a year, from December 28th, 2024 until Christmas Eve 2025.

Q.   In that time, how many times did you seek an indictment from a grand jury yourself?

A.   Multiple.  I would say at least three or four, in addition to this case.

Q.   What about before that?  In total how many times would you say you personally sought a grand -- an indictment from a grand jury?

A.   Certainly over 100.  It might be -- might be

hundreds.  It's definitely over 100.

Q.   As a prosecutor, can you explain for the Court what goes into the decision to seek an indictment?

A.   Well, for me, the decision is whether I first believe that the person committed a crime and that I can prove that to a jury beyond a reasonable doubt.  Once I've satisfied myself that that's the case, then I draft the charging document, and it's reviewed by other people in our office, and then we would present the necessary witnesses to the grand jury and propose that they indict a given defendant.

Q.   In all of the years that you've practiced as a prosecutor, have you ever sought an indictment where you did not believe there was sufficient evidence to find that a crime had been committed?

A.   Never.  And I never would.

Q.   Turning now to Mr. Abrego's case specifically.  Who is Agent Rana Saoud?

A.   Rana Saoud was the Special Agent in Charge over Homeland Security Investigations in Nashville in 2025.

Q.   And just so that the record reflects as much, you were not here for Agent Saoud's testimony today, correct?

A.   That's correct.  I've been in the hall waiting to be called as a witness.

Q.   How frequently in your duties would you speak to

Agent Saoud?

A.    Regularly.  Once a week, could be more, could be less, depending on what was going on with the cases that we had.  We had a number of important cases with HSI, and so I talked to her pretty regularly.

Q.    Could you generally describe what -- what you mean by important cases?

A.    For example, in -- in January of 2025 our office indicted a number of people in a sex trafficking case that had ties to Tren de Aragua, which is a Venezuelan street gang.  And that was an important case for our district, an important case for our community, and it was a case that was led by Homeland Security Investigations. So we were working on that case, and another -- you know, a variety of other what I would consider to be high profile matters.

Q.    And Homeland Security Investigations, or HSI, you work with them routinely?

A.    Yes, sir, all the time.

Q.    In addition to Agent Saoud they have other agents?

A.    They do.

Q.    Who would serve as case agents on your prosecutions?

A.    That's correct.

Q.    And they have done that routinely?

A.    Yes.  I've worked with HSI agents both before this

case and after this case on various matters.

Q. And in your mind is there any difference between an HSI agent and, say, an FBI agent?

A. No. It's just another federal agency that we work with in the U.S. Attorney's Office.

Q. In late April 2025, were you contacted by Agent Saoud?

A. I was.

Q. Do you recall what day -- what day of the week that was?

A. It was a Sunday, because I was at home. It was in the afternoon. It -- I was -- I had been on my deck. It was a pretty nice day, and that she called me. And it was unusual that she would call me on a Sunday. I knew it had to be something fairly important.

Q. And you're sure it was the afternoon?

A. It could have been early evening. I mean, it was that -- it was not early in the day.

Q. What do you recall her telling you?

A. She asked me if I was aware that Kilmar Abrego Garcia had been stopped by the Tennessee Highway Patrol in November of 2022, and I said I was not.

Q. Let's back up. How did you know anything about Kilmar Abrego Garcia?

A. I -- I had sort of generally followed the news that

spring about his -- his case.

Q.   Had anyone in the federal government contacted you about Kilmar Abrego Garcia prior to Ms. Saoud's call?

A.   No.

Q.   Had anybody in the local Tennessee government or any other local government contacted you in your official role as the Acting United States Attorney about Mr. Abrego?

A.   No, sir.

Q.   So the first time anyone associated with law enforcement or the federal government contacted you was that phone call on Sunday?

A.   That's correct.

Q.   And if you recall, do you know what day of the month that was?

A.   I believe it was April 27th.

Q.   After you spoke with -- or during that conversation with Agent Saoud, what did you tell her would happen next?

A.   Well, we both agreed that we needed to look into what that was all about, what this traffic stop was all about.  She described that there was some information that it was a potential human smuggling operation and that there were potentially other witnesses that had been interviewed.  And, of course, all that was being relayed

to me for the first time. So I said, well, we need to get into this and figure out what we've got and -- and then act accordingly.

Q. What did you do next?

A. I called Colonel Matt Perry, who is the head of the Tennessee Highway Patrol. I knew Colonel Perry, and we had worked with -- we had had Highway Patrol cases -- or witnesses involved in those cases before, and I just knew him through law enforcement circles. So I called him to basically ask what he knew about this traffic stop and was there body-worn camera or dash camera and how fast could I -- could I see it.

Q. And what did you learn from that conversation?

A. I learned that there was body-worn camera from the trooper stop in 2022. He kind of gave me a rough sketch of what had happened at the traffic stop, and then we made arrangements for me to try to get the body-worn camera earlier that week. I think I ended up getting it Tuesday morning.

Q. Following that conversation and sticking with Sunday, what else did you do on the case?

A. Well, I got an email from the DAG's office wanting to have a conversation the next morning with me and two other U.S. Attorneys.

Q. And without stating -- without stating the name of

the -- of the individual in that email, did you have a sense of what the -- what the DAG's office was reaching out about?

A.    Instantly.  When I saw the email, I thought to myself, okay, I know what that's about.

Q.    Okay.  And for the record, DAG means?

A.    Deputy Attorney General.

Q.    And to whom did you report as the Acting United States Attorney?

A.    I mean, the way I considered it, the people of my community, but also ultimately the Attorney General of the United States.  I mean, that's the way the Justice Manual describes it, is as the U.S. Attorney I'm the chief law enforcement officer for this community, but ultimately, you know, the -- the Attorney General directs the Justice Department.

Q.    Who is Aakash Singh?

A.    Mr. Singh is an attorney in the office of the Deputy Attorney General.

Q.    And in your mind what role did he play in the federal government?

A.    My understanding is that Mr. Singh was sort of the connection between the DAG's office and U.S. Attorneys across the United States.  And I had had multiple dealings with him before.  It was to communicate to

senior department leadership what was going on in our district. So if there was a noteworthy case, if there was an important matter that happened in the Middle District of Tennessee, he would be my conduit to let them know what was going on.

Q. And was it your understanding that he served that role for other districts, as well?

A. My understanding was he served that role for all districts.

Q. All right. You should have a binder of exhibits there in front of you. If you would, I would direct your attention to Tab 1, and what has been previously Bates labeled as Document 1. I believe that the Court and defense counsel also have these binders.

THE COURT: So just so it's clear, when you all refer to documents, I'm considering those in evidence. If you disagree, let me know.

MR. WOODWARD: Understood, Your Honor. Thank you.

(Whereupon, Government Exhibit 1 was marked for identification and received in evidence.)

BY MR. WOODWARD:

Q. So this has previously been marked as Exhibit 1, Bates 1, behind Tab 1 of the binders everyone should have. Very good.

Do you see an email there, sir?

A.    Yes, I do.

Q.    Dated April 27th?

A.    That's correct.  6:39 p.m.

Q.    About who is that email -- that email is sent from Mr. Singh?

A.    That's correct.

Q.    Who was that email sent to?

A.    It was sent to me, Prim Escalona, who was the United States Attorney in Northern Alabama, and Nicholas Ganjei, who was the United States Attorney in the Southern District of Texas.

Q.    And what is it that Mr. Singh is requesting in this email?

A.    He asks if we can discuss the above-captioned defendant, who was listed in the subject line, the next morning.

Q.    And just for the record is clear, the defendant listed in the subject line is not Mr. Abrego Garcia?

A.    That's correct.

Q.    But you testified earlier that you understood that person to be related to Mr. Abrego Garcia?

A.    I was aware that there had been a person who had been interviewed by HSI who had described being in this human smuggling operation with Mr. Abrego, and I knew

that was who that was.

Q.   How do you recall being made aware of that fact?

A.   I -- I believe I learned it from -- from Ms. Saoud, just -- because, like I said, my recollection was when I saw the email I was, like, okay, I know what that's about.

Q.   All right.  And so the next morning, did you, in fact, speak with Mr. Singh?

A.   Yes.  We had a Teams call with -- it was me and Ms. Escalona and Mr. Ganjei.

Q.   And as part of that conversation, what did you come to learn about Mr. Abrego?

A.   Well, the reason for the call was this individual who had provided information was being housed in a federal prison in Alabama, which was in Ms. Escalona's district, and had been convicted out of the Southern District of Texas, which was in Mr. Ganjei's district.  And so the call was really to get the three of us talking about, okay, what's going to happen next with this person.  You know, how is he going to get interviewed and those kinds of things.  It was a pretty logistic-oriented call.  And I had communicated -- I had talked to my HSI SAC the night before.  We were going to look into this traffic stop.  We were going to try to figure out how to interview this person, you know, that we had already kind

of started that ball rolling.

Q. But for the sake of clarity, in a period of 24 hours you've learned about several important pieces of information concerning Mr. Abrego?

A. That's correct.

Q. Okay. Could you just explain to the Court exactly what you recall learning at that time about Mr. Abrego?

A. Right. So Sunday night -- again, between my conversations with Agent Saoud and my conversations with Colonel Perry of the Highway Patrol, I had learned that Mr. Abrego had been traffic stopped by a Tennessee Highway Patrol trooper in November of 2022, that that case had previously not been presented to our office. This was the first -- you know, that we were all -- that our office was hearing about it.

Q. And if I may interrupt. And I apologize to the court reporter for doing so.

In 2022, what were you doing?

A. In 2022 I was an Assistant United States Attorney in this district, but I was the Deputy Chief over what we describe as the General Crimes Division, which -- and I was also the Immigration Crimes Coordinator.

So had -- had this case been presented in 2022 or early 2023, it would have initially been presented to me. And I asked Agent Saoud, you know, did we get this

case before. And she said, no, it had never been presented to a U.S. -- U.S. Attorney's Office.

Q. Understood.

A. And -- and -- I'm sorry.

Q. No. Please go ahead.

A. And so I -- between that conversation and my conversation with Colonel Perry, I learned about this traffic stop, I learned that there was bodycam of it, which, of course, I wanted to see, and wanted to get, you know, the opportunity to look at as quickly as possible. You know, I had already talked to Agent Saoud that we were going to have an HSI-Nashville case agent assigned to the case to start doing stuff. And I learned that there was some -- at least one person who had come forward and said he had information about the human smuggling operation that may have been reflected in this traffic stop.

Q. And the HSI agent "doing stuff," fair to say that was investigating?

A. That's correct. I guess what I mean is we knew that there was going to be an HSI case agent who was going to assemble whatever information had -- had happened before. Because again, I'm picking this up Sunday night. Some interviews had been done already. We were going to have somebody in Nashville start assembling whatever

information was already out there so we could look at it in what we were going to do in our case.

Q.    Okay.  Focusing just on that Sunday/Monday time period, was there anyone else in the federal government that you reached out to?

A.    So, Joint Task Force Vulcan is a Department of Justice task force that primarily deals with gang-related and transnational-related offenses.  We had met with members of Joint Task Force Vulcan earlier that year on a totally unrelated set of investigations.  And it had been a good meeting.  I had -- I had enjoyed meeting those guys, and they had suggested, hey, if you get any -- any cases that potentially have a transnational connection or a gang connection, you know, let us know.

And so I reached out to Jake Warren, who was a contact that I had with Joint Task Force Vulcan and said, hey, you know, it would be good to talk to you about this and see if you guys are interested in helping us out.

Q.    So in this early stage of your investigation you had reason to believe that there was a transnational or gang element to this case?

A.    The information that I had gotten was that, you know, there was possibility that Mr. Abrego had connections to MS-13.  And so I wanted to get my arms around, you know, was that true and did it connect to

this human smuggling operation, and in what way.

Q.   Okay.  And given that information, it was standing -- standard operating protocol to reach out to the Joint Task Force Vulcan folks?

A.   Yeah.  I mean, I guess I would say they had offered if you get any more of these cases, you know let us know.  And again, I had a good meeting with them and thought that would -- that made sense, to give us some additional resources to look at all this.

Q.   Was your office at that time facing any resource constraints?

A.   Definitely.  We had had some people who had already left our office, and -- and that continued throughout 2025.  So really by the end of 2025 we were at about 50 percent of our normal staffing.

Q.   And so always helpful to have prosecutors from other offices assist in cases?

A.   Yeah. Definitely.  You know, if there were opportunity to get more resources, I wanted to see if I could get them.

Q.   You previously testified that you had made arrangements to see the traffic stop video Tuesday.

A.   I wanted to try to get it Monday, but for whatever reason the person who could provide it to me was -- I think was off on Monday.  And so I ended up meeting her

on Tuesday morning and getting the flash drive Tuesday morning.

Q.   And so did you, in fact, review the video on Tuesday?

A.   Yes.  As soon as I got it.

Q.   And after reviewing that video, what did you conclude?

A.   I had previously prosecuted several human smuggling cases.  I had tried a human smuggling case in front of this Court.  I had tried one in another court.  I had handled another half dozen human smuggling cases.  And so I was immediately struck by how similar what was being depicted in the bodycam was to those investigations.

It was a large number of individuals traveling in an SUV, you know, with a -- with one driver who sort of spoke for the group.  Nobody had any luggage.  Nobody had any -- any indicia that they were working a job that was -- it was Texas plates on the vehicle.  It was, you know, connected to someone else who had had a human smuggling background.  The car was registered to that person.  The route was suspicious.

The driver, who I later learned was Mr. Abrego, described that he was traveling from St. Louis to Baltimore.  And a pretty simple Google search would show you that you don't drive through Nashville to get there;

that you would take I-70 through, I think West Virginia, and that you would -- that that would -- basically coming through Nashville and Cookeville would have added like three and-a-half hours to that trip. And they were going to drive all night.

There was a lot of things that connected with human smuggling cases that I had previously prosecuted that made me feel like, okay, this really looks like a human smuggling operation, to me.

Q. Was body-worn camera alone enough for you to conclude that there was evidence of a crime worth presenting for an indictment?

A. No. Just the body camera alone wouldn't have been sufficient in my experience to sustain a conviction, because the elements of the offense, we have to establish that, A, the individuals who are being transported are unlawfully in the United States, and that the person who is transporting them is doing so to further those individuals' unlawful presence. So -- and the bodycam didn't really speak to that. So we would need more information to sustain a charge.

Q. All right. And so I know that you previously testified that nobody directed you to seek an indictment in this case. But hypothetically speaking, if someone had directed you to seek an indictment in this case,

based only on the body camera video alone, would you have done that?

MR. PATTON: Objection, Your Honor.

THE COURT: Because? What's the basis of your objection?

MR. PATTON: He's asking for a hypothetical, Your Honor.

THE COURT: Overruled. I'll allow it.

BY MR. WOODWARD:

Q. If you had been directed to seek an indictment based only on the body-worn camera video, would you have done that?

A. No. We wouldn't have had enough evidence.

Q. Now, in addition to the individual in a facility in Alabama -- and forgive me, I can't recall if you testified that that individual was in Alabama.

A. He was in Alabama. And I did say that.

Q. Did you come to learn about another individual who had information relevant to your investigation?

A. Yes. There was a female in Texas who also had information about the same scheme. She had -- her information was a little dated. She had been a part of this human smuggling operation, I think in about 2018/2019. But she described that she had observed the defendant as part of this group. And that was an

important piece of information, because, unlike the fella in jail, she didn't have a obvious motive to try to fabricate a story or to give us something that she thought we wanted to hear. You know, she had given a statement as soon as she was asked by a federal agent, which was important.

Q.   Now, did you also come to learn about a case file that HSI had in Maryland concerning Mr. Abrego?

A.   Yeah. I became aware that Baltimore had had some case open on the defendant, but that they had closed it and then they had had reopen it. But I didn't -- I didn't really know a whole lot about it.

