# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA

v.

KILMAR ARMANDO ABREGO GARCIA,

*Defendant.*

No. 3:25-cr-115

Judge Waverly D. Crenshaw, Jr.

## DEFENDANT KILMAR ARMANDO ABREGO GARCIA'S POST-HEARING BRIEF IN SUPPORT OF HIS MOTION TO DISMISS FOR VINDICTIVE PROSECUTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ...................................................................................................................2

    I.   HSI Investigates, Unlawfully Deports Mr. Abrego, Then Closes the Investigation.......2

    II.  HSI Baltimore Reopens the Investigation into Mr. Abrego ...........................................3

    III. Nashville Officials Become Involved on April 27, 2025 .................................................4

    IV. Robert McGuire Charges the Case Under the Direction of ODAG................................5

ARGUMENT ........................................................................................................................9

    I.   Applicable Law .................................................................................................................9

    II.  The Government Failed to Rebut the Presumption of Vindictiveness .........................10

        A.  The Government Did Not Call Witnesses Who Could Explain its Change
            in Position From 'Deport But Not Prosecute' to 'Prosecute and Deport' ..............11

            1.   The Government Did Not Call Agent VanWie.........................................12

            2.   The Government Did Not Call the Actual Decisionmakers at ODAG.....13

        B.  Agent Saoud's and Mr. McGuire's Claims That They Were Good Faith
            Decisionmakers Are Irrelevant and Insufficient to Rebut the Presumption ...........16

            1.   Agent Saoud's Testimony Does Not Rebut the Presumption...................16

            2.   Mr. McGuire's Testimony Does Not Rebut the Presumption .................18

        C.  The Evidence Against Mr. Abrego Was in No Way "Previously Unknown"........22

CONCLUSION....................................................................................................................26

# TABLE OF AUTHORITIES

**CASES**

*Bd. of Governors of Fed. Rsrv. Sys. v. United States (In re Grand Jury Subpoenas)*,
    -- F. Supp. 3d --, 2026 WL 710202 (D.D.C. Mar 13, 2026)............................................. 22

*Blackledge v. Perry*,
    417 U.S. 21 (1974)........................................................................................ 24

*Bragan v. Poindexter*,
    249 F.3d 476 (6th Cir. 2001) .................................................................... 9, 22

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)........................................................................................ 22

*Noem v. Abrego Garcia*,
    145 S. Ct. 1017 (2025)..................................................................................... 3

*Texas v. Hernandez-Reyes*,
    No. 23-01-00070 (Tex. Dist. Ct. Mar. 7, 2023) .............................................. 3

*United States v. Adams*,
    38 F.3d 1217, 1994 WL 589509 (6th Cir. 1994) ........................................... 19

*United States v. Adams*,
    870 F.2d 1140 (6th Cir. 1989) ........................................................................ 2

*United States v. Andrews*,
    633 F.2d 449 (6th Cir. 1980) ............................................... 9, 10, 19, 22, 24

*United States v. Hernandez-Reyes*,
    No. 4:23-cr-00321 (S. D. Tex. May 29, 2024) ................................................ 3

*United States v. LaDeau*,
    734 F.3d 561 (6th Cir. 2013) ....................................................... 9, 10, 18, 22

*United States v. Zakhari*,
    85 F.4th 367 (6th Cir. 2023) ..................................................................... 9, 14

Case 3:25-cr-00115    Document 306    Filed 04/06/26    Page 3 of 30 PageID #: 5012

# PRELIMINARY STATEMENT

The Court ordered an evidentiary hearing to give the government an opportunity to rebut the finding that this case against Kilmar Armando Abrego Garcia is "likely" a vindictive prosecution. In doing so, the Court posed two simple, straightforward questions to the government: "(1) which individuals directed the government's change in position from 'deport but not prosecute' to 'prosecute and deport,' and (2) what factual circumstances motivated that change in position." (Dkt. 185 at 3). But the government failed to answer them. Indeed, it did not really try. Despite including on its witness list the HSI Baltimore agent who was responsible for both closing and reopening the investigation into Mr. Abrego, Agent John VanWie—who could have testified about who directed him to reopen the investigation and why—the government chose not to call him. Nor did it call officials at the Department of Justice ("DOJ") or Department of Homeland Security ("DHS") who were involved in the decision to investigate and prosecute Mr. Abrego from the beginning.

Instead, the government called two witnesses who were unable or unwilling to answer the Court's questions. First, it called former HSI Nashville Special Agent in Charge Rana Saoud, who had no information about why the investigation was reopened and did not open an investigation herself until days *after* charging documents were already being drafted. Second, it called the Nashville prosecutor on the case, Robert McGuire, who did not become involved until ten days after the investigation had been reopened. He learned about the case on Sunday, April 27, when he was contacted by Agent Saoud and Associate Deputy Attorney General Aakash Singh—the latter asking to speak about the primary witness in the case, CC-1, who had already been interviewed by an agent from Agent VanWie's office three days earlier. Neither Agent Saoud nor Mr. McGuire testified to any personal knowledge about why the investigation had been reopened at the urging of DHS "headquarters" just one week after the Supreme Court ordered the

1

government to facilitate Mr. Abrego's return. Nor did they identify who in the DOJ or elsewhere in the government decided to begin investigating and pressing for charges long before they became involved.

The government bears the burden to rebut the presumption of vindictiveness with "objective…explanations" for its decision to investigate and charge Mr. Abrego. (Dkt. 281 at 1-2). Even if the Court were to accept every word uttered by the government's witnesses as true, the hearing evidence fell woefully short of meeting that burden. Worse, not every word was true. Much of the testimony belied logic and common sense and was contradicted by the documentary evidence. Whether the Court credits all of that testimony, part of it, or none of it, the case against Mr. Abrego should be dismissed because it is abundantly clear that it is "tainted by improper motivation." (Dkt. 241 at 1 (quoting *United States v. Adams*, 870 F.2d 1140, 1141 (6th Cir. 1989))).

## **BACKGROUND**

### I. **HSI Investigates, Unlawfully Deports Mr. Abrego, Then Closes the Investigation**

On November 30, 2022, Tennessee Highway Patrol ("THP") pulled Mr. Abrego over in Cookeville, Tennessee, ostensibly for speeding.[1] (App. A at 1). This stop precipitated an investigation into Mr. Abrego by Homeland Security Investigations ("HSI") in Baltimore for "suspected…labor/human trafficking." (*Id.*). Though that investigation lasted over two and a half years, the agents involved, including Agent VanWie, learned of the facts underlying the charges here early on. By 2023, if not earlier, CC-1's connection to the traffic stop was clear. (*Id.* at 1). In early 2024, HSI agents surveilled CC-1's home and obtained phone records connecting

---

[1] Familiarity with much of the factual and procedural history is presumed and is not recounted in full here. A comprehensive timeline of key events relevant to the motion is attached as Appendix A ("App. A"). "Tr." refers to the transcript of the February 26, 2026 hearing (Dkt. 300); "GX" refers to the government's hearing exhibits; "DX" refers to the defense's hearing exhibits.

