# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 3:25-CR-00115** |
| **KILMAR ABREGO GARCIA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## UNITED STATES' POST EVIDENTIARY HEARING BRIEF

After a thirty-year law enforcement veteran first learned of a traffic stop involving an illegal alien that body worn camera footage depicted apparently smuggling human lives for personal gain, a career prosecutor began the investigative process that eventually led to the indictment of Defendant Kilmar Abrego Garica. The only potential politically motivated decision would have been one not to investigate or seek an indictment based on the fruits of that investigation. The public outcry over Defendant's indictment is unfounded given the overwhelming evidence uncovered by that investigation. The United States has not only rebutted but affirmatively proved that the decision to indict Kilmar Abrego Garcia was not vindictive. The evidence is unequivocal and undisputed. The decision to indict stemmed solely from the prosecutorial discretion of the Acting United States Attorney for the Middle District of Tennessee, a career prosecutor. That decision was not animated by animus toward Defendant. It was not made under political pressure or expectation. Equally as undisputed, the decision to indict was not ordered by leadership at the Department of Justice. Rather, the decision was guided only by the evidence. And the evidence was so strong that it would have been a derogation of duty to not pursue charges. No degree of infamy can distort those undisputed facts.

1

**SUMMARY OF THE EVIDENCE**

The undisputed evidence demonstrates that this case stems from nothing more than by-the-book investigative work carried out by the individuals charged with safeguarding their community.

Tennessee Highway Patrol initiated a traffic stop on November 30, 2022, in which Kilmar Abrego Garcia was the driver. *See* Tr. (ECF No. 300) at 65. At the time of the incident, the traffic stop was never reported to the United States Attorney's Office for the Middle District of Tennessee (USAO-MDTN) or Homeland Security Investigations (HSI) Nashville. *See* Tr. at 26–27, 57–58, 107–08.

Then-Acting United States Attorney for the Middle District of Tennessee, Robert McGuire, first learned of the November 2022 traffic stop on Sunday, April 27, 2025, when Special Agent in Charge for Homeland Security Investigations Nashville, Rana Saoud, called Mr. McGuire to ask whether his office had previously investigated the traffic stop. Tr. at 14–15, 19, 50. Mr. McGuire explained that he was not aware of the incident. Tr. at 50 ("She asked me if I was aware that Kilmar Abrego Garcia had been stopped by the Tennessee Highway Patrol in November of 2022, and I said I was not."). After discussing the existence of "some information that it was a potential human smuggling operation and that there were potentially other witnesses," Tr. at 51, 57, Mr. McGuire and Agent Saoud "both agreed that [they] needed to look into . . . what this traffic stop was all about," Tr. at 51. That partnership between HSI-Nashville and USAO-MDTN was typical, given HSI-Nashville investigates "child exploitation, human trafficking, human smuggling, financial crimes, drug trafficking, and smuggling technology exploitation, [and] weapons smuggling" across Kentucky and Tennessee. Tr. at 11.

After speaking with Agent Saoud, Mr. McGuire called the Tennessee Highway Patrol to confirm whether the traffic stop had occurred and whether there was video footage of the incident. Tr. at 52, 57. Tennessee Highway Patrol provided an overview of the traffic stop and arranged for

2

Mr. McGuire to review the footage. Tr. at 52. All showing, Mr. McGuire's investigation into a potential crime that occurred in his District had commenced, and at that point in time, Mr. McGuire had not spoken with any superiors at the Department of Justice.

Later that same evening, Mr. McGuire received an email from Aakash Singh, an attorney in the Office of the Deputy Attorney General (ODAG), who is responsible for coordinating with U.S. Attorney's Offices across the country. Tr. at 52–53. That email was addressed to Mr. McGuire and two other U.S. Attorneys requesting a virtual meeting to discuss a criminal defendant (not Abrego Garcia). Gov't Ex. 1 at 000001; Tr. at 52, 54–55. From conversations earlier that day with Agent Saoud, Mr. McGuire already knew that the criminal defendant had admitted to being in a human smuggling operation with Defendant just a few days prior. Tr. at 55–56; *see also* Tr. at 64. That call occurred the next day, where all attendees discussed coordinating logistics concerning the criminal defendant and Mr. McGuire's desire to interview him. Tr. at 56 ("It was a pretty logistic-oriented call."); *see also* Tr. at 120 (describing the logistics discussed).

Upon learning this information—again for the first time on April 27, 2025—Mr. McGuire quickly assembled the resources needed to run the investigation. Tr. at 58–59. In April 2025, Mr. McGuire's office was facing significant resource constraints, operating with only half of its normal staffing levels. *See* Tr. at 60. Given that challenge, Mr. McGuire thought it "made sense" to obtain "some additional resources," Tr. at 60, so he reached out to Joint Task Force Vulcan, "a Department of Justice task force that deals with gang-related and transnational-related offenses." Tr. at 59–60. Mr. McGuire's had previously met with Joint Task Force Vulcan and the task force offered their resources should the Middle District of Tennessee have "any cases that potentially have a transitional connection of gang connection." Tr. at 59. After putting his team in place, Mr. McGuire got to work investigating.

On Tuesday, April 29, 2025, Mr. McGuire reviewed the body camera and dash camera footage of the November 2022 traffic stop and his suspicions of wrongdoing only grew. Tr. at 60–61. Indeed, the car Defendant was driving when he was stopped in November 2022 was registered to another alien who had been previously convicted of alien smuggling. Tr. at 61, 66.[1] Defendant also appeared to be lying about his trip, given "[t]he route was suspicious." Tr. at 61. He claimed to be driving from St. Louis to Baltimore, but Nashville was nowhere near that route. Tr. at 61–62 ("[A] pretty simple Google search would show you that you don't drive through Nashville to get there . . . coming through Nashville and Cookeville would have added like three and-a-half hours to that trip.").