Q.   And did you have any knowledge of whether that case file involved the body-worn camera video that you had reviewed?

A.   I don't know that.

Q.   And did you have any knowledge of whether that case file had the witness statements that you had received?

A.   Well, I -- I didn't. I mean, those witness statements came forward three or four days before I got involved. I mean, they were very late -- they were almost right as I took the case over -- in terms of that I learned that that had just happened. Now, we ended up reinterviewing all those people, but none of that had come to light before that last week of April.

Q. So to your knowledge those witnesses had come forward in the April timeframe?

A. Yes. I believe -- they were right around the same timeframe. It was that last week of April before I got called from Agent Saoud.

Q. All right. So beginning with that Sunday, April 27th, and that phone call from Agent Saoud, you received the body-worn camera video, you received statements from two individuals with information related to the alleged conduct of Mr. Abrego. What other evidence did you uncover as part of your office's investigation?

A. It -- it, I mean, certainly evolved over the next couple of weeks. We determined that there was license plate reader data for that vehicle, the vehicle that Mr. Abrego had been stopped in on November 30th, 2022, that illustrated he had not -- the car had not been in St. Louis like he had told the trooper, which was important. It had been in Houston I think maybe the day before. And so that was very significant to us because it showed, well, it looks like Mr. Abrego lied to the trooper, which would be consistent with someone who was doing something they aren't supposed to do.

We also had information about -- there was a -- one of -- let me back up half a step.

One of the individuals who came forward, the fella who was in the federal prison -- we had access to phone contacts that he had from the relevant time period. And within his phone contacts was a listing for -- the way he had it listed was -- it was spelled Kitmar, K-I-T-M-A-R, and it had the word "chauffeur" in Spanish, for driver. And that phone number was connected to the defendant during that relevant time period, because it had been described in the order of protection petition that had been taken out against him. That had been the phone number his wife had listed. And so we knew, okay, that's Mr. Abrego's contact information in this fella's phone, which was important corroboration.

Q.   Do you also recall whether Mr. Abrego placed a phone call while the trooper was conducting the traffic stop?

A.   He did.  He said he was calling his boss.  And the -- because the question the trooper had asked was about the car registration.  And Mr. Abrego had said the car's registered to his boss, and that's who he was calling.  And we later found phone records that corroborated that Mr. -- during the traffic stop Mr. Abrego had called an individual named Jose Hernandez Reyes, who the car was registered to, who had been convicted of human smuggling previously.

Q.   Okay.  And that is the person that had come forward

with additional information --

A.    That's correct.  And that -- that fact that Mr. Abrego -- the records showed he had called him during the traffic stop was important corroboration of what Mr. Hernandez Reyes was saying.

Q.    This is the person who, alone, you might not have trusted completely, given that he had incentive while incarcerated to provide information helpful to federal authorities?

A.    Right.  Any time someone comes forward in any criminal case, you always have to assess, okay, what are they hoping to get out of it.  There really wasn't much question that Mr. Hernandez Reyes was hoping to improve his situation by providing information.

Q.    And just so the record is clear, this is all information that you were learning for the first time on April 27, 2025 or after?

A.    Absolutely.

Q.    All right.  Did you eventually make a decision to seek an indictment against Mr. Abrego?

A.    We did.

Q.    And did you present all of the evidence that you had uncovered to the Grand Jury in this district?

A.    That's correct.  I mean, by that time we had even had more witnesses that we had interviewed who had

described the same scheme.

Another person who was involved in the human smuggling operation said the same things, that he was involved, he had been involved for a long period of time, described the way that the operation worked. All of that was consistent with everything else we were learning.

And then we had a young woman who came forward who was not part of the alien smuggling scheme, that she stated, and later testified in front of the Grand Jury, that the defendant had tried to recruit her to be a part of the scheme, to see if she wanted to go on these what he called trips. And you know she didn't really have any kind of connection to the rest of the conspiracy. So all those things were presented and were very important in my decision to prosecute.

Q. And ultimately did the Grand Jury return an indictment against Mr. Abrego?

A. They did.

Q. Now, stepping back from Mr. Abrego's case specifically, speaking to the logistics of returning an indictment --

THE COURT: I'm going to get you to be a little slower for the court reporter.

MR. WOODWARD: Sure.

BY MR. WOODWARD:

Q. Stepping back from Mr. Abrego's case specifically and the logistics of returning an indictment -- turning to the logistics of returning an indictment generally, whose name appears on an indictment in this district?

A. Mine. Well, in 2025, it would have been mine as the Acting U.S. Attorney. But I was also -- I had decided that it was important for me to be the lead prosecutor on this case for a variety of reasons. And so I was signing it not only as the Acting U.S. Attorney, but as the person who was recommending the charges.

Q. And each time you sought an indictment personally from the grand jury, whose name appeared on that indictment?

A. Mine. I would sign it.

Q. And to you, as an officer of the Court, is there any significance to your name and signature appearing on a document like that?

A. Absolutely. I mean, this is a document that's charging somebody with a crime. It's going to affect their life. It is going to be a -- it's going to be scrutinized. Especially in this case. But even in the regular case that isn't, you know, covered in the newspapers, it -- it is going to be scrutinized by courts, by defense attorneys. And I knew that I was

going to be the person who was going to have to stand in court and defend it. I knew that ultimately if there was any questions raised it was going to come back to me, and it didn't matter who else wanted it or didn't want it, it was going to come back to me.

Q. You also have a license to practice law, sir?

A. I do.

Q. In this district?

A. Yes, sir.

Q. And is there an obligation that you have to the Court when you sign a document that is submitted to the Court?

A. There definitely is an obligation, and there's definitely, you know, rules -- rules of professional responsibility and all of those things. But me, personally, just, you know, as a man, as a person how I was raised, I wouldn't sign something that I didn't believe in.

Q. Now, are you familiar with the difference between a speaking indictment and a non-speaking indictment?

A. Yes.

Q. And could you explain for the Court what a non-speaking indictment is?

A. So a non-speaking indictment would just be a very basic summary of the charges: This person, on this

occasion, committed this offense, in violation of this portion of the United States Code.

Q.   And it lays out the statute that the United States is alleging has been violated?

A.   That's correct.

Q.   Any other specific information about the charges in a non-speaking indictment?

A.   You know, generally, it's a brief summary of what the -- what the claim is.  So in a felon in possession of a firearm case, it would say this person possessed this kind of firearm, having been previously convicted of a felony, and that the firearm had traveled in interstate commerce.  So it would be very brief.

Q.   The elements of the offense?

A.   Yes, sir.

Q.   What is a speaking indictment?

A.   A speaking indictment is something the Department of Justice uses in our district, and a lot of other places, in a case where we anticipate there will be a lot of public interest.  And the idea is the speaking indictment describes here's the evidence that the grand jury heard, that sort of lays out the case, the investigation, the facts of the case, and it is a way for the grand jury to communicate here's what the facts are behind the charge that we are levying.

Q. Fair to say a speaking indictment is more specific about --

A. It's far more specific. And you have to be more -- it requires more time to put together because you want to make sure that whatever is in that indictment is connected to evidence that the grand jury has heard.

Q. Well, regardless of whether you were seeking a speaking indictment or a non-speaking indictment, it's your name at the bottom of that indictment?

A. Absolutely.

Q. And so you're representing to the Court what about the facts that are contained in that document?

A. That they're accurate. That they're true.

Q. If we could turn back to the binders.

Over the course of your investigation, did you have further interactions with the office of the Deputy Attorney General?

A. Yes.

Q. If I could direct your attention to what has been previously marked as Bates Number 3 of Exhibit 1. Do you see this document?

A. Yes, sir.

Q. And at this point, do you see an exchange including yourself, as well as members of the -- of Joint Task Force Vulcan?

A.   Yes.   There's a variety of people on this case -- on this thread.

Q.   And that exchange begins on Wednesday, April 30th of 2025?

A.   That's correct.

Q.   And it concludes with an email from Mr. Singh in which he asks that you, quote, keep me posted?

A.   That's right.

Q.   Was that at all unusual in your experience?

A.   Not at all.   The Justice Manual, which is the policy that the Department of Justice has, that we all have to follow, the Justice Manual --

THE COURT:   Just a minute.

MR. WOODWARD:   I spoke too fast for the media room, Judge.

THE COURT:   All right.   Go ahead.

MR. WOODWARD:   Thank you, Your Honor.

BY MR. WOODWARD:

Q.   What is the Justice Manual?

A.   The Justice manual is a set of policies that govern the organization and operations of the Justice Department.   And one section of the Justice manual requires U.S. Attorney's offices to alert the Office of the Deputy Attorney General when there is a case that will be significantly -- for whatever reason, whether

it's going to draw congressional interest or it's going to make national news or is just a significant item of interest -- we are required to alert the Deputy Attorney General's office.

So this case certainly fell in that criteria. And I had previously been in the same situation with Mr. Singh in unrelated matters where I was giving him updates as to things that were happening in our district, whether they were high profile public corruption cases -- there was an unfortunate and terrible school shooting that occurred in January of 2025. That was something that I was filling him in on. That was our conduit to let senior leadership know what was going on in our district.

Q. And that email from Mr. Singh is sent at what time?

A. The email that I sent was at 10:33 in the morning on Wednesday, and that was the first time that I described we could have -- we could potentially charge this case.

Q. What time does Mr. Singh respond with the, quote, keep me posted?

A. So the emails are a little funny, because it -- it -- Mr. Singh is in the Eastern Time zone because he's in Washington D.C., and so it says 9:44 a.m. but it's clearly in response to an email I sent at 10:33 a.m. So I don't have a good explanation for that, other than there's something in the system that messes with the

timeframes. But it's -- he had emailed me back about ten minutes later saying keep him posted, which, of course, I was going to do and was required to do.

Q. So either 9:44 Eastern or 10:00 -- or -- sorry -- 9:44 Central or 9:44 Eastern, but in the morning on April 30th?

A. Yeah. Those emails -- the one on top at Bates 3 is in response to the one that I sent right below it.

Q. And so then directing your attention to the document that has previously been marked with a Bates stamp ending in 9. Do you see the email that you send also on Wednesday, April 30th?

A. Yes, sir.

Q. And what time is that email sent?

A. So I sent the -- the email that I sent at 5:06 p.m., so this would have been later that day.

Q. All right. And what are you updating the Office of the Deputy Attorney General with? What information are you updating them with?

A. The Tennessee Department of Safety, which is the organization over the Tennessee Highway Patrol was going to publicly release the body-worn camera of the traffic stop. And I was just letting them know, look, this is -- this is going to be kind of out there in the -- more in the public eye, I guess.

Q.   And so you had -- fair to say you had reason to believe this would be a matter of national media attention?

A.   Oh, there was no question.  As soon as I heard the defendant's name on that Sunday night, I knew this was going to be a major media story.

Q.   And you've now reviewed the body-worn camera video, correct?

A.   Correct.

Q.   And so given what you had seen in that video, you also had reason to believe what -- what the news media was about to depict would be of national interest?

MR. PATTON:  Your Honor, I'm just going to object.  There's been a lot of leading here.

THE COURT:  All right.  He makes a good point.

MR. WOODWARD:  Yes, sir.

BY MR. WOODWARD:

Q.   What was your understanding of what would happen after Tennessee released that video?

A.   It was going to be publicly reported on extensively, I expected.  I mean, I sort of don't -- not in that business, but it seemed to me like it was going to make a lot of news.

Q.   All right.  And so then directing your attention to the document previously Bates as ending in number 8.

A.    Right.

Q.    The page before.  Could you explain to the Court what you were intending to convey in your email of 5:19 p.m.?

A.    So to kind of go back to the one that's right before it, so the one that's right under it, Mr. Singh -- well, he asks how close do we think we are to charging.  And, of course, I had already told him earlier that morning that I thought we were going to potentially be in a position to make a charging decision the next week.  And so I don't know why he asked me again, but he did.  Or why he asked me after I had already told him what I thought.

And so I said, look, I think we're trying to decide whether we're going to seek a complaint or whether we're going to seek an indictment, and we have, you know, sort of stuff to do, but I think by next week we'll know a lot more of where we are about the charging.  And I wanted him to know that I was going to continue to comply with my obligations to keep the DAGs office updated with what we were doing in the Middle District of Tennessee.

Q.    And you used the phrase "high command."

A.    That was sort of a -- kind of the way I guess I talk.  I was using a euphemism to just sort of say I'm going to let everybody who needs to know know what we're

doing. That was just -- I don't know. Not really a joke, but sort of like a funny way of describing the leadership structure, in my mind.

Q. So fair to say you're referring to leadership?

A. Certainly. I mean, I understood that when I communicated with the DAG's office about what we were doing that that information was likely to get passed to other senior members of leadership.

Q. Because you previously testified that it was a matter of national concern?

A. He had -- Mr. Abrego was already nationally known, and his -- his -- his situation had already been extensively covered in the media, and I knew this would be the kind of thing that fell under the requirements of the JM.

Q. All right. Now, Mr. Singh responds to your email. Could you explain to the Court what you understood him to be referring to?

A. Well, he asks sort of what -- what do we have a sense of potential charges. Which again, is a pretty common question when I'm -- when I was dealing with the DAG's office. They kind of want to know what's going on or when are we going to do something, what is it going to be. And so I was just saying, you know, this -- we're still talking about it, is the short answer; we don't

really know yet. I mean, we're working on it right now, and I'm -- I'm going as hard as I can to make that decision because we were, from my perspective, two-and-a-half years behind.

I mean, this traffic stop had occurred in 2022, and I'm here in April of 2025. So I'm already late, you know, from my perspective. I would have wanted to start this investigation two years ago. So I really want to go make up for that lost time as -- wherever I can.

Q. In your response to Mr. Singh you reference a speaking indictment?

A. That's correct.

Q. What was your intent in doing that?

A. Well, I was basically describing there's a scenario where I think it would be important for us to let the public know this is what the facts are. You know, this -- unfortunately, in our times everything is very highly charged. And I knew this was going to be a controversial matter. And I thought it was important to let the public know, here are the facts, here's what we found, here's what the grand jury heard. That was very important to me. It was a way to describe this is what's going on.

Q. Were you considering the -- all of the ways in which the defense might try to challenge the prosecution should

it be brought?

A.   I mean, absolutely.  I mean, that's frankly one of the reasons I -- I assigned this case to myself.  I knew that there was going to be -- you know, that we were maybe going to be here in a courtroom like this one day.

Q.   So including the possibility that they might bring a vindictive prosecution?

A.   Yes.  Absolutely.  And I thought -- I wanted that to be -- I wanted to be the person in this chair and not any one of my colleagues.

Q.   Now, Mr. Singh responds, indicating that the case is a top priority.  What did you understand him to mean at this time?

A.   Any -- any matter that's of high profile importance, where there's a high profile defendant, you know, rises to the top of the priority list of the Department of Justice.  That's pretty common.  And so it wasn't a surprise to me that because the defendant was such a high profile person that this was -- the leadership wanted to know what was going on.  That did not surprise me at all. The cases that I've been involved in that have been high priority, the leadership always wants to know what's happening next.

Q.   Directing your attention to the document that has previously been Bates ending in 10.  We have now moved to

May 1st of 2025.  What are you advising Mr. Singh in your email at the bottom of the page there?

THE COURT:  So let's pause there, and we'll take a quick break to let everyone refresh themselves.

(Recess.)

THE COURT:  All right.  Be seated.

All right.  Let's continue.

MR. WOODWARD:  Thank you, Your Honor.

BY MR. WOODWARD:

Q.    Mr. McGuire, we were turning your attention to the document that previously has been Bates stamped ending --

THE COURT:  So we really need to refer to that by the exhibit number so the record's clear.

MR. WOODWARD:  Yes, sir.