2

Mr. Abrego to CC-1. (*Id.* at 1-2). Yet through March 2025, HSI Baltimore agents made no attempt to interview CC-1, who was easily accessible.[2] Rather than charge Mr. Abrego with a crime, HSI Baltimore arrested him on March 12, 2025, and unlawfully removed him to El Salvador. (*Id.* at 2). On March 24, Mr. Abrego challenged his illegal deportation in Maryland. (*Id.*). A week later, Agent VanWie approved a closing ROI stating that "[i]nvestigators have accomplished all goals for this case, and no further investigative efforts will be attributed" to it. (*Id.* at 2)*.

On April 10, the Supreme Court upheld the district court's order that the government "facilitate" Mr. Abrego's return. *See Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025). The Executive Branch responded with a relentless public retribution campaign. By April 16, President Trump, Vice President JD Vance, then-Attorney General Pamela Bondi, then-DHS Secretary Kristi Noem, to name a few, had all disparaged Mr. Abrego as (among other things) a "convicted MS-13 gang member" and "human trafficker." (Dkt. 69 at 1, 4-5).

## II.      HSI Baltimore Reopens the Investigation into Mr. Abrego

On April 17, 2025, one week after the Supreme Court ordered the government to "facilitate" Mr. Abrego's release, Agent VanWie reopened HSI Baltimore's investigation into Mr. Abrego that he had just closed. Why the sudden about-face? According to Mr. McGuire, Agent VanWie told him that he reopened the investigation "in response to inquiries from headquarters." (Tr. 116). And the day after Agent VanWie did so, DHS released a "bombshell investigative report" about the 2022 traffic stop, which it termed a "suspected human trafficking incident." (App. A at 3).

---

[2] From December 30, 2022—eight days after HSI Baltimore opened its investigation—until he was released to a halfway house in 2025 in exchange for his cooperation in this case, CC-1 was incarcerated. *See* Judgment, *Texas v. Hernandez-Reyes*, No. 23-01-00070 (Tex. Dist. Ct. Mar. 7, 2023); Judgment, *United States v. Hernandez-Reyes*, No. 4:23-cr-00321 (S. D. Tex. May 29, 2024), Dkt. 24.

Having reopened the investigation because of demands from "headquarters," agents began to revisit evidence they had already discovered in the preceding two and a half years. Most notably, on April 22, HSI Baltimore asked HSI Birmingham to "interview CC1…regarding the human smuggling activities of [Mr. Abrego]," a request Agent VanWie approved. (App. A at 3). HSI agents met with CC-1 that day and reinterviewed him two days later. (*Id.*; *see* DX 17, 19).

At some point after Mr. Abrego's removal—the exact timing, though known to the government, is not in the record—officials from the Office of the Deputy Attorney General ("ODAG") became involved. Mr. Singh's emails show that he was already formulating a case against Mr. Abrego and had independently learned about CC-1 by the time he contacted Mr. McGuire on April 27. (*Id.* at 4; Tr. 120).

## III. Nashville Officials Become Involved in the Case on April 27, 2025

The government's two witnesses, then-Special Agent in Charge Rana Saoud and then-Acting U.S. Attorney Robert McGuire, both testified that their involvement with Mr. Abrego's case began on Sunday, April 27—ten days after HSI Baltimore reopened its investigation and after HSI agents had already twice interviewed CC-1. Agent Saoud testified that she first learned about Mr. Abrego's 2022 traffic stop after reading an article published in the *Tennessee Star* on or around April 21, 2025, which someone had sent to her. (Tr. 12, 23-24, 27). That article was explicitly sourced to anonymous DHS officials,[3] and was published days after DHS publicly trumpeted its "bombshell" report about the traffic stop. Agent Saoud could not recall

---

[3] *See* Tom Pappert, *2022 TN Traffic Stop of Kilmar Abrego Garcia Was Day Three of Trip That Originated in Houston, Took Detour to St. Louis, Crossed Trafficking Hubs and Areas with MS-13*, Tenn. Star (Apr. 21, 2025), https://web.archive.org/web/20251215161100/ https://tennesseestar.com/justice/2022-tn-traffic-stop-of-kilmar-abrego-garcia-was-day-three-of-trip-that-originated-in-houston-took-detour-to-st-louis-crossed-trafficking-hubs-and-areas-with-ms-13/tpappert/2025/04/21/ [via the Wayback Machine].

4

who had sent her the article but she recalled receiving it on her government-issued phone, likely from someone she "trusted" and "worked with." (*Id.* at 42-43). She understood that any case against Mr. Abrego would be "high profile" as he "was in the news all the time at that point." (*Id.* at 30).

"[G]iven the high profile nature of this case," Agent Saoud called Mr. McGuire that same afternoon to discuss Mr. Abrego. (*Id.*). Mr. McGuire testified that this "unusual" Sunday call was the first time he learned about the 2022 traffic stop. (*Id.* at 50-51). But he had "generally followed the news that spring about [Mr. Abrego's] case" and "knew that it had sparked very strong feelings in the political landscape." (*Id.* at 50-51, 103). Because he knew that Mr. Abrego's case would be controversial and might result in a claim of vindictive prosecution, Mr. McGuire decided to handle the case himself rather than assign it to an Assistant United States Attorney in his office. (*Id.* at 80, 103-04).

## IV. Robert McGuire Charges the Case Under the Direction of ODAG

By the time Agent Saoud called Mr. McGuire on April 27, ODAG knew more about the investigation into Mr. Abrego than either of them did. (*See* Tr. 119). On that Sunday evening, Mr. Singh emailed Mr. McGuire and two other U.S. Attorneys—Nicholas Ganjei from the Southern District of Texas and Prim Escalona of the Northern District of Alabama—to ask them to "set aside some time tomorrow morning to discuss [CC-1] briefly." (*Id.* at 52, 102; GX 1 at 1). Although Mr. McGuire had never heard of CC-1, he knew "[i]nstantly" that the email was about Mr. Abrego. (Tr. 53, 118-19). The next morning, on Monday, April 28, they got on the phone to discuss getting CC-1 to Nashville and granting him proffer immunity. (Tr. 119-20).