Mr. McGuire also recognized behavior on the video that fits a pattern of human smuggling. Based on his prior handling of eight human smuggling cases, two of which proceeded to trial, Mr. McGuire "was immediately struck by how similar what was being depicted in the bodycam was to those investigations." Tr. at 61. Specifically, the footage shows "a large number of individuals traveling in an SUV . . . with one driver who sort of spoke for the group." Tr. at 61. "Nobody had any luggage. Nobody had . . . any indicia that they were working a job." Tr. at 61. In his view, based on his twenty years of experience as a prosecutor, several aspects of the footage showed "this really looks like a human smuggling operation." Tr. at 62; *see also* Tr. at 47.

But the video footage alone was not enough to conclude evidence of a crime, so Mr. McGuire continued his investigation. Tr. at 62. He interviewed the cooperating defendant initially discussed at the April 27, 2025 meeting. Mr. McGuire's investigation expanded to include interviewing a new witness in Texas who had independent information about the human smuggling

---

[1] This alien is the same criminal, cooperating defendant discussed by Agent Saoud and referenced in the April 27, 2025 email from Mr. Singh. Throughout the brief, the United States refers to this individual as the cooperating defendant.

scheme. Tr. at 63. That witness was not in custody, corroborated the testimony of the cooperating criminal defendant, and did not "have an obvious motive to try to fabricate a story." Tr. at 64. Mr. McGuire also reinterviewed the initial cooperating defendant twice, Tr. at 65, 176, and started obtaining several other pieces of evidence. In addition, multiple other witness interviews were conducted during the investigation that strongly corroborated the evidence gathering—including a minor female who Defendant tried to recruit to join the conspiracy who did not have "an obvious reason to fabricate." Tr. at 174–75.

The evidence all corroborated the cooperator's statements. His phone recorded Defendant in his contacts list as "the word 'chauffeur' in Spanish, for driver." Tr. at 66. And Mr. McGuire obtained phone records showing Defendant actually called the cooperating defendant during the traffic stop; Defendant can be heard referring to him to as "boss." Tr. at 66; *see also* 67 ("[T]he records showed [Defendant] had called him during the traffic stop[,] [which] was important corroboration of what [the cooperating defendant] was saying."). Mr. McGuire also established that Defendant's statement about his planned trip during his stop was, in fact, false. He obtained license plate reader data, which showed that the car Defendant was driving during the November 2022 stop was not previously in St. Louis as Defendant asserted. Tr. at 65. Additionally, Mr. McGuire's team spoke to another criminal defendant involved in the same smuggling scheme, whose testimony matched the other cooperator and who provided extensive information detailing the scheme. Tr. at 68. Accordingly, extensive new evidence was obtained or discovered by Mr. McGuire for the first time after April 27, 2025. *See* Tr. at 67. All of it pointed towards Defendant's guilt and largely none of it was previously known.

As the evidence continued to pile up, Mr. McGuire began contemplating seeking an indictment against Defendant for human smuggling. Tr. at 67. Consistent with normal practice,

Mr. McGuire and his prosecution team began drafting an indictment to sketch out potential charges after the initial days of the investigation. *See* Tr. at 164. (Q: "Is it your testimony that you start working on an indictment early on in an investigation?" A: "Any time you start an investigation you want to have a good sense of where you're going to end up. . . . So that's why you start working 'what are we going to indict,' from the moment you first feel like there's enough proof to charge the defendant. So we had been working on it for a couple of—two weeks maybe, at least.").

Throughout his investigation, Mr. McGuire kept Main Justice apprised of developments in the case as required by the Justice Manual given the national intrigue with Defendant. *See* Tr. at 155–56. Specifically, he informed Mr. Singh of the nature of the charges he was contemplating, logistical investigative updates, his decision to indict, and his intended timeline to seek an indictment. *See* Gov't Ex. 1 at 000003 ("[W]e could have a charging document next week."), 000008 (noting he planned to file "towards the end of next week"), 000007–000008, 000018 (detailing the completion and planning of grand jury testimony, as well as timing of the indictment); Tr. at 129. He also kept Mr. Singh posted of developments in the case that might garner national attention, such as local authorities publicly releasing video footage of the traffic stop. *See* Gov't Ex. 1 at 000009; Tr. at 125. Those types of communications, especially in a case that might draw national attention, are routine and common for Mr. McGuire with Main Justice. Tr. at 130 ("[C]onsistent in a high profile case, that they want to know, okay, you know, what are we going to charge, what are the facts, what does it look like."); Tr. at 74 ("I had previously been in the same situation with Mr. Singh in unrelated matters where I was giving him updates as to things that were happening in our district."); *see also* Tr. at 124, 145. Throughout these communications, it is evident that Mr. McGuire was in the driver's seat of his own investigation and case, merely providing updates on a high-profile matter. *See, e.g.*, Tr. at 157 ("All I can tell

6

Case 3:25-cr-00115    Document 307    Filed 04/06/26    Page 6 of 24 PageID #: 5053

you is nothing came back the other way. . . . I just gave him the information I had, and it was kind of a one-way street."); Tr. at 151 ("Main Justice was not involved in the charging decision. . . . I'm the person who's going to make this call."); *see also* Tr. at 126–27, 135–36, 138, 156. Indeed, it was Mr. McGuire who first brought up charging Defendant when he informed Mr. Singh that he and his team were moving toward "having a charging document next week." Gov't Ex. 1 at 000003.