THE COURT:  Exhibit Number 1.

MR. WOODWARD:  Yes, sir.

THE COURT:  Government's Exhibit Number 1.

MR. WOODWARD:  Yes, sir.  This is Government's Exhibit Number 1, and had previously also been Bates stamped ending in 10.

THE WITNESS:  Yes, sir.

BY MR. WOODWARD:

Q.    Are you there?

A.    Yes, sir.

Q.   Okay.  At the beginning of that email chain, what date are we on now?

A.    This is Thursday, May 1st.  And the context of this -- these exchanges -- there was a discussion in our off- -- or among the prosecution team about whether to seek a complaint or an indictment.  We had actually started to draft that complaint, as a possibility, on April 29th, the day before.

Mr. Singh had previously asked can we sketch out a complaint, which we were already doing.  So the way I took that was he kind of wanted to see what the potential charges were going to be, what the facts were that we had.  That was a way to sort of, you know, kind of get an update as to where things stood.  But, again, we were already doing that.

Q.   And --

A.    Go ahead.

Q.   Was there anything unusual about Mr. Singh asking you for information about a potential indictment?

A.    Not at all.  I mean, we would constantly be providing, "here are drafts of charging documents," to the DAG's office in high profile matters.  Because they wanted to see what are the charges going to be, and, you know, what -- in the case of a complaint or a speaking indictment, what are the facts for those charges.  And,

again, we were already -- we had -- I had started drafting one the day -- April 29th. It just we hadn't finished it because we were still gathering more information.

And I wasn't really -- I didn't want to do a complaint anyway. I wanted to do an indictment because I thought that was the better path. So, you know, it's in the context of these discussions Mr. Singh asks for what I believe to be a 2019 gang report by Prince George's County about Mr. Abrego, which I didn't have. And so I told him I don't have this, and I actually have never had it. So, you know, he, I guess got it from somewhere else, or I may -- maybe sent -- sent it to him later. I don't remember.

Q.    And your testimony earlier today was that you didn't have any of the information that HSI-Maryland had had?

A.    Very limited. I mean, because the interviews of the individual who had been in federal prison and then the lady in Texas and some other had been carried out by other HSI divisions, HSI-Alabama, HSI-Texas. So I had gotten that information directly from those groups. And so we didn't get a whole lot from Baltimore until later, like weeks later, in the investigation.

Q.    Now, you referenced that leadership wants to know about a case like this. Why is that?

A.   Well, from my perspective, the Justice Manual requires it.  But what -- I -- I presume, you know, they want to know what's going on in cases of public interest because they're going to get asked about it by reporters or whatever.

Q.   How would anyone know about it?  The grand jury process is secret.

A.   I mean, things get leaked, I guess.  I mean -- I suspect that, you know, people want to know what's going on in real time in case someone finds out before it's officially released.  And that way they understand what's happening.

Q.   And what about when an indictment is returned?  What happens?

A.   When an indictment is returned, normally it would be public unless we ask for it to be sealed, which we -- was an issue in this case at some point.

Q.   Why was that an issue in this case?

A.   By the time we got to the decision point where I said, okay, we're going to seek an indictment against this defendant, then the question moved to what's the timing, when are we going to do that.  I was in control of the timeframe.  The grand jury wasn't going to hear the case unless I said it was okay.  And so I knew there was -- once we charged the case, it was going to be a

major story, and I wanted to make sure that everyone in senior leadership had a heads-up that that was happening. I didn't want it to be a surprise.

So if we asked for the indictment and we asked for it to be sealed and that motion was not granted, then the indictment would be public and it would -- we couldn't do anything about it at that point; it would be out.

And I also knew, too, that the defendant was not in the United States at the time we were potentially seeking the indictment. And further, he was in a country where the President of that country had said we're not going to send him back to the United States. And if I charged him in an indictment, I was going have to bring him back to the United States to make an effective prosecution.

And so I needed leadership to know that -- because I knew I wasn't -- as the Acting U.S. Attorney in Middle District of Tennessee, was going to be able to do much about, you know, what the President of El Salvador wanted. That was going to have to come from Main Justice and maybe the State Department. So that -- where the rubber met the road on that decision was, I was concerned -- once we indicted the case, the Speedy Trial Act clock was going to start to run. The Speedy Trial

Act says we have to bring a defendant to trial in a certain period of time. And if he's in a foreign country, we have to start making steps to take him back.

Q. Directing your attention to what has been --

THE COURT: Let me ask -- by the time you're doing all of this, according to information you all have provided to me, the Supreme Court had already said bring him back.

THE WITNESS: Oh, there's no question.

THE COURT: Okay.

THE WITNESS: There's no question, Your Honor. And that was in the backdrop of this. But he was not back yet. And so I didn't know how that was going to shake out, and I wasn't going to be involved in that part of it.

THE COURT: All right.

THE WITNESS: So I didn't want the STA clock to start running until we kind of knew where we were headed with all of that.

BY MR. WOODWARD:

Q. Directing your attention to Government Exhibit 1, pages previously marked as ending in 18.

What is happening on Saturday and Sunday, May the 17th and 18th?

A. So these are the emails describing the conversations

that I was just referring to. We had an opportunity to present the case to the Grand Jury that Wednesday, which would have been May 21st, but we didn't have to. And so before I presented the case to the Grand Jury for potential indictment, I wanted to make sure that, you know, senior leadership knew what was happening; we were ready to get the defendant back, or take whatever steps we needed to to do that. All of which I knew weren't -- wasn't something that I was going to be able to do myself.

So the interaction was about is Main Justice ready for us to do this, because I can hold it. You know, if we want more time, I'm in control of the timeframe here. And if we want more time, we've got more time. I'm ready to charge the case, but if we want more time, we can use it.

And so there was this discussion about are we going to go forward on Wednesday or -- and potentially seal it, or are we going to wait -- we would have to wait two weeks at that point, because in our district our Grand Jury doesn't meet the week of a federal holiday, and the next week was Memorial Day. So if we didn't charge on May 21st it would be June 4th, or whatever the date is, that Wednesday. And so I was really trying to ascertain, I'm ready to go forward, is everybody else

ready for me to go forward.

Q.   And the bottom of that email when you referenced the indictment being unsealed --

A.   Right.

Q.   -- that's a reference to the discussion you previously had --

A.   That's right.  Mr. Warren was saying, you know -- who was one -- on the prosecution team at that point. We're proceeding that we're going to maybe unseal it; we can seal it.  You know, if it goes live -- because if it's unsealed, it's going to be public on Wednesday; is that -- you know, do all the press people know, and do -- we contacted -- has -- has Main Justice contacted everybody they need to contact about that.

And so, you know, Mr. Singh, at the top of that page, is saying, you know, let's keep close hold until we get clearance.  And I -- at the time, and I still don't know totally what clearance he's talking about, because we weren't sort of asking for permission.  We were saying this is happening; is everybody ready for this to happen.

And so, you know, he had said let's talk Monday.  This was -- this was an email over the weekend. And that's what the discussions were:  Are we ready to go forward on Wednesday, because we, as the prosecution team, are ready, but we know -- you know, is the

Department of Justice writ large ready for this.

Q.   Directing your attention to Government's Exhibit 1, the page that has previously been stamped ending in 23.

A.   Yes.

Q.   Do you see the email exchange between yourself and Mr. Singh in the middle of that page?

A.   I do.

Q.   What did you understand Mr. Singh to mean when he wrote that he's "looking on a draft memo?"

A.   In one of our calls, we had suggested we can draft a sort of brief one- to two-page summary of here's the proof, here are the charges, here's kind of the main gravamen of the case, so that it would be easier for senior leadership to get a read-in on what's going on. And that's what we're talking about.

And -- and this is Tuesday afternoon, so the idea is if we're going to charge tomorrow and it's potentially going to be public tomorrow, you know, can we get that summary of what the charges are.  So that's what that is referring to.

And we did end up sending sort of a brief summary of here's what we intend to charge, here's what the facts are, kind of the brief -- brief summary read-in of what we were doing.

Q.   Directing your attention to what has previously been

Bates ending in 60 of Government Exhibit 1. Do you see an email exchange between yourself and a Mr. Schrader?

A.    Yes. So this is a couple of days earlier. This is the week before we are charging. And at that point -- so this would have been -- this was May 15th. So about six days before we ended up presenting the matter to the Grand Jury. And I was talking to my team in the U.S. Attorney's Office, this would have been other supervisors in our leadership team, about the case. And I was recommending on that day that we indict the defendant for the charges that we indicted him for. And I knew it was going to be a very big decision. It was going to be a big decision for me personally. But as the leader of the office it was going to embrace the office. And I wanted everyone who was in a leadership position to be able to say what they thought.

Again, I knew from the get-go this was going to be a controversial matter. And so -- it was important to me to be transparent with my team of here's what we're looking at; tell me what you think. These are all very smart people, who I had tremendous respect for. They were excellent prosecutors, and they were invested in doing the right thing. And I wanted them to look at what I was looking at so if I had missed something, or if I was approaching this decision in the wrong way, they

could -- they could tell me that. Because I wanted desperately to try to get this right.

Q. Did Mr. Schrader ultimately recommend against seeking an indictment?

A. He did. And he had told me that before. He had said that he would recommend against it and that we shouldn't do it.

Q. Ultimately who made the decision to seek the indictment of Mr. Abrego?

A. I did. And I told them in that email that I sent on May 15th that ultimately this is going to be my decision and that's why I need your help.

Q. Did you fear any repercussion should you not have sought the indictment of Mr. Abrego?

A. If I believed that Mr. Abrego didn't commit a crime or that I couldn't prove it or there was some other reason that I thought was appropriate not to seek a charge, I would have said that to everyone. I would have said that to the DAG's office. I would have said it to my team, and then let whatever was going to happen. And if that meant I was going to get fired, then that was fine. I mean, I -- nobody wants to get fired, but I wasn't going to charge something I didn't believe in. And I wasn't going to charge something because someone else thought it was a good idea. And so I wasn't afraid

of it.  I mean, I knew that these decisions have consequences, but I was prepared -- I kept coming back to the proof.  I was prepared for whatever was going to happen because I felt very confident that the defendant had committed a crime and that I could prove it.  And it was just that simple.  It didn't involve anything for me other than that.  That -- it was first principles as a prosecutor:  What's the evidence, and what does it mean.

MR. WOODWARD:  Nothing further, Your Honor.

THE COURT:  All right.  Cross.

So just to be clear, I think reference was made to Government's Exhibit 2, and I guess 3 and 4.  So those are admitted.

MR. PATTON:  Thank you, Your Honor.

(Whereupon, Government Exhibits 2, 3, 4 were marked for identification and received in evidence.)

CROSS-EXAMINATION

BY MR. PATTON:

Q.   Good morning, Mr. McGuire.

A.   Good morning, Mr. Patton.

Q.   You've been a federal prosecutor since 2018?

A.   Yes, sir.

Q.   You like your job?

A.   Yes.

Q.   You don't want to leave the Department of Justice?

A.   I don't, but I also am not going to do something
that I think is wrong to keep my job.

Q.   You've said before that you actually prefer being an
AUSA to the U.S. Attorney because it means you don't have
to move on after a set period of time, right?

A.   That's exactly right.  I -- I preferred being a line
prosecutor to being the Acting U.S. Attorney.

Q.   And when the case came across your desk on
April 27th you were the Acting U.S. Attorney, right?

A.   Yes, sir, I was.

Q.   Your predecessor had promoted you to the number 2
position in the office and then shortly thereafter he
left, right?

A.   That's right.

Q.   So in an unexpectedly short period of time you went
from an AUSA to head of the office, right?

A.   That's correct.  And -- and it was an honor.  I was
honored to serve in that capacity.

Q.   And it's a job that comes with more public
visibility, right?

A.   That's correct.

Q.   And more risk, with respect to your job security, as
you talked about, right?

A.   I don't know that I would agree with that.  From my
perspective, I mean, I kept doing the same job as I

always had.

Q. You were aware that you could be let go by the Attorney General or the President, correct?

A. That's always true, but, yes, sir.

Q. Just a few months after you became Acting U.S. Attorney you were interviewed by the *Nashville Banner*, right?

A. That's correct.

Q. Engaging with the public is part of the job of the head of the office, right?

A. Yes. They had asked for an interview, and I agreed.

Q. And I take it you generally try to keep up with current events and the news of the day?

A. I do, yes, sir.

Q. It's both something you personally do, but it's also important for the job, right?

A. That's correct.

Q. And when you gave this interview, that was in February 2025, right?

A. I believe that's right.

Q. And before your scheduled interview with the *Banner* they reached out to your spokesperson to confirm that you still had a job, right?

A. Yes. There had been some U.S. Attorneys that had been held over from the prior administration, and they

had all been let go that day.

Q.   There had been at least a dozen U.S. Attorney firings right before that, right?

A.   I believe that's correct, yes, sir.

Q.   And not just on that day, but around this time period, quite a few federal prosecutors were being let go, correct?

A.   I was aware of that, yes, sir.

Q.   You're aware that in January of 2025 the Principle Associate Deputy Attorney General at the time, Emil Bove, ordered the disbanding of the January 6th prosecution team, right?

A.   Yeah, I believe I read that in the paper.

Q.   And one of the prosecutors who had been on that team was a man -- and forgive me if I'm not getting the pronunciation right, but was Cecil VanDevender?

A.   I think Mr. VanDevender had been assigned to the Special Counsel's Office.  I'm sorry.  That's not a J6 case.

Q.   You're correct.  That was Jack Smith's group, right?

A.   I believe -- yes, sir, it was.

Q.   And that was disbanded, right?

A.   It was.

Q.   And Middle District of Tennessee had been where he had come from, right?

A.   That's correct.

Q.   He had been an AUSA for about ten years?

A.   Yes, sir.  He was an excellent prosecutor.

Q.   Honorable prosecutor?

A.   Very.

Q.   And after the Special Counsel group was disbanded, he was intending to come back here to Nashville to resume his career as an AUSA, correct?

A.   That's correct.

Q.   And, in fact, on his way back he was fired, correct?

A.   That's correct.  He called me and told me that.

Q.   And members of your office got together to discuss that, right?

A.   Yes.  I -- I think we -- well, we got together to sort of toast Cecil.  But I also, you know, talked to the office and let them know that that had happened.

Q.   You were head of the office at that time, right?

A.   That's correct.

Q.   Did you make efforts to see that he could, in fact, return to the office and not be fired?

A.   Our original plan was that he would come back.  And I wasn't consulted about whether he was going to be fired or not.  He called me and told me that he had gotten a communication that he had been fired while he was coming back here.

Q. That came from superiors at DOJ, correct?

A. That's correct.

Q. And you knew there was nothing you could do about that, right?

A. By that point they told him he had been fired and had sent him that communication. So, yes.

Q. And you knew that if you tried, your job was at risk, correct?

A. That -- I wasn't worried about my job being at risk. It just seemed like it was -- it had happened and there was really not a lot anybody could do about it.

Q. You recall that in addition to the J6 firings and the Special Counsel team firings there was also a very well publicized group of AUSAs in the Southern District of New York who were let go, right?

A. Uh-huh. Yes.

Q. In connection with the Mayor Adams' investigation?

A. I read that in the news, yes, sir.

Q. You're also aware that the Attorney General -- the recently new Attorney General then -- Pam Bondi issued a number of DOJ memoranda around that time, correct?

A. Yes, sir.

Q. And that's something that typically happens with a change in administration, correct?

A. Yes, sir, in my experience.

Q. DOJ might focus its policies in certain ways, right?

A. Yes, sir.

Q. A common one might relate to sentencing or charging, right?

A. Yes, sir.

Q. But you're aware that -- if we could pull up what we have as -- is it 66?

A. Do you want me to look at something or?

Q. Yeah, I'm about to come up here. Pardon the delay.

So what we have here is Defense Exhibit 66.