The very next day, on April 29, Mr. McGuire started drafting a complaint. (*Id.* at 82-83). Far from waiting for his office or HSI Nashville to conduct an independent investigation, Mr. McGuire chose to work in lockstep with ODAG, which was many steps ahead. On April 30,

5

at 10:33 a.m., Mr. McGuire told Mr. Singh that he thought it was "reasonable to believe we could have a charging document next week" and assured him: "We are hammering as hard as we can on this effort." (GX 1 at 2). That email, Mr. McGuire testified, was his "first indication" that he "[thought] we're going to charge this case," even though he had started drafting a complaint the day before. (Tr. 123). About ten minutes later, Mr. Singh responded: "Awesome news thank you guys. Keep me posted." (GX 1 at 2). But Mr. Singh was not content to let Mr. McGuire "keep [him] posted." That same day he pressed: "How close do we think we are to charging? And can we set up a brief call before charges get filed?" (*Id.* at 4). Mr. McGuire reiterated that he would be ready to charge "towards the end of next week," and again assured Mr. Singh: "We're all hammering as hard as we can go." (*Id.*). He noted that he "[d]efinitely planned on a call before going ahead," because he "want[ed] the high command looped in," asserting that the case "is highest priority for me." (*Id.*). Mr. Singh also asked Mr. McGuire about the "potential charges" in this case, discussed whether to proceed by a "speaking indictment," and directed him to "sketch out a draft complaint…by 5pm tomorrow." (*Id.* at 3-4). Mr. Singh emphasized that this case is "top priority for us." (*Id.*). Mr. McGuire understood "us" meant "Main Justice leadership." (Tr. 135).

The next day, as Mr. Singh requested, Mr. McGuire shared a draft affidavit in support of a complaint. (*Id.* at 6). In response, Mr. Singh asked: "Do we have the Baltimore/Maryland report where he was arrested with MS-13?" (*Id.*). Mr. McGuire responded that he did not have it and had "never had it," but that he could "ask Baltimore HSI for it." (*Id.*). Only on May 2, after Mr. McGuire had already begun drafting a complaint and sent Mr. Singh a draft affidavit, did Agent Saoud open the HSI Nashville investigation into Mr. Abrego. (Tr. 27). By that time, of course, Mr. Singh had been enmeshed in the investigation and the drafting of charges. Nothing Mr. McGuire did during that harried first week of conversations with Mr. Singh, while relying on

HSI Baltimore's investigation, depended on Agent Saoud or HSI Nashville.

On May 15, Mr. McGuire circulated a prosecution memo and draft indictment to the leadership team of his office, including then-Criminal Division Chief Ben Schrader. In his email, Mr. McGuire downplayed ODAG's involvement, stating that he "would hope to have ODAG eyes on it as we move towards a decision about whether this matter is going to ultimately [be] charged" and asserting that he "ha[d] not received specific direction from ODAG other than [he had] heard anecdotally that the DAG and PDAG would like Garcia charged sooner rather than later." (GX 1 at 13-14). Mr. McGuire did not share with his leadership team that he had sent draft charging documents to Mr. Singh, ODAG's well-known "enforcer,"[4] at Mr. Singh's request, or that he had been in constant contact with him about the investigation. (*See id.* at 14). Nor did Mr. McGuire share the source of his "anecdotal[]" knowledge that the "DAG and PDAG would like [Mr. Abrego] charged sooner rather than later." Mr. McGuire instructed his leadership team not to respond in writing: "I think from here, it makes sense to potentially discuss in person." (*Id.*).

Defying that instruction, Mr. Schrader—who had participated in an interview with CC-1 (App. A at 6)—responded with "a memorandum recommending against charging [Mr. Abrego]." (GX 1 at 13). Mr. Schrader asked Mr. McGuire to "pass it along to relevant parties in D.C." (*Id.*). This was not the first time that Mr. McGuire had heard of Mr. Schrader's concerns: "[E]arly on in the investigation," Mr. Schrader warned that he was considering resigning over the case, and raised concerns about a possible vindictive prosecution. (Tr. 147, 167-68). Mr. McGuire told Mr. Singh

---

[4] Ben Penn, *In-Your-Face DOJ Aide Rides Prosecutors for 'Chief Client' Trump*, Bloomberg Law (Feb. 19, 2026), https://news.bloomberglaw.com/us-law-week/in-your-face-doj-aide-rides-prosecutors-for-chief-client-trump. Mr. Singh, one of Mr. Blanche's "most senior aides" who "wield[s] outsize power," has "assumed the role of communicating orders to—and setting priorities for—the 93 U.S. attorneys' offices across the nation." Alan Feuer, *Blanche, Trump's Former Defense Lawyer, Steps In as Acting Attorney General*, N.Y. Times (Apr. 2, 2026), https://www.nytimes.com/2026/04/02/us/politics/todd-blanche-attorney-general-trump.html.

that Mr. Schrader "potentially would resign…if we went forward with [the charges]." (*Id.* at 152).

On May 17, 2025, as the indictment was being finalized, Jacob Warren, a co-Director of Joint Task Force Vulcan ("JTFV")—and Mr. McGuire's "partner" on the case (*id.* at 129)—updated Mr. Singh. He told Mr. Singh that the team was "working over the weekend to finalize an indictment that we will send to you tomorrow night or first thing Monday." (GX 1 at 10). He noted that "[p]er our prior conversations on timelines, we are on track to present an indictment this Wednesday, May 21," but asked Mr. Singh to "let us know soonest" "[i]f anything on that front has changed." (*Id.*). Finally, he wrote that he was "[a]ssuming this will be unsealed," but asked Mr. Singh to "[p]lease let us know if not." (*Id.*). In response, Mr. Singh thanked Mr. Warren for the "really helpful information," and instructed him, Christopher Eason (the other co-Director of JTFV), and Mr. McGuire to "keep close hold until we get clearance."[5] (*Id.*).

As they were preparing to present the indictment, Mr. McGuire and his team "suggested" to Mr. Singh that they could provide a short summary of "the proof," "the charges," and "the main gravamen of the case, so that it would be easier for senior leadership to get a read-in on what's going on." (Tr. 89). On May 20, 2025, Mr. Singh emailed to ask about that summary, and Mr. Eason promised the team would send it that afternoon. (GX 1 at 12; Tr. 89). On May 21, 2025, Mr. McGuire presented an indictment to the grand jury, and a true bill was returned. (Dkt. 1). That same day, Mr. Schrader resigned, effective immediately. (Tr. 167).

On June 6, 2025, Mr. Abrego arrived in the Middle District of Tennessee. Mr. McGuire apparently did not know about Mr. Abrego's return, and then-Deputy Attorney General and current

---

[5] The JTFV co-Directors were not just "partner[s]" with Mr. McGuire (Tr. 129) but had their own line of contact to ODAG. Mr. McGuire could not recall the source of his "anecdotal[]" knowledge that "the DAG and PDAG would like [Mr. Abrego] charged sooner rather than later" (GX 1 at 14), but testified that he had likely heard that from "somebody in Joint Task Force Vulcan" (Tr. 148). JTFV members, including Mr. Warren, were present at the hearing, but not called as witnesses.

Acting Attorney General Todd Blanche called Mr. McGuire personally to tell him the news. (*Id.* at 179). That same day, Mr. Blanche appeared, along with then-Attorney General Bondi, at a press conference, and shortly thereafter he "revealed that the government started 'investigating' Abrego after 'a judge in Maryland…questioned'" the government's decision, found that it "'had no right to deport him,' and 'accus[ed] [the government] of doing something wrong.'" (Dkt. 138 at 6) (quoting Mr. Blanche). Mr. McGuire did not attend the press conference.