Ultimately, Mr. McGuire proceeded to present the evidence to the grand jury, including the testimony of numerous witnesses, in May 2025. Tr. at 87. The grand jury returned the indictment on May 21, 2025. ECF No. 3; Tr. at 164.

## ARGUMENT

The United States more than rebutted any presumption of vindictiveness. It indisputably disproved vindictiveness. This Court previously concluded that Defendant had met his burden of showing presumptive vindictiveness, not actual vindictiveness. ECF No. 138. Thus, the burden rested with the government to rebut that presumption by providing "objective, on-the-record explanations" for prosecution. *United States v. LaDeau*, 734 F.3d 561, 566 (6th Cir. 2013) (quoting *Bragan v. Poindexter*, 249 F.3d 476, 482 (6th Cir. 2001)). Explanations acceptable to rebut the presumption include "discovery of previously unknown evidence and previous legal impossibility." *Bragan*, 249 F.3d at 482. Here, the United States provided extensive, undisputed testimony demonstrating that this prosecution came to be based on new evidence. That testimony was undisputed and unshaken when tested. It can only be described as overwhelming. Mr. McGuire's testimony further disproves any allegation that the charging prosecutor shared the prosecution decision with another, was directed or pressured to prosecute, or was prevailed upon by another in making his decision. Because the record lacks any evidence demonstrating vindictiveness, this Court should deny Defendant's Motion to Dismiss, ECF No. 104. *See United*

7

*States v. Andrews*, 633 F.2d 449, 456 (6th Cir. 1980) (emphasizing that when, based on the record evidence, "the district court no longer believes that there exists a realistic likelihood of vindictiveness, then the charge will not be barred").

## I.      Mr. McGuire's Decision to Indict Defendant Followed Mounting New Evidence

Mr. McGuire made the decision to seek an indictment against Defendant after first learning of the traffic stop in April 2025 and only after his own investigation revealed additional new evidence previously unknown to anyone. Obtaining new evidence is textbook grounds to rebut the presumption of vindictiveness. *See Bragan*, 249 F.3d at 482 (noting an "acceptable explanation" is governmental "discovery of previously unknown evidence"); *Andrews*, 633 F.2d at 456 n.10 (same). That is precisely what happened here.

Prior to April 2025, neither HSI-Nashville nor USAO-MDTN were aware of the November 2022 traffic stop involving Defendant. Tr. at 12–13, 50. It was not until after a local news outlet published an article detailing the traffic stop on April 21, 2025, that HSI-Nashville and USAO-MDTN first became aware of the incident. Tr. at 12, 23–24, 50. Specifically, Agent Saoud learned of the traffic stop when a trusted friend sent her the *Tennessee Star* article detailing it. *See* Tr. at 12 ("I learned that there was a media article—I think it was in the *Tennessee Star*—that indicated the individual known as Abrego Garcia had been stopped in a vehicle with multiple individuals by the Tennessee Highway Patrol."); Tr. at 12 (Q: "So the first time you ever heard about this case was in the media?" A: "Correct."); *see also* Tr. at 23–24; 41–43. And Mr. McGuire first learned of the traffic stop in his call with Agent Saoud on April 27, 2025. Tr. at 50–51. In fact, Mr. McGuire's first communication with federal officials or law enforcement concerning anything involving Defendant or the traffic stop was from Agent Saoud on April 27, 2025. Tr. at 51 (Q: "So the first time anyone associated with law enforcement or the federal government contacted you was that

phone call on Sunday?" A: "That's correct."); Tr. at 51–52 ("[A]ll that was being relayed to me for the first time.").

Neither HSI-Nashville nor USAO-MDTN previously investigated the November 2022 traffic stop. Agent Saoud and Mr. McGuire were in key leadership positions in their respective offices. When Agent Saoud became the Special Agent in Charge over the HSI region covering Tennessee and Kentucky in January 2023, *see* Tr. at 9–10, 25, her agents briefed her on all open cases in the region, none of which included Defendant, *see* Tr. at 13; *see also* Tr. at 26 (Q: "And you don't recall seeing any open investigation into Mr. Abrego, right?" A: "That's correct." Q: "And that's because HSI-Nashville never opened an investigation into Mr. Abrego after that November 30th, 2022[,] traffic stop, right?" A: "That's correct."). And prior to serving as Acting United States Attorney, Mr. McGuire served as the human smuggling specialist in USAO-MDTN, "so had . . . this case been presented in 2022 or early 2023, it would have initially been presented to [him]." Tr. at 57. But Mr. McGuire was never alerted about Defendant's traffic stop in November 2022 until Agent Saoud's call on April 27, 2025. *See* Tr. at 50–51, 57. All showing that prior to late April 2025, the lead HSI investigator and prosecutor on this case were unaware of the basic facts forming the factual predicate of the charges against Defendant.