THE COURT: Any objection to that by the Government?

MR. WOODWARD: No, Your Honor.

THE COURT: All right. Admitted. So you really do need to move in -- that's really your job, not mine. 66 is admitted.

MR. HECKER: That's fine, Your Honor. I wasn't clear. For purposes of the hearing, do you want us to go through a formal admission process?

THE COURT: We need to create an evidentiary record.

MR. PATTON: Okay.

(Whereupon, Defendant's Exhibit 66 was marked for identification and received in evidence.)

///

BY MR. PATTON:

Q. So now with Defense Exhibit 66, you recognize this as a memorandum from Attorney General Bondi, right?

A. Yes, sir.

Q. And you know that this was essentially a memorandum issued on February 5th that was telling all government lawyers that they needed to be loyal to the President of the United States, correct?

MR. WOODWARD: Objection, Your Honor.

THE COURT: Go ahead.

MR. WOODWARD: I think the document speaks for itself and that counsel should not be characterizing --

THE COURT: Well, it's cross. But you're right. I can read if for myself, but I'll let him go ahead.

Go ahead.

BY MR. PATTON:

Q. Mr. McGuire, it's important for you to read and understand DOJ policy memoranda, correct?

A. I would agree with that.

Q. That is to guide your work as U.S. Attorney, right?

A. As -- and as an Assistant U.S. Attorney.

Q. And as an AUSA?

A. Yes, sir.

Q. And so you had to read this and come to some

understanding about it, correct?

A.   Yes, I did.

Q.   If we could look in the second paragraph there, where it begins with, "The responsibilities of Department of Justice attorneys include not only aggressively enforcing criminal and civil laws enacted by Congress, but also vigorously defending presidential policies and actions against legal challenges on behalf of the United States."

Do you see that?

A.   I do.

Q.   So the memorandum is talking about defending not just laws, but presidential policies and actions, correct?

A.   That's my understanding.

Q.   And then if we go down to the third paragraph there, it says, "When Department of Justice attorneys, for example, refuse to advance good-faith arguments by declining to appear in court or sign briefs, it undermines the constitutional order and deprives the President of the benefit of his lawyers."  Correct?

A.   That's what it says, yes, sir.

Q.   It's saying that government lawyers, DOJ lawyers, are the President's lawyers, correct?

A.   That's what it says, yes, sir.

Q.   And then it finishes by saying that, "It is therefore the policy of DOJ that any attorney who because of their personal political views or judgments declines to sign a brief or appear in court, refuses to advance good-faith arguments on behalf of the Administration, or otherwise delays or impedes the Department's mission will be subject to discipline and potentially termination, consistent with applicable law."  Right?

A.   That's what it says, yes, sir.

Q.   It wasn't very subtle, was it, Mr. McGuire?

A.   I mean, I understood the policy.

Q.   You understood the policy was that you were to act as the President's lawyer and to defend his actions, correct?

A.   The way I understood the memorandum when I read it was that the elected leadership of the country sets the policy for the Justice Department and that we are to follow the policy.  And that's pretty consistent with administrations I've -- I've served with before.  I don't know that I necessarily agree with the way they phrased it, but at the end of the day, I kind of got that, you know, the President and the Attorney General set the policy for the Department and we need to follow it.

Q.   You thought that was just an editorial mistake, that they referred to government lawyers as the President's

lawyers?

A.   I don't -- I can't comment on whether it was a mistake or what it -- was editorial.  I'm just telling you the way that I read it.

Q.   You received a call from Special Agent Saoud about the investigation into Mr. Abrego on the evening of Sunday, or late afternoon Sunday, April 27th, right?

A.   That's correct.

Q.   And she was at the time the Special Agent in Charge for HSI here in Nashville, right?

A.   Yes, sir.

Q.   And that very same Sunday evening you got an email about the case from Aakash Singh, an Associate Deputy Attorney General, right?

A.   That's correct.

Q.   That office is run by the Deputy Attorney General Todd Blanche, right?

A.   Yes, sir.

Q.   And the Deputy Attorney General, or the DAG, is the number 2 official at DOJ, correct?

A.   Yes, sir.

Q.   And it oversees the nationwide operations of the Department of Justice, correct?

A.   Yes, sir.

Q.   And Mr. Singh emails you on the very same Sunday

evening that you've heard from Agent Saoud, right?

A.    Yes, sir.

Q.    And that very same evening you make the decision to handle the case yourself?

A.    Yes, sir.

Q.    Even though you were now running the whole office yourself, you personally decided to take an alien smuggling case yourself, right?

A.    I think if -- folks in my office would say that I -- I probably handled more matters and in court than maybe any other U.S. Attorney who -- I don't know, maybe Jim Neal in the '60's, I guess.  But I've handled a lot of my own matters.  I like being in court.  I like handling the matters.

       In this case I had more experience in human smuggling than anybody else, and I knew this was going to be controversial, and I'd rather it be me than somebody else.

Q.    Well, that is the reason you handled it, right?  Because you felt like it was going to be controversial?

A.    I knew that Mr -- I mean, I had followed in the news the Abrego case to that point, and I knew that it had sparked very strong feelings in the political landscape.  And I figured anything we do, one way or the other, is going to come into that political landscape.

Q.   I believe you said on direct one of the reasons you thought it would be controversial was because you at that time could imagine that you would be in a hearing just like this on a vindictive prosecution motion, right?

A.   I knew there was going to be challenges.  I think that Sunday night I hadn't really thought about exactly what they would be.  But I knew it was going to be -- there was going to be a lot of opinions by a lot of people across the country about it, and I'd rather it be me than someone else.

Q.   So the testimony you just gave 20 minutes ago that you were thinking that it could end up in a courtroom just like this on a vindictive prosecution motion, you didn't actually mean that?

A.   What I communicated to Mr. Woodward was that I did believe that there would be a potential vindictive prosecution moment -- motion, which I believed ultimately before I charged the case.  It factored into my thinking about whether to charge.

The way I answered your question just now is that I wasn't thinking about that on Sunday night, April 27th, when I had first heard about it.  It was only once I kind of got into the case and started thinking about how it all might play out in the weeks before we charged that I considered, you know we're probably going

to get this motion.

Q. Part of why you thought you might get that motion was because of all the media attention surrounding the case, right?

A. Yes, sir. And just the politics that we live in, unfortunately.

Q. The politics we live in, unfortunately. I mean, the reason there might be a vindictive prosecution motion was because high officials in the Executive department were constantly talking about going after Mr. Abrego, correct?

A. No, sir, that's not the way I perceived why there might be a vindictive prosecution motion. I just knew that it was going to be a high profile matter, that Mr. Abrego would likely have his pick of attorneys, and that they would advance the most effective -- what they considered to be the most effective arguments against the case. And I knew this was a case that -- you know, the traffic stop happened two-and-a-half years ago. So obviously that would be a question. You know, why now? And I -- you know, I was sort of prepared that -- that there was going to be a challenge to that.

Q. Seems unusual, right?

A. Well, it -- from my perspective -- I first learned about it at the end of April. So I really can't control what happened before, but, you know, I acted on it as

soon as I knew about it. But I couldn't change the fact that the traffic stop had occurred when it occurred.

Q. Mr. McGuire, you've handled a number of high profile cases in your time, right?

A. Yes, sir.

Q. Have you ever dealt with a vindictive prosecution motion before?

A. No, sir.

Q. So it just occurred to you that this high profile case, of all the high profile cases you've worked on, might involve a vindictive prosecution motion, even though you've never handled a vindictive prosecution motion before, right?

A. When we consider whether to indict a case, one of the things that we have to do -- and when we sort of prepare it for our colleagues' review, is we have to consider what are any and all potential defenses, issues, things that might get raised. And so we have to put on our defense lawyer hat. If I was the defense lawyer, what would I do? And here's one of the things that they could do. And -- and other people in my office raised the same thing. You know, you're probably going to get this motion. How are you going to respond to it? So that's kind of baked in.

It's not -- you know, just because I haven't

personally had that experience doesn't mean that I can't conceive that it is an issue that we need to think about on whether, you know, we are, or going -- or should charge the case.

Q.    Mr. McGuire, you know that the initial HSI investigation of Mr. Abrego began following this traffic stop we've been talking about --

A.    Yes, sir, I'm aware of that.

Q.    -- in 2022, right?

A.    Yes, sir.

Q.    And HSI was made aware because THP made a referral to HSI in Maryland about the traffic stop, right?

A.    Yes, sir.  I think they -- they called -- there was an NCIC entry to call some FBI line, and they did.  And I think that's how it ultimately got routed to Baltimore.

Q.    And I believe you testified to your knowledge, before April 27th, neither you nor your office had any involvement with it, right?

A.    That's correct.  We did not.

Q.    You're familiar with the charges in this case, right, 18 -- sorry -- 8 U.S.C. 1324, right?

A.    Yes, sir.

Q.    You've charged cases like this before?

A.    I have.  Yes, sir.

Q.    And they often go quickly from investigation to

charge, right?

A.   In my experience, yes, sir.

Q.   And they often begin with some sort of stop, right?

A.   The ones that I have prosecuted did, yes, sir.

Q.   And you're familiar with the chart that we filed in our briefing in this case showing the typical timeline; in fact, the entire timeline of all the cases in the Sixth Circuit, right?

A.   Yes, sir.  I read your filing.

Q.   And you're aware what an extraordinary outlier this case is in terms of the timing, right?

A.   I agree.  It was extraordinary for me, too.  It's -- I, you know, learned about this case in April and the traffic stop had occurred two years earlier.

Q.   Mr. Abrego was ultimately arrested by HSI on March 12th, 2025, right?

A.   I believe that's correct.  Yes, sir.

Q.   And that was in connection with his removal ultimately to El Salvador, right?

A.   Yes, sir.

Q.   And no referral was made at that time for criminal prosecution, right?

A.   Correct.  Neither to here or to Maryland, as I understand.

Q.   The investigation is closed, and he is, in fact,

removed to El Salvador, right?

A. That's my understand, yes, sir.

Q. And you as the lead prosecutor on this case, you're familiar with the Reports of Investigation in this case?

A. Yes, sir, I am.

Q. All right. And you know that in the ROI -- the Report of Investigation closing it out, that the agent noted that all the goals had been accomplished and no further investigative efforts will be attributed to this investigation?

A. I did read that.

Q. And there were a number of investigative steps that then ended up taking place after March 12th, correct?

A. That's right.

Q. And one of those steps -- and I think you referred to this a little bit in your direct -- was interviewing a gentleman named Jose Hernandez Reyes, right?

A. Yes, sir.

Q. He's otherwise known as CC1 in this case?

A. Yes, sir.

Q. An alleged coconspirator, right?

A. That's correct. Yes, sir.

Q. And the car that Mr. Abrego was driving in 2022 was registered to Mr. Hernandez Reyes, right?

A. It was.

Q. That was known back then, right?

A. It was. Well, not by me. But I mean it was known to Baltimore, yes, sir.

Q. It was known by HSI, correct?

A. Yes, sir.

Q. If we could take a look at Defense Exhibit 17 and put it up for identification.

Mr. McGuire, do you recognize --

THE COURT: Any objection to 17 by the Government?

MR. WOODWARD: No, Your Honor.

THE COURT: All right. Admitted.

(Whereupon, Defendant's Exhibit 17 was marked for identification and received in evidence.)

BY MR. PATTON:

Q. Mr. McGuire, this is one of those Reports of Investigation that we've been talking about, right?

A. Yes, sir.

Q. And if we just take a look at the first page here, you see that it's referring to -- in the synopsis section -- this Tennessee Highway Patrol stop and the initial referral, right, to HSI?

A. Yes, sir, this would have been HSI-Baltimore.

Q. And this was -- this ROI was approved by John Van Wie, right?

A.   I believe so.  Yes, sir.

Q.   If you look down to --

A.   Yes.

Q.   -- sort of the left-hand side on the bottom -- do you see that?

A.   Yes, sir.  And it -- I guess it related to the April 24th proffer.

Q.   That's right.  And this report was approved on May 12th, 2025, right?

A.   That's what it says.  Yes, sir.

Q.   And if we go to the second page here, starting on the Details of Investigation, this is reporting on the interview of Mr. Hernandez Reyes on April 24th, 2025, right?

A.   Yes, sir.

Q.   And that's being conducted by HSI agents from Birmingham and Baltimore, right?

A.   Yes, sir.

Q.   Nobody from Nashville there, right?

A.   That's correct.

Q.   And it then goes on to memorialize the interview that was had with Mr. Hernandez Reyes, right?

A.   Yes, sir.

Q.   In which, in part, he talks about how he had run a smuggling operation, correct?

A.   Yes, sir.  That he and Mr. Abrego had worked in the smuggling operation during, you know, the period that we were looking -- or we eventually were looking at.  At this time I was not involved in the case, when this happened.

Q.   Understood.  But you've familiarized yourself with the record --

A.   Absolutely.

Q.   -- right?

A.   Absolutely.

Q.   And you know that, in part, Mr. Hernandez Reyes was explaining that Mr. Abrego would be a driver for him sometimes, use his car, right?

A.   That's correct.

Q.   And he would get paid various amounts for doing that, right?

A.   Yes, sir.

Q.   If we could look at Defense Exhibit 19, and put that up, please.

          THE COURT:  Any objection to 19?

          MR. WOODWARD:  No, sir.

          (Whereupon, Defendant's Exhibit 19 was marked for identification and received in evidence.)

BY MR. PATTON:

Q.   And here, this is another synopsis coming from

HSI-Maryland, right?

A.    Yes, sir.

Q.    And they're requesting assistance from Birmingham, again about CC1, right?

A.    Yes, sir.

Q.    And it refers to an interview on April 22nd, 2025, right?

A.    Yes, sir.

Q.    Again, that's -- there's no HSI-Nashville involvement there, correct?

A.    That's correct.  We didn't know about it when this was done.

MR. PATTON:  And could we pull up, please, Defense Exhibit 30.  Show that to the witness.

THE COURT:  Is there a motion?

MR. PATTON:  I'm sorry?

THE COURT:  Is that a motion?

MR. PATTON:  I'm sorry.  I was speaking to my --

THE COURT:  Well, you can't show it until it gets into evidence.

MR. PATTON:  Okay.  I apologize, Your Honor.  I was going to show it for identification before moving it in.  But if we can just move it in, I'm happy to do that.

THE COURT:  Any objection?

MR. WOODWARD: Can I see -- no objection, Your Honor.

THE COURT: Admitted.

(Whereupon, Defendant's Exhibit 30 was marked for identification and received in evidence.)

BY MR. PATTON:

Q. So do you recognize this as another HSI investigation's report?

A. Yes, sir.

Q. And if we can turn to the end of this report, page 5 of 5. Well, my apologies.

If we go to page 4 and the narrative section.

Do you see that once again this is related to Mr. Abrego, and it's again referring to the initial 2022 stop by Tennessee Highway Patrol?

A. Yes, sir.

Q. And then if we go to the next page, page 5, and down towards the bottom there, you see the "approved" boxes?

A. Yes, sir.

Q. And you see here where in the bottom approved box it says "John Van Wie - Reopen Approval by Supervisor?"

A. Yes, sir, I see that.

Q. And that's dated April 17th, right?

A. Yes, sir.

Q. 2025. So that's -- and you know from reviewing the

records in this case, that's the reopening of the investigation that had been closed in March, right?

A.    Yes, sir.  That was my understanding, is that they had closed it when they anticipated the defendant would be deported and then reopened it subsequent to that.  But again, this was before I was involved.

Q.    But you later spoke with Agent Van Wie about this reopening, correct?

A.    Yes, sir, I did.

Q.    And he explained to you that the reopening had come about because he had gotten word from headquarters that they wanted it reopened, right?