**ARGUMENT**

## I.      Applicable Law

The February 26 hearing, and this brief, concern only the second step of the burden-shifting framework that applies to Mr. Abrego's claim of vindictive prosecution. (Dkt. 281 at 3). Where, as here, a defendant has made a "*prima facie* showing…that there is a realistic likelihood that the prosecution against him may be vindictive" (Dkt. 138 at 9), "a presumption arises in [the] defendant's favor" (Dkt. 281 at 1 (quoting *United States v. Zakhari*, 85 F.4th 367, 379 (6th Cir. 2023))). The burden then shifts to the government to "rebut [the presumption] with objective, on-the-record explanations" establishing that this case was brought for legitimate, non-vindictive reasons. *Zakhari*, 85 F.4th at 379. "If the government fails to present evidence sufficient to rebut the presumption, the presumption stands and the court must find that the prosecutor acted vindictively." *Bragan v. Poindexter*, 249 F.3d 476, 482 (6th Cir. 2001).

"[O]nly objective, on-the-record explanations can suffice to rebut a finding of [a] realistic likelihood of vindictiveness." *United States v. Andrews*, 633 F.2d 449, 456 (6th Cir. 1980). Examples of "objective" explanations for the decision to charge include "governmental discovery of previously unknown evidence or previous legal impossibility." *Zakhari*, 85 F.4th at 379 (quoting *United States v. LaDeau*, 734 F.3d 561, 566 (6th Cir. 2013)). By contrast, assertions by individual prosecutors or other government officials about their own personal motives are not

9

considered, because, as the Sixth Circuit has explained, "we do not think that judges should pass on subjective good faith assertions by prosecutors." *Andrews*, 633 F.2d at 456; *see also LaDeau*, 734 F.3d at 572 (prosecutors' "subjective rationales" insufficient to rebut presumption).

## II.     The Government Failed to Rebut the Presumption of Vindictiveness

The Court asked the government to answer the following questions in response to Mr. Abrego's *prima facie* case of vindictiveness: "(1) which individuals directed the government's change in position from 'deport but not prosecute' to 'prosecute and deport,' and (2) what factual circumstances motivated that change in position." (Dkt. 185 at 3). In attempting to "produce objective, on-the-record explanations for Abrego's prosecution that rebuts the presumption of vindictiveness" (Dkt. 281 at 3), the government called just two witnesses, Agent Saoud and Mr. McGuire, neither of whom addressed the Court's questions. Instead, the government tried to craft a narrative that this case independently landed on Mr. McGuire's desk through Agent Saoud. But that narrative is at odds with both the documentary record in this case and common sense.

*First*, the government's testimony—whether the Court credits it entirely, in part, or not at all—only underscored that the very witnesses who could have explained the government's "change in position" were absent from the hearing. This list includes Agent VanWie, who closed and reopened the investigation; Mr. Singh, who handed Mr. McGuire the key cooperator and pressured him to charge quickly; and, of course, their bosses—the leadership of DOJ and DHS. None of these witnesses, who were the source of the decision to investigate and prosecute this case, were present at the hearing.[6] *Second*, as much as the government sought to impart that Agent Saoud and

---

[6] But one high-level DOJ official was present, not as a witness but as counsel for the government: Associate Attorney General Stanley E. Woodward, the number three official at the Department of Justice who oversees civil matters. Mr. Woodward appeared in this case after the Court granted discovery on Mr. Abrego's vindictive prosecution claim (Dkt. 199, 215), making plain that senior DOJ officials remain in charge of this prosecution.

10

Mr. McGuire believed that they were independent actors who were not influenced by the retaliatory motives or actions of other Executive Branch officials, that subjective explanation is irrelevant to the Court's inquiry as a matter of law. What the hearing testimony did show is that, at every turn, their actions and decisions were intertwined with Mr. Abrego's unlawful deportation and resulting lawsuit, and influenced by the improper motivations of other Executive Branch officials. And *third*, the government's attempt to establish that it unearthed "newly discovered evidence" fell flat, because the decision to charge had already been made before new evidence was "discovered"—and that evidence was not, in any real sense, "new."

Months ago, the Court found the government's "unwillingness to provide discovery that answers" the questions at the heart of the vindictive prosecution inquiry "particularly puzzling." (Dkt. 185 at 3). But the government's presentation at the hearing solves that puzzle: The government has no non-vindictive, "objective explanations" for the decision to charge Mr. Abrego. The testimony and limited discovery the government has produced supports no explanation for this case other than the one Mr. Blanche has publicly expressed: that Mr. Abrego was vindictively prosecuted because he successfully challenged his unlawful removal to El Salvador.

### A. The Government Did Not Call Witnesses Who Could Explain its Change in Position From "Deport But Not Prosecute" to "Prosecute and Deport"

Because "[c]ases do not magically appear on the desks of prosecutors," the Court has focused its inquiry on how the case arrived on Mr. McGuire's desk and, specifically, "why…it show[ed] up on April 27, 2025, when the case had previously been closed by DHS on April 1, 2025." (Dkt. 185 at 2). The government avoided calling the witnesses the Court would need to hear from to answer those questions: Agent VanWie and the actual decisionmakers at ODAG. Regardless of whether the Court finds Mr. McGuire's or Agent Saoud's testimony credible, the government cannot rebut the presumption of vindictiveness because it did not call the witnesses

who could actually explain the decision to reinvestigate and prosecute Mr. Abrego.

### 1. The Government Did Not Call Agent VanWie

In the months leading up to this hearing, Agent VanWie appeared on all of the government's witness lists. (Dkt. 196 at 1; Dkt. 295 at 1). Indeed, the government long recognized Agent VanWie as key to explaining the timing of this case—it even tried to avoid producing discovery on the ground that Agent VanWie would "testify about the reasoning behind" his decision to "sign[] off on the closing of the initial investigation by HSI Baltimore on April 1, 2025, as well as the re-opening of the investigation on April 17, 2025." (Dkt. 178 at 6). Yet when the hearing arrived, the government declined to call him.

The cross-examination of Mr. McGuire ultimately made clear why: Agent VanWie's testimony would have exposed that the decision to reopen the investigation came—at a minimum—from higher levels at DHS. (Tr. 116). Mr. McGuire responded in the affirmative when asked if Agent VanWie had told Mr. McGuire that he "reopened it in response to inquiries from headquarters." (*Id.*). Mr. McGuire further admitted on cross that Agent VanWie said he reopened the investigation into Mr. Abrego because he was "getting a lot of requests for information" from DHS headquarters to "look into this" or "to talk to this person" and "needed to reopen the case to be able to task…agents" to handle the investigative tasks leadership was requesting. (Tr. 115-16). And documents reveal that agents supervised by Agent VanWie were investigating Mr. Abrego, including by interviewing CC-1, before Mr. McGuire came on the scene. (App. A at 3).