New evidence formed the basis for Mr. McGuire's decision to investigate and later indict Defendant. The preliminary investigation in late April 2025 quickly revealed two pieces of evidence extremely probative of criminal activity that were previously unknown by Mr. McGuire. First, the video footage of the November 2022 traffic stop showed numerous other individuals in the car when Defendant was pulled over participating in what looked exactly like human smuggling. Tr. at 19, 52. The car was connected to another individual involved in human trafficking smuggling. Tr. at 61. Defendant lied about where he was going and Mr. McGuire knew it. Tr. at

61–62, 65. The details of the footage struck both Mr. McGuire and Agent Saoud as consistent with a human smuggling operation. *See* Tr. at 19–20, 61. Neither HSI-Nashville nor Mr. McGuire knew of that evidence prior to the end of April 2025, and Mr. McGuire did not view the footage until April 29, 2025. Tr. at 60–61. Second, just days before Mr. McGuire found out about the traffic stop, a cooperating defendant had voluntarily come forward on April 22, 2025, testifying that the traffic stop was exactly what it looked like on the video: a human smuggling operation. Tr. at 55, 58, 113. Prior to the end of April 2025, that new testimony did not exist. Having two preliminary pieces of evidence that Defendant had engaged in a human smuggling operation, Mr. McGuire and Agent Saoud had an ethical duty to investigate the "potential human smuggling operation" going on within the community that they are charged with protecting. Tr. at 51.

Mr. McGuire's own investigation revealed additional new evidence that supported seeking an indictment against Defendant for human smuggling. From the beginning, Mr. McGuire verified all preexisting information for himself. *See, e.g.*, 52, 56–59. But the case was broken open by his team's own efforts that obtained "important discovery," Tr. at 174, all of which occurred after April 27, 2025, Tr. at 65, 172. Specifically, Mr. McGuire and his team collected more license plate reader data. Tr. at 172–73. They "got cell phone records." Tr. at 172. They "got the phone data" from the initial cooperator linking him to Defendant. Tr. at 172. They "got more witnesses and cooperators." Tr. at 172. And they "reinterviewed" the witnesses that came forward at the end of April 2025, which yielded new helpful information. Tr. at 172. Mr. McGuire personally interviewed one of these witnesses twice. Tr. at 176. All those efforts resulted in new information about the human smuggling offense after April 27th. Tr. at 172. Evidence that the prosecutor "conducted a comprehensive" and "independent investigation" and that the prosector "elected to proceed based

solely on" that investigation, is the exact type of testimony sufficient to "successfully rebut[]" any presumption of prosecutorial vindictiveness. *Bragan*, 249 F.3d at 484–85.

The evidence uncovered by Mr. McGuire's investigation was crucial to his decision to indict Defendant. The only piece of evidence that existed prior to the end of April 2025—the traffic stop video footage—was insufficient alone to support the indictment against Defendant, *see* Tr. at 62 (Q: "Was body-worn camera alone enough for you to conclude that there was evidence of a crime worth presenting for an indictment?" A: "No."), because the video footage was silent as to key elements of a human smuggling offense, *see* Tr. at 62 ("Just the body camera alone wouldn't have been sufficient in my experience to sustain a conviction, because the elements of the offense, we have to establish that . . . the individuals who are being transported are unlawfully in the United States, and that the person who is transporting them is doing so to further those individuals' unlawful presence." "[A]nd the bodycam didn't really speak to that."). And Mr. McGuire did not know about the stop or its footage prior to April 27, 2025, anyway. Thus, the evidence necessary to support an indictment against Defendant stemmed solely from Mr. McGuire's team after the end of April 2025. That evidence critical to supporting elements of the offense included evidence surrounding Defendant's knowledge that the people he was transporting were illegal aliens and that Defendant was being paid for their transport in order to further their unlawful presence, none of which was established by the body worn camera alone. And not only was that new, critical evidence previously unknown to Mr. McGuire and HSI-Nashville prior to the end of April 2025, it was also unknown to any other government actor too. Put differently, evidence that would be legally necessary for an indictment of Defendant for human smuggling did not exist prior to the end of April 2025, much less was known by the charging prosecutor. Thus, unlike *LaDeau*, where the evidence "remained unchanged over the entire course of the prosecution," there was both "new

revelation" and "new discovery" supporting Mr. McGuire's decision to seek an indictment against Defendant at the juncture he did. 734 F.3d at 571.

Neither the appropriateness nor the fitness of Mr. McGuire's decision to seek an indictment is altered by Mr. McGuire first learning of the incident over two years later. Most importantly, the statute of limitations for violating 8 U.S.C. § 1324 is five years. *See* 18 U.S.C. § 3282. And Mr. McGuire sought an indictment before even half of the statute of limitations had run. *See* Tr. at 161 (Q: "And on its face there's nothing problematic about the fact that the indictment charges conduct that occurred in 2022?" A: "No. It was definitely within the statute of limitations. It wasn't even close to the statute of limitations.").

Additionally, Mr. McGuire, upon learning of the incident, proceeded at normal pace. As admitted by Defendant, and Mr. McGuire, "charged cases like this" "often go quickly from investigation to charge." Tr. at 107–08. From the time of first learning of the traffic stop—April 27, 2025—to the date of a returned indictment—May 21, 2025—only twenty-four days had passed, showing that Mr. McGuire proceeded in accordance with the pace with which prosecutors often move upon first learning of a traffic incident indicative of human smuggling. *See* ECF No. 105-1 (cataloguing lengths of prosecutions); Tr. at 161 (noting that after first learning of the traffic stop, it only took Mr. McGuire "a couple of weeks" to decide to bring charges). A careful prosecutor cannot be faulted for moving only as quickly as the evidence develops, especially when the prosecutor and the law enforcement investigator were previously unaware of the culpable conduct to begin with.[2]

---

[2] Nor does a prior investigation into Defendant for different conduct impugn the credibility of Mr. McGuire's investigation. Prior to this case and Defendant's prior removal from this country, HSI-Baltimore "had a case involving transnational gangs," which included allegations that "Mr. Garcia may have been involved in some activity related to MS-13." Tr. at 18. But that "was a completely separate case" from HSI-Nashville's investigation into Defendant for human