A.    The way he described it to me was that at some point that HSI-Baltimore was getting a lot of requests for information to look into this, to talk to this person, and he needed to reopen the case to basically get his agents to be able to do that.  They -- they had to be traveling under an open case to do it.  That's the way he described it to me.

Q.    Understood.  Because they were getting requests from headquarters, and if you're going to look into a matter, you have to reopen it, correct?

A.    That's my -- that's the way he described it to me, yes, sir.

Q.    You can't -- you can't just -- there are procedures

HSI follows, correct?

A.   Yes, sir.  The way he described it is you couldn't do that on a closed case.  You had to reopen it to get agents to go do tasks.

Q.   If you're going to investigate a case it has to be open, right?

A.   That was -- that's my --

Q.   In essence?

A.   Yes, sir, that's my understanding.

Q.   And so they were going to investigate it because of these requests from headquarters, right?

A.   I don't know that they were investigating so much as they were trying to answer the requests they were receiving.  But again, all of that was before I even knew about it.  So I can't say that I know for sure.

Q.   Right.  But you recall having a meeting with many people at this table right here -- and I'm referring to the defense table -- in which you told us that Agent Van Wie told you --

A.   Yeah.

Q.   -- that he reopened it in response to inquiries from headquarters?

A.   Yeah.  He had gotten these requests and needed to reopen the case to be able to task these agents to do whatever they were going to do.  That was what he had

described to me.

Q.   I want to go back and speak with you now about these emails with Mr. Singh at ODAG.

MR. PATTON:  And my apologies, Your Honor. We've also marked these.  So with the Court's permission I was going to use our nomenclature, only because that's what I have in my outline.  But if the Court prefers, I can try to shift gears here.

THE COURT:  I would prefer to use one exhibit, but if you -- for sake of moving along.  Before you all leave, get together, and whatever we have duplicates, we need to make that clear in the record.

MR. PATTON:  I will do that.  So for now, because I'm going to be asking for these to be pulled up on the screen, I'm going to refer to them as Defense exhibit numbers.  But for the record, these are all contained in Government's Exhibit 1 tab, or Government's Exhibit --

THE COURT:  All right.  Go ahead.

MR. PATTON:   -- Exhibit 1.

If we could pull up Defense Exhibit 88.

(Whereupon, Defendant's Exhibit 88 was marked for identification and received in evidence.)

BY MR. PATTON:

Q.   So this is the email that you received on that same

Sunday evening that you got outreach from Agent Saoud, right?

A. Yes, sir.

Q. And it is from Aakash Singh, right?

A. Yes, sir.

Q. Who is in the office of the Deputy Attorney General?

A. Yes, sir.

Q. And it includes two other U.S. Attorneys, one in Northern Alabama and one in Southern Texas, right?

A. Yes, sir.

Q. Yourself, and then two other people from ODAG, right?

A. Yes, sir.

Q. And the subject line is "Jose Ramon Hernandez Reyes," right?

A. Yes, sir.

Q. Otherwise known as CC1?

A. Yes, sir.

Q. The gentleman that HSI had interviewed on April 22nd and 24th that we've reviewed the reports of, correct?

A. Yes, sir. Yes, sir.

Q. Just a few days earlier, right?

A. Yes, sir.

Q. And so Mr. Singh is emailing you about a witness in Mr. Abrego's investigation, right?

A.   Yes, sir.  That was the subject line of the email.

Q.   So on the very first day you're finding out about this case Mr. Singh already knows about a particular witness in the case, right?

A.   That's what it appears from the email.  He emailed me that night.

Q.   And he -- he knows about this witness before you know about this witness, correct?

A.   Right.  Because other people obviously knew about this witness before I knew about this witness.

Q.   And he asks if you and the others can talk tomorrow morning, meaning Monday morning, right?

A.   Yes, sir.

Q.   And I believe you mentioned earlier that this stood out to you because it was a little unusual to get outreach on a Sunday evening, right?

A.   I believe I referred to that -- what I was talking about, Ms. Saoud calling me, that she wouldn't call me on a Sunday if it wasn't important.  Frankly, I would get emails from the DAG's office at any time day or night. So that -- the email itself wouldn't have been unusual. Agent -- Special Agent -- a SAC calling you on a Sunday afternoon would signify it's an important call.  They would otherwise do it during business hours.

Q.   And you did, in fact, have this call the next

morning, right?

A.    Yes, sir.

Q.    And the call was about -- I believe you described it as sort of the logistics of getting CC1 to Nashville, to coordinate with the Alabama U.S. Attorney's office and your office to get CC1 to Nashville, correct?

A.    Yeah.  As I recall, the HSI agents in Alabama had interviewed Mr. Hernandez Reyes.  He was convicted out of Texas.  And so the three U.S. Attorneys needed to talk about, okay, what's going to happen next.  If he is going to, you know, get some kind of proffer immunity, who is going to give that.  Is it me?  Is it Texas?  Is it Alabama?  Because that's where he is.  You know, if we're going to try to interview him further, what's the best way to do that; do we need to kind of get him out or -- you know, it was all those kinds of logistics.  And I was communicating to that group my SAC has already brought this to me, we're going to look into this, so it sort of makes sense for me to be, you know, calling the shots, I guess, for a better word.

Q.    And Mr. Singh, obviously from his email on Sunday, to Alabama and Texas, he's aware of all these different components, right?

A.    That would be a fair assumption based on the email.

         MR. PATTON:  Could we please pull up now

Defense Exhibit 50.

(Whereupon, Defendant's Exhibit 50 was marked for identification and received in evidence.)

BY MR. PATTON:

Q.   So this is another email exchange that you're on with Mr. Singh just a couple days later, right?

A.   Yes, sir.

Q.   And this is Wednesday, April 30, right?

A.   Yes, sir.

Q.   And this begins with Mr. Warren, who's part of the Vulcan group, right?

A.   Yes, sir.

Q.   Attaching -- including an attachment that -- that relates to Mr. Hernandez Reyes, right?

A.   Yes, sir.

Q.   And again, he's including the same group of people that we discussed on the earlier email, right?

A.   That's correct.

Q.   And Mr. Singh thanks him, right?

A.   Yes, sir.

Q.   And then you respond to that email, right?

A.   Yes, sir.

Q.   And by the way, I think just to clarify some of the timing on this, so we have this down, you tell me if you think I've got this wrong, but I think the timestamps

there are the time of the recipient.

A. That could be true. I -- I -- you know, in looking at this -- I -- I can just say the sequence of the emails, but the time -- the timestamps are, obviously, sort of weirdly inconsistent. And I don't know if it's the recipient or the sender, but I can kind of tell you the sequence because I remember the sequence.

Q. Well, just so we can try to nail it down, and you tell me if this makes sense, the email from Mr. Warren, who is on Eastern Time, right, is sending that to various folks, including you, in Central Time, and it says 10:29 a.m., right?

A. What I'm looking at, there's an email that says 9:31 a.m., but I'm. . .

Q. Sorry. I was going all the way down to the bottom.

A. That's okay. I see what you're seeing now.

Q. It doesn't make sense that an email responding to the one before would have come before it, correct?

A. That's exactly right.

Q. Okay. So you respond here, and if -- if I'm right about the timing here, you've gotten an email from Mr. Singh at 9:31, and just a couple minutes later there, if 10:33 is actually 9:33 your time, you're responding and giving him some updates, right?

A. That's correct.

Q.   And you say, "Jake and I have been talking several times a day," right?

A.   Yes, sir.  We had been.

Q.   And you explain how you're dividing up your workload, right?

A.   Yes, sir.

Q.   And you discuss working on logistics about getting Mr. Hernandez Reyes to Nashville from Alabama for the Grand Jury, right?

A.   Yes, sir.  That's correct.

Q.   And that's -- is it fair to say that's sort of the continuation of the conversation you were having on Monday about the logistics?

A.   Yes, sir.  That was one of the things we were working on early in that week.

Q.   And you tell Mr. Singh that you could have a charging document ready by the next week, right?

A.   I did say that, yes, sir.  It's kind of an ambitious timeframe.  And I guess I -- my mind, I was thinking that the draft of whatever -- whatever we were going to do.  That was kind of my first indication of I think we're going to charge this case.

Q.   And you're telling him that you're "hammering as hard as we can on this effort," right?

A.   Yes, sir.  Again, I was two-and-a-half years behind,

so I was trying to go as fast as I could.

Q.   You're assuring him that you're working quickly on this, right?

A.   Yeah.  I wanted him to know it's high profile; I know it's an old, you know, traffic stop -- and also, again, I only first learned about it Sunday evening.  So I'm trying to get all the way up to speed with everything that's happened.

Q.   And you were telling him these things because you knew it was a high priority for him, too, right?

A.   Yeah.  Any high profile case, I know that leadership always wanted to know what's going on.  So I anticipated, you know, he was getting asked, and so I was trying to kind of let him know I'm trying to get to -- get you the information for leadership, you know, when I have it.

Q.   And he thanks you, says "awesome news," right, and he says "keep me posted?"

A.   He does say that.

Q.   And you do keep him posted, right?

A.   Absolutely.

Q.   In fact, later that same day you email him again, right?

A.   I do.

            MR. PATTON:  If we could pull up Defense Exhibit 51, please.

(Whereupon, Defendant's Exhibit 51 was marked for identification and received in evidence.)

BY MR. PATTON:

Q.   And this is across a couple pages.  So in order to go in order of the emails let's go to the last page.

And for clarification sake, this is the Bates number ending in 09, which would refer to the Government's Exhibit 1.

And here --

THE COURT:  But so the record's clear, you're really talking -- you're also in reference to 51, your 51.

MR. PATTON:  Correct.  What we have up on the screen is Defense Exhibit 51.

BY MR. PATTON:

Q.   And beginning on -- at around 5:00 somebody's time, right, on Wednesday, April 30th --

A.   Yes, sir.

Q.   -- you're emailing Mr. Singh information that Tennessee officials are going to release the bodycam footage, right?

A.   That's correct.

Q.   And he responds, "thanks for flagging."  And then there's some additional communication that's redacted here, right?

A.   Yes, sir.

Q.   And you respond that you're going to get a copy of the redacted version, and then there is more in this exhibit that's redacted, right?

A.   Yes, sir.

Q.   So you reach out to talk about the bodycam footage, right?

A.   Yes, sir.

Q.   And then the next one where Mr. Singh says "10-4 thanks Rob," do you see that?

A.   I do see that.

Q.   He then changes the topic, right?

A.   Yes, he goes to a different topic about the -- he's asking how close do we think we are to charging.

Q.   He's asking you now about timing of charging and whether you can set up a call, right --

A.   Yes, sir.

Q.   -- to talk about it?

A.   Yes, sir.

Q.   And in response to that -- and again, if -- if I'm right about the timing here -- it looks like you're responding maybe about eight minutes later or so; is that fair?

A.   Yes, sir.  That's right.

Q.   And you tell him, "I think towards the end of next

week." And I believe you said on direct you were a little confused about why he was continuing to ask about the charging since you had already -- you felt like you had already kept him posted on the charging earlier that day, right?

A. I had sent him the email earlier that morning saying I think we're going to have, you know, sort of a draft charging document; we're going to start being able to kind of focus on the decision next week. This was middle the week of April 30th. So I was -- or the week of that April.

Q. Just three days after you first heard from him on this, right?

A. Yeah. But by that time I had seen the bodycam. I had reviewed the reports -- well, let me -- I had talked to the agents who had interviewed the witnesses. The one -- Mr. Hernandez Reyes, and the other woman in Texas. So I had a really good sense of, at least early on, I think there's enough proof here we're going to end up charging this case. Still, obviously, we're looking at some more stuff; we're doing some more things, but -- by that point -- and it wasn't a particularly complicated set of facts. And so I felt like I think we're -- we're headed to going to charge this case. It's pretty clear, based on the video and what I've learned, I think he

committed this crime.

Q.   So three days after you first had contact with him and this evening after you've already told him your plans on charging he's asking about it again.  He's pretty eager here, isn't he?

A.   I don't know about that.  I mean, he might not have focused on what I told him earlier.  I mean, I -- but he had -- clearly had asked me when do we think -- what's the timeframe, which is a pretty constant, you know, what's going to happen next question from the DAG's office on any high profile matter.  So I was trying to kind of answer that.

Q.   And when you answer it, yet again, "I think towards the end of next week," and then there's some section that's redacted, and then you go on, "My vision was that I would talk with you and Jake about complaint versus indictment and pass the charging documents up the chain of command before swearing them out," right?

A.   That's right.  I wanted to convey -- we're trying to decide between a complaint and indictment.  I think we should do an indictment, and here's why.  And, you know, I want -- was going to say here's what the charging documents are, kind of this is the snapshot of what's happening in Nashville as of, you know, May 1st/ April 30th.

Q.   And I think you talked about different cases proceed in different charging routes.  You can go by complaint; you can go by indictment; you can go by speaking indictment, right?

A.   That's right.

Q.   And you were telling him I'm going have these conversations with you about how to do this charging, right?

A.   I was letting him know what we were talking about internally on the prosecution team.  You know, this is the latest and greatest of what is happening with the case.  We had drafted -- we had started drafting a complaint the day before.  I was kind of leaning towards doing an indictment.  We were kind of talking about that.  And I was kind of giving him the up-to-date brief here's where things sit.

Q.   What you say to Mr. Singh is that you would talk with him and Jake?

A.   That's right.  I was -- because Jake -- at that -- Jake Warren was my partner in that process.  He and I had been the most engaged about that.  So I thought it was appropriate to have Jake sort of explain, from his perspective, you know, this is why we think we're doing what we're doing.

Q.   So you and Jake were going to talk to Mr. Singh --

A.    That's right.

Q.    -- about how to charge the case before then passing it up the chain of command, right?

A.    I was going to tell Mr. Singh here's how we're approaching it.  But I want to be clear, I wasn't asking Mr. Singh's permission or getting him to buy-in on it as I was telling him here's the conversations we're having and here's what our reasoning is, and I want you to know what we're going to charge and what it looks like before we do it so you can brief senior leadership before it happens.  That's what I'm communicating there.

Q.    Senior leadership, chain of command, that refers to just the hierarchy of authority, correct?

A.    Right.  Whoever needs to know at the Main Justice level that this is happening.

Q.    And he responds in the next email here, "Thank you Rob I appreciate that.  Do we have a sense of potential charges," right?

A.    Yes, sir.

Q.    So he's continuing this conversation about the charges, and he wants some more detail, correct?

A.    Yeah.  And again, that would be pretty consistent in a high profile case, that they want to know, okay, you know, what are we going to charge, what are the facts, what does it look like.  And I would be briefing them,

here's what we're looking at. And at that point I don't think we knew what the sense of the potential charges was. We were -- that was up for discussion.

Q. And then you then respond, "We could also do a speaking indictment." And then there's a large section here that's redacted, right?

A. Right. Yes, sir.

Q. And you -- you alluded to this on -- in your direct testimony. A speaking indictment is one that includes more facts, right?

A. Yes, sir.

Q. More detail?

A. Yes, sir.

Q. It's more of a narrative account, rather than just the statutory offenses themselves, right?

A. Yes, sir. In my experience, that's what it is.

Q. And you're not required by law to file one or the other; that's your choice, right?

A. That's correct.

Q. You could just file an indictment that just has the statutory allegations and kind of a bare bones factual component, right?

A. We could. In my experience, on a high profile case, we're more likely to do a speaking indictment.

Q. Well, you know that after you charge someone there

are all sorts of ethics rules and local rules about what you can say publicly about the defendant, correct?