The only reasonable conclusion to draw from these circumstances is that the reopening of the case at the behest of "headquarters" was part and parcel of the Executive Officials' attempt to tarnish and punish Mr. Abrego for his Maryland lawsuit. The pressure Agent VanWie received from "headquarters" came at the same time as the public assertions by senior government officials, such as then-Secretary Noem, that Mr. Abrego was a "violent criminal," gang member, and human

12

trafficker.[7] Indeed, just one day after Agent VanWie reopened the investigation, DHS published a "bombshell" press release about the 2022 traffic stop, the source of the *Tennessee Star* article Agent Saoud was likely sent. *See supra* n.3; (App. A at 3). The government claims that this article precipitated Agent Saoud's and Mr. McGuire's involvement in this case, but these events underscore the central role DHS headquarters played from the start.

As much as the government tried to sanitize the origins of this prosecution by casting Agent Saoud as an independent source of this investigation, all the government accomplished by shielding Agent VanWie from the Court was to make crystal clear that it will not answer the Court's questions. The government failed to offer any explanation for the "close timing between developments in Abrego's civil suit and HSI reopening its investigation into him" that this Court has already found particularly "alarming" and suggestive of retaliatory motive. (Dkt. 138 at 14).

### 2. The Government Did Not Call the Actual Decisionmakers at ODAG

Nor did the government call the actual decisionmakers at ODAG who directed this prosecution. This Court's finding of likely vindictiveness relied in part on Mr. Blanche's remarks the day the indictment was unsealed: that the government began "investigating" Mr. Abrego "after a judge in Maryland…questioned" its decision to deport him, found it "had no right to deport him," and "accus[ed] us of doing something wrong." (Dkt. 138 at 6-7, 10, 14-15). But Mr. Blanche did not come to Court to rebut the presumption resulting from his own statements. Nor did his deputy, Mr. Singh, who was already a driving force of the investigation by the time he emailed Mr. McGuire out of the blue the same afternoon Agent Saoud called him, reflecting that ODAG

---

[7] *See, e.g.*, THE REAL STORY: Kilmar Abrego Garcia is an MS-13 Gang member with a History of Violence, DHS (Apr. 16, 2025), https://www.dhs.gov/news/2025/04/16/kilmar-abrego-garcia-ms-13-gang-member-history-violence; *Kristi Noem to Newsmax: Man Deported in Error 'Very Dangerous'*, Newsmax (Apr. 4, 2025), https://www.newsmax.com/newsmax-tv/kristi-noem-deported-kilmar-abrego-garcia/2025/04/04/id/1205764/.

had already decided that Mr. McGuire would be participating in the case. Mr. McGuire was also only one of three prosecutors Mr. Singh emailed that Sunday evening to plan the logistics of offering proffer immunity to the key witness in this case, CC-1. In other words, Mr. Singh was orchestrating the prosecution before Mr. McGuire knew the first thing about it.

Having failed to call these absent witnesses, the government cannot provide "objective, on-the-record explanations" to establish that the decision to prosecute Mr. Abrego was based on non-vindictive reasons. *Zakhari*, 85 F.4th at 379. The record is clear that ODAG officials pushed for Mr. Abrego's indictment as a "top priority." When Mr. Singh called Mr. McGuire on April 27, 2025, ODAG already knew more about this case than Mr. McGuire did. Mr. Singh had identified the key witness in this case, CC-1—who had already twice been interviewed by Agent VanWie's team, likely with the approval of ODAG[8] and certainly *not* at Mr. McGuire's direction. And Mr. Singh's first move when he contacted Mr. McGuire was to coordinate a call to sign CC-1 up as a cooperator.[9] Mr. Blanche, too, was always a step ahead of Mr. McGuire, not least by calling him on June 6 to let him know that Mr. Abrego had been returned to the United States. (App. A at 8).

Mr. Singh continued to pull the strings along the way. Three days after Mr. McGuire began

---

[8] In fact, Mr. Singh was corresponding directly with DHS headquarters about Mr. Abrego: On April 28, then-Acting Assistant for Domestic Operations for HSI William Walker emailed Mr. Singh a copy of THP's report on the traffic stop. (App. A. at 4). No one else from DOJ or DHS was included on this email. Agent Saoud also admitted that she alerted DHS headquarters of her decision to investigate Mr. Abrego by calling Mr. Walker before her office opened the investigation on May 2. That Mr. Walker was already corresponding directly with Mr. Singh four days earlier undermines Agent Saoud's testimony that Mr. Walker simply told her to keep him updated and underscores that DHS leadership was already involved in the case. (Tr. 15, 21, 34-35).

[9] Mr. McGuire testified that he had not heard CC-1's name until he received Mr. Singh's email, and that he had not heard about the existence of any witnesses until just hours earlier, when he claimed that Agent Saoud mentioned potential witnesses in the case. (Tr. 55-56, 119-20). But Agent Saoud did not testify that she told Mr. McGuire about witnesses on the day she called him; in fact, she learned about "cooperating defendants in other districts…that had come forward with information" about the traffic stop only after her office began investigating on May 2. (*Id.* at 19).

14

Case 3:25-cr-00115    Document 306    Filed 04/06/26    Page 17 of 30 PageID #: 5026

working on the case, Mr. Singh asked Mr. McGuire, "how close do we think we are to charging," prompting Mr. McGuire to assure him that Mr. McGuire was "hammering as hard as we can." (GX 1 at 2, 4). Mr. Singh then asked about the potential charges and directed him to draft a complaint by 5 p.m. the next day.[10] (*Id.* at 3). Mr. Singh was not just receiving information; he was seeking it out on behalf of "Main Justice leadership," because it was a "top priority" for them. (Tr. 135). He even received a copy of THP's traffic stop incident report from HSI directly and inquired about a report—which Mr. McGuire did not have—about Mr. Abrego's 2019 arrest in Maryland. (*Id.* at 137; GX 1 at 15). Over the next few weeks, Mr. McGuire sought Mr. Singh's approval on the timing of presenting and unsealing the indictment and whether to involve the press. (GX 1 at 10-11). Mr. Singh then directed Mr. McGuire to "keep close hold [on the draft indictment] until we get clearance" to file. (*Id.* at 10). This was far from a "one-way street" of communication. (*See* Tr. 157): Mr. Singh gave Mr. McGuire his key witness, asked about additional evidence before Mr. McGuire had ever seen it, and pushed Mr. McGuire to draft charging documents at lightning speed.

But the government offered no testimony that might even purport to supply an objective explanation for ODAG's role in the investigation and charging decision. Neither Mr. Singh nor Mr. Blanche showed up for the hearing. And Agent Saoud and Mr. McGuire both testified that they had *no* knowledge of these officials' motivations or reasons for their actions in connection with this case. (Tr. 35-37, 156-59). Instead, the government has fought tooth and nail to put any explanations beyond the Court's reach—refusing to produce discovery from any of these potential

---

[10] Mr. McGuire claimed that he found Mr. Singh's request "[c]an we sketch out a draft complaint" baffling and that it did not mean what it plainly states on its face. (Tr. 135-36). But the words speak for themselves and refer to a collaborative effort. The statement by Mr. Singh about jointly drafting a complaint is followed by a redaction, so the defense is unable to see whether Mr. Singh is in fact referring to specific charges. But the Court is privy to that language—as well as other redacted language in the emails—and can make its own determination.