* * *

In sum, Mr. McGuire's on-the-record explanations showing an objective basis for his decision to indict Defendant are unrebutted and entitled to respect. *See Andrews*, 633 F.2d at 456 (emphasizing that on-the-record explanations of the prosecutor that "have an objective basis" should not be passed on lightly but instead "deserve consideration"). His undisputed testimony proves that his decision to investigate Defendant for human smuggling was based on new evidence that surfaced in late April 2025, and his decision to seek an indictment was based on new evidence obtained by his own investigative efforts. Thus, the Government has proven that "[t]he timing of Abrego's indictment" had nothing to do with Defendant's Maryland lawsuit, ECF No. 138 at 13, so any presumption of vindictiveness has been rebutted.

## II. Mr. McGuire Made the Exclusive and Independent Decision to Prosecute Defendant

The decision to seek an indictment against Defendant was made by Mr. McGuire alone. *See* Tr. at 46–47 (Q: "Who made the decision to seek an indictment of Mr. Abrego?" A: "I did."). He made that decision without influence, pressure, or inducement. *See* Tr. 46–47 (stating neither Deputy Attorney General Todd Blanche, Main Justice, the White House, or the Department of Homeland Security directed, asked, or insinuated that he should seek an indictment against

---

smuggling. Tr. 18; *see also* Tr. at 19 (Q: "And to be clear, did your case here in the Nashville region have anything to do with his immigration case in Maryland?" A: "Nothing to do with it at all."). Although Tennessee Highway Patrol reported the traffic stop to HSI-Baltimore, Tr. at 107, neither HSI-Nashville nor USAO-MDTN relied on the previous HSI-Baltimore investigation or were involved with that investigation. *See* Tr. at 19 ("I had instructed the investigative team to start from the beginning, start from scratch and look at this organically in the human smuggling elements and not be swayed or concerned with the Baltimore investigation."); Tr. at 28 ("And your testimony to the Court is your decision to open an investigation on May 2nd, 2025, was entirely independent of anything that had ever gone on in Baltimore; is that right?" A: "Yes, sir."). In fact, neither HSI-Nashville nor USAO-MTDN knew "the particulars of that case." Tr. at 28; *see also* Tr. at 64.

Defendant); Tr. at 171–72 ("[T]he charging decision that I made was—I didn't talk to any of those people. And I really kind of didn't want to, because I wanted to make it—I wanted to feel good about it on my own."); Tr. at 151 ("Main Justice was not involved in the charging decision. That's why I described, I'm the person who's going to make this call. . . . I'm the person who's ultimately going to decide whether we indict this case."). Mr. McGuire has always led, and still leads, the prosecution team in this case. Tr. at 170. In making the decision to seek an indictment, Mr. McGuire's sole consideration was "whether [he] first believed that the person committed a crime and that [he] [could] prove that to a jury beyond a reasonable doubt." Tr. at 48. In making that determination, the only individuals he consulted were members of his own team. Tr. at 146. Mr. McGuire shared the draft indictment with members of USAO-MDTN but specifically noted that, "ultimately, the office's decision to charge will land on [him]." Gov't Ex. 1, Bates No. 000060. Yet, Mr. McGuire still invited his team's feedback, showing he exercised his prosecutorial discretion in a measured and cautious manner. Tr. at 146. As the Acting U.S. Attorney at the time and lead prosecutor in the case, Mr. McGuire took seriously that it was his name that would appear on the indictment. Tr. at 69. And by signing his name, he was making a personal and professional affirmation to the Court that it was he "who was recommending the charges," Tr. at 69, and representing that facts in the indictment are "accurate" and "true," Tr. at 72. Thus, it is undisputed that Mr. McGuire was the sole decision-maker in deciding to seek an indictment against Defendant; no fanciful narrative can rebut Mr. McGuire's undisputed testimony on that point.

Mr. McGuire and his case team maintained exclusive control over the drafting of the indictment. *See* Tr. at 163. The decision to proceed with a speaking indictment instead of a complaint was Mr. McGuire's decision, which he felt was essential to "let the public know this is what the facts are" given that our political landscape is "highly charged." Tr. at 79; *see also* Tr. at

128–29 (explaining his decision process in electing to go with a speaking indictment); Tr. at 130 ("I wasn't asking Mr. Singh's permission or getting him to buy-in on it as I was telling him here's the conversations we're having and here's what our reasoning is"); Tr. at 132 (noting it was common practice to use "speaking indictments to inform the public about the facts of a case in matters that we expect there to be some public interest"). Mr. McGuire did not receive any external feedback or edits on the indictment. *See* Tr. at 171 (Q: "[R]eturning to your sharing the [prosecution memorandum] and the draft indictment with your colleagues. Did anyone provide input on the language or correct any typos at all to those documents?" A: "No. I never got any red line. I never got a 'Think about this, but not that. Do this, don't do that.' I never got anything back from it. We sent it up, and that was the last I heard of it."); Tr. at 171 (Q: "[S]o no one outside of Nashville provided any input whatsoever to the charging documents?" A: "No, sir."). Nor did Mr. McGuire receive instruction or pressure from ODAG to advance any narrative against Defendant, including that Defendant was a member of MS-13. *See* Tr. at 163 (Q: "[D]id anyone ask you to include reference to MS-13 in the indictment?" A: "No. Nobody gave me direction on anything to put in the indictment."). Consistent with every fact that was included in indictment, Mr. McGuire included Defendant's ties to MS-13 as a fact in the charging document based on the evidence and given that his connection "to a transnational gang . . . was an important part of the overall conspiracy." Tr. at 163.[3]

---

[3] As an initial matter, this Court rejected Defendant's argument that allegations regarding his MS-13 membership were irrelevant. *See* ECF No. 192 at 5. Instead, the Court found "good cause to believe" that Defendant's "alleged MS-13 membership, his alleged narcotics and firearms trafficking, and his alleged abuse of female undocumented aliens are at least matters the Government 'hopes to properly prove at trial,'" *id.* at 5 (quoting *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993)), and will connect to the charges brought in the indictment, *id.* at 6.