A.   That's correct.

Q.   But you if you put it in an indictment, then it's out there for the public already, right?

A.   I mean, I think department-wide we use speaking indictments to inform the public about the facts of a case in matters that we expect there to be some public interest, and here are the facts, here's what the grand jury heard before, you know, they issued their indictment.  I think that's pretty routine department-wide.

Q.   And you ended up filing a speaking indictment in this case, right?

A.   Yes, sir, we did.

Q.   And it included things like that Mr. Abrego was an MS-13 gang member, right?  It included that allegation?

A.   Yes, sir.

Q.   It included the allegation that he trafficked in firearms, right?

A.   Yes, sir.  That was the information we had.

Q.   It included an allegation that he trafficked in drugs, right?

A.   Again, that was information that we had uncovered during the investigation.

Q.   He wasn't charged with any of those things, right?

A.   No, sir.  I mean, the information that we had about those was not confined to a timeframe or a location.  So in other words, we couldn't say where that had happened or when.

So that would be important -- to -- to indict him for a trafficking -- a narcotics trafficking offense, for example, I would have to establish that that happened in the Middle District of Tennessee or touched the Middle District of Tennessee, but we didn't have that information.

Q.   He was charged with unlawful transportation of undocumented aliens, right?

A.   That's correct.  Yes, sir.

Q.   None of those things I ticked off are an element of that offense, right?

A.   No, sir.  It -- it is -- we would put in information that we relied on to move the case that we thought was important.  In this case, the trafficking -- the narcotics trafficking and the firearms information was, in our opinion, relevant to the overall conspiracy.

Q.   And the Grand Jury didn't make any findings about MS-13 or firearms or drugs, correct?

A.   We presented the Grand Jury with a copy of the speaking indictment.  And said, you know, this is what

we're presenting, and they voted it out.

Q. They only vote on whether or not the elements have been met, correct, of what -- of what's been charged?

A. Yes.

Q. They don't get to edit the indictment, correct?

A. I suppose if the grand jurors -- and this hasn't happened to me -- but if the grand jurors felt like there was a part of the indictment they didn't agree with they could reject it. I mean, I think there's been times where the grand jury, not necessarily in my experience again, where they've said we're going to indict on Count One, but not Count Two.

Q. And you were looping Mr. Singh into this discussion about filing a speaking indictment, correct?

A. Yes, sir. I wanted him to know that was, you know, one of the things that we were talking about. I was saying we could do that. We're still trying to figure out -- and when I say "we," I mean me and Joint Task Force Vulcan as the prosecution team. We were having these discussions.

Q. And after you talked to him about the possibility of a speaking indictment, he responds, "Thanks for the detailed readout and consistent updates. I appreciate you and Jake and your team's pushing on this. It's a top priority for us," right?

A. Yeah. Yes.

Q. Who did you understand the "us" to be there in the "it's a top priority for us?"

A. I presumed it was Main Justice leadership.

Q. And then he goes on to say, "Can we sketch out a draft complaint," right?

A. He did ask for that, which we were already doing.

Q. So once again, he wanted to be speaking with you and working with you on the details of the charging document, correct?

A. I think the reason -- well, from my perspective --

Q. And -- I --

A. Okay.

Q. You're welcome to elaborate further, but that is, in fact, what he's asking here, correct, to be involved in drafting the charging document?

A. Well, he says, "Can we sketch out a draft complaint." The way I took that was he wants to see what the facts are -- because the complaint would necessarily -- we would have to allege "here's what happened, here's what the facts are," and that would be a easy way to summarize the state of the investigation at that point. That's the way I took "can we sketch out a draft complaint." Because we were already doing that. It wasn't -- he didn't direct us to. We were already

doing it. My -- the way I read that was he wants to see what we're coming up with, so he can pass it to whoever he's going to pass it to.

Q. Your takeaway from "can we sketch out a draft complaint" meant to you that he didn't want to be involved in crafting the charges?

A. Yes. I mean I didn't think that he wanted to be involved in drafting the charges. The way I read that "can we sketch out a draft complaint" -- because he wasn't sketching anything out. I mean, he was saying -- it was sort of a "I'm going to do this," talking about me, as the prosecutor, and I'm going to send it to him to say here's where we are. But we were already doing that.

Q. He didn't say to you can you sketch out a draft complaint and send it to me, did he?

A. He used the word "we," but he wasn't involved in the drafting.

MR. PATTON: If we could take a look at Defense Exhibit 93.

(Whereupon, Defendant's Exhibit 93 was marked for identification and received in evidence.)

BY MR. PATTON:

Q. So this is another email exchange the next day, following the one we were just looking at, right?

A. Yes, sir.

Q.   And you are sending Mr. Singh -- you say, "Akash, this -- this draft is attached that Jake has reviewed" and then there's some redactions in the email, correct?

A.   Yes, sir.

Q.   And -- so you are, in fact, following up with him on his queries about wanting to be involved in the details, correct?

A.   I was providing him this is the draft that we have; Jake's taken a look at it, so this is kind of the latest of our thinking.

Q.   And he responds to you, "Do we have the Baltimore, Maryland report where he was arrested with MS-13," right?

A.   Yes, sir.  He did ask that.

Q.   And you responded you don't have it, you've never had it, but you can ask Baltimore-HSI for it, right?

A.   That's right.

Q.   So he was in the weeds enough to know about some Baltimore report that you didn't possess, correct?

A.   That -- yeah, I think that report had been sort of publicly reported on.  And so he was asking if I had it, and I said I didn't and -- you know, I can ask for it but I don't have it.

Q.   Do you know who Mr. Singh was sharing the various drafts with --

A.   No, sir.

Q. -- at DOJ?

A. No, sir.

Q. Do you know if he was showing them to Mr. Blanche?

A. I don't know that.

Q. Do you know if he was showing them to Attorney General Bondi?

A. No, sir.

Q. Do you know if he or they were sharing them with people at the White House?

A. I don't. I mean, I can tell you that they never came back -- Mr. Singh or anybody else -- to say put this in there or don't say this or don't say that. It was a one-way conversation. I was sending him things, and he was saying thanks, and that was the last I heard of it. So I don't know what happened after that. But I can tell you nothing happened that came back to me.

THE COURT: Counsel, just a minute. Well, we have some technical issues, so we'll take a quick 30-minute break while she deals with that.

MR. PATTON: Your Honor, I apologize. Could I just ask the witness not have contact with counsel during the break?

THE WITNESS: Oh, I won't.

(Recess.)

THE COURT: All right. Be seated.

So before you continue, there's a housekeeping measure. One, the exhibits by the defendants did not redact email addresses. So that's. . . So that may be we should just use the Government's Exhibit 1. And the redactions aren't consistent. There's one place where the -- the Court redacted the name of the -- Mr. Reyes. But now that it's come out I don't see any prejudice to anyone. So that had initially been redacted in the documents. The defendant's copy disclosed that and placed it on the monitor.

So when I found those discrepancies, it triggered me to make sure to look at the other redactions that the Court had approved. And based on what's been presented -- and you all may want to look at your documents -- I think some of the material I redacted should not have been redacted.

In particular, number 8, it's the April 30th email from Mr. McGuire to Mr. Singh and Mr. Warren. Re: Tennessee traffic stop. In the third paragraph, where it says, "We're all hammering as hard as we can go," and it stopped there, I think the other material need not be redacted. Okay.

MR. PATTON: Your Honor, I --

THE COURT: That will be the material to the end of that sentence.

MR. WOODWARD:  I don't have, Your Honor, a copy of the unredacted, but I'll get it as quickly as I can.

THE COURT:  Well, I'll let you come up here and look at it.  Why don't you both come.

(Bench conference off the record.)

THE COURT:  All right.  Let's proceed.

All right.  Let's continue.

MR. PATTON:  Your Honor, may I -- we'll certainly for the record square away the redaction issues --

THE COURT:  Except you're showing your unredacted documents on the monitor.

MR. PATTON:  Okay.  So would Your Honor prefer then that we try to pull up the Government's version?

THE COURT:  Yeah.  I think so.

MR. PATTON:  Okay.

Your Honor, would it be possible to pull them up for the witness only and not show them to the public?  I understand it's technically possible but. . .

THE COURT:  If she -- if it's okay with the courtroom deputy.  Well, he has a hard copy.  You can just have him look at the hard copy.

MR. PATTON:  Fair enough.  That's great.

THE COURT:  All right.  Go ahead.

BY MR. PATTON:

Q. Mr. McGuire, I'm now going to refer to the binder that you've got, which is Government's Exhibit 1. And we'll turn to the Bates marking of 08.

A. I'm there.

Q. So we've already talked about various portions of -- of this email. Do you recall that?

A. Yes, sir.

Q. This is part of an April 30th exchange between yourself and Mr. Warren and Mr. Singh?

A. Yes, sir.

Q. And if we go to your email to Mr. Singh that the time on this is marked 5:19, at 08. Recall that we talked about your email about -- talking to Mr. Singh about complaint versus indictment and passing the charging documents up the chain of command before swearing them out?

A. Yes, sir.

Q. And then you said, "We're all hammering as hard as we can," right?

A. I did say that, yes, sir.

Q. And then the last paragraph there says, "Definitely planned on a call before going ahead - we want the high command looped in," right?

A. Yes, sir.

Q.    "High command" referring to folks with higher authority in DOJ, correct?

A.    Yeah.  That was my sort of colloquial way of describing senior management.

Q.    And you said, "Happy to talk at any time; this is highest priority for me right now," right?

A.    And it was.

Q.    Your office handles all sorts of criminal cases, right?

A.    We do.

Q.    Violent crimes?

A.    Yes, sir.

Q.    Crimes involving murder, right?

A.    Yes, sir.

Q.    Sex offenses, right?

A.    Yes, sir.

Q.    Serious conduct with people who are sometimes still at large, right?

A.    Yes, sir.

Q.    Not in custody, right?

A.    Yes, sir.

Q.    And at this time you were the Acting U.S. Attorney, right?

A.    I was.

Q.    You oversaw all sorts of cases like the ones I just

described --

A.   Yes, sir.

Q.   -- right?

Mr. Abrego was in prison in El Salvador at this time, right?

A.   That's correct.

Q.   And in 2022, when he had been pulled over, he hadn't even been given a speeding ticket, right?

A.   That's correct.

Q.   And HSI had been looking into this for roughly two-and-a-half years, right?

A.   They had.  I hadn't.  But they had.

Q.   And yet, with someone in custody on a two-and-a-half-year-old alien smuggling case, you indicated to Mr. Singh that this was your highest priority, right?

A.   Yes, sir.  Because, again, it was a two-and-a-half-year-old case, as you said, and it wasn't getting better with age.  I mean, cases rarely do.

And so I need to get to where -- wherever we were going to go as soon as I could get there.  And it was a high profile matter.  I mean that, you know, is something that the public wants to know what we're going to do.

I especially -- once the -- the body camera was

officially released, I knew there was going to be a lot of public interest in, "Is the defendant going to get charged with a crime based on this?"  And I wanted to have some answer for the public of, "Yes, we are" or, "No, we aren't," and here's why.

MR. PATTON:  Sorry, Your Honor.  I'm trying to marry up the government version here.

BY MR. PATTON:

Q.   If you could turn now to Government Exhibit 1 with the Bates marking of 12.

A.   Yes, sir.  I'm here.

Q.   You see this is now an exchange between May 1 and May 4 between you and Mr. Singh and Mr. Warren?

A.   Yes, sir.

Q.   And here, it begins on May 1, with the subject matter of "Forwarded documents for review."  Mr. Warren is sending you and Mr. Singh, "Attached is what our intel chief pulled from open source," right?

A.   Yes, sir.  And I think I had already seen these. Mr. Warren was just copying me on the email to Mr. Singh.

Q.   So this was really for Mr. Singh's sake, right?

A.   Yes, sir.  It was more updating on what was happening, here's what we know, at the time.

Q.   These were investigative documents of some sort, right?

A.   Yes, sir.

Q.   And so he's providing investigative documents directly to Mr. Singh, right?

A.   Yes, sir.  Which would be pretty consistent with the way we would have passed documents in high profile matters, in addition to Mr. Abrego.

Q.   Let's talk now about your email that -- that you discussed on your direct to your own office.  This was Government Exhibit 1, Bates 60.

A.   Yes, sir.  I'm here.

Q.   And this is a May 15th email, right?

A.   Yes, sir.

Q.   From you to various supervisors and leadership within the Middle District, right?

A.   That's correct.

Q.   And you start with -- the email with "As you know I have been working on the Abrego Garcia case," right?

A.   That's correct.

Q.   And "as you know," because people were well aware of the investigation, right?

A.   Certainly.  I mean, all these people that are on this email list are leaders within the office, and I had told them this is what's going on previously.

Q.   And people had -- there had been discussion between yourself and some of these people about whether or not to

charge Mr. Abrego, right?

A.    Yes, sir.

Q.    And you understood that some folks in your office were opposed to charging him, correct?

A.    At least one, yes, sir.

Q.    Well, was it more than one?

A.    No, sir.  I mean, I think when we ultimately decided, most of the leadership team said we should go ahead and charge, but there were certainly people who had concerns and questions about it.

Q.    And the -- you were emailing a group to, in part, address some of those concerns, right?

A.    I wasn't trying to address their concerns so much as I wanted to know what they thought.

         I was recommending that we charge the defendant with these crimes, was providing here's the prosecution memo, the summary of the facts and the law, and here's why I think we should do it, here's the proposed -- a proposed charging document; what do you think?  You know, ultimately I'm going to make the decision and I need your advice.

Q.    Well, it wasn't just the proposed charging document, you also included a prosecution memo, right?

A.    That's correct.  That's what I said.

Q.    And a prosecution memo, I think you described

earlier, is that sort of process where in part you put on the defense attorney's hat, right, and you go through all of the possible pros and cons of charging the case, right?

A.    Yes, sir.  That's one of the things that we usually in a prosecution memo in our district, summarize the facts, summarize the appropriate law elements, and then the potential defenses, or any other issues that might come up.

Q.    And I believe you testified earlier one of those things you were mulling over was a possible vindictive prosecution motion, right?

A.    We had definitely had those discussions.

Q.    And you included that in your draft memo, didn't you?

A.    I'm sure -- I think I did.  I honestly don't remember, but I feel like we would -- that was in the water, I know, because that was something that had been raised in our discussions with the leadership team.

Q.    It was one of the things Ben had raised with you, right?

A.    Absolutely.

Q.    And you -- in your email you're telling them -- you're asking them to take a look at the drafts, and you're also telling them that you'll be sharing these

drafts with ODAG, as well, correct?

A.   Yes, sir.  I was -- you know, wanted to be transparent of, you know, this is a high profile case, they're going to see what we do before we do it in terms of the charging documents, but that's why I said, ultimately, I'm going to be the one making the call here.

Q.   And you tell them that you've heard anecdotally that the DAG and PDAG would like Garcia charged sooner rather than later, right?

A.   I had heard that.

Q.   How had you heard that?

A.   And I knew you would ask that.  And I honestly don't remember how I learned that information.  I think it was from somebody in Joint Task Force Vulcan, but I don't remember.  I just wanted to be transparent with my team that I hadn't been told to do anything, but clearly there's some interest.  I wanted them to -- I wanted to be transparent about that.

Q.   And the DAG and the PDAG at this time were Todd Blanche and Emil Bove, right?

A.   Yes, sir.

Q.   And you then point everyone to the links to your memo and indictment, right?

A.   Yes, sir.

Q.   And you say that you believe that Mr. Abrego

committed a crime in the Middle District that could be proved, right?

A. Yes, sir. I did believe that. I still believe it.

Q. And you then say that you have tried -- I believe what you say exactly is "you have tried to focus on that aspect most of all in this writing," right?