15

witnesses, let alone bring them to court. The most likely explanation for that resistance is that any attempted explanation would be futile and expose the vindictiveness at the core of this prosecution. At bottom, the government's silence is fatal—it cannot offer objective explanations for the decision to prosecute Mr. Abrego without any evidence from the actual decisionmakers involved.

**B.** **Agent Saoud's and Mr. McGuire's Claims That They Were Good Faith Decisionmakers Are Irrelevant and Insufficient to Rebut the Presumption**

Instead of calling the actual witnesses who could explain the decision to reinvestigate and charge Mr. Abrego, the government called Agent Saoud and Mr. McGuire. But their testimony is insufficient to meet the government's burden because it is both legally irrelevant and patently incredible. As he has throughout this case, Mr. McGuire attempted to present himself as an independent decisionmaker who could not be swayed by pressures from the "high command" to indict Mr. Abrego for vindictive reasons. He insisted throughout his testimony that he was taking no direction from ODAG and was merely keeping Mr. Singh updated. Similarly implausible, Agent Saoud claimed to have decided on her own, based on a newspaper article (planted by DHS sources according to the article itself), to open a purportedly separate investigation into Mr. Abrego. These explanations for the decisions to reopen the investigation and ultimately charge Mr. Abrego fly in the face of the documentary record, strain common sense, and amount to nothing more than legally irrelevant assertions of subjective good faith.

**1.** **Agent Saoud's Testimony Does Not Rebut the Presumption**

The record is clear that DHS headquarters' inquiries about Mr. Abrego prompted Agent VanWie to reopen the investigation into Mr. Abrego just days after his victory at the Supreme Court. Rather than concede this truth, the government offered the testimony of Agent Saoud to cast her as the independent source of the investigation who placed the file on Mr. McGuire's desk, and who had no apparent connection to the Maryland investigation, the deportation of Mr. Abrego,

16

or the requests from DHS headquarters. The government would have the Court believe that Agent Saoud decided on her own to open a "completely separate" investigation into Mr. Abrego after reading about the traffic stop in a *Tennessee Star* article planted by DHS that she received on her government-issued phone from a colleague whose name she could not recall, though she claimed to remember that the colleague was "trusted."[11] (*Id.* at 18, 42-43). And even as she knew Mr. Abrego was "in custody" in El Salvador, she urgently called Mr. McGuire on a Sunday afternoon to discuss how to "address" "this public safety threat." (*Id.* at 30, 44).

HSI Nashville's investigation was not, in reality, "completely separate" from that of HSI Baltimore. Agent Saoud insisted that the HSI Baltimore investigation was "separate" because it concerned Mr. Abrego's alleged involvement in "activity related to MS-13," while HSI Nashville's investigation concerned only alien smuggling. (Tr. 18-19, 27-28). But as Agent VanWie could have explained if called, the HSI Baltimore investigation always concerned smuggling activities. HSI Baltimore's December 2022 report commencing the investigation stated that Mr. Abrego was "suspected of labor/human trafficking as well as MS-13 gang activity," and the investigators tracked alleged coconspirators' involvement in smuggling operations. (*See* App. A at 1). Nor did the HSI Nashville investigation focus solely on smuggling allegations; it later concerned Mr. Abrego's alleged gang affiliation too. (*See* App. A at 7).[12] The HSI Nashville investigation was, at best, nothing more than a continuation of the investigation Agent VanWie had recently reopened.

---

[11] Curiously, the government—to which Agent Saoud returned her phone and which is subject to record-retention policies—made no effort to refresh Agent Saoud's recollection, or to collect and produce information from the phone that could have confirmed how she learned about Mr. Abrego.

[12] Allegations of Mr. Abrego's gang membership were known to Agent Saoud from the start—the *Tennessee Star* article that Agent Saoud referenced in her testimony included numerous references to MS-13 and Mr. Abrego's alleged membership in a gang. Pappert, *supra* note 3.

But even on its own terms, Agent Saoud's testimony reflected that her investigation was not actually separate from Mr. Abrego's unlawful deportation and his civil litigation. It was for that reason that Agent Saoud treated him differently: She called Mr. McGuire directly and alerted DHS headquarters about her investigation because Mr. Abrego was a "high profile" subject and "given [his] notoriety." (Tr. 15, 30). And she admitted that Mr. Abrego was "high profile" because he had been covered widely in the news, President Trump was talking about him, he had been illegally deported to El Salvador, and the Supreme Court had ordered the government to facilitate his return. (*Id.* at 39-40). And, in any event, Agent Saoud opened HSI Nashville's investigation on May 2, *after* a charging decision had been made solely on the basis of the evidence gathered in the original HSI Baltimore investigation. (*Id.* at 27). At its core, Agent Saoud's testimony does not help the government rebut the presumption because it does not explain the decision to reinvestigate Mr. Abrego. It instead makes plain that she was driven to pursue this case in large part because of the government's unlawful actions that made him a high-profile target. And the government's decision to call her alone, and not Agent VanWie, only spotlights the question the government is not answering: Why was the case reopened on April 17?

### 2. Mr. McGuire's Testimony Does Not Rebut the Presumption

As for Mr. McGuire, as an initial matter, his assertions that he harbored no ill will toward Mr. Abrego, was not improperly influenced by others, and would never charge a case that he did not believe in (*see* Tr. 46-48; Dkt. 121-1 ¶ 46), are not "objective" explanations under Sixth Circuit precedent. In *LaDeau*, the government failed to rebut the presumption of vindictiveness because its claims that a prosecutor would have filed the superseding indictment even without a vindictive motive, and that no prosecutor in their office "would seek to retaliate against a defendant" for filing a suppression motion, were "subjective rationales" and not "sufficiently 'objective' explanations for the government's conduct." 734 F.3d at 565, 572. So too here. Mr. McGuire's

18

assertions about his own motives and independence are subjective explanations that cannot rebut a presumption of vindictiveness as a matter of law. Crediting them would require this Court to "pass on [his] subjective good faith assertions," contrary to the Sixth Circuit's instruction that courts must "avoid such difficult and unpleasant decision-making." *Andrews*, 633 F.2d at 456.

Mr. McGuire's stated independence is also at odds with the record. As explained above, his narrative is belied by his promises to Mr. Singh to "pass the charging documents up the chain of command," his assurances that this case was his "highest priority" that he was "hammering" away, and his desire that the "high command" be "looped in." And when Mr. McGuire received Mr. Singh's repeated outreach, he was already anticipating a vindictive prosecution motion. (Tr. 80, 104-06, 147-49). As much as the government might try to argue that it "ensured that the charging decision was untainted by a desire for retaliation," *United States v. Adams*, 38 F.3d 1217, 1994 WL 589509, at *2 (6th Cir. 1994) (unpublished table decision), that is not this case. Unlike in *Adams*, where "the ultimate decision-makers neither knew the details of Ms. Adams' lawsuit…nor had any ulterior motive for wishing to punish her," *id.*, Mr. McGuire was working with ODAG from the start, and ODAG was ahead of him every step of the way.