Mr. McGuire's communications with ODAG reveal neither direction nor influence. To the contrary, the communications were largely "a one-way street." Tr. at 157; *see* Tr. at 138. Throughout the investigation, Mr. McGuire kept ODAG apprised of the progress of his investigation. Mr. McGuire's communications with Mr. Singh focused on updates about the investigation, potential charges, and the timing Mr. McGuire would present to the grand jury. *See, e.g.*, Tr. at 77–80, 82–85. Mr. McGuire "gave him the information [he] had" and "nothing came back the other way." Tr. at 157; *see also* Tr. at 138. That includes Mr. McGuire's decision to indict, a crucial development in the investigation. The first mention of indicting Defendant was from Mr. McGuire when he informed Mr. Singh that he and his team were moving toward a charging document. Gov't Ex. 1 at 000003. But Mr. McGuire did not relay every step of the investigation to ODAG, only major developments as appropriate. *See* Tr. at 173–74 (Mr. McGuire detailing numerous pieces of evidence and important discovery in the case that he did not provide to ODAG, nor did ODAG ask for). All showing, keeping leadership updated on events within the Middle District of Tennessee does not amount to dependence nor joint decision-making.

Such communications were not—and are not—unusual. Rather, they are routine intradepartmental coordination and reflect an appropriate level of respect in keeping the Department leadership informed on the status and milestones of a case that, as Mr. McGuire correctly surmised, would garner significant public interest. Prior to Defendant's case, Mr. McGuire was in frequent contact with Department leadership to provide "updates as to things that were happening in our district," including "high profile public corruption cases" or events of national importance such as the "terrible school shooting that occurred in January of 2025." Tr. at 74. The Justice Manual makes communications of this sort mandatory. *See* Tr. at 73–74. Specifically, it requires U.S. Attorney's Offices to notify ODAG of any cases that may "draw

congressional interest," "may make national news," or touch on "a significant item of interest." *See* Tr. at 73–74; Gov't Ex. 2, Justice Manual § 13.000. Normally, emails between members of the Department of Justice are not public and much of the "behind the scenes" work of Department attorneys remains just that. Yet here, the Court ordered disclosure of internal communication to Defendant. But extraordinary disclosure does not signify that the communications themselves are anything more than routine, even if rarely seen.

At most, Mr. McGuire looked to ODAG for guidance on post-indictment logistics, which occurred only after Mr. McGuire had decided to seek an indictment, finalized the indictment, obtained grand jury testimony, and scheduled grand jury witnesses. *See* Tr. at 157–58; Gov't Ex. 1 at 00018. Given the highly charged media coverage of this case, it would have been irresponsible not to. *See* Gov't Ex. 2, Justice Manual § 13.000 (requiring USAOs to "inform Department leadership" of "major developments in significant investigations" and "events . . . likely to generate national media"). For example, after Mr. McGuire had already decided to seek an indictment, he had exchanges with Main Justice concerning the timeline for presenting the case to the grand jury. *See* Tr. at 87–89. It was essential for Mr. McGuire to apprise ODAG on the logistics surrounding the grand jury for two reasons. First, once an indictment was returned, it would potentially be unsealed and, given Defendant's national recognition, the indictment would likely draw widespread media attention. *See* Tr. at 88. Thus, Mr. McGuire looked to ODAG for "clearance" only about "sealing the indictment," not about whether to indict given the anticipated press reaction. Tr. at 169, 170–71. But requesting signoff to go public with a decision that Mr. McGuire has already made is not equivalent to making the underlying decision itself. Second, once the indictment was returned, the clock to proceed to trial would begin to run, triggering Mr. McGuire's timeline to bring Defendant to trial. *See* Tr. at 85–86. Given Defendant was in another country, Mr.

17

McGuire would need assistance with securing his return to the United States to face prosecution. *See* Tr. at 87.[4] All showing, logistical coordination does not amount to joint control over the prosecutorial decision. Nor does the undisputed evidence support such a suggestion given Mr. McGuire had already made and communicated his decision to seek an indictment and commenced grand jury proceedings.

At bottom, across all communication streams, Mr. McGuire provided updates to Mr. Singh, but no commands or corrections were ever passed back from Mr. Singh to Mr. McGuire. Accordingly, the undisputed evidence proves that Mr. McGuire had exclusive control over the decision to prosecute and that he was not influenced or induced to make that decision.

III. **The Undisputed Record Disproves Any Assertion of Animus on Part of the Prosecution**

Defendant's narrative of animus has been disproven by the undisputed record revealing the actual facts of this prosecution. Defendant was indicted because Mr. McGuire, a career prosecutor, believed the evidence shows beyond a reasonable doubt that Defendant smuggled illegal aliens across our Nation's border and then across the country. Given Mr. McGuire's undisputed testimony, this Court should put an end to Defendant's antics of alleging some retaliatory conspiracy amongst the Executive's top officials. The record evidence affirmatively disproves any such assertion.