A. Correct.

Q. Because there were other aspects, including things like vindictive prosecution, right?

A. What I would -- meant by that statement is I was focusing on what's the proof; what's the evidence; did he commit a crime and can we prove it. It doesn't matter what the rest of the political landscape looks like, what may come politically, you know, controversially if we charge or don't charge. Let's focus on the facts and the evidence and what we can prove. That was what I was trying to impart in that sentence.

Q. You conclude the email by telling people not to put their thoughts about the case in email and instead to communicate in person, right?

A. No, I was really just concerned -- I didn't want a bunch of emails flying back and forth if people had drafts. I figured let's just meet and talk. Because I think that's going to be -- then we're not responding off time. That was kind of my -- my way, in -- when I was

having these leadership meetings is, let's talk in person, let's get together in a conference room. We can all see each other, hear each other. That's what I was trying to convey.

Q. Mr. McGuire, isn't it true that you didn't want people putting in writing we shouldn't charge this case because it's wrong?

A. Oh, no. No. Obviously --

Q. You didn't want people putting in writing, we shouldn't be participating in a vindictive prosecution; isn't that true?

A. No. No. If someone had emailed that to me, that would have been fine, if that was their belief. It was more of a, "How are we going to talk about this? Let's talk as a group." I thought that was the better way to make a decision. But if people -- and people did feel that way. I mean, Ben Schrader felt that way. And that was fine if other people felt that way. I wanted to hear that feedback. And if they wrote it in an email or in they told me in person, I wanted to hear about it.

Q. You wanted to hear about it in writing, but that's why you told them not to put anything in writing?

A. It was fine if they put it in writing. I wanted to have a conversation amongst our leadership team. To me that made the most sense so that we could all be heard at

the same time.

Q.   Mr. Schrader, in fact, did put something in writing, didn't he?

A.   He did.

Q.   So he responds by email and includes a memorandum recommending against prosecution, right?

A.   That's correct.

Q.   And in the email, at the end of that first paragraph, he says, "Please pass it along to relevant parties in DC, as well," right?

A.   I'm sorry.  What page are you on?

Q.   This is still 60.  We're at Government's Exhibit 1, Bates 60.

A.   I see.  I'm sorry.  I see where you are now.  He did say that.

Q.   All right.  And you understood that he did that because he knew from the discussions you had been having that Main Justice was involved in the charging decision?

A.   He knew Main Justice was interested.  I communicated clearly to my team that Main Justice was not involved in the charging decision.  That's why I described, I'm the person who's going to make this call.  And -- and I'm the person who's ultimately going to decide whether we indict this case.  He wanted -- I don't want to speak for Ben, because I don't know why he said to pass it along to

relevant parties in DC, but clearly that was what he said. But I was communicating to my team that the decision lands with me and that's why I want your help.

Q. You thought he just thought the folks at Main Justice might be curious about his thoughts?

A. I don't know why he told me to do that. I really don't. I mean, I -- I was -- I have a lot of respect for Ben. He's a friend and he's a very good prosecutor.

The way I had always talked to him about it is, "They're definitely interested, there's no question about it." But ultimately, I'm the one who is going to have to come into court and defend this. It's not going to be anybody else. So I'm the one who's going to make a decision. It can't get into the grand jury without me saying it's okay."

Q. Did you, in fact, share Mr. Schrader's memorandum with anyone at Main Justice?

A. I don't know if I forwarded -- I don't know if I forwarded the memo or not. I certainly told the -- Mr. Singh in a phone conversation that the Criminal Chief was against the charges, that he potentially would resign if -- if we went forward with them. Because I wanted them to know that. Because I expected that would be of public interest, if it -- if it came to pass. And so I communicated here are his concerns to Mr. Singh at least.

And I had communicated them to my colleagues in Joint Task Force Vulcan, and everyone in the leadership team at least in our office knew about that.

Q. You and Ben Schrader were close work colleagues, weren't you?

A. Yes. We're friends.

Q. You worked together for almost -- or maybe the entire time you were in the U.S. Attorney's office until he left, right?

A. Yeah, and certainly for me -- he was there when I started. But the time -- he was there the whole time I was there.

Q. You thought he was a good prosecutor?

A. He's an excellent prosecutor.

Q. Thought he was an honorable prosecutor?

A. He's an honorable man.

Q. He resigned the day after you indicted Mr. Abrego, right?

A. He did.

Q. And he resigned effective immediately, correct?

A. He did.

Q. When prosecutors leave the office, normally they give some period of notice, correct?

A. That's correct.

Q. Important for transitioning duties in cases and the

like?

A.    That's correct.

Q.    But he left that very day, right?

A.    Unfortunately, yes.  I tried to talk him out of it.

Q.    Let's take a look now -- and again, I'm going to continue to use the Government's Exhibit 1.

And let's look at an exchange between May 17 and 18.  If we could go to Government's Exhibit 1, Bates 18.

A.    Yes, sir.  I'm here.  18.  Yes, sir.

Q.    And you see here that this string starts with an email from Mr. Warren on Saturday, May 17th at somewhere in the neighborhood of 10:30 at night, right?

A.    Yes, sir.

Q.    And it's to -- it's to Mr. Singh, but it CCs another member of Vulcan and yourself, correct?

A.    Yes, sir.

Q.    And Mr. Warren is giving Mr. Singh a few updates about the investigation, right?

A.    That's correct.

Q.    He tells him about the Grand Jury testimony during the past week?

A.    Yes, sir.

Q.    Says that you're working over the weekend to draft an indictment and you'll get it to Mr. Singh either

Sunday night or first thing Monday morning?

A.   I think he uses the word "finalize."

Q.   And he says that there are more witnesses heading into the Grand Jury and that you were on track to present by Wednesday, right?

A.   That's correct.

Q.   And he also suggests a call on Monday after he gets a draft of the indictment, right?

A.   Yes, sir.

Q.   And Mr. Singh responds early Sunday morning, right?

A.   Yes, sir.

Q.   And he tells you to "Let's keep close hold until we get clearance," right?

A.   He did say that.

Q.   And "close hold" basically means don't share outside of this group, right; keep it confidential?

A.   I think that's right.  Yes, sir.

Q.   And "clearance" means approval, right?

A.   I still don't know totally what he meant by "until we get clearance," but that's what he said.

Q.   You're confused about what the phrase "get clearance" means?

A.   I don't know how he intended it.  Because we weren't seeking clearance about the charges.  And I wouldn't have gotten -- I wouldn't have made a public statement

without -- about anything related to this case without checking with the DAG's office pursuant to the JM. So I'm not totally sure what he meant by clearance.

The way I sort of took it is, until we're kind of ready to charge, you know, don't let anybody know that we're about to do this, which, of course, I wasn't going to do anyway.

Q. Mr. McGuire, you understand that generally the phrase "get clearance" means get approval?

A. I understand that. I'm -- that's why I'm telling you based on the fact that I was going to be the one to decide whether we took it into the grand jury, I don't know why he used that phrase. I still don't.

THE COURT: So, let the -- we need to take a break because in our overflow courtroom that we provided for the public, they're not getting a connection.

So have him come on over, Melissa.

(Respite.)

THE COURT: All right. Go ahead.

BY MR. PATTON:

Q. Mr. McGuire, you don't know who Mr. Singh was talking to about Mr. Abrego's case at Main Justice, right?

A. I don't know that.

Q. You don't know what conversations he was having with

Todd Blanche or Emil Bove?

A.   I don't know that.

Q.   You don't know what conversations he might have been having with the Attorney General or folks outside of DOJ, right?

A.   I don't know that.  He never told me he was talking to anybody.

Q.   Including, you don't know who he might have been talking to at DHS or the White House, right?

A.   I don't -- I don't know that.

Q.   And you don't know whether the folks he was talking to at DOJ were talking to any of those other people right?

A.   I don't.  All I can tell you is nothing came back the other way.  In other words, he never told me, I've talked to this person and they want you to do X, Y or Z. I just gave him the information I had, and it was kind of a one-way street.

Q.   When Mr. Singh was saying that you needed to "hold for clearance," you don't know who he was referring to in terms of getting clearance, right?

A.   So during that period of time -- so we're talking Sunday into that coming Wednesday -- I made the final decision that I thought we're going to charge this case probably Monday afternoon or evening.  The question was

are we going to go forward on the 21st, and if we need more time -- and I'm talking about the entire Department of Justice, because of press, because of the fact that he's in a foreign country -- we have that time.  So that was the discussion.  And, frankly, that was the piece that Mr. Singh played, is, okay, he's going to talk to the Main Justice press people; he's going to alert the -- whoever in the State Department needs to get alerted that we're going to try to get this guy back, because that wouldn't have been my role.

So, you know, I don't know what he meant by clearance, but the reason we were having these conversations is because that wasn't something I could do by myself.  And so this decision about when to charge was are we -- do we have our feet set to do this with all the other parts of the government that need to be brought to bear, not just me in Nashville, Tennessee.

Q.   Mr. McGuire, you don't know what he meant by clearance in part because you never spoke to him about what he meant by clearance, right?

A.   No.  I didn't ask him.  We were having these discussions about do we charge on Wednesday or wait based on all the things I just described.  But there wasn't -- you know, at one point I think in an order the Court said Mr. Singh may have taken a leading role, and

unfortunately -- I mean, that's just not true. He had a role, which was my conduit to all the other parts of the Justice Department, but we were the ones making the decisions. I mean, he couldn't get grand jury time without me.

Q. He was a conduit for a number of people and you don't really know what those interactions were, correct?

A. Like I said, that's true, but nothing ever came back. So I don't know -- he never told me I've talked to so-and-so and they want me to do this. That never happened. It was always we're communicating, here's the update, here's where we're headed. You know, are we ready to do this. And then we did it.

Q. That Sunday evening that you first got outreach from both Ms. Saoud and Mr. Singh, he was already coming to you with information about the case, right, Mr. Hernandez Reyes?

A. Yes. It's -- again, someone -- there obviously had been events in Alabama and potentially Houston before I knew about the case. So I guess the way I read that, is either Alabama or Houston told him about this per the Justice Manual and they know the traffic stop happened in Tennessee so let's all talk together. That was the way I intuited that email.

MR. PATTON: No further questions, Your Honor.

THE COURT:  All right.  Redirect.

MR. WOODWARD:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. WOODWARD:

Q.   Mr. McGuire, you testified in cross that -- and I think even in direct -- that you felt it was incumbent upon you to hurry up in bringing these charges?

A.   Yes, sir.

Q.   That the underlying events had occurred in 2022?

A.   Well, the traffic stop had occurred in 2022.  And then the -- the conspiracy we understood was ongoing, but certainly, yeah, the fact that the traffic stop had happened in 2022 was a big piece of evidence, and it was two-and-a-half years old.

Q.   Okay.  And -- and my colleague highlighted for you and has highlighted in their motions practice that it is unusual for a case involving a traffic stop to take so long to reach prosecution?

A.   Well, the only caveat I would make to that is federal investigations can take years.  What was unusual was that I wasn't involved in it until two years later.  You know, a long-term federal investigation is not at all unusual.  What was different is that I wasn't involved until two-and-a-half years after the traffic stop.

Q.   Well, you've anticipated my next question.

A.    Okay.

Q.    Which was, you know, how long -- after learning about the traffic stop, how long did it take you to bring criminal charges in this case?

A.    I mean, for me it was a couple of weeks.  Again, once I watched the video and then talked to the agents who had interviewed these witnesses, it was pretty clear to me that the defendant had committed a crime, and then the question was are we going to be able to prove it at trial.  And so I spent the next couple of weeks filling -- making -- taking as much efforts as I could before an indictment to feel like, yes, we can win this case at trial.  And that's what we did.

Q.    And on its face there's nothing problematic about the fact that the indictment charges conduct that occurred in 2022?

A.    No.  It was definitely within the statute of limitations.  It wasn't even close to the statute of limitations.

Q.    And I know the Court is aware.  So the record is clear, what is the statute of limitations?

A.    It's five years.

Q.    And what does that mean for -- from your perspective as a prosecutor?

A.    I mean, any time that you are dealing with criminal

conduct that comes close to the statute of limitations, you have to really respect that. You don't want to get caught short with the statute. But here we weren't at all close to it. So it -- it felt like, yes, this is a two-year old traffic stop. Again, we had information that this was one part of an ongoing years' long human smuggling ring. And so we weren't really close to the statute.

Q. Okay. Now, my colleague also asked you about information in the indictment that was not necessary as part of the elements of the offense.

A. Yes, sir.

Q. And if you recall, my colleague asked you about Mr. -- the allegation of Mr. Abrego's ties to MS-13.

A. Yes, sir.

Q. Did you have an understanding of Mr. Abrego's ties to MS-13 when you included that information in the indictment?

A. Yes, sir.

Q. And does that relate to our colloquy earlier in your testimony about every word in the indictment that bears your signature?

A. Yes, sir. I can chart everything in the indictment to a specific witness, piece of proof, something that I would anticipate being able to offer at trial subject to

cross-examination and public scrutiny. That's the way we do it.

Q. And did anyone ask you to include reference to MS-13 in the indictment?

A. No. Nobody gave me direction on anything to put in the indictment. I mean, me and the Joint Task Force Vulcan partners that I had, we drafted the indictment.

Q. And, in fact, it was your testimony on direct that the reason you called the Joint Task Force partners was because of a believed connection to an international gang?

A. Yes, sir. I mean this was, again, a conspiracy that stretched across borders. That there was -- we had information that Mr. Abrego was -- was part of a larger network that started in Central America and ended in the United States. And a part of that was it was connected to a transnational gang, or at least he had that tie. That was an important part of the overall conspiracy.

Q. Now, you -- you just stated something that is of note. You mentioned that you and your colleagues on the Joint Task Force Vulcan worked to draft the indictment, and I want to ask you about that.

A. Yes, sir.

Q. For the record, I'm referring to the indictment itself, which is Docket -- Exhibit -- or Docket Number 3.

And I have copies if it would be of benefit to the Court.

The indictment was returned on May 21st, 2025?

A.   Yes, sir.

Q.   Did you write the indictment on May 21st, 2025?

A.   No.  We had been drafting it for weeks prior to that.

Q.   Well, Mr. McGuire, you just testified that the investigation only lasted weeks.  Is it your testimony that you start working on an indictment early on in an investigation?

A.   Any time you start an investigation you want to have a good sense of where you're going to end up.  So, okay, "what -- is there a charge here; what is it?"  And so if you can't prove it, you don't have proof of it, then it really doesn't matter what you think you're going to charge.  So that's why you start working "what are we going to indict," from the moment you first feel like there's enough proof to charge the defendant.  So we had been working on it for a couple of -- two weeks maybe, at least.

Q.   And you've also testified today that you were working on various forms of charging documents, whether an indictment or complaint, speaking, nonspeaking.

A.   Right.

Q.   Are there similarities between the final versions of

those types of documents?

A.   They all ultimately allege that an individual has committed a crime and what crime they've committed and what statute they've violated.  You know, a complaint also obviously doesn't have the imprimatur of the grand jury.  It's only a judge signing off on it.  And I thought this was an important case to put it in front of the Grand Jury, to have citizens review our proof.  But ultimately you put in the charging documents what you believe you can prove.

Q.   When -- does a complaint have any other materials attached to it?

A.   Usually an arrest warrant and maybe identification of how -- what the charge carries.

Q.   And does an arrest warrant accompany an affidavit?

A.   It would accompany an affidavit.  So the complaint would have an affidavit sworn by a law enforcement officer, basically petitioning the judge to issue an arrest warrant based on these facts.  Whereas, an indictment would have allegations made by a federal grand jury.

Q.   And just so we're clear, the allegations in the complaint might mirror the allegations that end up in an indictment?

A.   They might.  But a lot of times a complaint only has

some of the potential allegations. I mean, there are plenty of times in my experience and career where we -- we seek a complaint on a discrete charge and then the indictment comes later and has far more charges or facts or evidence in it. I mean, that happens all the time.