Even against this record, Mr. McGuire tried to portray his interactions with Mr. Singh as a "one-way street," maintaining that he "just gave [Mr. Singh] the information [he] had" and "nothing came back the other way." (Tr. 157). But Mr. Singh was far more than a receiver of information: he was quarterbacking the prosecution of Mr. Abrego by handing Mr. McGuire the key cooperator, arranging the logistics of getting the cooperator to Nashville, asking Mr. McGuire to draft a charging document, and telling Mr. McGuire to hold the indictment until Main Justice had given "clearance." And even though Mr. McGuire testified that "[n]obody gave [him] direction on anything to put in the indictment," (*id.* at 163), Mr. Singh in fact asked Mr. McGuire "whether

the charging document would reference Abrego's alleged MS-13 affiliation." (Dkt. 241 at 7). Mr. Singh did this after having inquired about whether Mr. McGuire had a report about Mr. Abrego's arrest in 2019 alongside alleged members of MS-13. Tellingly, Mr. McGuire ultimately did include MS-13 allegations in the speaking indictment that he discussed with Mr. Singh. But even if Mr. McGuire genuinely believed that he was an independent actor, he was mistaken. No reasonable person could have read Mr. Singh's emails and understood them to be anything but directives.

Mr. McGuire's attempts to explain away Mr. Singh's obvious influence on this prosecution were utterly implausible. He claimed that he told Mr. Singh this case was "highest priority" for him and that he needed to "hammer away" not because of the explicit time pressure from ODAG, but because he was "two-and-a-half years behind, so I was trying to go as fast as I could," and the "two-and-a-half-year-old case…wasn't getting better with age." (Tr. 123-24, 143). In other words, the case was a priority for Mr. McGuire because it had *not* been a priority in the two and a half years since Mr. Abrego had been stopped by THP. It is worth pausing on that bit of upside-down logic. Absent the Trump administration unlawfully removing Mr. Abrego and engaging in a highly public smear campaign, there was nothing the least bit noteworthy about this case. There can be no plausible claim that a run-of-the-mill alien smuggling case that had been lying stale for two and a half years was worthy of the immediate, all-consuming, personal attention of the head of the U.S. Attorney's Office. It insults the intelligence of even a casual observer of the justice system to claim otherwise. Of course, Mr. McGuire had no choice but to admit that he knew this case was a top priority for "Main Justice" (*id.* at 135), and that this case had attracted "very strong feelings in the political landscape" (*id.* at 103). Those are the real reasons it was a priority for Mr. McGuire.

Mr. McGuire's implausible claims did not stop there. He testified that Mr. Singh had no role or interest in drafting the charging document, insisting that Mr. Singh's statement "[c]an we

sketch out a draft complaint" was something other than Mr. Singh directing the team to prepare a draft charging document. (*Id.* at 136). He maintained that he did not know why Mr. Singh told him to keep the draft indictment confidential until "we get clearance," when he also understood the phrase generally means "get approval." (*Id.* at 155-56). He also insisted that he conferred with ODAG as to the timing of the indictment only because he was "concerned" about whether Mr. Abrego would be returned to the United States in time "to make an effective prosecution," even though, as the Court noted, "the Supreme Court had already said bring him back." (*Id.* at 85-86). And he was apparently at a loss when Mr. Schrader asked that his memorandum recommending against prosecution be sent to officials in Washington, D.C. (*id.* at 151-52), even though Mr. McGuire himself wanted the "high command looped in" and asked for a call with Mr. Singh's office "before going ahead," (*id.* at 141). Mr. McGuire could not explain away what is abundantly clear: Mr. Singh and his bosses at ODAG had control of this prosecution from the very beginning.

Mr. McGuire also insisted that he did not know how his supervisors at ODAG would have reacted had he declined to charge Mr. Abrego. (*Id.* at 179-80). But Mr. McGuire was fully aware that "there w[ere] going to be consequences" of not charging this case for his career at the DOJ. (*Id.* at 168). He knew within "a week or ten days" after this case landed on his desk that Mr. Schrader might resign over it. (*Id.* at 168). He was aware of other firings and resignations of U.S. Attorneys and prosecutors who refused to do the government's bidding or had ended up on the wrong side of its political priorities. (*Id.* at 95-97). And he understood that he had to "follow" then-Attorney General Bondi's memorandum warning that "any attorney who…delays or impedes the Department's mission will be subject to discipline and potentially termination." (DX 66; Tr. 101). Even if Mr. McGuire had the theoretical authority to make the charging decision in this District, he could only keep exercising that authority so long as he made the decision that ODAG wanted.

In sum, Mr. McGuire's claims that he was the sole and ultimate decisionmaker and was insulated from any external influence are not remotely plausible, and the law does not require this Court "to exhibit a naiveté from which ordinary citizens are free." *Bd. of Governors of Fed. Rsrv. Sys. v. United States (In re Grand Jury Subpoenas)*, -- F. Supp. 3d --, 2026 WL 710202, at *9 (D.D.C. Mar. 13, 2026) (Boasberg, C.J.) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019)). But even if the Court were to credit all of this testimony, it would only highlight the importance of the Sixth Circuit's requirement that the government produce "'objective, on-the-record explanations'…to rebut a finding of realistic likelihood of vindictiveness." *Bragan*, 249 F.3d at 482 (quoting *Andrews*, 633 F.2d at 456). If the purportedly subjective good faith of a prosecutor could carry the day, the law on vindictive prosecution would be a dead letter. It would mean that the government could simply install a prosecutor who believed in his own motives—or was prepared to claim as much under oath—and thereby erase the publicly stated vindictive motivations of other officials, like Mr. Blanche, even if those officials set the prosecution in motion and had their subordinates influence it at every opportunity. That is not the law.

## C.      The Evidence Against Mr. Abrego Was in No Way "Previously Unknown"

The government's apparent fallback theory, elicited on redirect (*see* Tr. 173-75), is that the charges against Mr. Abrego were based on the "discovery of previously unknown evidence." *LaDeau*, 734 F.3d at 566 (quoting *Bragan*, 249 F.3d at 482). But this theory of the case cannot be squared with the two-and-a-half-year investigation into Mr. Abrego and the reopening of that investigation long before Agent Saoud and Mr. McGuire ever got involved. The government offered nothing new at all between the time the investigation was closed on April 1 and its reopening on April 17. And the government's reopened investigation merely pulled on threads the government already knew about before the investigation was closed. All of the evidence was by definition "new" to Mr. McGuire on April 27, when he joined the investigation. But it was certainly

22

not new to those who placed the file on Mr. McGuire's desk, and any facts that were actually newly discovered about Mr. Abrego came only after Mr. McGuire had already made the (almost immediate) decision to charge the case.