HSI-Nashville was not prevailed upon by higher officials and did not act with improper motive. The facts show exactly the opposite. Agent Saoud acted independently in learning of and

---

[4] While it is clear that the Supreme Court had ordered Defendant returned to the United States by this time, the logistics of the physical return of Defendant to the United States from a foreign country would be something beyond Mr. McGuire control, which is why he needed assistance from other Department components and, therefore, consulted with ODAG about those steps. *See* Tr. at 85–86.

18

investigating the traffic stop. *See* Tr. at 12–13. When she did begin communicating with superiors, her communications were strictly notification protocol to inform them "about the inception of the case." Tr. at 15, 20. There was nothing unusual about this. She did so "all the time," especially when the subject of the investigation had any "notoriety." Tr. at 15, 20; *see also* Tr. at 20 (Q: "Is that pretty routine, just reaching out to [Department leadership] to let them know what's going on?" A: "We do that all the time. We did it in the, you know, R. Kelly case and other cases around the country."). Her decision—far from improper—is not the least bit surprising. Agent Saoud only knew who Defendant was given "his situation was consistently on TV, whether it was CNN or Fox News or any media," Tr. at 17, and the extent of her familiarity with Defendant's immigration case did not extend beyond what she "saw in the news." Tr. at 17; *see also* Tr. at 17 (noting she was not tracking Defendant's "legal process and deportation" beyond being an observer of the news). Her communications with her superiors were brief, not continual. Tr. at 20 ("[W]e don't have to keep them informed of the progress of the investigation."). And she *never* received any direction, pressure, command, or instruction concerning her investigation. Tr. at 21 (Q: "[B]ut based on your conversations with these bosses, did anyone give you directives on how to proceed in this case?" A: "No. They just said let us know when, you know, [you] have an indictment or anything significant comes up." Q: "And did anyone ever tell you to ensure that the case progressed towards prosecution?" A: "No."); *see also* Tr. at 22 (Q: "[F]rom when you first learned about the investigation, or all the way up to its presentation to grand jury, whether from DOJ or HSI, did anybody ever pressure you or tell you that you had to 'make this case,' if you will?" A: "No.").

The proof that Agent Saoud was not pressured is undisputed. To the contrary, Agent Saoud was driven only by the evidence. *See* Tr. at 16 ("[M]edia attention to an investigation does not deter us from investigating crimes that were committed in the United States. We're not swayed by

political attention or political posturing or whatever the, you know, situation is at that time."). "If the facts did not add up, then [HSI-Nashville] would have ceased to move forward, but unfortunately the evidence kept getting stronger." Tr. at 22. If "the facts didn't add up like they ultimately did and someone wanted [her] to press forward with this prosecution," Agent Saoud "would not have done it." Tr. at 22. The only decision that would have been political would be to refrain from continuing the investigation.

Mr. McGuire's decision to investigate and eventually charge Defendant was likewise untainted by improper motive or influence. *See* Tr. at 177 (Q: "[W]ho made the decision to investigate this case?" A: "Well, I made the decision once I heard [on] April 27th, I told Rana Saoud, we need to get into this; we need to find out what the facts are and act accordingly."). The proof on this point is equally undisputed. Mr. McGuire's sense of duty to "the people of [his] community" has guided every decision he has made to seek an indictment. Tr. at 53. Just so here. Mr. McGuire acted with integrity and humility in making the decision to seek an indictment. *See* Tr. at 69 (describing the caution and humility with which he approaches any decision to indict given "this is a document that's charging somebody with a crime" that is "going to affect their life" and "be scrutinized"); Tr. at 70 (acknowledging his obligation to the Court and the "rules of professional responsibility" and affirming that "as a man, as a person how [he] was raised, [he] wouldn't sign something that [he] didn't believe in"). He was not guided by ambition nor pressure, only his own judgment. *See* Tr. at 62-63 (Q: "[I]f someone had directed you to seek an indictment in this case, based only on the body camera video alone, would you have done that?" A: "No. We wouldn't have had enough evidence."); Tr. at 70 (noting "it didn't matter who else wanted it or didn't want it, it was going to come back to me"); Tr. at 93 ("I also am not going to do something that I think is wrong to keep my job."). Mr. McGuire set aside any political considerations, *see* Tr.

at 149 ("I was focusing on what's the proof; what's the evidence; did he commit a crime and can we prove it. It doesn't matter what the rest of the political landscape looks like, what may come politically, you know, controversially if we charge or don't charge. Let's focus on the facts and the evidence and what we can prove."), and he even set aside his own personal relationships, *see* Tr. at 168–69 (explaining he set aside a personal friend's feelings on the matter and instead "focus on the facts" and on "what [he] thought the right thing to do" was).

This case was handled with diligence and caution, not ambition. From the start, Mr. McGuire and Agent Saoud recognized that although the charges in the case are quite ordinary, *see* Tr. at 39 (noting the "alleged conduct" did not itself make the case high profile), investigating an individual that the media had become infatuated with would be heavily scrutinized given "[t]he politics that we live in," Tr. at 105; *see also* Tr. at 39, 69. Thus, it is not unusual that local leadership was intimately involved in this case. Mr. McGuire was the most experienced prosecutor in his office for human smuggling cases. *See* Tr. at 103. And he had a working relationship with Agent Saoud. *See* Tr. at 49. Neither Mr. McGuire nor Agent Saoud were political employees, rather they were career veterans of the federal government, working under numerous prior administrations. Throughout the investigation, they both disregarded any political considerations, and instead were guided purely by the evidence. *See, e.g.*, Tr. at 149 ("I was focusing on what's the proof; what's the evidence; did he commit a crime and can we prove it. It doesn't matter what the rest of the political landscape looks like, what may come politically, you know, controversially if we charge or don't charge."); *see also* Tr. at 16, 22. Further proving prudent action, Mr. McGuire ensured every effort by his team was made "to get this case tight and right." Gov't Ex. 1 at 000008; *see id.* (emphasizing his team was working hard "on the work that we need to do"). Thus, any assertion that this case was handled in bad faith is affirmatively disproven by the uncontested record.