Q. And again, you're working on this document almost from the inception of the case?

A. Right. Because that's ultimately what you're going to be judged on. The jury's going to take the indictment back into the jury room and they're going to vote on the charges that you've alleged. So you need to be very clear, this is what we're charging and this is how we think we can prove it in your indictment process. And you make decisions along the way, we're going to charge this and we're not going to charge that, you know. And those are discussions that we're having during that period. I felt confident after a couple of days at least the traffic stop in Tennessee -- I felt very good that that is a federal crime that the defendant committed that we can prove beyond a reasonable doubt. Then it was, what else in this incident rises to the level of a violation that we can prove. And there were some things that we included and some things that I decided that we shouldn't include.

Q. On cross-examination my colleague asked you about a

memo that you received from Mr. Schrader.  Do you recall that?

A.    I do.

Q.    Do you recall approximately when -- or what day it was that you received that memo?

A.    It would have been around that May 15th timeframe, either before or after -- I don't remember the exact sequence of events, but it was in that -- that timeframe where we're trying to decide -- you know, kind of finally, all in, call the ball, "What am I going to do?"

Q.    Okay.  And I would direct your attention to Government's Exhibit 1, the document that ends in Bates number 60.

A.    I'm here.

Q.    Do you recall specifically when Mr. Schrader tendered his resignation?

A.    It would have been May 21st.

Q.    And May 21st is the day that the indictment was returned?

A.    That's correct.

Q.    Was that the first time he had discussed with you his resigning from your office?

A.    Unfortunately, no.  He had talked to me pretty early on that that was something he was contemplating.  And I was trying to talk him out of it.

Q.    I'm sorry.  Pretty early on?

A.    Pretty early on in the investigation.  I -- that night -- the night of April 27th, Sunday, when I first learned about it, I called -- after I called the law enforcement partners that I described, I called Ben that night and let him know HSI was going to present this case to us.  Because I knew it was going to be controversial and I knew it was probably going to put me in a hot seat, much like I'm in right now, and I wanted him to know about it.  He was the Criminal Chief, and he was also a friend and someone whose opinion I respected and whose evaluation I respected.

Q.    And when was the first time that he brought up the possibility of his resignation?

A.    Maybe a week or ten days later.  I don't remember the exact time.  He -- he came to my office and shared with me, here's where I am on this, and we talked about it, and I really -- I didn't want to lose him.  I didn't want the department to lose him.  I didn't want the people of the Middle District of Tennessee to lose him. He's a really smart guy.  He's a good prosecutor.  And that was one of the harder moments of this process, because I knew that if I made the decision I made that was going to be one of the consequences.  And I -- there was going to be consequences whatever I decided.  And I

just wanted to, again, focus on what I thought the right thing to do was. And, you know -- and people -- he obviously disagreed. And people can disagree. And that's fine. But I really tried hard to focus on the facts and what I thought was the right thing to do. And people were entitled to their opinions. And he was entitled to his, and I respect it. And I understand it, even if I disagreed with it.

Q. My colleague in your cross-examination also asked you about the emails that are at Government's Exhibit 1 ending in Bates 18.

A. I'm here.

Q. Okay. My colleague -- do you recall being asked about what Mr. Singh meant when he wrote "hold until we get clearance?"

A. I remember those questions, yes, sir.

Q. Okay. Now, the email below that, who is that coming from?

A. It's coming from Jake Warren.

Q. All right. And where does Jake Warren fall in the chain of command as far as this prosecution is concerned?

A. He was on the -- what I would consider to be the prosecution team, which was me, Jake Warren, Jeremy Franker, Chris Eason and Jason Harley.

Q. And --

A.    So he was one of my teammates, is the way I would describe it.

Q.    Well, who led that prosecution team?

A.    I did.

Q.    Who leads that prosecution team?

A.    I do.

Q.    And so Mr. Warren reports to you?

A.    He did in this -- in this instance.  We were charging this case in our district.  So Mr. Warren would not have been able to charge it without me.  If I -- if he said I want to charge this case and I said no, then that would be that.

Q.    And if I could ask you to take a careful look at all of the information that Mr. Warren is providing to Mr. Singh.

        Do you see a particular place where Mr. Warren is asking a question of Mr. Singh?

A.    We're talking about the sealing of the indictment. And the reason that's important is because if the indictment is unsealed on May 21st it's going to be on the front page of every newspaper in the English speaking world.  So -- and probably others.

        So the question is, you know, if it's not going to be unsealed -- you know, are we going to seal it and are we ready if that doesn't work?  I mean, it's all

about discussion, like I was saying, about are we ready for this to -- for what I would say go live. Are we ready for it to be out there. And if we're not, we can wait, because we're in control of the timeframe.

Q. Now, returning to your sharing the cross memo and the draft indictment with your colleagues. Did anyone provide input on the language or correct any typos at all to those documents?

A. No. I never got any red line. I never got a "Think about this, but not that. Do this, don't do that." I never got anything back from it. We sent it up, and that was the last I heard of it.

Q. And so no one outside of Nashville provided any input whatsoever to the charging documents?

A. No, sir.

Q. Not Mr. Singh?

A. No, sir.

Q. And have you ever spoken to Mr. Blanche directly about this prosecution?

A. About the charges? No. About the charging decision, that was my decision. I never talked to Mr. Blanche, Mr. Bove, anybody at Homeland Security that wasn't the case agent and the SAC. You know, the charging decision that I made was -- I didn't talk to any of those people. And I really kind of didn't want to,

because I wanted to make it -- I wanted to feel good about it on my own.

Q. Now, my colleague asked you about a ROI from HSI-Baltimore. Do you recall that?

A. Yes, sir, I do.

Q. And he quoted the ROI as having -- noting that all goals have been accomplished and no further investigative efforts will be attributed to the investigation; do you recall that?

A. I do.

Q. After that ROI was created, were any further investigative efforts taken?

A. I mean, yes. And -- and -- I -- yes. Certainly Baltimore sent out collateral leads to Alabama and Texas, like we've discussed. And then when we got involved, we had our case and said, you know, we're going to deal with this, so they didn't do anything after that.

Q. So you uncovered additional information pertinent to the charges?

A. Absolutely. After April 27th, we had -- we got more information in the form of LPR data. We got cell phone records. We got the phone data from Mr. Hernandez Reyes that I described. We got more witnesses and cooperators. We also reinterviewed the ones -- the witnesses that Alabama and Texas had interviewed, and got more

information from them that was helpful.  So we uncovered a lot of what I would consider to be new information about this offense after April 27th.

Q.   Well, my colleague -- my colleague asked you -- or characterized Mr. Singh as having been involved in the weeds of this investigation.  Do you recall that?

A.   I recall his question, yes, sir.

Q.   He was asking you about a specific report that Mr. Singh requested?

A.   Yes, sir.

Q.   And in that regard your response -- and I would direct you to Government's Exhibit 1, Bates ending in 10. Your response there is, "I don't have it."

A.   That's correct.  Because I didn't.

Q.   But if we could go through the investigative fruits that you've just discussed.  You said LPR data?

A.   That's correct.

Q.   What is LPR data?

A.   License plate reader data.

So the vehicle that Mr. Abrego was driving in the traffic stop had -- we knew what the license tag number was.  So one of the first things that we did in our investigation starting the end of April, "run that tag through the LPR data."  Was he in St. Louis, like he said he was?  And if not, where was he?  And it turned

out that the car was in Houston.  I don't know -- you know, it certainly wasn't in St. Louis.  And that was an important discovery.

Q.   Did you provide that data to Mr. Singh?

A.   No.

Q.   Did he ask for it?

A.   No.

Q.   How about phone data?

A.   We got a good amount of phone data.  We got -- like I said, we got the contact information.  We eventually uncovered the phone record from Mr. Abrego's cell phone records showing that he was in contact with Hernandez Reyes.  And, you know, we got phone data that corroborated what Mr. Hernandez Reyes said.

Q.   Did Mr. Singh request that data?

A.   No, sir.

Q.   Did you provide it to him?

A.   I didn't.

Q.   You mentioned -- you testified, rather, that you interviewed witnesses.

A.   We did.

Q.   Did you interview a woman in this case?

A.   Yes, sir.  So there was a young female who had -- was in Baltimore, who knew the defendant from their time in Maryland.  She had described that she had had a

texting relationship with him. She was a minor at that point. And he had invited her to go on these -- these what he called "trips," which we believed were alien smuggling runs.

Q. Was that interview at all instructive in your decision to seek an indictment in this case?

A. Oh, absolutely. Because this was an individual who was not involved in the conspiracy, and -- and didn't have sort of an obvious reason to fabricate. You know, she wasn't getting anything from us for testifying. So, you know, it was important because it corroborated what the co-conspirators had said, who did potentially have liability, but, you know, was sort of a clean witness.

Q. Did you provide any documentation of that interview to Mr. Singh?

A. Certainly no documentation. I mean, I -- I don't -- I can't say if I summarized it in a phone call or something, but I mean it was -- we didn't send any of the reports to him.

Q. My colleague also asked you about the early-ish April interview of Mr. Hernandez Reyes that had occurred.

A. So talking about the ones in like, I think, April 22nd and 24th?

Q. Sure.

A. Okay.

Q.   Before you became involved in the investigation.

A.   Yes, sir, I remember those questions.

Q.   And my colleague pointed out that you -- that nobody from Nashville was involved in that interview?

A.   That's correct.  We didn't know about it.

Q.   Did you ever have an opportunity to speak with Mr. Hernandez Reyes?

A.   Oh, yes.  We -- we reinterviewed both of those witnesses.  I didn't interview the woman in Texas, but I interviewed Mr. Hernandez Reyes at least twice.  It may have been more than that.

Q.   Personally?

A.   Yes, sir.

Q.   And the woman in Texas, do you recall who interviewed that person on behalf of this investigation?

A.   Jake Warren interviewed her, partially, because she was in Texas and I was here in Nashville, and that -- we just divided the workload that way.

Q.   I hope he'll forgive my asking.  Who is Jake Warren?

A.   Jake Warren is one of my colleagues in -- he's -- in the Joint Task Force Vulcan.

Q.   So you didn't rely on the investigation that had been conducted by HSI-Baltimore in charging this case?

A.   Well, I mean, we -- we certainly took their information, but I wanted the case agent here to

interview those people, or somebody from Task Force Vulcan, or me personally, because, again, it's my name on the dotted line. I'm the one signing the indictment. So I wanted as much personal information as I could have so that I could justify it in court.

Q. Well, let me ask you about that. I had focused my inquiry on who made the decision to charge this case. And let me ask you now, who made the decision to investigate this case?

A. Well, I made the decision once I heard -- April 27th, I told Rana Saoud, we need to get into this; we need to find out what the facts are and act accordingly. So whatever happened before me I can't speak for. When I knew about it I said we need to get into it.

Q. Who led the prosecution team in this case?

A. I did.

Q. Who leads the prosecution team today in this case?

A. I do.

MR. WOODWARD: Thank you, Your Honor. No further questions.

THE COURT: All right. So I generally don't do a recross, but I'll give you some leeway. Limited leeway.

THE WITNESS: You don't have to this time,

Judge, if you don't want to.

THE COURT: Limited.

MR. PATTON: I appreciate it, Your Honor. I will --

THE COURT: Very limited.

MR. PATTON: -- try not to try your patience.

BY MR. PATTON:

Q. Your colleagues working on this matter with you from the Joint Task Force Vulcan, they're stationed at Main Justice, right?

THE COURT: I think I've kind of gathered that in the case.

THE WITNESS: I think they actually may sit physically in other places, but, yes, they are out of Main Justice.

BY MR. PATTON:

Q. Part of the criminal division at Main Justice, correct?

A. Yes.

Q. And you don't know who they're talking to at Main Justice, right?

A. I mean, I like to think that they would tell me if it's something that affected our investigation, but, no, I'm mean, I'm not following them around, so. . .

Q. They had access to all of the same investigative

materials you do, correct?

A. Absolutely.

Q. You were asked a question about Mr. Blanche. Do you recall that Mr. Blanche called you on June 6th, the day that Mr. Abrego was brought back into the country and arrested in this case?

A. I had a very brief phone call where he told me that Mr. Abrego was going to be back into the United States.

Q. And he congratulated you and thanked you for your hard work on the case, right?

A. I'll be honest. I don't totally remember all the things he said because I was so surprised for all of it. But, I mean, that would be pretty standard, I think.

Q. You said that you didn't get comments back on some of the drafts that you sent up to Mr. Singh and ODAG. Do you think you would have gotten comments if instead of your memo saying we should charge, you had said we shouldn't charge?

A. I don't know. I mean, I like to think that I have a very good reputation as a prosecutor and -- and one who is -- has good judgment. And I think if I said, we don't have this, and this isn't a -- you know, a good case, that they would have listened to me, but I don't know what would have happened.

Q. Do you think they would have just said, "Thank you,

Mr. McGuire, we appreciate your hard work on this"?

A.   Maybe not.  But that would have been an acceptable outcome.  I mean, my job is to investigate the facts and apply the facts to the law, and to make an honest recommendation about whether I think a person is guilty and can I prove it.  And if my recommendation had been we can't do that, that -- I would have stood by that.  And whatever came my way, that would have been an easier thing to swallow than to sacrifice my integrity.

Q.   Including being fired?

A.   Nobody wants to get fired, Mr. Patton.  I don't want to get fired, but I would rather be fired as an honest man than live as somebody who's doing somebody else's job.

MR. PATTON:  Thank you, Your Honor.

THE COURT:  All right.  Nothing further?

MR. WOODWARD:  No further evidence from the government.

THE COURT:  Do you have another witness?

MR. WOODWARD:  No.

THE COURT:  All right.

MR. WOODWARD:  The only thing I would ask if Mr. McGuire -- if you'll excuse him, then he can join us again.

THE COURT:  Sure.

MR. WOODWARD: Thank you.

THE COURT: All right. So that concludes the evidentiary hearing. I'm going to ask for you all to give me post hearing briefs 30 days after the transcript becomes available, and it should be available since it's limited to this day. And you'll file those simultaneously. I'll read those, along with everything else that you've presented, and probably make a determination if we need to get back together again or not, or make just a decision on the papers.

Any questions from the government?

MR. WOODWARD: No, Your Honor.

MR. HECKER: No, Your Honor.

THE COURT: Now, you all need to get together with Ms. Seay and make sure the exhibits are in proper order.

MR. WOODWARD: Yes, Your Honor.

THE COURT: And by "y'all" -- by lawyers, I mean the government lawyers and the defense. Y'all need to agree on what -- I think it's clear, but I just want you all to bless it.

MR. WOODWARD: And if we could maybe borrow your law clerk, with the highlighting on the documents, we'll adjust the redactions at the same time.

THE COURT: Well, he didn't do that. I did

that.

MR. WOODWARD:  Well, I just don't want to ask you, sir.  I think I have it right, but I don't want to be wrong.

THE COURT:  So again, so the record's clear, what I've underlined in pink is not going to be redacted by the Court's order, and you all had a chance to look at that.

All right.  Well, thank you for your hard work.

(Court adjourned.)

REPORTER'S CERTIFICATE PAGE

I, Lise S. Matthews, Official Court Reporter for the United States District Court for the Middle District of Tennessee, in Nashville, do hereby certify:

That I reported on the stenotype shorthand machine the proceedings held in open court on February 26, 2026, in the matter of UNITED STATES OF AMERICA v. KILMAR ABREGO GARCIA, Case No. 3:25-cr-00115-1; that said proceedings were reduced to typewritten form by me; and that the foregoing transcript is a true and accurate transcript of said proceedings.

This the 5th of March, 2026.

s/ Lise S. Matthews
LISE S. MATTHEWS, RPR, RMR, CRR
Official Court Reporter