*First*, the evidence in this case was not, in any real sense, newly discovered in April 2025. The government had all the tools it needed to charge this case in 2023, if not 2022. Of course, it had the traffic stop itself and the associated body camera footage, which Mr. McGuire viewed as essentially sufficient to charge the case, (*see* Tr. 127). And the prior investigation had already identified CC-1: During the traffic stop, Mr. Abrego asserted that the car he was driving was owned by his "boss," and he gave the THP troopers the car's registration, which lists CC-1's name. (Dkt. 61 at 15-17). In March 2023, HSI Baltimore received information from a license plate reader system about the vehicle that Mr. Abrego had allegedly been driving when he was stopped by THP and which agents determined was registered to CC-1. (App. A at 1). By January 2024, HSI Baltimore had already identified CC-1 as a coconspirator in a human smuggling/trafficking organization. (*Id.*).

At any time in 2023 or 2024, CC-1 could have led investigators to still more cooperating witnesses. Indeed, his connection to the other cooperators in this case was either already known to the government at the time—given that they surveilled the home CC-1 shared with CC-4 in January 2024 (*see id.*)—or could easily have been found, given that the majority of the other co-conspirators are CC-1's relations or former partners. But even though agents at HSI Baltimore knew of CC-1 years earlier, they made no attempt to interview him until April 22, 2025—less than two weeks after the Supreme Court's order and *after* reopening the investigation on April 17. And the government has delivered extraordinary benefits to induce CC-1 to cooperate against Mr. Abrego, which it could have done at any time. What changed was not the availability of

evidence—it was the government's newfound willingness to reward a violent and dangerous criminal for cooperating down on one of his (many) employees. This was not a case where it was "impossible to proceed" against Mr. Abrego "at the outset." *Andrews*, 633 F.2d at 456 (quoting *Blackledge v. Perry*, 417 U.S. 21, 29 n.7 (1974)). It was the opposite: The government had all the tools, but none of the desire to charge Mr. Abrego—until there was a vindictive motivation.

*Second*, even if the Court were to ignore the extensive prior investigation of Mr. Abrego, any nominally new evidence developed by HSI Nashville came after Mr. McGuire—not to mention ODAG—had already committed to charging him. As discussed above, HSI Baltimore, at the urging of officials at DHS headquarters, was reinvestigating the case before Mr. McGuire and Agent Saoud were ever involved. But once they did get involved, none of the further investigative steps they took were needed for Mr. McGuire to decide to charge the case.

On the very day Mr. McGuire learned of the case, he was already on the back foot—it was Mr. Singh who knew more about a potential cooperator against Mr. Abrego than McGuire did.[13] And once Mr. McGuire reviewed the footage from the traffic stop—footage that had existed since the day the traffic stop occurred two and a half years prior—it was clear to him that he would charge the case. (Tr. 127). As a result, he quickly began drafting a charging document on April 29, two days after the initial outreach from Agent Saoud and Mr. Singh and before Mr. McGuire undertook any material investigative efforts. (*Id.* at 128-29). Meanwhile, the next day, Mr. Singh continued to press Mr. McGuire for updates—not about the progress of Mr. McGuire's review of the facts, but about "[h]ow close" Mr. McGuire was "to charging" and what the "potential charges"

---

[13] Indeed, the same is true for Agent Saoud. Though she claims to have learned of the traffic stop from an article in the *Tennessee Star* from on or around April 21, that article was based on DHS's "bombshell" press release. *See supra* at 14. Just as ODAG knew more about Mr. Abrego's case than Mr. McGuire, the person tasked with charging him, so too did DHS officials know more about Mr. Abrego than Agent Saoud, the person overseeing the field office tasked to investigate him.

would be, and to tell him that this case was a "top priority for us," meaning "Main Justice leadership." (*Id.* at 126, 129-30, 134-35; GX 1 at 2, 4). Indeed, by April 29, though Mr. McGuire acknowledged that his team was "looking at some more stuff" and "doing some more things," after having seen the video of the traffic stop and learning about CC-1, Mr. McGuire had concluded that "it wasn't a particularly complicated set of facts," that Mr. Abrego had "committed this crime," and that they were "going to charge this case." (Tr. 127-29).

Critically, Mr. McGuire had made up his mind days before Agent Saoud testified that she even assigned an agent from HSI Nashville to investigate the case on May 2. (*Id.* at 35). As a result, the "stuff" HSI Nashville looked at and the "things" it did in its investigation after April 29 were immaterial to Mr. McGuire's ultimate decision to charge. To be sure, some investigative steps occurred after that point, such as further interviews of CC-1 and his family members or other cooperators and witnesses. (*See id.* at 173-75). But Mr. McGuire's testimony on February 26, coupled with his emails to Mr. Singh, made clear that those steps were mere window dressing on the ultimate decision to charge, made long before that investigation ever took place.

*     *     *

In its opinion concluding that Mr. Abrego was entitled to discovery on this motion, the Court asked a pointed question: "[H]ow did Abrego's case arrive on [Mr. McGuire's] desk and why did it show up on April 27, 2025, when the case had previously been closed by DHS on April 1, 2025?" (Dkt. 185 at 2). Instead of answering that question, the government attempts to conjure up an imaginary world where the prosecution of Mr. Abrego began when Agent Saoud suddenly called up Mr. McGuire after reading about the traffic stop in the *Tennessee Star*. But it is now painfully clear that adopting that narrative requires disregarding reality. The Court should reject the government's invitation to do so.

25

**CONCLUSION**

For the foregoing reasons, the government has failed to rebut the presumption of vindictiveness, and the Court should dismiss the Indictment.

Dated: April 6, 2026
      New York, New York

Respectfully submitted,

/s/ Sean Hecker
Sean Hecker*
Jenna M. Dabbs*
David Patton*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
shecker@heckerfink.com
jdabbs@heckerfink.com
dpatton@heckerfink.com

\* admitted *pro hac vice*

Rascoe Dean (No. 034209)
SHERRARD ROE VOIGT & HARBISON PLLC
1600 West End Avenue, Suite 1750
Nashville, Tennessee 37203
Telephone: (615) 742-4200
Fax: (615) 742-4539
rdean@srvhlaw.com

*Counsel for Defendant Kilmar Armando Abrego Garcia*

26

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 6, 2026, I electronically filed the foregoing document with the clerk of the court by using the CM/ECF system, which will send a notice of Electronic Filing to the following: Acting United States Attorney, Robert E. McGuire, 719 Church Street, Suite 3300, Nashville, Tennessee 37203; Assistant United States Attorney, Jason Harley, 210 Park Avenue, Suite 400, Oklahoma City, Oklahoma 73102; Associate Attorney General Stanley E. Woodward, Jr., 950 Pennsylvania Avenue NW, Washington, D.C. 20530.

/s/ Sean Hecker

27