Running to ground a purported crime in your community,[5] even if it had received widespread media coverage, is not animus—it is merely doing your job.

In the end, Defendant's theory falls apart. No one seems to doubt Mr. McGuire's version of the facts. He is a highly credible veteran prosecutor. Certainly no evidence establishes that the decision to charge was made by anyone other than him, as he testified. And the record is completely devoid of facts tending to cast doubt on his credibility. Yet Defendant would have the Court believe that the emails show that Mr. McGuire was somehow ensorcelled by other officials at the Department of Justice, who harbored the improper animus that Defendant implicitly concedes Mr. McGuire—the undisputed sole and exclusive decisionmaker—lacks. Mr. McGuire is not a simpleton. The much more logical explanation for the charges against Defendant is that they were warranted by newly discovered facts so overwhelming that Defendant's own legal team cannot bother to mention them, let alone explain why they would *not* lead any reasonable prosecutor to proceed to indictment. An honest accounting of the emails shows that they were merely the sort of routine intradepartmental background and scheduling that would be expected in a case with this high political temperature. If they appear unfamiliar to the uninitiated, that is practically a tautology; executive communications are not commonly put on public display. What they certainly do not demonstrate is that Mr. McGuire was untruthful about where ultimate accountability for the

---

[5] Given Defendant was not in the country when Mr. McGuire and Agent Saoud first learned of the traffic stop in April 2025, he did not present an active public safety threat at that juncture. *See* Tr. at 16, 43–44. Thus, both Mr. McGuire and Agent Saoud had time to ensure the investigation was thorough. And often "human smuggling organizations" "are tied to other individuals still involved in crime," so although Defendant was not in the country when the investigation started, the possibility of "other individuals or a conspiracy by a larger group to continue to smuggle individuals into the United States," was of vital importance to law enforcement in Nashville. Tr. at 44. Investigations under these circumstances are consistent with HSI-Nashville's practice of "investigat[ing] individuals abroad all the time." Tr. at 17.

decision to charge Defendant lies. This alone is dispositive in resolving Defendant's motion to dismiss.

Regardless of the tale Defendant invites this Court to believe, any narrative of animus has been affirmatively disproven by the Government's undisputed evidence.

\* \* \*

All told, the Government has presented textbook evidence that the Sixth Circuit has routinely considered sufficient to rebut a presumption of vindictiveness. In *Bragan*, the prosecutor who made the prosecutorial decision had "total autonomy" and had conducted an "independent investigation." 249 F.3d at 484. In holding that the Government had "successfully rebutted" "a presumption of prosecutorial vindictiveness," the Sixth Circuit specifically focused on the prosecutor's "authority to terminate the case," testimony that the prosecutor took the "decision on whether to proceed very seriously" as the result "would be attributed to him," and the prosecutor's own "independent investigation" and "comprehensive review" of the evidence. *Id.* And in *Adams*, the Sixth Circuit concluded that the Government "offered ample evidence that the prosecution was legitimate" based on the lack of improper influence, investigations proceeding according to a sense of duty, and decision makers being independent from anyone with purported ulterior motive. *See United States v. Adams*, 38 F.3d 1217, 1994 WL 589509 at \*1–2 (6th Cir. 1994).

Here, the Government's evidence is in lockstep with *Bragan* and *Adams*. Mr. McGuire was the sole and exclusive decision maker in seeking an indictment against Defendant. There is no evidence to the contrary. That decision followed new evidence that surfaced in April 2025 and only after his own investigation yielded essential evidence for the charges. The undisputed testimony proves neither USAO-MDTN nor HSI-Nashville were influenced, pressured, or directed in their investigative or prosecutorial efforts. And Defendant offered zero "reason to disbelieve the

23

government's account of the events leading to [his] indictment and prosecution." *Adams*, 38 F.3d at 1217. He failed to even suggest that the Government's "justification was pretextual." *Bragan*, 249 F.3d at 485. Thus, the Government's evidence must be credited, and this Court should conclude that "the charging decision was untainted by a desire for retaliation." *Adams*, 38 F.3d at 1217. Given the undisputed evidence, no further proceedings are necessary.

## CONCLUSION

For these reasons, the Court should deny Defendant's Motion to Dismiss, ECF No. 104, because the Government has indisputably shown "legitimate reasons for its prosecution of [Defendant] that are unrelated to his case in the District of Maryland," ECF No. 138 at 15.

Date:   April 6, 2026

Respectfully Submitted,

*/s/ Stanley E. Woodward, Jr.*
STANLEY E. WOODWARD, JR.
Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530

BRADEN H. BOUCEK
United States Attorney
719 Church Street, Suite 3300
Nashville, TN 37203

ANNA EDWARDS
Counsel to the Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530

JACOB WARREN
Co-Director, Joint Task Force Vulcan

JASON HARLEY
Joint Task Force Vulcan